R. Rex Parris, Esq. (SBN 96567)
  rrparris@rrexparris.com
Alexander R. Wheeler, Esq. (SBN 239541)
  awheeler@rrexparris.com
Kitty Szeto, Esq. (SBN 258136)
  kszeto@rrexparris.com
Jacob L. Karczewski, Esq. (SBN 268295)
  jkarczewski@rrexparris.com
John M. Bickford, Esq. (SBN 280929)
  jbickford@rrexparris.com
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:  (661) 949-2595
Facsimile:  (661) 949-7524

Edwin Aiwazian, Esq. (SBN 232943)
  edwin@lfjpc.com
**LAWYERS *for* JUSTICE, PC**
410 West Arden Avenue, Suite 203
Glendale, California 91203
Telephone: (818) 265-1020
Facsimile:  (818) 265-1021

Attorneys for Plaintiff and the Putative Class

Robert J. Herrington (SBN 234417)
  herringtonr@gtlaw.com
Alana C. Srour (SBN 271905)
  sroura@gtlaw.com
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone:  (310) 586-7700
Facsimile:  (310) 586-7800

Attorneys for Defendant
Wal-Mart Stores, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALADDIN ZACKARIA; individually, and on behalf of other members of the general public similarly situated, and on behalf of aggrieved employees pursuant to the Private Attorneys General Act ("PAGA");<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES, INC., a Delaware corporation and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 5:12-cv-01520-FMO-SP<br><br>**CLASS ACTION**<br><br>**JOINT BRIEF RE: PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date:       May 29, 2014<br>Time:      10:00 a.m.<br>Courtroom:  22<br><br>[Assigned for All Purposes to the Honorable Fernando M. Olguin, Courtroom 22] |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that in accordance with this Court's Order Re: Motion for Class Certification dated February 21, 2014 [Dkt. #77], the Plaintiff Aladdin Zackaria ("Plaintiff") and Defendant Wal-Mart Stores, Inc. ("Walmart") hereby respectfully submit a Joint Brief reflecting a single, fully integrated joint brief covering each party's position" with respect to Plaintiff's Renewed Motion for Class Certification,[1] which Motion is scheduled to be heard on May 29, 2014, at 10:00 a.m., in Courtroom 22 of the United States District Central District of California ("the Court"), located at 312 North Spring Street, Los Angeles, California 90012, at which time Plaintiff Aladdin Zackaria ("Plaintiff") will and hereby does move the Court for an order certifying the following class:

> All current and former California-based salaried Asset Protection Coordinators/Asset Protection Managers (or persons who held similar job titles and/or performed similar job duties) who worked for Defendant Wal-Mart Stores, Inc. in the State of California from four years preceding the filing of this lawsuit to final judgment.

The Joint Brief is brought pursuant to this Court's Order and is based upon this notice, the accompanying Memorandum of Points and Authorities, the Plaintiff's Summary of Evidence, Walmart's Statement of Evidence, the Plaintiff's Appendix of Evidence, Walmart's Appendix of Evidence, and the Plaintiff's [Proposed] Order Granting Class Certification; the papers and records on file with the Court in this case; and upon any oral argument that the Court may permit.

---

[1] Walmart respectfully objects to the joint procedure this Court has adopted. *See, e.g.,* Local Rule 7-9 (procedure for oppositions); 7-10 (governing reply papers). Although Walmart has done all it can to present its arguments in the context of the procedure adopted by the Court, the procedure deprives Walmart of an adequate opportunity to oppose Plaintiff's renewed request for certification in the manner it normally would do under the governing rules.

Date:  March 31, 2014

**GREENBERG TRAURIG LLP**

By: /s/ Robert J. Herrington
Robert J. Herrington
Alana C. Srour

Attorneys for Defendant
Wal-Mart Stores, Inc.

**R. REX PARRIS LAW FIRM**

By: /s/ Alexander R. Wheeler
Alexander R. Wheeler
John M. Bickford

Attorneys for Plaintiff
and the Putative Class

ii

# TABLE OF CONTENTS

PAGE

PART ONE:  INTRODUCTION ....................................................................................... 1

    I.    PLAINTIFF'S INTRODUCTION ............................................... 1
    II.   WAL-MART'S INTRODUCTION ................................................ 1

PART TWO:  FACTS ....................................................................................................... 3

    I.    ASSET PROTECTION/ORGANIZATIONAL STRUCTURE ..................... 3

        A.    Plaintiff's Position ...................................................... 3

        B.    Wal-Mart's Position:  Walmart's Asset Protection Structure Mandates Considerable Discretion to its Local APC Managers .......... 4

    II.   WRITTEN DOCUMENTS ASSOCIATED WITH THE APC POSITION ......................................................................... 5

        A.    Plaintiff's Position ...................................................... 5

            1.    The APC Job Description Does Not Reflect What APCs Are Actually Doing ........................................ 5
            2.    The APC Routine........................................................ 5
            3.    The National Priorities.............................................. 5

        B.    Wal-Mart's Position:  Walmart's Written Materials Reflect the Performance of Exempt Managerial and Administrative Work .......... 6

            1.    The Job Descriptions Focus on Exempt Duties......................... 6
            2.    The APC Routine Does Not Eliminate Discretion and Judgment................................................................ 8
            3.    The Auditing Program Does Not Dictate the Actual Amount of Time Spent by Each APC in Managing Store Processes .............................................................. 9

iii

III.   THE WORK ACTUALLY PERFORMED BY APCS ............................... 10

    A.    Plaintiff's Position:  APCs Perform the Same "Inspection-Oriented Job Duties" Regardless of Their Store's Size, Type, or Location ...................................................................... 10

    B.    Wal-Mart's Position:  The Declarations Submitted by Both Parties Demonstrate the Wide Variation in an APC's Work Experiences ....................................................... 12

        1.    Variations in Time Spent on Exempt Managerial Duties ........ 13
        2.    Variations in Time Spent on Exempt Administrative Duties ...................................................... 14
        3.    Variations Resulting From Unique Job Demands ................... 15

IV.   WAL-MART CLASSIFIES ITS APCS AS EXEMPT/SALARY EMPLOYEES ................................................................. 17

    A.    Plaintiff's Position ................................................. 17

        1.    Wal-Mart Is Aware That APCs Were Not Paid Overtime and Did Not Receive Compliant Meal and Rest Breaks ......... 17
        2.    Wal-Mart Never Told Its APCs to Spend Over 50% of Their Time on Exempt Job Duties ............................. 17

    B.    Wal-Mart's Position:  Variations in Hours Worked and the Number of Breaks and Rest Periods Taken Preclude Certification ...................................................... 18

V.   IMPLICATIONS OF THE DOL LETTER, *BRAMBLE*, AND *PATEL* ....... 19

    A.    Plaintiff's Position ................................................. 19

        1.    The DOL's Letter Supports Plaintiff's Position That the Court Should Look at the APCs' Actual Job Duties, Not the Fictitious APC Job Description ......................... 19
        2.    *Bramble* and *Patel* Are Both Factually and Legally Distinguishable ...................................... 20

iv

B.    Wal-Mart's Position: Prior APC Decisions Confirm that Exempt Status Cannot be Determined Absent Individualized Inquiry ..................................................................21

PART THREE: LEGAL ISSUES ................................................................23

I.    CALIFORNIA LEGAL STANDARDS FOR CLASSIFICATION OF EXEMPT EMPLOYEES ...........................................................23

    A.    Plaintiff's Position ............................................................23

    B.    Wal-Mart's Position: Determination of Exempt Status Requires the Court Examine the Work Actually Performed by Each APC .......23

        1.    Determination of Exempt Status is Fact Intensive ..................24
        2.    California Permits the Tacking of Exempt Duties ..................25

II.    RULE 23(A)(2) COMMONALITY .....................................................26

    A.    Common Questions of Law and Fact Offered by Plaintiff ................26

        1.    Plaintiff's Position ....................................................26

        2.    Wal-Mart's Position: The Fact-Specific Inquiry Mandated for Determination of Exempt Status Obviates Common Questions ..................................................27

    B.    Common Proof of Class-Wide Resolution Offered by Plaintiff .........28

        1.    Plaintiff's Position ....................................................28

        2.    Walmart's Position: Plaintiff's Common Proof Cannot Establish What APCs Actually Do in Any Given Day or Week ....................................................29

III.    RULE 23(b) PREDOMINANCE ......................................................30

    A.    General Predominance ......................................................30

        1.    Plaintiff's Position: The Three Common Issues Predominate ..........................................................30

|  |  | i. | Common Issues Predominate on Whether APCs Perform a Uniform and Finite Set of Job Duties ........... 31 |
|  |  | ii. | Common Issues Predominate on Whether the APCs' Job Duties Regularly Require the Exercise of Discretion and Independent Judgment ..................... 32 |
|  |  | iii. | Common Issues Predominate Over on Whether APCs Spend Over 50% of Their Time Performing Exempt Job Duties ........................................ 34 |
|  | 2. | | Wal-Mart's Position: Individual, Not Class, Issues Predominate ....................................................... 35 |
|  |  | i. | "Do APCs perform a uniform and finite set of job duties?" ........................................................ 36 |
|  |  | ii. | "Which of the APCs' job duties, if any, regularly require the exercise of discretion and independent judgment?" .................................................... 38 |
|  |  | iii. | "Do APCs spend over 50% of their time on exempt job duties?" .......................................... 39 |
| B. | | | Affirmative Defenses ................................................ 40 |
|  | 1. | | Plaintiff's Position ................................................ 40 |
|  |  | i. | Plaintiff's Class Certification Theory Is Only Concerned With the Common Exemption Elements ...................................................... 40 |
|  |  | ii. | The DLSE Recently Made Clear That "Tacking" Is Not Permitted Under California Law ........................... 42 |
|  | 2. | | Wal-Mart's Position: Proper Assessment of Walmart's Affirmative Defenses Requires an Individualized Inquiry ...... 44 |
| C. | | | Damages ................................................................ 45 |
|  | 1. | | Plaintiff's Position: Individual Issues Relating to Damages Do Not Precluded Class Certification ..................... 45 |
|  | 2. | | Wal-Mart's Position: Examination of Damages Necessitates Individualized Inquiry ......................... 46 |

vi

IV.   OTHER CONTESTED CLASS CERTIFICATION
      REQUIREMENTS ........................................................................47

      A.    Typicality and Adequacy ...............................................47

            1.    Plaintiff's Position:  Plaintiff's Claims Are Typical And
                  He Is an Adequate Representative..............................47

            2.    Wal-Mart's Position:  Plaintiff Fails to Establish
                  Typicality Under Rule 23(a)(3) or Adequacy Under Rule
                  23(a)(4) ..............................................................48

      B.    Superiority and Manageability........................................48

            1.    Plaintiff's Position:  Class Treatment Is Superior ...................48

            2.    Wal-Mart's Position:  Plaintiff Fails to Establish
                  Superiority and Manageability Under Rule 23(b)...................49

vii

# TABLE OF AUTHORITIES

**PAGE(S)**

**Federal Cases**

*Aburto v. Verizon California, Inc.,*
No. CV 11-03683, 2012 WL 10381 (C.D. Cal. Jan. 3, 2012) .................................30, 39

*Akaosugi v. Benehana Nat'l Corp.,*
2012 WL 1094425 (N.D. Cal. Mar. 30, 2012) ..........................................................30

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)...................................................................................................44

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ....................................................................................27

*Brady v. Deloitte & Touche LLP,*
No. C 08-177 SI, 2012 WL 1059694 (N.D. Cal. Mar. 27, 2012)...............................39

*Bramble v. Wal-Mart Stores, Inc.,*
No. 09–4932, 2011 WL 1389510 (E.D. Penn. Apr. 12, 2011)........................20, 21, 22

*In re Bridgestone /Firestone,*
288 F.3d 1012 (7th Cir. 2002) ...................................................................................44

*Bryant v. Service Corp. Intern.,*
No. C 08-01190 SI, 2011 WL 855815 (N.D. Cal. Mar. 9, 2011)...............................47

*Campbell v. PricewaterhouseCoopers LLP,*
642 F.3d 820 (9th Cir. 2011) ...............................................................................28, 31

*Casida v. Sears Holdings Corp.,*
1:11-CV-01052, 2012 WL 3260423 (E.D. Cal. Aug. 8, 2012) .............................12, 50

*Chavez v. Lumber Liquidators, Inc.,*
No. CV-09-4812 SC, 2012 WL 1004850 (N.D. Cal. Mar. 26, 2012) ........................30

*Comcast Corp. v. Behrend,*
133 S. Ct. 1426 (2013)...........................................................................................45, 46

*Conley v. Pac. Gas & Elec. Co.,*
131 Cal.App.4th 260, 266 (2005) ..............................................................................23

*Cruz v. Dollar Tree Stores, Inc.,*
2011 WL 268296 (N.D.Cal., July 8, 2011) ............................................24, 30, 39, 46

viii

# TABLE OF AUTHORITIES

PAGE(S)

*Forrand v. Federal Exp. Corp.*,
   2013 WL 1793951 (C.D. Cal. Apr. 25, 2013) ............................................................46

*Friend v. Hertz Corp.*,
   No. C-07-5222, 2011 WL 750741 (N.D. Cal. Feb. 24, 2011), *aff'd* 2014 WL
   1016848 (9th Cir. Mar. 18, 2014)..................................................................................36

*Gales v. Winco Foods*,
   No C 09-05813, 2011 WL 3794887 (N.D. Cal. Aug. 26, 2011) ................30, 37, 50

*Gartin v. S & M Nutec LLC*,
   245 F.R.D. 429(C.D. Cal. 2007)1 ..................................................................................44

*Guido v. L'Oreal, USA, Inc.*,
   2013 WL 3353857 (C.D. Cal. July 1, 2013).................................................................46

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .................................................................26, 35, 47, 48

*Heffelfinger v. Elec. Data Sys. Corp.*,
   580 F.Supp.2d 933 (C.D. Cal., 2008), *aff'd in part, vacated in part on other
   grounds* in 492 Fed.Appx. 710 (9th 2012) .................................................................39

*Hill v. R+L Carriers, Inc.*,
   690 F. Supp. 2d 1001 (N.D. Cal. 2010) ......................................................................25

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977)........................................................................................................26

*In re Hotel Tel. Charges*,
   500 F.2d 86 (9th Cir. 1974) ..........................................................................................44

*Jacob v. Duane Reade, Inc.*,
   No. 11–cv–0160 (JPO), 2012 WL 260230 (S.D.N.Y. Jan. 27, 2012).........................21

*Jimenez v. Domino's Pizza, Inc.*,
   238 F.R.D. 241 (C.D. Cal. 2006)...........................................................36, 40, 46, 50

*Juback v. Radioshack Corp.*,
   No. 8:08-cv-768-T-24-TBM, 2009 WL 1259990 (M.D.Fla. May 6, 2009)................25

*Kress v. Price Waterhouse Coopers*,
   No. CIV S–08–0965 LKK GGH, 2012 WL 1991951 ..........................................31, 40

ix

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................46, 47

*Local Joint. Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas*,
    244 F.3d 1152 (9th Cir. 2001) .........................................................30, 31

*Marlo v. United Parcel Serv., Inc.*,
    639 F.3d 942 (9th Cir. 2011) ..........................................24, 32, 36, 38, 41

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ................................................................26

*Mullins v. Target Corp.*,
    No. 09 C 7573, 2011 WL 1399262 (N.D.Ill. Apr. 13, 2011) ....................24

*Musgraves v. Sears Holding Management Corp.*,
    No. CV 11-0625-GAF, 2012 WL 3222905 (C.D. Cal. July 19, 2012) .................25, 42

*Novak v. Boeing Co.*,
    No. SACV09-01011, 2011 WL 7627789 (C.D. Cal. Dec. 19, 2010).........................30

*O'Dell v. Alyeska Pipeline Service Co.*,
    856 F.2d 1452 (9th Cir. 1998) ................................................................39

*Patel v. Wal-Mart Stores, Inc.*,
    No. 2:08–cv–337–MEF, 2009 WL 1759568 (M.D. Ala. Jun. 19, 2009) .........20, 21, 22

*Pattillo v. Schlesinger*,
    625 F.2d 262 (9th Cir. 1980) ..................................................................50

*Pedroza v. PetSmart, Inc.*,
    No. ED CV 11-298, 2013 WL 1490667 (C.D. Cal. Jan. 28, 2013)............27, 30, 37, 39

*Rodriquez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ................................................................47

*Roe-Midgett v. CC Servs., Inc.*,
    512 F.3d 865 (7th Cir. 2008) ..................................................................39

*Spainhower v. U.S. Bank Nat'l. Ass'n*,
    No. 2:08-CV-000137, 2010 WL 1408105 (C.D. Cal. Mar. 25, 2010) .......................35

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408, 123 S. Ct. 1513 (2003).........................................................45

x

## TABLE OF AUTHORITIES

**PAGE(S)**

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ...............................................................30

*Traylor v. Pyramid Servs., Inc.*,
   2008 WL 8667410 (C.D. Cal. Sept. 24, 2008) .........................................25

*Valentino v. Cartier-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ..........................................................48, 50

*Velazquez v. Costco Wholesale Corp.*,
   No. SACV 11-00508-JVS-RNBx 2011 WL 4891027 (C.D. Cal. Oct. 11, 2007)........36

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) .........................................5, 28, 31, 36, 37

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S.Ct. 2541 (2011).................................................26, 27, 32, 42, 48

*Wang v. Chinese Daily News*,
   737 F.3d 538 (9th Cir. 2013) ...............................................................29

*Weigele v. FedEx Ground Package Sys., Inc.*,
   267 F.R.D. 614 (S.D. Cal. 2010) .........................................................36

*In re Wells Fargo Home Mortg.*,
   268 F.R.D. 604 (N.D. Cal. 2010).........................................................37

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) .......................................30, 31, 35, 36, 37, 49

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   722 F.3d 838 (6th Cir. 2013) ..........................................................45, 47

*Whiteway v. Fedex Kinkos Office & Print Servs.*,
   2009 U.S. Dist. LEXIS 127360 (N.D. Cal. Sept. 29, 2009) ........................36

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .............................................................50

**State Cases**

*Amaral v. Cintas Corp. No. 2*,
   163 Cal. App. 4th 1157 (2008) ............................................................25

PAGE(S)

*Bell. v. Farmers Ins. Exchange*,
  87 Cal.App.4th 805 (2001) .................................................................23

*Brinker v. Rest. Corp.*
  53 Cal. 4th 1004 (2012) ......................................................................40

*In re Google Inc., Gmail Litig.*,
  No. 13-MD-02430, 2014 WL 1102660 (N.D. Cal. Mar 18, 2014) ..............................44

*Heyen v. Safeway, Inc.*
  216 Cal. App. 4th 795 (2013) ..............................................................35

*Nordquist v. McGraw-Hill Broad. Co.*,
  32 Cal. App. 4th 555 (1995) ...............................................................43

*Ramirez v. Yosemite Water Co.*,
  20 Cal.4th 785, 794 (1999) ...........................................................23, 32

*In re United Parcel Serv. Wage & Hour Cases*,
  190 Cal.App.4th 1001, 118 Cal.Rptr.3d 834 (2010) .....................................24, 25

**Federal Statutes**

28 U.S.C. § 2072(b) ..........................................................................44

**State Statutes**

Cal. Lab. Code § 510 .........................................................................17

Cal. Code Regs. tit. 8, § 11040, subd. (1)(A) ................................................32

Cal. Code Regs. tit. 8, § 11040, subd. (1)(A)(d) & (e) .......................................32

Cal. Code Regs. tit. 8, § 11040, subd. (1)(A)(1)(e) and subd. (1)(A)(2)(f) ....................34

Cal. Code Regs. tit. 8, § 11040, subd. (1)(A)(2)(b) & (f) ....................................32

Cal. Code Regs. tit. 8, § 11090(1)(A)(1)(e) ..................................................24

Cal. Code Regs. tit. 8, § 11090(1)(A)(1)-(2) .................................................34

Cal. Code. Regs. tit. 8, §§ 11010–11170 ......................................................17

# TABLE OF AUTHORITIES

PAGE(S)

**Federal Rules**

29 C.F.R.541.2 ................................................................................................33

29 C.F.R. 541.200 ..........................................................................................19

29 C.F.R. 541.207 ..........................................................................................28

29 C.F.R. 541.207(b) ......................................................................................33

29 C.F.R. 541.207(c)(2) ..................................................................................33

Fed. R. Civ. P. 23(a)(3) ..................................................................................47

Fed. R. Civ. P. 23(a)(4) ..................................................................................48

Fed. R. Civ. P. 23(b)(3) ..................................................................................48

Fed. R. Civ. P. 23(b)(3) ..................................................................................30

Fed. R. Civ. P. 23(c)(4) ..................................................................................46

**Regulations**

29 C.F.R. § 541.102 through 541.602 ............................................................43

29 C.F.R. § 541.600 ..................................................................................42, 43

Division of Labor Standards Enforcement Opinion Letter 2003.05.23 ...........25

Industrial Welfare Commission's Wage Order No. 7-2001 .............................23

U.S. Department of Labor Opinion Letter FLSA 2006-30...............................24

**Constitutional Provisions**

Fourteenth Amendment ...................................................................................45

**Other Authorities**

5 J.W. Moore, *Moore's Federal Practice* ¶ 23.46[1] (3d ed. 1997 & Supp. 2004) ..........49

xiii

## <u>JOINT MEMORANDUM OF POINTS AND AUTHORITIES</u>
## <u>PART ONE:  INTRODUCTION</u>

## I.    <u>PLAINTIFF'S INTRODUCTION</u>

Plaintiff Aladdin Zackaria moves to certify a class of all Asset Protection Coordinators ("APCs") that worked for Defendant Wal-Mart Stores, Inc. ("Wal-Mart") in California during the class period.  Plaintiff alleges that he and the other APCs were misclassified as exempt employees (i.e., salaried) despite the fact that an APC's day-to-day job consists of non-exempt inspection work (i.e., hourly duties).  To prove that this determination is susceptible to common proof, Plaintiff has submitted 41 declarations from other APCs, hundreds of pages of deposition transcripts, and countless standardized forms, policies, and checklists.  This evidence demonstrates that all APCs in California perform the same uniform and finite set of core job duties, and that these job duties do not regularly require the exercise of discretion and independent judgment so as to qualify them as exempt.  That uniformity of core job duties will allow this Court to decide the exemption issue as to all APCs in "one stroke."  As such, common questions predominate over individualized issues, and classwide adjudication is the superior mean s of adjudicating liability.  Class certification should therefore be granted.

## II.   <u>WAL-MART'S INTRODUCTION</u>

Plaintiff maintains that the alleged misclassification of over 350 Asset Protection Managers working at 220 different stores throughout California over the span of seven years can properly be determined through representative testimony and purported "common proof." While Plaintiff concedes that the Court must "assess the employee's 'actual job duties'" to determine exempt status, he urges the Court to consider his motion through the lens of general guidance documents only, with no reference to what each APC actually did on a daily basis.  Moreover, Plaintiff asks this Court to disregard the fact that there are two separate exemptions at issue in this litigation, administrative and managerial, and that exempt work performed under either category may properly be

combined to meet California's required fifty percent threshold.[2]  Generalities in the form of job descriptions and expectations are insufficient to bases for classwide adjudication where, as here, Plaintiff's own evidence demonstrates significant variations among class members in the time spent performing tasks under both exemptions.  Viewing the record in its entirety, there is simply no "common" work experience of APCs from which to make a classwide determination of misclassification.

Federal courts throughout California have consistently held that the class action mechanism cannot be used to eviscerate material variations in work experiences that go to the heart of a classification determination.  Two federal courts reviewed the specific APC position at issue here and denied certification.  The U.S. Department of Labor separately considered the APC position and concluded that while an individual performing the full range of APC duties and responsibilities is properly classified as exempt, classification determinations for anyone purportedly not performing the full range of duties must be made on an "individual basis."  Plaintiff's effort to avoid these decisions on the basis of a professed "robust" record does nothing to advance his class claims.  The record serves only to highlight the material variations among APCs in the time spent supervising associates, exercising discretion, and managing the asset protection function within each particular store.  This is not the type of factual record that permits the claimed experiences of one to be fairly extrapolated to the class as a whole.  Plaintiff's motion should therefore be denied.

---

[2] The criteria for each separate exemption are set forth on Page 41. Briefly, administrative work is specialized non-manual labor directly related to business matters of significance; managerial work includes supervision of at least two reports. Each exemption imposes unique criteria, but both require the employee customarily and regularly exercise independent judgment and discretion, and perform exempt duties over 50% of the time.

2

# PART TWO: FACTS

## I.     ASSET PROTECTION/ORGANIZATIONAL STRUCTURE.

### A.     Plaintiff's Position.

Wal-Mart is an international retailer with approximately 220 stores located

throughout California.  PSE 1.  These stores are divided into three types:  Discount Stores

(basic retail stores); Supercenters (basic retail stores with groceries); and Neighborhood

Markets (smaller retail stores with limited merchandise).  PSE 2.  Despite different store

types, Wal-Mart has implemented a uniform Asset Protection program to manage the

shrink, safety, and security at each of its stores.  PSE 3.

This program is run by a hierarchical Asset Protection department.  PSE 4.  At the

top is the Vice-President of Asset Protection who reports directly to Wal-Mart's Chief

Operating Officer.  PSE 5.  Under the vice-president are three Senior Directors of Asset

Protection (aka "Business Unit Leaders"), who are each responsible for their own

geographical "Business Unit" (Eastern, Central, and Western).  PSE 6.  Business Units

are divided into "Divisions," led by Divisional Directors of Asset Protection, PSE 7, and

Divisions are further subdivided into "Regions," led by Regional Asset Protection

Managers, PSE 8.  California is located in Wal-Mart's Western Business Unit's Pacific

Division, which consists of four Regions, three of which make up California (Northern,

Central, and Southern).  PSE 9.

Regions are further subdivided into "Markets," led by a Market Asset Protection

Manager, and contain between 9 and 15 stores ("MAPM").  PSE 10.  MAPMs are

ultimately responsible for managing the shrink, safety, and security at each of the stores

located within their Market.  PSE 11.  They do this by managing each store's Asset

Protection Coordinator ("APCs").[3]  PSE 12.  Under each APC are several Asset

[3] Recently, Wal-Mart changed the title of the APC position to Asset Protection Manger
("APM"); however, Wal-Mart admits that this title change did not affect the APC's daily

job duties.  PSE 13.

Protection Associates ("APAs") to assist the APCs in handling shoplifting investigations. PSE 14.

**B.** **Wal-Mart's Position: Walmart's Asset Protection Structure Mandates Considerable Discretion to its Local APC Managers.**

The parties are in agreement with respect to several material facts relevant to the structure of the asset protection organization. Plaintiff concedes that at each store, APCs are the highest asset protection authority. WSE 1. Plaintiff concedes that in this role APCs are responsible for deterring theft, preventing and investigating accidents, ensuring compliance with regulatory procedures and security measures, and auditing store processes to prevent losses. *Id.* 2. Plaintiff also concedes that all APCs are responsible for supervising APAs, *id.* 3; indeed, some APCs supervise 12 or more APAs, *id.* 4.

Plaintiff has not submitted any evidence to dispute that APCs operate without any direct supervision at a store and only under the general supervision of an off-site Market Asset Protection Manager ("MAPM"), who oversees a large geographic "Market" which comprises anywhere from 6 to 19 stores. WSE 5. The autonomy with which APCs work in their assigned stores requires the APC to use judgment and discretion to develop and implement Walmart's strategic asset protection goals in each particular store. *Id.* 6. With over 200 stores in California, *id.* 7, differences in store size, staffing and location have a direct impact on the day-to-day responsibilities of each APC, *id.* 8.

There are only a few aspects of the asset protection function on which the parties disagree. The parties disagree as to the extent of the changes in the APC position over the class period and the impact of that evolution on the misclassification and certification analysis. Some witnesses state their jobs remained the same while others attest to material changes. WSE 9. The parties also dispute exactly how much managerial authority and administrative discretion each APC exercises with respect to the duties outlined in the written job descriptions, as well as the time spent by each APC in performing those duties. These differences serve to highlight the variations in individual work experiences. *Id.* 10. For instance, some witnesses claim they spend no time

4

managing APAs while others state that almost all of their time is spent supervising APA's.  *Id*. 11.  Irrespective of the particular function at issue, the testimonial record establishes significant variations in work experiences day to day and store to store. *Id*. 12.

## II.  WRITTEN DOCUMENTS ASSOCIATED WITH THE APC POSITION.

### A.  Plaintiff's Position.

#### 1.  The APC Job Description Does Not Reflect What APCs Are Actually Doing.

Wal-Mart has drafted an APC job description, which sets forth a finite list of "essential functions" and "competencies" that Wal-Mart claims APCs fulfill on a daily basis.  PSE 15.  However, the APC job description is broadly and ambiguously phrased, and does not shed any light on how APCs actually spend their time.  PSE 16; *see also Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009).  Instead, an APC's actual day-to-day job duties are best reflected in two standardized programs: (1) the APC Routine checklist and (2) the National Priorities.  PSE 17.

#### 2.  The APC Routine.

Wal-Mart created the APC Routine in order to ensure that APCs perform their daily, weekly, and monthly job duties.  PSE 18.  Wal-Mart describes the Routine as "a prioritized listing of time sensitive, daily and weekly tasks that an APC is responsible for completing" to help them to "be more time and task effective."  PSE 19.  Put simply, the Routine is a checklist of tasks and duties that *every* APC is required to complete by a certain time or date.  PSE 20.  Although the format of the checklist has changed over time, its list of *mandatory* duties has largely remained the same.  PSE 21.  While the number of duties is too numerous to list here, they include, checking hazardous waste, reviewing CCTV, and inspecting safety equipment.  PSE 22.

#### 3.  The National Priorities.

In addition to the tasks enumerated on the Routine, APCs are also required to complete the tasks enumerated on Wal-Mart's National Priorities.  Wal-Mart describes the National Priorities as a "task based audit program designed to help asset protection

5

and operations focus on high-shrinkage areas and divine into the root causes to then share that information across all partners and organizations."  PSE 23.

While some of the APC National Priorities' tasks are similar to those enumerated on the APC Routine Checklist, the difference between the APC Routine Checklist and the National Priorities is that the National Priorities require APCs to fill out a series of sub-checklists and "YES" or "NO" questions related to asset protection.  PSE 24.  Those results are then submitted to Wal-Mart at periodic times throughout the month so it can evaluate national and regional trends.  PSE 25.  When an "exception" is found (i.e., anything that is not as it should be), APCs are referred to Wal-Mart's Standard Operating Procedures ("SOPs") for step-by-step instructions on how to fix the problem.  PSE 26. Although Wal-Mart occasionally changes the tasks and questions on the National Priorities, PSE 27, at any given time, every APC in California is following, filling out, and submitting the same National Priorities forms to corporate.  PSE 28.  If an APC fails to properly follow the National Priorities or turns in the results late, then the APC is written-up and/or disciplined.  PSE 29.

Wal-Mart has conducted several time studies to determine how long it takes APCs to complete the checklists and audits enumerated on the National Priorities.  PSE 30.  To do this, Wal-Mart surveyed a random sample of APCs on how long it took them to complete each of the National Priorities audits.  PSE 31.  Wal-Mart then calculated the average time spent on each task.  PSE 32.  These studies have concluded that it takes, on average, approximately 22.5 hours each week to complete the National Priorities.  PSE 33.  This estimate has been verified through APC testimony.  PSE 34.

**B.**    **Wal-Mart's Position:  Walmart's Written Materials Reflect the Performance of Exempt Managerial and Administrative Work.**

**1.**    **The Job Descriptions Focus on Exempt Duties.**

Plaintiff admits that the different written job descriptions in use over the class period are broadly phrased to encompass a set of essential functions and competencies expected of the position, but do not mandate "how an APC spends their time" on a day-

6

to-day basis.  WSE 13.  Moreover, the multiple versions of the job descriptions that Plaintiff submitted – together with the evolution of the program described in the Declaration of Ron Lance – establish the expansion of APC responsibilities over time. *Id*. 14.  Plaintiff similarly does not dispute that the responsibilities contained in the job descriptions are both managerial and administrative.  *Id*. 15.  By way of example, the latest job description envisions a "successful[]" APC utilizing discretion and authority to:

- "Provide[] supervision and development opportunities for associates by ***hiring and training, mentoring, assigning duties,*** providing recognition, and ensuring diversity awareness";

- "Monitor[] safety and risk controls within a facility by ensuring an effective safety program is in place; supervising the safety team; identifying accident trends to ***develop and implement solutions to prevent accidents***; observing work practices and ***providing training to associates*** on accident prevention techniques; communicating plans to minimize accidents; and overseeing safety reviews and ***implementing plans to improve safety***";

- "Control[] the unexplained loss of merchandise and improves profitability by ***identifying and communicating performance goals and objectives***; building accountability for policies and procedures; measuring adherence to loss prevention policies and procedures; reviewing variances to inventory reports; conducting operational and pre-inventory reviews; gathering data, auditing results and monitoring deficiency trends; ***identifying improvement opportunities, communicating and working with managers and associates to determine corrections needed*** to inventory controls and influencing the implementation and execution of control corrections; and ***teaching managers and associates*** operational controls and processes in multiple stores." WSE 16.

The standards by which APCs are trained and by which their performance is measured mirror the responsibilities identified in these job descriptions. *Id*. 17. Plaintiff acknowledges that Walmart provides each APC with a formalized onboarding process

7

that comprises an extensive six to eight week training course to develop the supervisory skills and business judgment required of the position. *Id*. 18. The very premise of the program places a premium on an APC's "role" as an effective manager, through accountability, leading by example, and developing other associates. *Id*. 19. Likewise, APC performance evaluations do not consider the performance of the rote "inspection-oriented duties" focused upon by Plaintiff. To the contrary, the standards of performance in the materials submitted by Plaintiff himself correlate directly to the criteria outlined in the job descriptions, with a focus on "Training," "Manag[ing]," and "Leadership." *Id*. 20.

### 2. The APC Routine Does Not Eliminate Discretion and Judgment.

"I have the authority and judgment to change the routines according to what I am doing and what is needed of me daily." WSE 21. This is the candid admission of Plaintiff's own witness and current APC, Steve Oliver. It is consistent with the views of many APCs. *Id*. 22. Plaintiff ignores all of this testimony and instead insists that the existence of a single document identifying APC "routines" talismanically eliminates all record evidence of discretion and judgment. It does not. There is simply *no evidence*, let alone *classwide evidence*, that supports Plaintiff's blithe assertion that the existence of routines or guidelines establish that APCs lack discretion. To the contrary, each routine document submitted by Plaintiff includes the following admonition: "**This is not an all-inclusive listing and could vary depending on the store format**." *Id*. 23. And this makes good sense, for routines simply provided the framework for APCs to exercise discretion and to "use facts, information and expertise to set priorities and make informed decisions." *Id*. 24. Perhaps no witness better articulated what a good APC exercising the judgment required to implement the guidelines can accomplish than Plaintiff Zackaria, who stated in his 2010 performance evaluation: "I have managed to teach assistant managers, department managers, and my team of APAs on how to identify shrink opportunities as a team. At [my two stores], we managed to make a great impact on shrink in general[] compared to last year." *Id*. 25. Not surprisingly, Plaintiff's other

witnesses – and numerous other APCs – all acknowledge that they do not adhere to the routines as a requirement, but instead use them as a tool or guide. *Id*. 26 - 27.

### 3. The Auditing Program Does Not Dictate the Actual Amount of Time Spent by Each APC in Managing Store Processes.

Plaintiff argues that through the implementation of a national auditing program – the purpose of which is to assist APCs in identifying loss trends, implementing solutions to correct them, and reporting to assess achievement – Walmart dictates a set of finite tasks to its APCs which serve to eliminate the need for discretion and judgment in all areas of performance. Plaintiff's assertion is wrong and contrary to a record that reveals significant variations in the amount of discretion individual APCs claim to exercise in performing their auditing duties. WSE 28. As explained by APM Leticia Euley, the audit tasks in no way eliminate the discretion that must be exercised by APCs:

> Figuring out how I'm going to fix something, what resources I can use, what tactic I will use, who I can partner with - this all requires I use my discretion and make judgment calls. If I identify a problem in an audit answer, I have to develop a plan of action, coordinate with others, and follow-up to make sure it is being executed. *Id*. 29.

As articulated by Plaintiff witness Henry Garcia, while he "would get general ideas on shrink plans from Corporate … as an APC [he] would need to use [his] judgment and adapt to specific departments to address those departments." *Id*. 30.

Apparently recognizing this, Plaintiff grasps at one last straw, focusing myopically on a single study related to the audit process for the proposition that completion of the audits "takes, on average, approximately 22.5 hours each week."[4] As an initial matter, the study was never designed to do what Plaintiff suggests. Walmart 30(b)(6) deponent Ron Lance testified that Walmart conducted this national (not California) survey in an effort to streamline and refine a version of the audit program then under development.

---

[4] While referring to "several" time studies, Plaintiff cites to only one. WSE 31.

WSE 32.  Moreover, the 22.50 hour figure lifted from page PA0616 of the study by Plaintiff reflects the total time spent on audit-related tasks *by all store associates, including Assistant Managers and APAs working under the direction of the APC*.  *Id*. 33.  Further, the study shows wide variation in the time it took a small group of individual APCs to perform a broad range of weekly and monthly job tasks.  *Id*. 34.  By way of example, in their performance of just one of the tasks on page PA0621, it took one group of 14 APCs on average 4.23 hours to investigate cash shortages and approve theft reports; versus the 1.07 hours it took on average for a second group of 13 APCs to perform that same task. *Id*. 35. No two groups had the same time on any task.  *Id*. Accordingly, Plaintiff's limited evidence makes Walmart's point: the amount of time APCs perform audit tasks varies.

## III.  THE WORK ACTUALLY PERFORMED BY APCS

### A.  Plaintiff's Position:  APCs Perform the Same "Inspection-Oriented Job Duties" Regardless of Their Store's Size, Type, or Location.

Since the checklists and audits enumerated in the APC Routine and National Priorities are the same at every Wal-Mart store, all APCs in California perform the same inspection-oriented job duties regardless of their store's size, type, or location.  PSE 35. Because of this, APCs can, and often do, work at multiple stores without any additional training or experience, PSE 36, and an APC's job duties do not vary based on his or her level of experience, PSE 37.  Indeed, Earl Watson, the Senior Director of Asset Protection for Wal-Mart's Western Business Unit, testified that "if you strip away the personality-of-the-individual" there are no "major variations or differences" in how the APC position is performed.  PSE 38.  "[A]n experienced [APC should] be able to shift over to a store they've never worked at and get that AP[C] job done with little new training required."  PSE 39.  This is because there are no "differences in how asset prevention and safety policies and procedures are carried out at the store level in the state of California."  PSE 40.

This expectation is overwhelmingly supported by APC testimony. Jim Galbreath, for example, explained that he did "pretty much basically the same" thing at the two Wal-Mart stores he worked at. PSE 41. And Henry Garcia testified that "the shrink departments [at Wal-Mart's stores] are basically the same" regardless of what "kinds of products" the stores carry. PSE 42. Because of this, his "job duties were nearly identical to the other APCs at other Wal-Mart stores in California." PSE 43; *see also, e.g.,* PA 240–41 [Ex. 7.D] (Banks Depo. at 186:14–187:13) (testifying that she was "performing substantially the same job duties" as the other APCs in California); PA 300–01 [Ex. 7.H] (Galbreath Depo. at 189:21–190:8) (testifying that he worked at two stores and that "[i]t was pretty much basically the same" because he was just following the APC Routine); PA 333–34 [Ex. 7.I] (Garcia Depo. at 185:6–186:19) (testifying that "[his] job duty was nearly identical to the other APCs at other Wal-Mart stores in California"); PA 350–51 [Ex. 7.J] (Gomez Depo. at 146:23–147:11) (testifying that he was "doing the same job duties at a super center that [he was] at a regular Wal-Mart"); PA 388 [Ex. 7.L] (Howdeshell Depo. at 161:4–9) (testifying that, based on his conversations with other APCs, his job duties were "very similar to the job duties" of other APCs); PA 394–95 [Ex. 7.M] (Kaiser Depo. at 86:21–87:5) (testifying that she performed the "same job duties" and "follow[ed] the same policies and procedures" at the two Wal-Mart stores she worked at).

Indeed, the only evidence Wal-Mart submits to claim otherwise is the solitary and self-serving declaration of MaryAnn Dabney—a former Regional Asset Protection Senior Manager—which was signed just a mere two days before Wal-Mart's original opposition was due. PSE 44. In it, she highlights the "differences" in Wal-Mart's stores and then states, in conclusory fashion, that, "in light of these variations, Walmart's asset protection structure affords considerable discretion to its local teams to implement Walmart's strategic asset protection goals." PSE 45. But the record clearly shows that this conclusory statement is simply not true. In reality, APCs are afforded very little independent discretion when performing their job duties since nearly all their duties are

11

dictated by Wal-Mart's uniform Routines, National Priorities, and SOPs. After all, even Ms. Dabney admitted that Wal-Mart created its uniform policies and procedures with the intention that they be followed. PSE 46. And, as explained above, APCs have confirmed that they actually do follow these policies when performing their job duties. PSE 47.

In fact, APCs are disciplined and/or fired when they do not follow Wal-Mart's standardized policies and procedures. Patricia Kaiser, for example, testified that she did not "deviat[e] specifically from a Wal-Mart policy or procedure" because it was her "job to follow policies and procedures" and she could have been "disciplined" if she failed to properly follow them. PSE 48. And Randall Howdeshell was fired because he "wasn't keeping certain reports and paperwork up to date." PSE 49. Indeed, there are countless examples of APCs being written-up for failing to comply with Wal-Mart's APC Routines and National Priorities. PSE 50.

### B. Wal-Mart's Position: The Declarations Submitted by Both Parties Demonstrate the Wide Variation in an APC's Work Experiences.

Plaintiff's own submission of sworn testimony reflects material variations in the number of associates APC's supervise, the level of disciplinary authority, and the varying methods of managing store processes and developing solutions. His own declarations also reflect variations as high as thirty percent in the amount of time APCs spent on exempt managerial duties (and are entirely silent with respect to the percentage of time spent on exempt administrative duties). The sections below highlight the variations in the APC work experience as testified to by both Plaintiff and Walmart witnesses. [5]

_____

[5] Plaintiff's suggestion that this Court should view with skepticism the declarations filed by current employees of Walmart is unfounded and has been rejected by sister courts. *See, e.g., Casida v. Sears Holdings Corp.*, 1:11-CV-01052, 2012 WL 3260423, at *6 (E.D. Cal. Aug. 8, 2012) (dismissing plaintiffs' contention that declarations from defendant's current employees were "inherently suspect").

12

### 1. Variations in Time Spent on Exempt Managerial Duties.

The chart below highlights the wide variability among a handful of *Plaintiff's own witnesses* in time spent supervising and scope of authority. Ex. EE and FF; WSE 36.

| Plaintiff Witness | % Directly Supervising | Authority to Hire? | Authority to Train? | Authority to Discipline? | Authority to Fire |
|---|---|---|---|---|---|
| Banks | 10% | Yes | Yes | Yes | Yes |
| Garcia | 35% | Yes | Yes | Yes | No |
| Hamori | 5% | Silent | Silent | No | No |
| Lincoln | 15% | Yes | Yes | Yes | Yes |
| Ortiz | 25% | No | Yes | Yes | No |
| Sampier | 15% | No | Yes | No | No |
| Schull | 30% | Silent | Yes | Silent | Silent |

Despite Plaintiff's assertion that all APCs "perform the same inspection-oriented [] duties," the record demonstrates that the actual responsibilities of many APCs do include all stages of the managerial process, including interviewing and hiring APAs, mentoring and training those associates, creating schedules and directing the work of their reports, preparing performance evaluations, as well as disciplining and terminating reports when appropriate. *Id.* 37 - 43. The evidence submitted by Plaintiff also establishes that claimed individual experiences cannot be extrapolated to the class he seeks to represent:

| Testimony Submitted by Plaintiff | Contradictory Testimony of APCs |
|---|---|
| Eleven witnesses state that they could not discipline employees. WSE 44. | Thirty-five witnesses listed "disciplining employees" amongst their duties. *Id.* 45. |
| Four witnesses state that they spent ninety-five percent of their time on non-supervisory duties. *Id.* 46. | Forty witnesses spend between fifteen to one hundred percent of their time directly supervising APAs. *Id.* 47. |
| Nineteen witnesses said they did not play a role in hiring employees. *Id.* 48. | Twenty-six witnesses testified they played a role in the hiring of APAs at their respective stores, including Plaintiff witnesses Zackaria, |

| | |
|---|---|
| | Banks, Lincoln, and Gomez. *Id*. 49. |
| In her declaration, Plaintiff witness Kahala Lincoln asserts: "I do not have the authority to fire employees, even if they are [APAs]." *Id*. 50. | In her deposition, Lincoln admits that she recommended the termination of two APAs, following which both were terminated. *Id*. 51. Twenty-one others testified as to their authority to terminate. *Id*. 52. |

These are just a few examples of the many ways that APC managerial duties differ throughout Walmart's stores in California. Others are set forth in Exhibits EE & FF.

### 2. Variations in Time Spent on Exempt Administrative Duties.

Not a single one of Plaintiff's declarations address the administrative duties performed by an APC and upon which an exempt classification may be properly based. Rather, each declaration submitted by Plaintiff contains the same Paragraph 4, in which each witness identifies the same set of tasks as either "managerial" or "non-managerial," without further articulating how or why they categorized those tasks into one of the groupings apparently crafted by Plaintiff's counsel. The declarations thus demonstrate – at best – only that these individual APCs spend anywhere from fifteen to thirty-five percent of their time performing exempt "managerial" duties. Even those numbers are suspect. Plaintiff took a declaration from Steve Oliver in which he stated that he spent eighty-five percent of his time on non-managerial tasks. WSE 53. However, Walmart obtained a declaration from him in which he stated, "I would say that every day I spend 100% of my time exercising independent judgment in the performance of my duties and making decisions that impact the Company's profit and loss." *Id*. 54.

In contrast, Walmart submitted the declarations of eighteen APCs, all of whom attest in their own words to the types of duties performed. Through a comparison of all declarations, it is apparent that the approach APCs take to tasks that are administrative in nature varies. WSE 55. Some APCs focus on financial reports, others spend additional time reviewing video to identify theft or mishandling by store associates, while others rarely undertake these duties either because they delegate them to someone else or

14

because the APC has identified alternative ways to uncover shrink. *Id*. 56 - 58. APCs also correct negative trends in different ways. While some may craft formal shrink plans for use by the entire store, others may undertake additional one-on-one training. *Id*. 59 - 60.

Plaintiff claims that there is no difference in how APCs oversee store processes, but the testimony of his own APC declarants demonstrates otherwise. For example:

- Jim Galbreath stated that "[t]hrough the resources provided to me, I have been able to implement solutions to safety and shrink concerns within the store. One example of this was identifying what the root cause was of locations accidents. Through data and video review we were better able to train the associates to prevent these accidents", *id*. 61;

- Randall Howdeshell created Excel spreadsheets for the accounting and other offices to streamline data selection and review with respect to shrink numbers, theft trends, and cash figures, *id*. 62; and

- Kahala Lincoln designed a safety map for use in the store that color coded the location and type of accidents to educate and raise awareness, *id*. 63.

All of this simply confirms that there is no single way to meet the objectives and goals of the APC position; rather, a successful APC is one who uses the tools provided to identify problems and then uses his or her individual knowledge, creativity and discretion to craft a tailored solution to an individual problem.

### 3. Variations Resulting From Unique Job Demands.

Plaintiff acknowledges that Walmart operates over 200 stores in California of varying sizes and types. WSE 64. Each of the stores varies with respect to their sales volume and complexity, size, geographic location, market, risk factors, workforce, configuration, and store type. *Id*. 65. Some stores operate in metropolitan centers, while others cater to smaller, rural communities. *Id*. 66. Walmart also operates a variety of store types in California, from relatively small discount merchandise stores, to large 24-hour Supercenters, to smaller, grocery-focused Neighborhood Markets. *Id*. 67. The physical features and services and departments offered also differ across stores. *Id*. 68. Some retail

15

locations, for example, offer Tire & Lube Express, grocery, pharmacy, vision, or other centers; some have a selection of some of these features; and some have none. WSE 69.

While Plaintiff admits to store variations, he refuses to concede that the attendant management needs vary among the stores depending upon factors like size, geographic region, and the particular challenges each store faces. Plaintiff instead relies on testimony that he believes supports his position, and maintains that the only evidence to the contrary is a single declaration of Mary Ann Dabney. The frailty of Plaintiff's view is exposed through the testimony of his own witnesses, several of whom affirm that the process of identifying and implementing solutions varies by store. Plaintiff witness Howdeshell, for example, explained that "different geographic locations call for different merchandise to be protected at one store and not at another" with relevant factors including "where the store is set up, if their camera system was good or bad … [and whether] they [are] open 24 hours, are they close to a freeway …." *Id.* 70. Banks, another of his witnesses, confirmed that her hiring responsibilities varied by store. *Id.* 71. The testimony of other APCs further demonstrates that factors unique to an individual store necessarily affect the types of duties performed and the allocation of time to each duty. *Id.* 72.

Plaintiff makes much of Earl Watson's testimony that there are not major variations in the position from store-to-store when you "strip away the personality-of-the-individual." Yet a review of the testimony in context evinces that Watson was referring to the broad range of goals and expectations shared by all APCs. Contrary to Plaintiff's assertions, there is nothing suspect about a Company setting forth the same expectations, goals and tools for a position. Such documents do not establish (and Watson did not testify) that in carrying out their responsibilities, APCs approach the position in the same way, achieve the goals in the same manner, or have no need to exercise discretion and judgment in achieving those goals. To the contrary, Watson's testimony confirmed his "expectation that [APCs] achieve their results" with a recognition that "***the goal itself, what they're tasked to do, may vary based on the store's demand and history***." *Id.* 73.

16

# IV. WAL-MART CLASSIFIES ITS APCS AS EXEMPT/SALARY EMPLOYEES.

## A. Plaintiff's Position.

### 1. Wal-Mart Is Aware That APCs Were Not Paid Overtime and Did Not Receive Compliant Meal and Rest Breaks.

Since Wal-Mart classifies its APCs as exempt employees, they do not receive overtime compensation when they work more than eight hours a day or forty hours a week. PSE 51; *see also* Cal. Lab. Code § 510. They are required to work as many hours as it takes to get their job done. PSE 52. Although APCs are "scheduled" to work 45 hours a week without overtime pay, PSE 53, it is not uncommon for them to work as many as 50 to 60 hours each week, PSE 54. Sometimes, APCs work as many as 10 to 12 hours in a single day. PSE 55. Wal-Mart is aware of this because it creates the APCs' 45-hour-a-week schedules, PSE 56, and APCs are required to inform their MAPMs of how many days they work. PSE 57.

APCs also do not receive compliant meal and rest breaks. Generally, California law entitles non-exempt employees to a meal break of 30 minutes for each five-hour work period, and a rest break of 10 minutes for every four-hour work period or "major fraction thereof." Cal. Code. Regs., tit. 8, §§ 11010–11170. During these time periods, employees must be completely relieved of all duty." *Id.* Although APCs have a scheduled meal break, PSE 58, they are still considered "on duty" when eating, causing their meal breaks to be frequently interrupted or cut short, PSE 59. Similarly, APCs rarely take rest breaks; and even when they do, they are still not relieved of all their duties. PSE 60. Indeed, Wal-Mart doesn't even include rest breaks in its APCs' schedules. PSE 61.

### 2. Wal-Mart Never Told Its APCs to Spend Over 50% of Their Time on Exempt Job Duties.

Although they are considered part of a store's "management team", PSE 62, Wal-Mart does not instruct its APCs to spend a majority of their time on "exempt" job duties.

17

PSE 63.  In fact, Wal-Mart never even trained its APCs on California's exemption requirements; it only trains them on its standardized policies and procedures.  PSE 64. However, even if Wal-Mart had instructed APCs to spend a majority of their time on exempt job duties, such an instruction would have been unreasonable given the amount of time it takes APCs to complete the checklists and audits enumerated on the APC Routines and National Priorities.  PSE 65.  Indeed, APCs estimate that they spend approximately 65% to 95% of their time on what they consider to be non-managerial and non-administrative tasks, PSE 66, or conversely, approximately 5% to 35% of their time on tasks they consider to be managerial and administrative, PSE 67.

**B.**    **Wal-Mart's Position:  Variations in Hours Worked and the Number of Breaks and Rest Periods Taken Preclude Certification.**

The parties agree that Walmart classified APCs as exempt[6] employees, and, therefore, the wage and hour requirements otherwise applicable to non-exempt employees were not applied to APCs.  Accordingly, Walmart does not maintain time records or record breaks taken by APCs.  WSE 75.  Instead, over the course of the class period each APC has been scheduled to work between 35 and 45 hours in a week, inclusive of meal periods and rest breaks.  *Id.* 76.  However, the evidence submitted by Plaintiff and referenced in his brief reflects wide deviation in the hours actually worked by his APC witnesses.  Many of Plaintiff's declarants maintain that they worked around 45 hours per week, *id.* 77, while some claim to have worked on average 50-60 hours a week, *id.* 78, and a few claim to work in in excess of 70 hours per week, *id.* 79.  The evidence reflects that same variation regarding meal periods and rest breaks.  *Id.* 80. Thus, it not only follows that the actual functions performed by an APC vary greatly

---

[6] Virtually all of the duties that an APC is expected to perform are exempt by nature, WSE 74, and there is accordingly no need to advise APCs to spend a particular percentage of their time performing specific duties as Plaintiff suggests.  Furthermore, as noted earlier, Plaintiff's claim that his witness declarations address both managerial *and* administrative tasks is flatly contradicted by the declarations themselves.

18

amongst individuals, but an individualized inquiry is the only avenue available to determine the viability of any one APC's overtime and meal/rest break claims.

# V.  IMPLICATIONS OF THE DOL LETTER, *BRAMBLE*, AND *PATEL*.

## A.  Plaintiff's Position.

Wal-Mart relies on a letter from the U.S. Department of Labor ("DOL") and two *unpublished FLSA* cases to argue that this Court should summarily deny Plaintiff's motion for class certification.  Neither the letter nor the cases, however, preclude certification here.

### 1.  The DOL's Letter Supports Plaintiff's Position That the Court Should Look at the APCs' Actual Job Duties, Not the Fictitious APC Job Description.

First, Wal-Mart claims that the DOL has already concluded that Wal-Mart properly classified APCs as exempt.  This simply isn't true.  In reality, Wal-Mart sent a letter to the DOL in 2008 seeking to confirm that "the DOL ha[d] determined that [the APC] position meets the requisites for exemption from *the FLSA's* overtime requirements under 29 C.F.R. 541.200" based on the APC job description, not whether they were exempt under California law.  PSE 68.  The DOL responded by telling Wal-Mart that it was "concerned that [its] statement concerning the exempt status of those people occupying the APC position [was] overly broad."  PSE 69.  It explained that its "finding was that those people who are *actually performing* the full range of duties contained in the *APC position description*, including the exercise of discretion and independent judgment with respect to matters of significance would qualify for exemption under 29 C.F.R. Part 541.200. . . .  [I]ndividual people are exempt based on the *duties they perform*, positions are not exempt or non-exempt."  PSE 70.

Here, Plaintiff has already demonstrated that Wal-Mart's APC job description does not accurately reflect what APCs actually do on a day-to-day basis.  *See supra* II.A. Thus, as the DOL correctly pointed out, the Court should examine what duties APCs

actually perform, which is best reflected in the APC Routine, National Priorities, SOPs, and declarations filed in support of Plaintiff's motion for class certification.  PSE 71.

### 2. *Bramble* and *Patel* Are Both Factually and Legally Distinguishable.

Second, Wal-Mart claims that this Court should deny class certification because conditional FLSA collective certification was denied in both *Bramble v. Wal-Mart Stores, Inc.*, No. 09–4932, 2011 WL 1389510 (E.D. Penn. Apr. 12, 2011) and *Patel v. Wal-Mart Stores, Inc.*, No. 2:08–cv–337–MEF, 2009 WL 1759568 (M.D. Ala. Jun. 19, 2009).  For both factual and legal reasons, neither of those cases precludes class certification here.

In *Bramble*, for example, the plaintiffs sought nationwide conditional certification on behalf of "similarly situated" APCs who they claimed they were misclassified as exempt employees under the FLSA.  *See Bramble*, 2011 WL 1389510 at *1.  However, in support of their contention, the plaintiffs produced only "their own deposition testimony [and] the deposition [testimony] of [two other APCs]."  *Id.* at *2.  The court explained that this deposition testimony was "largely specific to their own experiences at Wal-Mart" and that the plaintiffs "ha[d] produced little evidence to substantiate their assertions that their responsibilities, as performed, were similar to those actually performed by other APCs, either at their stores or at other stores nationwide."  *Id.*; *accord id.* ("[H]is testimony does not include any information to support an inference that the work experiences of other APCs were or are similar to his own experience."); *id.* at *5 (noting that "the deposition testimony . . . provide[d] only limited evidence from which [the court] could conclude that APCs nationwide are similarly situated").  Consequently, "[b]ased on the sparse evidence submitted to support plaintiffs' contention that all APCs similarly performed non-exempt tasks, [the court] f[ound] that plaintiffs h[ad] not met their modest burden to proceed collectively with an action on behalf of APCs nationwide."  *Id.* at *8.

Here, Plaintiff has submitted much more than "[his] own deposition testimony [and] the deposition [testimony] of [two other APCs]." Rather, to support his claim that all APCs are expected to and actually do perform the same "inspection-oriented" job duties, Plaintiff has submitted the deposition testimony of over twenty individuals from nearly every position in Wal-Mart's Asset Protection Department, nearly forty APC declarations, and hundreds of documents containing Wal-Mart's uniform policies and procedures—all of which prove that APCs perform the same or similar job duties regardless of their store's size, type, or location. Thus, unlike *Bramble*, it can hardly be said that Plaintiff's evidentiary showing is "sparse" or "largely specific to [his] own experience[ ]." Indeed, courts interpreting *Bramble* have limited its application to cases where the plaintiff has failed to meet its evidentiary burden. *See, e.g., Jacob v. Duane Reade, Inc.*, No. 11–cv–0160 (JPO), 2012 WL 260230 (S.D.N.Y. Jan. 27, 2012) (distinguishing *Bramble* and granting certification because the plaintiffs had provided sufficient evidence "that many [assistant store managers]. . . performed similar, non-managerial duties"). For this reason, *Bramble* should not influence the Court's determination of whether Plaintiff has provided sufficient evidence to certify the class.

*Patel* is also distinguishable, but for a much simpler reason. There, the court denied conditional certification because the plaintiffs did not "carr[y] their burden of demonstrating that other employees exists who desire to opt-in to the collective action." *Patel*, 2009 WL 1759568. There is no comparable opt-in requirement for class certification under Rule 23, making the reasoning in *Patel* completely inapplicable to this case.

## B. Wal-Mart's Position: Prior APC Decisions Confirm that Exempt Status Cannot be Determined Absent Individualized Inquiry.

In 2006, the Wage and Hour Division of the DOL audited approximately 30 Walmart stores as part of its "retail initiative" audit. WSE 81. In its review, the DOL considered whether the APC position was properly classified as exempt. *Id*. As Plaintiff concedes in his papers, the DOL determined through its investigation that APCs "actually

21

performing the full range of duties contained in the APC position description, including the exercise of discretion and independent judgment with respect to matters of significance, would qualify for exemption under 29 CFR Part 541.200." *Id*. 82.

Of equal importance, the DOL expressly recognized that, if a particular APC is not performing the full range of duties set forth in the APC job description, as Plaintiff claims is the case here, the determination of exempt status "needs to be made on an *individual basis* and determined based on when each individual is performing duties of an exempt nature." *Id*. 83. In other words, such an inquiry is not possible on a classwide basis. Not surprisingly and following this determination, two federal courts denied conditional certification of an APC class asserting claims of misclassification. *See, e.g., Bramble v. Wal-Mart Stores, Inc*., No. 09-4932, 2011 WL 1389510 (E.D. Pa. Apr. 12, 2011); *Patel v. Wal-Mart Stores, Inc.*, No. 2:08-CV-337, 2009 WL 1759568 (M.D. Ala. June 19, 2009). In the most recent of these decisions, the *Bramble* court rejected the effort of Pennsylvania, California and Massachusetts APCs to mount a collective action against Walmart under a less rigorous "similarly situated" standard than that applicable to Rule 23. The *Bramble* court concluded that those APC plaintiffs had failed to make even a "modest factual showing" that they were similarly situated to the rest of the class. *Bramble*, 2011 WL 1389510, at *8. Plaintiff attempts to distinguish this case on the grounds that his evidentiary submissions are more "robust" than those of his peers, but the "robust" evidence in this case serves only to bolster Judge O'Neill's conclusion:

> [A]n analysis of plaintiffs' claim that APCs are misclassified as exempt would require an individualized inquiry as to whether the tasks in fact performed by each putative collective action member are or were similar to the tasks that plaintiffs claim they performed….

*Bramble*, 2011 WL 1389510, at *8. Put simply, more evidence does not establish the priority of class certification when that additional evidence further highlights the individualized issues necessary to resolve each potential class member's claim.

# PART THREE: LEGAL ISSUES

## I. CALIFORNIA LEGAL STANDARDS FOR CLASSIFICATION OF EXEMPT EMPLOYEES.

### A. Plaintiff's Position.

Under California law, employees are entitled to meal and rest breaks, and overtime pay for any work in excess of eight hours in one workday, unless the employer affirmatively establishes that the employee qualifies for a statutory exemption. *Conley v. Pac. Gas & Elec. Co.*, 131 Cal.App.4th 260, 266 (2005). The two exemptions at issue here—the administrative exemption and managerial exemption—are set forth in the Industrial Welfare Commission's Wage Order No. 7.

Wage Order 7 is a "quasi-legislative regulation subject to normal principles of statutory interpretation." *Bell. v. Farmers Ins. Exchange*, 87 Cal.App.4th 805, 810 (2001). Statutory provisions regulating wages that are enacted to protect employees are liberally construed with " 'an eye to promoting such protection.' " *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 794 (1999). Exemptions are narrowly construed and, as affirmative defenses, must be proved by the employer. *Id*. at 794–95. Further, because the elements of the exemption are stated in the conjunctive, ***all*** criteria must be established for the exemption to apply. *Bell,* 87 Cal.App.4th at 828–29 (elements of exemption impose independent requirements).

### B. Wal-Mart's Position: Determination of Exempt Status Requires the Court Examine the Work Actually Performed by Each APC.

The Parties agree that the legal standards for classification of exempt employees in California are set forth in Wage Order No. 7-2001. Despite clear and controlling precedent, Plaintiff refuses to acknowledge that in order to determine the exempt status of any individual, it is necessary to consider both the administrative and managerial duties *actually performed* by the employee in *the aggregate.*

## 1. Determination of Exempt Status is Fact Intensive.

Under California law, "[d]etermining whether or not all of the elements of [an] exemption have been established is a fact-intensive inquiry. The appropriateness of any employee's classification as exempt must be based on the actual job duties performed by that employee." *In re United Parcel Serv. Wage & Hour Cases,* 190 Cal.App.4th 1001, 1014–15, 118 Cal.Rptr.3d 834 (2010). Moreover "[n]o bright-line rule can be established classifying everyone with a particular job title as *per se* exempt or nonexempt – the regulations identify job duties not job titles." *Id.* at 1015, 118 Cal.Rptr.3d 834. Thus, by way of example, the applicable regulations state that in determining whether an employee is "primarily engaged" in exempt work, "[t]he work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work ... shall be considered." Cal. Code Regs. tit. 8, § 11090(1)(A)(1)(e). State and federal California courts construe this language to mean that "[t]he 'primarily engaged' prong of the exemption inquiry requires a week-by-week analysis of how each employee spent his or her time." *Cruz v. Dollar Tree Stores, Inc.,* 2011 WL 268296 at *4 (N.D.Cal., July 8, 2011) (citing *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011) (finding that the district court correctly applied California law by requiring a week to week showing of the work actually performed)).

Consistent with the foregoing, and as discussed more fully in Part 2.V.B *infra*, the DOL has confirmed that APCs actually performing the full range of duties contained in the job descriptions qualify for exemption. This position is in accord with the conclusions reached in DOL opinion letters and court decisions across the country with respect to the classification of employees performing duties and responsibilities analogous to those of an APC. *See* DOL Opinion Letter FLSA2006-30 (concluding that a company's loss prevention managers whose primary function was to implement loss prevention and shortage control programs were properly classified as exempt); *Mullins v. Target Corp.*, No. 09 C 7573, 2011 WL 1399262, *5-6 (N.D. Ill. Apr. 13, 2011) (asset protection investigator who analyzed data, identified possible areas of theft, and

24

conducted investigations classified as exempt); *Juback v. Radioshack Corp*., No. 8:08-cv-768-T-24-TBM, 2009 WL 1259990, *1-3 (M.D. Fla. May 6, 2009) (loss prevention manager who investigated shrink and performed audits properly classified as exempt).

## 2. California Permits the Tacking of Exempt Duties.

Plaintiff fails to address in this brief the separate administrative exemption that applies in conjunction with the managerial exemption to determine the exempt status of an APC. This glaring omission requires denial of his motion. In an effort to avoid this outcome, Plaintiff suggests in later sections of this brief that California law does not permit the Court to consider a combination of exemptions to meet the threshold for exempt work. Plaintiff's position is directly contradicted by the holdings of numerous California state and federal courts interpreting California law. Indeed, "California law permits 'tacking' of one type of exempt work with another type, so that an employee who spends more than 50 percent of his or her work time performing exempt managerial and exempt administrative work meets the 'primarily engaged' test, and is exempt." *Musgraves v. Sears Holding Management Corp.*, No. CV 11-0625-GAF, 2012 WL 3222905, at *12 (C.D. Cal. July 19, 2012) () (citing D.L.S.E. Opinion Letter, 2003.05.23, p.5) [7]; *see also Hill v. R+L Carriers, Inc*., 690 F. Supp. 2d 1001, 1008 (N.D. Cal. 2010) (California law "recognize[s] a similar 'combination' exemption" as that codified under federal law); *Traylor v. Pyramid Servs., Inc.*, 2008 WL 8667410 *11 n. 3 (C.D. Cal. Sept. 24, 2008) ("Plaintiffs' executive and administrative tasks may also be 'tacked' ... 'so that a person who performs a combination of executive and administrative duties may qualify for an exemption.'"); *In re United Parcel Serv. Wage & Hour Cases*, 190 Cal. App. 4th 1001 (2010) (analyzing a combination of managerial and administrative duties to meet exemption test).

---

[7] Plaintiff's reliance on a 2002 Update to a DLSE Manual to attack the Opinion Letter is unavailing, first because the manual was prepared *before* the DLSE issued its 2003 Opinion Letter on tacking, but also because the manual "may be given no weight in a judicial analysis," *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1212 (2008).

This combination exemption is necessary to avoid the illogical conclusion embraced by Plaintiff here that an employee who performs forty percent administrative and forty percent managerial exempt work would be considered a non-exempt employee despite the fact that he devotes eighty percent of his time to exempt duties. Such a finding does not thwart any plain language of the Wage Orders as argued by Plaintiff. To the contrary, it is entirely consistent with and fully supported by California law.

## II. RULE 23(A)(2) COMMONALITY

### A. Common Questions of Law and Fact Offered by Plaintiff.

#### 1. Plaintiff's Position.

The Supreme Court has explained that Rule 23(a)(2) commonality requires that the class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Put another way, commonality focuses on whether common questions will "generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original and internal quotation marks omitted). These common questions and answers act as the "glue" holding the individual class members' claims together. *Id.* at 2552; *see, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) (holding that even "pattern or practice" evidence can be sufficient to establish a "company's standard operating procedure" and provide the requisite "glue" for commonality and predominance under Rule 23).

Although common questions are required, " '[a]ll questions of fact and law need not be common to satisfy the [requirement]. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts with disparate legal remedies within the class.' " *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (second alteration in original) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Therefore, commonality is generally satisfied where, as here, "the lawsuit challenges a system-wide practice or

26

policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).

Here, Plaintiff seeks class certification under the following three common questions, the answers to which will drive the resolution of this litigation:

1.  *Do APCs perform a uniform and finite set of job duties*?

2.  *Which of the APCs' job duties, if any, regularly require the exercise of discretion and independent judgment*?

3.  *Do APCs spend over 50% of their time on exempt job duties*?

## 2. <u>Wal-Mart's Position</u>: The Fact-Specific Inquiry Mandated for Determination of Exempt Status Obviates Common Questions.

The Parties agree that under *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), the commonality requirement of Rule 23 mandates that the moving party articulate a common question or questions "capable of classwide resolution." The three purportedly common questions presented by Plaintiff suffer from the same flawed presumption: that Plaintiff can establish through general policies, the actual day-to-day duties and responsibilities performed by each of over 350 APCs in California. Because the elements required to determine application of the administrative and managerial exemptions are fact specific, and because those factual specifics differ from APC to APC, store to store, and day to day, Plaintiff's misclassification questions are not capable of generating "common answers apt to drive resolution of the litigation" on a classwide basis. *Dukes,* 131 S.Ct. at 2551. As Judge King explained in *Pedroza v. PetSmart, Inc.*, No. ED CV 11-298, 2013 WL 1490667, at *13 (C.D. Cal. Jan. 28, 2013):

The [] testimony shows that even if the manuals and policies impose certain restrictions on the [Class Members], their application, in practice, left room for the [class] to exercise their discretion on matters of consequence. Thus, whether Class Members in fact exercise their discretion 'customarily and regularly' cannot be resolved on a classwide basis in one stroke.

27

The same is true here. What will instead drive the litigation are the myriad individualized inquiries comprising the "crucial touchstone" of Plaintiff's employment misclassification claims – namely, each "employee's actual job duties and responsibilities." *Campbell v. PricewaterhouseCoopers LLP*, 642 F.3d 820, 830 (9th Cir. 2011).

### B. Common Proof of Class-Wide Resolution Offered by Plaintiff.

#### 1. Plaintiff's Position.

Plaintiff has submitted substantial evidence demonstrating that his common questions are susceptible to common proof.

1. *Do APCs perform a uniform and finite set of job duties*? This question is the starting point for any misclassification class action. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 958 (9th Cir. 2009). If the answer to this question is yes, then the class' claims are susceptible to common proof. In this case, Plaintiff has put forth a mountain of evidence demonstrating that Wal-Mart expects APCs—and APCs actually do—perform the same uniform job duties (i.e., the APC Routine, National Priorities, and SOPs) throughout California, regardless of the store's type, size or location.

2. *Which of the APCs' job duties, if any, regularly require the exercise of discretion and independent judgment*? Once the Court answers whether APCs perform a uniform and finite set of job duties, the Court will then need to turn to Wal-Mart's affirmative defense: whether APCs are exempt (on which Wal-Mart bears the burden of proof). To do this, the Court will first need to determine which duties, if any, regularly require the exercise of discretion and independent judgment within the meaning of 29 C.F.R. § 541.207). *See infra* III.A.1.ii. The answer to this question will determine which duties are exempt and which are not. Since Wal-Mart has created standardized policies on exactly how each of these duties are to be performed (the APC Routine, the APC National Priorities, and the SOPs), and APCs do, in fact, perform these duties, the answer to this question is also susceptible to common proof.

3. *Do APCs spend over 50% of their time on exempt job duties*? The other aspect to Wal-Mart's exemption affirmative defense is whether the APCs are "primarily engaged in" (i.e., 51% of their time) exempt job duties. *See infra* III.A.1.iii. This analysis will be performed using classwide proof by comparing

28

Wal-Mart's detailed time studies and the class members' declaration and deposition testimony to the uniform and finite set of job duties identified in Question 1 and classified in Question 2. If the APCs' exempt job duties (again, to the extent they even exists) fail to account for 51% of the APCs duties, then Wal-Mart's exemption defense will fail.

As explained in detail below, each one of these questions will also predominate over any purported individualized issues. *See infra* III.A.1.

2. **Walmart's Position:** **Plaintiff's Common Proof Cannot Establish What APCs Actually Do in Any Given Day or Week.**

Plaintiff must demonstrate that the examination of class claims would produce "a common answer to the crucial question" at issue. *Wang v. Chinese Daily News*, 737 F.3d 538 (9th Cir. 2013). "Dissimilarities within the proposed class may 'impede the generation of common answers.'" *Id*. To try and establish the requisite "commonality," Plaintiff attempts to try his case through generalities in the form of policies and guidelines, while simultaneously ignoring the individualized testimony showing wide variations in work experiences. These forms of common proof relied upon by Plaintiff come nowhere close to providing the requisite "glue" holding "the alleged reasons for" misclassification together, because they cannot tell us what each APC actually did – particularly where, as here, the record evidence unequivocally demonstrates that each APC performed different functions at different stores on different days.

These variables and significant variations in work experiences mean that Plaintiff's claims cannot be adjudicated on a classwide basis, a conclusion supported by numerous recent cases in which courts presented with the same evidentiary submissions have declined to certify misclassification claims. The *Gales v. Winco Foods* court denied certification in a similar case where the plaintiff relied on virtually identical evidence:

…Plaintiff relies largely on the AM Job Description, Job Analysis, centralized training, centralized policies limiting some of the control AMs have over their stores … and WinCo's uniform classification of AMs as

29

exempt.  Although that evidence gives the Court a general sense of the AM job (as involving hiring, supervising and disciplining hourly employees, ordering, merchandising, lifting things, and standing for long periods of time), **it does not tell the Court with the requisite specificity how [employees] actually spend their time**.

No C 09-05813, 2011 WL 3794887, at *10 (N.D. Cal. Aug. 26, 2011) (emphasis added).  This decision is just one in a series of California misclassification cases denying certification.[8]

Because Plaintiff has failed to come forth with the type of common proof that would permit the fact finder to decide "in one stroke" whether APCs were "primarily engaged" in exempt duties, he has failed to carry his burden here.

### III.  <u>RULE 23(b) PREDOMINANCE</u>

#### A.  <u>General Predominance</u>

##### 1.  <u>Plaintiff's Position</u>:  **The Three Common Issues Predominate.**

Rule 23(b)(3) first requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b) (3).  In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses "on the relationship between the common and individual issues."  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (international quotation marks omitted) (quoting *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009)).  It is satisfied "[w]hen common questions present a significant aspect of the case and they be resolved for all members of the class in a single adjudication."  *Local Joint. Exec. Bd.*

---

[8] *See, e.g., Pedroza*, 2013 WL 1490667:*Aburto v. Verizon Cal., Inc.,* No. CV 11-03683, 2012 WL 10381 (C.D. Cal. Jan. 3, 2012); *Akaosugi v. Benehana Nat'l Corp.*, 2012 WL 1094425 (N.D. Cal. Mar. 30, 2012); *Chavez v. Lumber Liquidators, Inc.*, No. CV-09-4812 SC, 2012 WL 1004850 (N.D. Cal. Mar. 26, 2012); *Cruz,* 2011 WL 2682967, at *8; *Novak v. Boeing Co.*, No. SACV09-01011, 2011 WL 7627789 (C.D. Cal. Dec. 19, 2010).

*of Culinary/Bartender Trust Fund v. Las Vegas*, 244 F.3d 1152, 1161 n.23 (9th Cir. 2001).

      i.      *Common Issues Predominate on Whether APCs Perform a Uniform and Finite Set of Job Duties.*

To determine whether an employee is exempt, courts must assess the employee's "actual job duties, not the employee's job title or professional field." *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 826 (9th Cir. 2011); *accord Kress v. Price Waterhouse Coopers*, No. CIV S–08–0965 LKK GGH, 2012 WL 1991951, at * 2–3 (recognizing that "Ninth Circuit defined the administrative exemption as requiring an inquiry into what 'associates actually do (and what [the employer] reasonably expects them to do)' "). Although the Ninth Circuit has rejected any "presumption that class certification is proper when an employer's internal expectation policies are applied uniformly to the employees," it also acknowledges that "uniform corporate policies will often bear heavily on questions of predominance and superiority. Indeed, courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes. Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." *In re Wells Fargo*, 571 F.3d at 958–59. Therefore, although uniform corporate policies are an important factor to consider, they are not dispositive. Courts must also "focus[ ] on whether the employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedure governing employees, uniform training programs, and other factors susceptible to common proof." *Vinole*, 571 F.3d at 946 (citing cases).

Here, Plaintiff has submitted extensive evidence demonstrating that the work actually performed by all the APCs is consistent with Wal-Mart's expectation. As explained above, Wal-Mart has created a uniform and finite set of job duties (through the APC Routine and National Priorities), which APCs are expected to, and do, follow. *See*

31

*supra* II & III.  In fact, an APC's failure to follow the Routines or National Priorities results in being written up and/or disciplined.  *See supra* III.  This rigid policy makes individual deviations from Wal-Mart's policies and procedures practically non-existent because, to the extent such deviations do exist, Wal-Mart either (1) corrects the behavior through discipline and/or further training or (2) fires the APC.  Accordingly, individual inquiries do not predominate over whether APCs perform a uniform and finite set of job duties.

> ii. *Common Issues Predominate on Whether the APCs' Job Duties Regularly Require the Exercise of Discretion and Independent Judgment.*

While Plaintiff bears the burden of demonstrating the requirements for class certification have been met, Wal-Mart "bears the burden of [proving its defense that APCs are] exempt from the [California] Labor overtime requirements." *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).  Wal-Mart therefore claims that there are individualized issues related to its affirmative defense and that they will predominate over the common questions of law and fact.  Therefore, to the extent it believes it is necessary (it is not), the Court should consider how the merits of Wal-Mart's exemption defense will impact class certification.  *See Dukes*, 131 S. Ct. at 2551–2552 (2011) (noting that class certification's "rigorous analysis" will sometimes "overlap with the merits of the plaintiff's underlying claim").

In California, exemptions from the Labor Code are narrowly construed.  *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785, 795 (1999).  Industrial Welfare Commission Wage Oder No. 7 ("IWC Wage Order"), which covers Wal-Mart's APCs, exempts "persons employed in administrative [and] executive . . . capacities."  Cal. Code Regs., tit. 8, § 11090(1)(A).  **Both** of these exemptions require, among other things, that exempt employees (1) "customarily and regularly exercise[ ] discretion and independent judgment," and (2) are "primarily engaged in duties which meet the test of the exemption."  *Id*. at § 110090(1)(A)(1)(d) & (e); *Id.* at § 110090(1)(A)(2) (b) & (f).

The distinction between the exercise of discretion/independent-judgment (exempt duties) and the mere application of skills/procedures (non-exempt duties) is the "most frequently misunderstood and misapplied" element of the exemption tests. 29 C.F.R. § 541.207(b). "An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . is not exercising discretion and independent judgment within the meaning of Sec. 541.2. This is true even if there is some leeway in reaching a conclusion . . . ." *Id*., at subd. (c)(1). Particularly instructive for our purposes is subdivision (c)(2), which explains that inspection-oriented job duties, like the APCs' job duties, do not involve the exercise of discretion and independent judgment:

> A typical example of the application of skills and procedures is ***ordinary inspection work*** of various kinds. Inspectors normally perform specialized work along standardized lines involving ***well-established techniques and procedures which may have been cataloged and described in manuals or other sources***. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections, but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. In such cases a decision to depart from the prescribed standards or the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations in Subpart A of this part.

29 C.F.R. § 541.207(c)(2) (emphasis added).

Here, Plaintiff has submitted more than enough evidence for the Court to conclude that a majority, if not all, of the APCs' job duties involve "ordinary inspection work," and non-managerial clerical work, and therefore are non-exempt duties. As explained above, APCs merely follow Wal-Mart's well-established techniques and procedures, which are cataloged and described in" in the APC Routines, the APC National Priorities, and the corresponding SOPs. For example, most of the duties on the APC Routine involve little

33

more than inspecting various aspects of the store.  *See supra* II(A)(2).  Likewise, the National Priorities—which takes approximate 20 hours a week to complete—is nothing more than following a series of checklists and "YES" or "NO" questions, and implementing Wal-Mart's pre-created, step-by-step shrink plans.  *See supra* II(A)(3).  To the extent APCs make recommendations and conduct investigations, they do so within the confines of Wal-Mart's rigid policies and procedures, and any deviation from those policies must be approved of by the APC's MAMP.  Indeed, Wal-Mart has admitted that it created its uniform policies and procedures with the intention that they be followed, and that APCs are routinely disciplined for failing to do so.  *See supra* III.

Thus, when this case reaches the merits, the Court will look at the finite APC job duties (identified in Question 1), examine their associated checklist and procedures, and determine whether those duties involve exercising discretion and independent judgment within the meaning of 29 C.F.R. § 541.207(b) and (c).  That determination will be made based on the same common, uniform policies applicable to every APC in California (i.e, the Routines and National Priorities).  At that point, if the Court determines that APCs lack sufficient discretion in carrying out their job duties, it will preclude Wal-Mart from ever proving both of their exemption affirmative defenses.

### iii. *Common Issues Predominate Over on Whether APCs Spend Over 50% of Their Time Performing Exempt Job Duties.*

Additionally, in order to satisfy either of its affirmative exemption defenses, Wal-Mart must also be able to eventually prove that the putative class was "primarily engaged" (i.e., 51% of their time) in performing exempt duties.  Cal. Code Regs., tit. 8, 11090, subd. (1)(A)(1)-(2)).  "The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement."  (*See* Cal. Code Regs., tit. 8, 11040, subd. (1)(A)(1)(e) and subd. (1)(A)(2)(f), emphasis added.)  Job duties are either exempt or

34

non-exempt and multitasking (i.e., performing non-exempt tasks but purportedly still "managing") is not permitted. *Heyen v. Safeway, Inc.* 216 Cal. App. 4th 795, 822 (2013).

Individualized issues will not predominate over the question of whether APCs spend over 51% of their time performing exempt job duties. As explained above, Wal-Mart has gone through great pains conducting detailed, task-specific time studies demonstrating exactly how long each National Priorities question—and their corresponding SOPs—take APCs to complete. *See supra* II(A)(3). These time studies are remarkably accurate; every APC deposed has stated that Wal-Mart's time studies correctly state approximately how long it takes them to complete each task. To the extent the Court needs to pry into the merits, Plaintiff has gathered declarations from forty-one putative class members (approximately 10% of the total class) who state that APCs estimate that they spend approximately 65% to 95% of their time on what they consider to be non-managerial and non-administrative tasks, or conversely, approximately 5% to 35% of their time on tasks they consider to be managerial or administrative. Since no APC testified that they spend more than 50% of their time on exempt job duties, there is very little room for individualized issues, and the final question predominates.

### 2. Wal-Mart's Position: Individual, Not Class, Issues Predominate.

The predominance factor determines whether the "'proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). It is only when "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," that Rule 23(b)(3)'s predominance factor is satisfied. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir. 1998). "[W]here a defendant claims exemptions … individualized inquiries about the actual hours worked, percentage of exempt versus non-exempt work performed, particular job experiences, and other inquiries are critical." *Spainhower v. U.S. Bank Nat'l. Ass'n*, No. 2:08-CV-000137, 2010 WL 1408105, at *4 (C.D. Cal. Mar. 25, 2010). Thus, when the amount of time spent by class members on different potentially exempt duties varies, as it

35

does here, a long line of Ninth Circuit authority finds predominance lacking, such that the case should not be certified.[9]

As detailed above, Plaintiff's own evidentiary submission demonstrates that individual issues predominate over any common ones. Plaintiff admits (and then asks the Court to disregard) that APCs perform a variety of exempt tasks that include directing the work of other associates, training associates, and disciplining and terminating their hourly reports, all duties that are almost by definition exempt. WSE 84. Plaintiff admits that two different exemptions, the administrative exemption and the managerial exemptions, may potentially apply, and that each requires an individual analysis of each APC's duties. *Id.* 85. He also acknowledges that to decide this case, the finder of fact must determine whether an APC spends greater than fifty percent of his time on exempt duties, *id.* 86. Nothing in the evidentiary record demonstrates the need for individualized inquiry more than the two conflicting declarations signed by APC Steve Oliver. *Supra* Part 2.III.B.2. On this and other points, Plaintiff offers no evidentiary basis beyond supposition that his own individual work experiences can fairly be extrapolated to the class as a whole.

> i.  *"Do APCs perform a uniform and finite set of job duties?"*

Plaintiff concedes that the Court must "assess the employee's 'actual job duties,'" WSE 85, and agrees that uniform policies are not decisive, but then urges a myopic focus on general guidance documents with no reference whatsoever to the wide variations to which individual APCs testified. The mere existence of uniform policies and guidelines is far from dispositive. Two cases relied upon by Plaintiff – *Vinole* and *Wells Fargo* –

---

[9] *See, e.g., Friend v. Hertz Corp.,* 2011 WL 750741 (N.D. Cal. Feb. 24, 2011), *aff'd* 2014 WL 1016848 (9th Cir. Mar. 18, 2014); *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 944 (9th Cir. 2009); *Wells Fargo,* 571 F.3d at 958; *Marlo v. United Parcel Serv., Inc.,* 639 F.3d 942 (9th Cir. 2011); *Weigele v. FedEx Ground Package Sys., Inc.,* 267 F.R.D. 614, 622 (S.D. Cal. 2010); *Whiteway v. Fedex Kinkos Office & Print Servs.,* 2009 U.S. Dist. LEXIS 127360 (N.D. Cal. Sept. 29, 2009); *Velazquez v. Costco Wholesale Corp.,* No. SACV 11-00508, 2011 WL 4891027 (C.D. Cal. Oct. 11, 2007); *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006).

36

establish that the existence of policies does not deprive managers of their discretion and independent judgment. Even in the face of highly detailed policies, the Ninth Circuit denied certification, holding the predominance factor lacking "where exempt status depends on an individualized determination of an employee's work." *Vinole*, 571 F.3d at 946-47; *see also Wells Fargo*, 571 F.3d at 957-59 (reversed certification, holding the district court's reliance during predominance inquiry on internal policies was an abuse of discretion). Both opinions further confirm that "a court evaluating the applicability of […an] exemption **must conduct an individualized analysis of the way each employee actually spends his or her time**, and not simply review the employer's job description." *Vinole*, 571 F.3d at 945 (emphasis added); *Wells Fargo*, 571 F.3d at 958-59 (same). In applying these standards, California federal courts have since denied certification in cases involving an examination of similar managerial and administrative exemptions. *E.g., Pedroza*, 2013 WL 1490667 at *13; *Gales*, 2011 WL 3794887, at *6.

Plaintiff has failed to articulate why this Court should reach a different conclusion. The record demonstrates significant differences in what APCs do, how they perform their work, and how much time they devote to particular tasks. A determination of exempt status will thus be a fact-intensive, individualized inquiry that will "inevitably consume the majority of a trial, and overwhelm the adjudication of common issues." *In re Wells Fargo Home Mortg.*, 268 F.R.D. 604, 611 (N.D. Cal. 2010) (on remand, denying the plaintiffs' renewed motion for class certification). Plaintiff has failed to propose any form of common proof that would render these individualized issues manageable. Instead, he repeatedly makes the conclusory assertion that common issues predominate because all APCs at all stores perform the same tasks in the same manner according to a uniform set of policies and guidelines. But insisting does not make it so. The record shows beyond question that the tasks performed vary widely from one APC to another.

In the face of all this, Plaintiff relies almost entirely on Walmart's general policies. Yet, a careful examination of these policies belies Plaintiff's position. By their own terms, the policies encourage managers to make judgments and exercise discretion. WSE

37

87.  Indeed, Plaintiff all but concedes that the job descriptions reflect an exempt position, a finding previously made by the DOL.  The resolution of his misclassification claims therefore does not turn on a common job description, but instead on what each APC actually did *in practice.*  Investigating the existence of and reasons behind any such alleged departures from the duties identified in the job description necessarily entails an individualized, APC-by-APC inquiry that would defeat any gains in efficiency the class action tool was designed to accomplish.  Interwoven into this inquiry is the fact that the duties of the position varied and evolved over the course of the 7-year class period.

There is also no consistent testimony that policies in any way constrain APCs in their exercise of discretion and judgment.  To the contrary, the policies empower APCs to use discretion to solve problems and create innovative solutions.  Although Plaintiff focuses on the routines and audit program, the record undercuts Plaintiff's view that these guidelines turn APCs into automatons.  Some performed many of the tasks identified in the routines and auditing program, some performed few, and many spent a significant amount of time on other relevant tasks that are not reflected in Plaintiff's list.  WSE 88.

ii.  *Which of the APCs' job duties, if any, regularly require the exercise of discretion and independent judgment?*"

As an initial matter, the burden of proving that Walmart misclassified APCs as exempt employees on a classwide basis for purposes of certification remains *at all times* with Plaintiff.  *Marlo*, 639 F.3d at 947.[10]  In tackling that burden, the answer to Plaintiff's question here cannot possibly yield a common answer because "[w]hether an employee has discretion … is judged by examining the actual duties performed, ***not by the***

---

[10] In his submission, Plaintiff cites *Marlo* for the unremarkable proposition that Walmart bears the burden of proving the exemptions at the merits stage – but we are not at the merits stage.  The *Marlo* Court expressly rejected a similar effort by the moving plaintiff to shift the burden of proof to the employer during certification, reasoning: "Because [the employee] has brought a class action challenging UPS's exemption of [the position] as a policy of misclassification, he must be able to demonstrate pursuant to either scenario that misclassification was the rule rather than the exception…" 639 F.3d at 947.

*employee's subjective evaluation*." *Heffelfinger v. Elec. Data Sys. Corp.,* 580 F.Supp.2d 933, 963 (C.D. Cal., 2008) (emphasis added), *aff'd in part, vacated in part on other grounds* at 492 Fed.Appx. 710 (9th 2012). The administrative exemption applies even where the employee's discretion in the performance of her duties is circumscribed by an employer's detailed instructions or regulations. *See, e.g., O'Dell v. Alyeska Pipeline Service Co.,* 856 F.2d 1452 (9th Cir. 1998) (field inspector properly classified as exempt, because he had discretion to handle discrepancies set forth in "control documents"); *Roe-Midgett v. CC Servs., Inc.,* 512 F.3d 865, 875 (7th Cir. 2008) (claims adjusters exercised independent judgment even though they used manuals and software to guide their work but had leeway to deviate from manual when conducting inspections).

Courts in this Circuit have time and again held at the certification stage that the examination of discretion and judgment simply cannot be productively litigated at once because it cannot be shown to be true or false on a classwide basis. *Brady v. Deloitte & Touche LLP,* No. C 08-177 SI, 2012 WL 1059694, at *6-8 (N.D. Cal. Mar. 27, 2012) (decertifying class because individualized issues predominated as to determination of professional and administrative exemptions); *Aburto,* 2012 WL 10381, at *5 (certification denied where "the question of whether all [managers] were improperly classified as exempt will depend on answers unique to each potential plaintiff"). Even if it were possible to make a theoretical list of "finite tasks" and sort those tasks into "exempt" and "non-exempt" categories, it would still be necessary to conduct an individual inquiry into how much time each APC spends on each task. *Pedroza,* 2013 WL 1490667, at *10. In any case, as explained above, the existence of "uniform and finite" tasks is a fiction, and many of the tasks do not fall easily into one category or the other.

       *iii.*     *"Do APCs spend over 50% of their time on exempt job duties?"*

Courts have similarly declined to accept the question of whether a class as a whole "customarily and regularly" spends over 50% of the time on exempt work where it cannot yield a common answer for all class members. *See Cruz,* 2011 WL 2682967, at *8 (decertifying class of store managers who "share[] a number of common employment

39

experiences," where the court could not determine "whether they were spending more than fifty percent of their time performing exempt tasks"); *Jimenez,* 238 F.R.D. at 251("the question presented is not whether the tasks performed are exempt but rather how much time is spent on each task, which is necessarily an individualized inquiry"). Here, the question is particularly incapable of producing a common answer since the estimates of time incurred on one task over another, even as characterized by Plaintiff, vary dramatically. The supposed "common" question is further undermined by the fact that Plaintiff presented ***no evidence*** addressing one of the two exemptions at issue here. The wide variance in total hours worked by Plaintiff's witnesses further complicates any attempt to come up with classwide percentages on individual tasks.

## B.    <u>Affirmative Defenses.</u>

### 1.    **Plaintiff's Position**

Wal-Mart spends pages pointing out that APCs have the purported authority to supervise, train, hire, fire, and discipline their APAs. But these facts are irrelevant under Plaintiff's theory of class certification. What matters is whether "plaintiffs have made a sufficient showing that the class . . . cannot be engaged in the work [Wal-Mart] says would exempt them from California's labor laws." *Kress*, 2013 WL 140102, at *10. Plaintiff intends to do by demonstrating that Wal-Mart's APCs are not regularly exercising discretion and independent judgment related to matters of significance for Wal-Mart's business.

> #### i.    <u>*Plaintiff's Class Certification Theory Is Only Concerned With the Common Exemption Elements.*</u>

When faced with a motion for class certification, "a trial court must examine ***plaintiff's*** theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common questions predominate." *Brinker v. Rest. Corp.* 53 Cal. 4th 1004, 1025 (2012) (emphasis added). Here, Plaintiff contends that Wal-Mart improperly classified its APCs as exempt employees. Thus, at the merits stage, Wal-Mart will "bear[ ] the burden of [proving that its APCs are] exempt from the

40

[California] Labor overtime requirements." *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011). To do this, Wal-Mart will need to prove that its APCs fall under either the "managerial" or "administrative" exemption.

As explained above, the legal standards for classification of exempt employees for this case are set forth in the Industrial Welfare's Commission's Wage Order No. 7. Under section 1(A)(1) an employee is exempt under the "managerial exemption" if:

1. His or her duties involve management of a recognized department;

2. S/he directs the work of two or more other employees;

3. S/he has authority to hire or fire or his or her recommendations as to hiring and firing are given particular weight;

4. S/he ***customarily and regularly*** exercises ***discretion and independent judgment*** related to ***matters of significance*** to the employer's business;

5. S/he is ***primarily engaged*** in exempt duties (51% of the time); ***and***

6. S/he earns a salary equivalent to at least two times the minimum wage.

*See* Wage Order 7, § 1(A)(1)(e). Under Section 1(A)(2) an employee is exempt under the "administrative exemption" if:

1. His or her duties and responsibilities involve the performance of office or non-manual work directly related to the company's management policies or business operations;

2. S/he performs work requiring special training, experience, or knowledge under general supervision only;

3. S/he ***customarily and regularly*** exercises ***discretion and independent judgment*** related to matters of ***significance*** to the employer's business;

4. S/he is ***primarily engaged*** in exempt duties (51% of the time); ***and***

5. S/he earns a salary equivalent to at least two times the minimum wage.

*See* Wage Order 7, § 1(A)(1)(e).

41

Comparing these requirements demonstrates that these exemptions share common elements that must be independently satisfied in order for an employee to fall under either exemption. In other words, at the merits stage, Wal-Mart will have to prove that APCs (1) customarily and regularly exercise discretion and independent judgment related to matters of significance for the employer's business **and** (2) are primarily engaged in exempt job duties in order to prove *either* of its exemption affirmative defenses.

Plaintiff has tailored his class certification theory to these two elements by identifying three common questions that will "generate common *answers* apt to drive the resolution of th[is] litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original):

1. Do APCs perform a uniform and finite set of job duties?

2. Which of the APCs' job duties, if any regularly required the exercise of discretion and independent judgment related to matters of significance to the employer's business?

3. Do APCs spend over 50% of their time on exempt job duties?

The second and third questions track the two common elements for the managerial and administrative exemptions. If Wal-Mart cannot meet its burden on these, the class wins. Conversely, if Wal-Mart succeeds, the class loses. The other exemption elements are irrelevant under Plaintiff's theory.

ii. <u>The DLSE Recently Made Clear That "Tacking" Is Not Permitted Under California Law.</u>

Wal-Mart argues that California permits the "tacking" of exempt work to determine whether an individual is exempt from overtime compensation. For support, it cites to a solitary district court order, which, in turn, relied on a 2003 DLSE opinion letter to justify its holding. *See Musgraves v. Sears Holding Mgmt. Corp.*, No. CV 11–0625 GAF (JEMx), 2012 WL 3222905, at *12 (C.D. Cal. July 19, 2012). That opinion letter states that the DLSE "construes state law, like federal law (see 29 CFR § 541.600), to permit the so-called 'tacking' of one type of exempt work with another type, so that, for

42

example, an employee who spends more than 50% of his worktime performing exempt managerial and exempt administrative work would meet the 'primarily engaged' test." PSE 72.

However, this letter has lost its persuasiveness due to the recent revisions to the DLSE Enforcement Policies and Interpretations Manual, which "summarizes the polices and interpretations which [the] DLSE has followed and continues to follow in discharging its duty to administer and enforce labor statutes and regulations of the State of California." PSE 73. At the end of the manual "is a compilation of the Federal Regulations which were in effect on July 1, 2000. The entire series of 29 C.F.R. §§ 541.102 through 541.602 is included." PSE 74. The DLSE explains that "[*o*]*nly parts* of the[se] regulations were adopted by the IWC for purposes of interpreting the administrative, executive (managerial) and professional exemptions. The portions which are not applicable are in strikeout." PSE 75. (underline in original). It goes on to explain that "[t]he inapplicable sections are reproduced here simply as a guide and aid to enforcement staff in explaining the differences between the federal interpretations and those allowed under California law." PSE 76.

Importantly, 29 C.F.R § 541.600—the old federal section that allowed tacking under the FLSA—is set forth in strikeout text, indicating that the IWC did ***not*** intend it to be used in "interpreting the administrative, executive (managerial) and professional exemptions." *Id*. And no point during the manual's numerous revisions has this strikeout been altered or affected in anyway. Thus, any persuasiveness that the old 2003 DLSE letter may have had for permitting tacking is lost as the DLSE has shown its intent to no longer rely on 29 C.F.R. § 541.600 in interpreting California wage and hour laws. Indeed, this interpretation complies with California's policy of construing its exemption laws against the employer. *Nordquist v. McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555, 562 (1995).

## 2.  **Wal-Mart's Position**:  Proper Assessment of Walmart's Affirmative Defenses Requires an Individualized Inquiry.

Plaintiff's argument underscores the need for this Court to consider at a minimum two exemption requirements common to both the managerial and administrative exemption.  However, Plaintiff yet again improperly attempts to shift the burden of proof to Walmart and bypass the need for this Court to address both administrative and managerial duties through the application of tacking.  Walmart previously addressed both those issues.  *See* Part 2.III.B.2 and Part 3.I.B.2.  The remainder of Plaintiff's submission simply ignores Walmart's other affirmative defenses such as comparative fault, failure to mitigate, accord and satisfaction, and waiver, the proper adjudication of which requires an individualized inquiry.  "[T]he presence of defenses unique to a particular class member precludes certification … on predomination grounds." *Gartin v. S & M Nutec LLC*, 245 F.R.D. 429, 441(C.D. Cal. 2007).

Adjudication of Walmart's defenses on a classwide basis would also violates Walmart's right to due process, because it serves to deprive Walmart of the opportunity to rebut evidence introduced against it.  *In re Google Inc., Gmail Litig.,* No. 13-MD-02430, 2014 WL 1102660, at *21 (N.D. Cal. Mar 18, 2014).  Walmart's right to question claimants and have the Court assess the relevance and weight of the parties' evidence on such matters is not abridged merely because a case is brought as a class action.  *In re Bridgestone /Firestone,* 288 F.3d 1012, 1020 (7th Cir. 2002).  Plaintiff's proposed approach also runs afoul of the Rules Enabling Act, 28 U.S.C. § 2072(b), which instructs that the rules of procedure "shall not abridge, enlarge, or modify any substantive right." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613 (1997); *In re Hotel Tel. Charges,* 500 F.2d 86, 89 (9th Cir. 1974) ("Unless the Court is to allow the procedural device of the class action to wear away the substantive requirements to maintain a private … cause of action, this suit raises far too many individual questions to qualify for class

44

action treatment."). Finally, Plaintiff's effort to seek an award of fines and penalties without the necessary link to individualized proof, discovery, and testimony gives rise to a separate violation of Walmart's rights under the Fourteenth Amendment. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416, 426, 123 S. Ct. 1513, 1519 (2003).

### C. Damages.

#### 1. Plaintiff's Position: Individual Issues Relating to Damages Do Not Precluded Class Certification.

Wal-Mart relies on *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) to claim that class adjudication should be denied because individual issues relating to damages will predominate. But *Comcast* merely stands for the general principle that a plaintiffs' class certification damages model—to the extent there is one—must measure the damages associated with the certified theory of liability. The problem in *Comcast* was that the plaintiffs' expert submitted a damages model that included claims that hadn't been certified for class treatment. Consequently, although the court only certified one claim, the damages model included additional, non-certified claims. The plaintiffs presented one "global" damages analysis, and didn't plan for a grant of partial certification that would require parsing out the damages calculations. Since Plaintiff here is only seeking to certify one theory of liability—i.e., that he and the other APCs were improperly misclassified as exempt employees—and does not seek to certify a classwide damages model, *Comcast*'s concerns do not apply here.

Indeed, individual damage issues only bar certification when a court certifies both the liability *and* damages questions. This concept has recently been explained by the Sixth Circuit in *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, ___ F.3d. ___, 2013 WL 3746205 (6th Cir. July 18, 2013). There, the Sixth Circuit affirmed the district court's holding granting class certification because it "certified only a liability class and reserved all issues concerning damages for individual determination." *Id.* at *17. It explained that "[w]here determination on liability and

45

damages have been bifurcated, *see* Fed. R. Civ. P. 23(c)(4), the decision in *Comcast*—to reject certification of liability and damages class because plaintiffs failed to establish that damages could be measured on a classwide basis—has limited application." *Id.* When the district court is merely asked to certify the issue of liability, all that a plaintiff must show is "that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). District courts in this district have recognized this and certified liability-only wage-and-hour cases, leaving damages issues for consideration further down the road. *See, e.g., Jimenez v. Allstate Ins. Co.*, No. LA CV10–08486 JAK (FFMx), 2012 WL 1366052, at *15 (Apr. 18, 2012).

> ### 2. <u>Wal-Mart's Position</u>: Examination of Damages Necessitates Individualized Inquiry.

In March 2013, the Supreme Court vacated a class certification order because the plaintiff failed to establish "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433, 185 L.Ed.2d 515 (2013). Indeed, "a plaintiff must bring forth a [damages] measurement method that can be applied classwide and that ties the plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct." *Forrand v. Federal Exp. Corp.*, 2013 WL 1793951, at *3 (C.D. Cal. Apr. 25, 2013) (denying certification where "the need for individualized fact inquiries dominates the determination of liability and damage issues"); *Guido v. L'Oreal, USA, Inc.,* 2013 WL 3353857, at *16 (C.D. Cal. July 1, 2013) ("[C]ourts can only certify a Rule 23(b)(3) class if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability"). Where, as here, the evidence shows that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class," Plaintiff "cannot show Rule 23(b)(3) predominance." *Comcast*, 133 S. Ct. at 1433. *See also Cruz*, 2011 WL 2682967, at *18-19 (in decertifying a class, the court held: "it is not clear

to the Court how, even if classwide liability were established, a week-by-week analysis of every class member's damages could be feasibly conducted.").

Rather than meet his burden to prove a classwide damages model, Plaintiff asserts that the Court need not concern itself at this juncture with the necessity of calculating damages on an individualized basis. This is contrary to what Rule 23 requires. To recover any damages at all APCs here must have actually worked compensable overtime. Plaintiff offers no classwide proof of damages attributable to his theory of liability, which relies on the performance of work not captured in any time and attendance system. *See, e.g., Bryant v. Service Corp. Intern.*, No. C 08-01190 SI, 2011 WL 855815, at *10 (N.D. Cal. Mar. 9, 2011) (certification denied on predominance grounds where "plaintiffs will not be able to use timecard or payroll records to prove" liability or damages).[11]

## IV. OTHER CONTESTED CLASS CERTIFICATION REQUIREMENTS[12]

### A. Typicality and Adequacy

#### 1. Plaintiff's Position:  Plaintiff's Claims Are Typical And He Is an Adequate Representative.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is " 'permissive' " and requires only that the named plaintiff's claims and defenses are " 'reasonably co-extensive' " to those of the absent class members—" 'they need not be substantially identical.' "  *Rodriquez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020).  Plaintiff was an APC at Wal-Mart during the class

_____

[11] Plaintiff's post-*Comcast* cases are thus inapposite, as they involve circumstances where the liability determination was clearly common to the class, and damages, even if different for each individual, could be readily measured.  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.,* 722 F.3d 838 (6th Cir. 2013) (all machines "share a common design defect"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ( a "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim").

[12] For purposes of this Submission, Walmart does not contest numerosity.

period.  And, just like any other APC, he was required to complete the same uniform and finite set of job duties, which he did, in fact, perform.   His claims are therefore typical of those of the class.

The requirement of adequacy contained in Rule 23(a)(4) is determined by asking (1) whether Plaintiff has any conflicts of interest with other class members and (2) whether Plaintiff will prosecute the action vigorously on behalf of the class.  *Hanlon*, 150 F.3d at 1020.  There are no unique circumstances involving Plaintiff's employment as an APC that destroys his ability to fairly and adequately represent the proposed class, and Plaintiff has indicated his willingness to advocate for their interests, even above his own.  PSE 77.  Adequacy is therefore satisfied.

### 2. <u>Wal-Mart's Position</u>:  Plaintiff Fails to Establish Typicality Under Rule 23(a)(3) or Adequacy Under Rule 23(a)(4).

Typicality and adequacy requirements "tend to merge" with commonality.  *Dukes*, 131 S. Ct. at 2551 n.5.  They all "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Id*.  Plaintiff here cannot prove the claims of the absent class members based on his claimed personal experiences, because – as the declarations submitted by both Plaintiff and Walmart show – Plaintiff's alleged performance of mostly non-exempt work is at odds with the testimony of other APCs, and with the expectations of Walmart for the APC position.

### B. <u>Superiority and Manageability</u>

### 1. Plaintiff's Position:  Class Treatment Is Superior

Rule 23(b)(3)'s other prong requires the plaintiff to demonstrate that "a class action is superior to other available methods" of adjudication.  Fed. R. Civ. P. 23(b) (3). A class action is superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Cartier-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Here, because common questions of law and fact

predominate, judicial economy and the parties' resources will be furthered by a class action trial. As explained above, classwide liability can be established by answering three common questions, and these common questions predominate over any purported individualized issues. Therefore, rather than conducting up to 340 individual mini-trials for each putative class member (all of which would be substantially identical in how liability is established), it makes more sense to prove the elements of liability through common proof. Indeed, the relative efficiency of a class action adjudication of liability is most pronounced in the case, where 41 putative class members have already signed declarations in support of Plaintiff's motion—a considerable percentage of the total proposed class. Many of these declarants, and more putative class members, are ready and willing to join in this action to pursue their individual claims along with the named Plaintiff. These plaintiffs would then prove their case in the exactly the same way class liability would be proven. They would (1) submit their uniform and finite set of job duties; (2) the Court would then classify each duty as either exempt of non-exempt by examining the APC Routine Checklist, the APC National Priorities, and the SOPs; and (3) the Court would use Wal-Mart's own time studies and the plaintiffs' testimony to determine how much time the they spent performing exempt and non-exempt job duties. The similarities between how liability would be established in individual case, compared to that of a class action, demonstrates not only that a class action is a superior method for adjudicating liability, but also that common issues predominate over individualized issues.

> ### 2. <u>Wal-Mart's Position</u>: Plaintiff Fails to Establish Superiority and Manageability Under Rule 23(b).

The superiority requirement is designed to ensure that a class action does not "sacrific[e] procedural fairness or bring[ ] about other undesirable results." *Wells Fargo,* 571 F.3d at 958. The party seeking class certification bears the burden of demonstrating that a class action would be "***better than***, and not merely as good as, other methods of adjudication." 5 J.W. Moore, *Moore's Federal Practice* ¶ 23.46[1] (3d ed. 1997 & Supp.

2004) (emphasis added). A class action is superior where "no realistic alternative to a class action exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996). Here, as concluded by the numerous courts to have grappled with certification of classes nearly identical to those now facing this Court, individualized determinations inundate the proposed action, creating staggering problems of manageability and impeding judicial efficiency. *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) ("[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication."); *Gales*, 2011 WL 3794887, at *11 (because "trying the case as a class would involve many individualized inquiries about what [managers] actually do or did in the performance of their jobs – the Court finds that a class action would be impractical and unmanageable"); *Casida*, 2012 WL 3260423, at *23 (same). In addition, any APC who believes she is owed overtime compensation may avail herself of the speedy, efficient, and effective alternatives such as individual lawsuits and administrative hearings. *Pattillo v. Schlesinger*, 625 F.2d 262, 265 (9th Cir. 1980) (affirming denial of certification where use of the class action procedure was not superior to administrative proceedings); *Jimenez*, 238 F.R.D. at 252-54 (denying certification, in part, where a DLSE hearing "present[s] a viable alternative" to court proceedings). Use of either of these vehicles is superior to the unmanageable class action urged by Plaintiff.

Date: March 31, 2014

**GREENBERG TRAURIG LLP**

By: /s/ Robert J. Herrington
Robert J. Herrington
Alana C. Srour

Attorneys for Defendant
Wal-Mart Stores, Inc.

**R. REX PARRIS LAW FIRM**

By: /s/ Alexander R. Wheeler
Alexander R. Wheeler
John M. Bickford

Attorneys for Plaintiff
and the Putative Class