# DECLARATION OF CHRIS HOOK

I, CHRIS HOOK, declare that:

1.     I am over eighteen years of age and a resident of the City of East Vale in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     From approximately February 2009 to approximately March 2011, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." During my employment as an "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Laguna Niguel in the State of California.

3.     As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately ninety-five (95) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories:  observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.     Most of my job duties and the amount of time I spent performing each job duty was governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities" checklist.

PA0099

1     6. The observation and reporting of safety issues included walking the floor
2 for safety purposes and looking for accidents or spills, debris, misplaced products, carts
3 obstructing aisle ways, pallets stacked incorrectly, and unattended ladders. Once a safety
4 issue was identified I would typically resolve the issue myself. The investigation and
5 documentation of security incidents included conducting audits of cash registers and
6 merchandise, reviewing video surveillance, investigating possible thefts or fraud, walking
7 the floor and looking for suspicious behavior, and apprehending and processing
8 shoplifters. For each incident that occurred, I was required to enter a report into Wal-
9 Mart's computerized "Asset Protection Information System" (APIS) and was required to
10 contact local law enforcement if necessary. I also worked on "National Priorities"
11 checklists. A "National Priorities" checklist was a list of questions provided by Wal-
12 Mart with "Yes" or "No" answers. The checklist guided the person filling out the
13 checklist through the store and asked whether certain Wal-Mart policies and procedures
14 were being followed. The answer to each question on the checklist was either "Yes" or
15 "No" and I played no role in the formulation of the checklists. Customer service included
16 the answering of customer questions as I walked through the store.

17     7. Wal-Mart's shoplifter apprehension policy is "AP09." It was a detailed
18 policy that specifically outlines what Asset Protection Coordinators can and cannot do
19 once they have identified a shoplifter. I played no role in preparing the "AP09" policy,
20 did not have any influence over what goes into the policy, and was not permitted to
21 deviate from the policy. The "AP09" policy plays an important role in the Asset
22 Protection Coordinator's job and a substantial portion of my daily job duties had to be
23 performed in accordance with that policy.

24     8. I estimate that approximately five (5) percent of my time was spent
25 performing "managerial" tasks (i.e. tasks different than those regularly performed by the
26 hourly paid employees), such as training or disciplining employees. I did not have the
27 authority to hire or fire employees, and I also did not have the authority to set or adjust
28 rates of pay. I did not have the authority to formulate policy for the store, but rather
simply implemented Wal-Mart's policies without discretion.

2

**DECLARATION OF CHRIS HOOK**

9. I regularly worked over eight (8) hours per work day and over forty (40) hours per work week. I typically worked five (5) days per work week, however the days that I worked varied considerably from week to week. I typically worked from approximately 7:00 a.m. to 7:00 p.m., 10:00 a.m. to 10:00 p.m., or 3:00 p.m. to 12:00 a.m. each work day. Additionally, during shifts when Wal-Mart received inventory, I was required to work fourteen (14) to sixteen (16) hours per work day. Thefts or accidents occasionally occurred while I was at home. As a salaried employee I was always "on call," and if such an issue occurred I was required to respond to the issue over the phone or in person at the store even though I was not scheduled to work. I estimate that as an "Asset Protection Coordinator" I typically worked approximately sixty (60) to seventy (70) hours per work week. I was instructed to work as many hours as necessary to complete the tasks and job duties assigned to me, and as a salaried "Asset Protection Coordinator" I was required to work shifts of twelve (12) hours or more per work day.

10. As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. As I was considered an "exempt" employee, I was not told I was entitled to overtime compensation and I did not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart did not require that I record my hours, so it was not my practice to do so.

11. My immediate supervisors at Wal-Mart knew we were spending the vast majority of our time performing the same tasks as the hourly employees, and it was never conveyed to me in any way that this is not what Wal-Mart expected. I was never once instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers. Even if Wal-Mart's expectation was that "Asset Protection Coordinators" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the job duties of an "Asset Protection Coordinator."

12. As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I was permitted to take a thirty (30) minute off duty meal break where I was relieved of all

3

**DECLARATION OF CHRIS HOOK**

PA0101

duties. I almost never was able to take a thirty (30) minute uninterrupted, off duty meal period. As "Asset Protection Coordinators" I was constantly "on call" and my work duties took precedence over our lunch and rest breaks. For example, on occasions when I witnessed a customer committing theft or fraud, or when an employee reported a theft or fraud to me, I was required to respond to the issue, regardless of whether I was trying to take a lunch break. This occurred regularly. My lunch breaks were also commonly interrupted by security and safety meetings, visits from senior management, conference calls, internal investigations, and questions from associates and my supervisors. As a result, I regularly had to work through part or all of my lunch periods and almost never was able to take a thirty (30) minute, uninterrupted off-duty meal period. Similarly, I was almost never able to take a ten (10) minute rest break. As an "exempt," salaried employee, when I worked through my rest and meal breaks, I was not paid one hour of pay for any meal or rest break missed.

13. As an "Asset Protection Coordinator" for Wal-Mart, I was not reimbursed for necessary business-related expenses that I incurred. As an "Asset Protection Coordinator," I was expected to use my personal cell phone for work-related phone calls throughout the day when I was at the store and also when I was not at the store. I was not reimbursed for any of the costs I incurred as a result of these work-related phone calls. I also was not reimbursed for the miles that I traveled to and from other Wal-Mart locations to assist other "Asset Protection Coordinators" in interviewing possible shoplifters. I was required to drive to other Wal-Mart locations approximately four (4) or five (5) times, and was not reimbursed for the necessary business-related expenses incurred on these occasions. When I asked my supervisor about my reimbursement request, she replied that it was denied because it did not comport with company policy.

///
///
///
///

4

**DECLARATION OF CHRIS HOOK**

PA0102

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 24 day of July, 2013, at Eastvale , California.

CHRIS HOOK

PA0103

## DECLARATION OF RANDALL JOE HOWDESHELL, JR.

I, RANDALL JOE HOWDESHELL, JR., declare that:

1.     I am over eighteen years of age and a resident of the City of Anaheim in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     From approximately June of 2006 until April of 2013, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." During my employment as "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Cerritos in the State of California.

3.     As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately eighty-five (85) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories: observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.     Most of my job duties and the amount of time I spent performing each job duty was governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities" checklist.

PA0104

6.      The observation and reporting of safety issues included walking the floor for safety purposes and looking for accidents or spills, debris, misplaced products, products stacked or shelved in an unsafe manner.  Once a safety issue was identified I would typically resolve the issue myself, or I would radio an associate to resolve the safety issue.   The investigation and documentation of security incidents involved conducting audits of cash registers and merchandise to determine any shortages or overages, reviewing video surveillance, investigating possible thefts or fraud, walking the floor and looking for suspicious behavior, and apprehending and processing shoplifters. For each incident that occurred, I entered a report into Wal-Mart's computerized "Asset Protection Information System" (APIS) and would contact local law enforcement if necessary.  Regarding quality control, I checked temperatures in the food section and checked sell-by dates on meat.  I also worked on "National Priorities" checklists.  A "National Priorities" checklist is a list of questions with "Yes" or "No" answers, provided to me by Wal-Mart, that guides the person filling out the checklist through the store and asks whether Wal-Mart's policies and procedures are being followed.  The answer to each question on the checklist was either "Yes" or "No," and I played no role in the formulation of the checklists.  Customer service included the answering of customer questions as I walked through the store.

7.      Wal-Mart's shoplifter apprehension policy is "AP09."  It is a detailed policy that specifically outlines what Asset Protection Coordinators can and cannot do once they have identified a shoplifter.  I played no role in preparing the "AP09" policy, did not have any influence over what goes into the policy, and was not permitted to deviate from the policy.  The "AP09" policy plays an important role in the Asset Protection Coordinator's job and a substantial portion of my daily job duties had to be performed in accordance with that policy.

8.      I estimate that approximately fifteen (15) percent of my time was spent performing "managerial" tasks (i.e. tasks different than those regularly performed by the hourly paid employees), such as training or directing the work of subordinate employees.

**DECLARATION OF RANDALL JOE HOWDESHELL, JR.**

PA0105

1   I did not have the authority to hire or fire employees, set or adjust rates of pay, or
2   formulate Wal-Mart policy.

3        9.    I regularly worked over eight (8) hours per day and over forty (40) hours
4   per week. I typically worked nine (9) hour shifts, such as from 8:00 a.m. to 5:00 p.m. or
5   from 2:00 p.m. to 11:00 p.m.   I would generally work five days a week.   Additionally,
6   safety and security issues sometimes arose while I was at home, such as customers
7   running out of the emergency door, apprehension of shoplifters, broken counters, or
8   police officers being called to the store.  As a salaried employee I was always "on call"
9   and hourly employees were required to contact me if such an issue arose.  I would then
10  have to deal with the issue over the phone or in person at the store even though I not
11  scheduled to work.  Also, I would sometimes have to review paperwork or security
12  surveillance videos at home after my shift had ended.  I estimate that as an "Asset
13  Protection Coordinator" I worked approximately forty-five (45) hours each week.  I was
14  instructed to work as many hours as necessary to complete the tasks and work duties
15  assigned to me, and the implication of being a salaried employee was that working shifts
16  of nine (9) hours or more was the norm.

17       10.   As an "Asset Protection Coordinator" at Wal-Mart, I was considered an
18  "exempt" employee and I was paid a salary.  As I was considered an "exempt" employee,
19  I was not told I was entitled to overtime compensation and I did not receive overtime
20  compensation, regardless of the number of hours I worked each week.  When I discussed
21  the possibility of overtime wages with my supervisor, I was told "[m]anagers do not get
22  overtime.  That is why Asset Protection Coordinators, as managers, get paid more."  Wal-
23  Mart did not require that I record my hours, so it was not my practice to do so.

24       11.   My immediate supervisors at Wal-Mart knew we were spending the vast
25  majority of our time performing the same tasks as the hourly employees, and it was never
26  conveyed to me in any way that this is not what Wal-Mart expected.  I was never once
27  instructed by management, my immediate supervisor or anyone else at Wal-Mart that I
28  should be spending more than 50% of my time performing work different than the work
    performed by the hourly workers.   Even if Wal-Mart's expectation was that "Asset

3

PA0106

Protection Coordinators" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the work duties of an "Asset Protection Coordinator."

12.    As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I was permitted to take a thirty (30) minute off duty meal break where I was relieved of all duties. I was able to take a thirty (30) minute uninterrupted, off duty meal period only once per work week, and frequently had to eat my lunch while completing work duties. As "Asset Protection Coordinators" we were constantly "on call," and if a safety or security issue arose we would be contacted on our radio. For example, if an associate required assistance to apprehend a possible theft suspect I had to assist, regardless of whether I was trying to take a lunch break. If I witnessed an accident or spill I would have to attend to the issue until it was resolved. Also, I was never able to take ten (10) minute rest breaks. As an "exempt," salaried employee, when I worked through my rest and meal breaks, I was not paid one hour of pay for any meal or rest break missed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _19th_ day of July, 2013, at _Anaheim_, California.

RANDALL JOE HOWDESHELL, JR.

**DECLARATION OF RANDALL JOE HOWDESHELL, JR.**

PA0107

## DECLARATION OF CARLOS IGLASIAS

I, Carlos Iglesias, declare that:

    1.    I am over eighteen years of age and a resident of the city of Lancaster, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

    2.    I am still currently employed by Wal-Mart Stores, Inc. ("Wal-Mart"). I have worked for Wal-Mart since 2007, and have been employed as an "Asset Protection Coordinator" ("APC") since 2010. From March 2010 to October 2010, I worked as an APC in the Wal-Mart located on 4101 Crenshaw Blvd. in Los Angeles. In October 2010, I was transferred to the Wal-Mart located in East Palmdale, California, and resumed by duties as an APC at my new store location in December 2011. In the beginning of 2012, Wal-Mart changed the title of APCs to "Asset Protection Managers" ("APM"). The transition from APC to APM has been a title change only, and there have been no changes in my job duties as a result of this title change.

    3.    As an APM at Wal-Mart, I am paid a salary and do not receive overtime compensation regardless of the number of overtime hours I work. During the time that I have worked as a salaried APC and APM for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices. However, I have not been trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

    4.    I spend approximately eighty-five percent (85%) of my time as an APM performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fall into five (5) main categories: (1) touring the store; (2) investigating and documenting internal theft and apprehensions; (3) conducting audits; (4) compliance and safety assurance; and (5) customer service.

    5.    I tour the store for approximately one hour every day. During my store tours, I look for suspicious activities, possible cases of internal or external theft, and safety hazards. Occasionally, I will conduct a tour "undercover," in the same manner as

1

PA0108

the "Asset Protection Associates." If I witness an incident of external theft, I apprehend the shoplifter and enter their information into Wal-Mart's computerized Asset Protection Information System (APIS). Investigating and documenting internal theft and apprehensions includes conducting investigations of internal theft and documenting apprehensions (as noted above). I will either be assigned an internal investigation by another Wal-Mart associate, such as the cashier lead who has noticed that a certain employee's register has come up short, or from something I saw while walking through the store. After I have completed the investigation, I submit this information to my supervisor, Monica Terrazas, who makes the final determination of what to do with the suspected employee. After the case has concluded, I enter all of the relevant information into the APIS. I spend thirty percent (30%) of my time performing investigations alone. For my department audits, I am given weekly, monthly, and yearly audits to complete. These audits are assigned to me in the "National Priorities" checklists that outline what audits must be done, and what steps are needed to complete each audit. For example, if I am assigned to audit the cell phone sales, I have to physically go to the store floor to check that all the phones that are supposed to be out are still on the shelves and have not been stolen. I match up the sale receipts with the cell phones that are off the shelves, check all the merchandise, and make sure we are not under-stocking. Meeting compliance standards and safety assurance involves conducting building inspections to make sure the store is following Wal-Mart safety policies and any relevant safety codes. For example, I have to check to make sure that all of the hazardous materials are being disposed of properly. In order to do this, I have to put on a rubber apron, gloves, and goggles, and open up each bin to look for leaks or possible safety threats. I also have to walk through the pharmacy and tire and lube to make sure there are no apparent safety or health violations. Customer service includes, but is not limited to, walking through the store to speak with customers and answering any questions they might have. If a customer alleges that they did not receive an item that they paid for or that they left it in

2

PA0109

1  the store, I have to review the surveillance video of their visit and check their receipts to
2  see if they had actually purchased the item.

3       6.    I estimate that approximately fifteen (15%) of my time or less is spent
4  performing "managerial" tasks such as training subordinate employees or drafting
5  schedules.  I do not have the final authority to hire or fire any employee.  If I observe
6  behavior that warrants termination, I have to report this information to my supervisor,
7  Monica Terrazas, or a store manager, who make the final determination.

8       7.    I regularly work between forty-five (45) and sixty (60) hours per week.  My
9  average day is between nine (9) and ten (10) hours.   However, even after I have worked
10  my ten (10) hour shift and returned to my home, I am regularly called by either my
11  supervisor, store manager, or other Wal-Mart employees.  Approximately once a week, I
12  am called at home either to be informed of a safety incident, or asked to come back to the
13  store to deal with the incident.

14       8.    I regularly visit other Wal-Mart stores to assist other APMs with their pre-
15  inventory prep or to conduct a special audit on the store.  I have been able to observe
16  several other APMs at work in many Wal-Mart stores.   Through these observations, it
17  seems to me that all APMs are given the same job duties and responsibilities, and have
18  the same job position at all Wal-Mart stores.

19       9.    As an "Asset Protection Coordinator" at Wal-Mart, I am considered an
20  "exempt" employee and I am paid a salary.  I was told that as an "exempt" employee, I
21  would not receive overtime compensation, regardless of the number of hours I worked
22  each week.  My Supervisor, Monica Terrazas, knows that I am working in excess of my
23  scheduled hours, but I was not required to record the hours that I actually worked each
24  week.

25       10.   My immediate Supervisor, Monica Terrazas, knows we were spending the
26  vast majority of our time performing the same tasks as hourly employees, and it was
27  never conveyed to me in any way that Wal-Mart expected otherwise.  I have never once
28  been instructed by management, or anyone at Wal-Mart, that I should be spending more

Declaration of Carlos Iglesias

PA0110

than fifty percent (50%) of my time performing work that was different from the work performed by the hourly workers. Even if Wal-Mart's expectation was that an APC or APM spend more than fifty percent (50%) of their time on managerial work, it would be unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC or APM

11.    As an APM at Wal-Mart, I am frequently not able to take a full thirty (30) minute uninterrupted meal break. If I stay in the store during my meal break, I will almost always be interrupted or have some issue that must be dealt with immediately. I am not allowed to ignore pages or calls when I am on "break," because I am a salaried employee, and must deal with the incidents as they occur. I am forced to work through my lunch break four (4) out of five (5) days a week. My job duties also make it difficult to take full ten (10) minute rest breaks. I have to work through several of my rest breaks each week in order to meet deadlines and deal with incidents. As an "exempt," salaried employee, when I work through my rest and meal breaks; I am not paid one (1) hour of pay for any meal or rest break that I missed. I have never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 19th day of January, 2013, at Lancaster, California.

_____

CARLOS IGLESIAS

## DECLARATION OF SCOTTY KELLEY

I, Scotty Kelley, declare that:

1.    I am over eighteen years of age and a resident of the city Red Bluff, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.    I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") from March 2004 to June 2011. I worked as an "Asset Protection Coordinator" from 2009 to 2010. Throughout the duration of my employment as an "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Red Bluff, in the State of California.

3.    As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, as an "Asset Protection Coordinator" I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.    I spent approximately ninety-five percent (95%) of my time as an "Asset Protection Coordinator" performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fell into five (5) main categories: (1) touring the store; (2) investigating and documenting internal theft and apprehensions; (3) conducting audits; (4) compliance and safety assurance; and (5) customer service.

5.    My work duties of touring the store consisted primarily of walking through the store, looking for suspicious activity and safety hazards. I would spend at least one (1) hour each day walking through the store. During the one (1) year that I worked as an "Asset Protection Coordinator," I apprehended approximately thirty-five (35) shoplifters during my walks through the store. Investigating and documenting internal theft and apprehensions included conducting investigations and documenting apprehensions. For every apprehension that I was involved in, I had to fill out a report into Wal-Mart's

1

PA0112

computerized "Asset Protection Information System" (APIS). If an "Asset Protection Associate" conducted the apprehension, they would enter the information into the APIS themselves. If the attempted theft was of a higher priced item, Wal-Mart required that I call the police, fill out their paperwork, and produce any relevant video surveillance footage for them. I also spent a significant amount of time conducting internal investigations. Once or twice a week, an accounting associate would ask me to help them find the source of the loss in their department. Accounting associates, who are hourly employees, will often find the source of the loss themselves, but I am there to assist in any investigations they do not have time for, or to find the video footage to substantiate their suspicious. Conducting audits was a constant and ongoing process that had to be completed on a weekly basis. I was assigned audits that had to be completed weekly, monthly, quarterly, or yearly. The weekly audits primarily consisted of auditing the "high shrink" departments. I would review the receipts and inventory of these departments and calculate the weekly shrinkage, write up a report containing all the relevant information, and turn this information into my supervisor, Kyle Cabacungan, at the end of the week. Compliance and safety assurance included, but was not limited to, conducting building inspections, inspecting the hazardous materials bins, and making sure emergency systems (such as lighting and alarms) were operational. Customer service included, but was not limited to, speaking with customers while I was out on the floor, answering questions, and resolving conflicts.

6.      As an "Asset Protection Coordinator," I regularly visited six other Wal-Mart stores to conduct additional audits and assist other APCs. Because all of the "Asset Protection Coordinators" have the same job duties and are assigned the same audits to perform each week, the position of "Asset Protection Coordinator" appears to be the same in all Wal-Mart store locations. From the observations I made as an "Asset Protection Coordinator," all "Asset Protection Coordinators" performed identical jobs and had the same job duties and responsibilities.

PA0113

1       7.     I estimate that approximately five percent (5%) of my time or less was
2 spent performing "managerial" tasks, such as training subordinate employees or drafting
3 schedules. I was not able to hire or fire any employees. I did not have the clearance to
4 access the computer system that handled terminations, only my supervisor, store
5 managers, and other members of management had this access.

6       8.     I usually worked between forty-five (45) and fifty (50) hours per week as
7 an "Asset Protection Coordinator." I was told by my Market Asset Protection Manager,
8 Kyle Cabacungan, that my hours were determined by the work I got done, not the hours
9 that I was scheduled to work. Kyle Cabacungan would tell us, "If the job is too much for
10 you, or you can't do the job today, then you can't do the job tomorrow." I understood
11 this comment to mean that if I did not put in all of the hours needed to stay on top of my
12 deadlines each day, I would lose my job as an "Asset Protection Coordinator."

13     9.     As an APC at Wal-Mart, I was considered an "exempt" employee and I was
14 paid a salary. I was told that as an "exempt" employee, I would not receive overtime
15 compensation, regardless of the number of hours I worked each week. Wal-Mart knew
16 that I was working in excess of my scheduled hours, but I was not required to record the
17 hours that I actually worked each week.

18     10.    My immediate Supervisor, Kyle Cabacungan, knew we were spending the
19 vast majority of our time performing the same tasks as hourly employees, and it was
20 never conveyed to me in any way that Wal-Mart expected otherwise. I was never once
21 instructed by management, or anyone at Wal-Mart, that I should be spending more than
22 fifty percent (50%) of my time performing work that was different from the work
23 performed by the hourly workers. Even if Wal-Mart's expectation was that an "Asset
24 Protection Coordinator" spend more than fifty percent (50%) of their time on managerial
25 work, it would be unreasonable and unrealistic expectation in light of the nature of the
26 responsibilities of an "Asset Protection Coordinator."

27     11.    As an "Asset Protection Coordinator" at Wal-Mart, I was occasionally not
28 able to take my rest or lunch breaks. As an "exempt," salaried employee, when I worked

PA0114

through my rest and meal breaks; I was not paid one (1) hour of pay for any meal or rest break that I missed. I was never given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _28TH_ day of January, 2013, at Red Bluff, California.

SCOTTY KELLEY

4

PA0115

# DECLARATION OF APRIL LEE

I, April Lee, declare that:

     1.    I am over eighteen years of age and a resident of the Santa Rosa, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

     2.    I am currently employed by Wal-Mart Stores, Inc. ("Wal-Mart"). I have worked for Wal-Mart for nine (9) years. I have been employed as an Asset Protection Coordinator ("APC") since November, 2008. When I started working as an APC, I worked in the Wal-Mart located in Rohnert Park. In 2010, I was transferred to the Wal-Mart located in Windsor. Throughout the duration of my employment with Wal-Mart, I have worked in the State of California. In 2012, Wal-Mart changed the title of Asset Protection Coordinators to Asset Protection Managers ("APM"). This change was a change in title only, and I have had no changes in my job position as a result of this change.

     3.    As both an APC and APM at Wal-Mart, I have been paid a salary and do not receive overtime compensation regardless of the number of overtime hours I that I work. As a salaried APC/APM for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices. However, I have not been trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

     4.    I spend approximately eighty-five (85%) of my time as an APM **performing** "non-managerial" tasks. The "non-managerial" tasks I performed typically fall into seven (7) main categories: (1) attending meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

     5.    Attending meetings with associates includes general store meetings as well as safety meetings and several other meetings that are held throughout the week. For the

1

PA0116

safety meetings, either the Safety Team Lead Associate or I will print out the meeting outline, and read through the topics that Wal-Mart provided to the group. Following National Priorities procedures generally includes completing the National Priorities checklist. The checklist guides me through a tour of the store in which I document whether or not the store is meeting the Wal-Mart's guidelines. The checklist tells me exactly what to look for, and I either confirm that the guideline is being met, or I give the item a "no." The checklists are an important way for the Market Asset Protection Mangers (MAPM) to know what is going on in each of the stores in their market. I submit the checklist to my MAPM after it is completed, so that they can review it. Verifying compliance with policies and safety procedures required me to complete a few more checklists in addition to the National Priorities checklist. The primary difference is that the safety compliance checklists have guidelines set out my OSHA and are not just reviewed by my MAPM, but my Store Manager as well. I also spend approximately an hour every day walking through the store. As part of the Asset Protection Team, when I walk the store, I keep an eye out for any possible shoplifters that may be in the store. I also conduct tours to look for safety hazards (such as unguarded spills). Conducting investigations requires me to review surveillance video for possible cases of internal theft. I will usually review video for a certain department or employee because there have been reports indicating internal theft, but I will also review surveillance footage of high shrink departments to make sure there are no visible instances of theft. If I see an instance of theft on tape, I have to burn a copy of the portion of the video that shows the theft. I am required to keep my MAMP informed about investigations I am working on, and give them all evidence and video that indicate an employee has engaged in internal theft. Performing customer service duties included, but was not limited to, speaking with customers while I am walking the store, answering questions, and reviewing video tape to help customers find lost belongings, or items that they left at the register. I review exceptions to reports on a daily basis. Wal-Mart trained me to look for specific errors or "red flags" in the reports that might indicate a possible shrinkage or case of internal theft.

2

PA0117

6.     Throughout my employment as an APC and APM, I have had an opportunity to visit several other Wal-Mart stores, and work with many APCs and APMs. I personally have been involved in the training of many APCs and APMs. I have trained all APCs/APMs in the same way, and train them to perform the exact same position. The APM position is a uniform position across all Wal-Mart stores. Every APM has identical job duties and tasks that they are responsible for performing.

7.     I estimate that approximately fifteen percent (15%) of my time or less is spent performing "managerial" tasks, such as training subordinate employees or drafting schedules. The Asset Protection Associates were trained during courses at other stores and by other personnel. Therefore, even though I drafted the schedules for the Asset Protection Associates, I am not primarily charged with their training. I spend very little time training subordinate employees, and in fact, the only time consuming training that I engage in is the training of my peers by helping new APMs. The APMs receive other formal training, but will shadow me at my store one (1) to three (3) weeks.

8.     Throughout my employment as an APC and APM, I regularly work in excess of forty (40) hours. Over the years, I have routinely worked anywhere between forty-five (45) and sixty (60) hours each week.   I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart knows that I was working more than 40 hours per week, but I was not required to record the actual number of hours that I spend working each day, and it was not my practice to do so.

9.     I have never once been instructed by management or anyone at Wal-Mart, that I should be spending more than fifty percent (50%) of my time performing "managerial" tasks. Even if Wal-Mart's expectation was that an APM spend more than fifty percent (50%) of their time on managerial work, it would be unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APM. A majority of my time has to be spent conducting the National Priorities checklists and internal investigations due to the deadlines that Wal-Mart imposes on the APMs.

3

PA0118

10.    I am very rarely able to take any rest or meal breaks.  In order to meet the demands of the job, I have to work through my rest breaks and meal breaks every day. My fellow APMs and I have repeatedly brought it to the attention of our MAPMs that we are not provided an opportunity to take breaks due to the demands of our jobs.  However, Wal-Mart has not provided us any way to take these breaks, even though they have been notified of the problem.  I am still required to take all calls and respond to incidents in the store, and I am never permitted to delay responding to a call or situation because I am trying to take a break.  As an "exempt," salaried employee, when I work through my rest and meal breaks, I am not paid one (1) hour of pay for any meal or rest break that I missed.  I have never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this _28_ day of February, 2013, at Santa Rosa, California.

APRIL LEE

PA0119

# DECLARATION OF KAHALA LINCOLN

I, Kahala Lincoln, declare that:

1.      I am over eighteen years of age and a resident of the city of Antelope, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.      I am currently employed by Wal-Mart Stores, Inc. ("Wal-Mart"). I have worked for Wal-Mart as an "Asset Protection Coordinator" since 2008, but I have been with the company for eighteen (18) years. In early 2012, Wal-Mart changed titles of all "Asset Protection Coordinators" ("APC") to "Asset Protection Managers," ("APM") but there have been no changes in my job duties or responsibilities as a result of this title change. Throughout the duration of my employment as an APC and APM, I have worked in the Wal-Mart store located in the City of Roseville, in the State of California.

3.      As an APM at Wal-Mart, I am paid a salary and do not receive overtime compensation regardless of the number of overtime hours I work. During the time I have worked as a salaried APC and APM for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices. However, I have not been trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.      I spend approximately eighty-five percent (85%) of my time as an APM performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fall into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

5.      Each day I am required to attend the general store meetings with the other available associates. I also attend several other meetings throughout the week, such as the meetings with the safety team or the cash department. Following the National Priorities procedures requires me to complete a checklist. For the majority of my time as

1

PA0120

an APC and APM, the checklist was due each week. However, in the last few months, the checklist has become due once every two weeks. The National Priorities checklist is a large list of policies and procedures that are supposed to be in place in the store. I tour the store and review reports to see if the store is in compliance with the standards described in the checklists. I give each item on the checklist a "check" or a "no" and submit it online so my supervisors can review it. Following National Priorities procedures also sometimes requires me to conduct audits of other Wal-Mart stores. Occasionally, APMs are sent to other stores in order to make sure the policies are being followed, and that the APM at that store was properly reporting the store's level of compliance. My duties of verifying compliance with policies and safety procedures requires me to conduct safety audits. For example, I have to make sure all of the safety stations (which contain items to clean up spills that could cause a safety hazard) are well stocked and fully supplied. My store has over twenty (20) of these stations which must be check and restocked several times throughout the week. Each day I am required to walk the store. I routinely walk the store, aisle by aisle, every morning. During these walks, I look for possible safety hazards (such as spills) and any possible shoplifters that might be in the store. If a see and apprehend a shoplifter, I have to call the authorities and file a police report. This process can take up to ninety (90) minutes to complete. To perform my job duties of conducting investigations, I review surveillance footage throughout the store to see if there are any visible instances of internal theft. For high shrink areas, such as the back room where shipments are received, I will review surveillance footage for at least forty (40) minutes each day. If the surveillance video shows any instances of internal theft, I document what the video showed, and copy the portion of the video showing the act. I put these items in an "investigation folder," which is reviewed by my Market Asset Protection Manager. Performing customer service duties includes, but is not limited to, speaking with customers while I am walking the store, answering questions, and helping local authorities. Oftentimes, police officers will be called to the store, either because of criminal activity that occurred in the store, such as

2

PA0121

1  fraudulent checks, or because a customer complained that she had been robbed or injured
2  in the store. I pull up video surveillance that the officers request, and help make copies
3  of this footage for them. My duty of reviewing exceptions to reports requires me to read
4  over all the reports that show "exceptions" or errors and abnormalities. For example, a
5  cash register that has under reported will be marked as an exception. My job is to
6  confirm the exception that the program reported. Every morning I go down to the cash
7  office and go through their numbers to make sure the register was actually short.

8    6.    I have visited and worked in several other Wal-Mart stores, although the
9  Roseville store has been my only "home" store as an APM. All the Wal-Marts that I
10 have visited have the same policies and procedures that the APMs are required to follow,
11 and are assigned the same job duties to the APM. All APMs perform the exact same
12 audits, follow the same investigation procedures, and have the same responsibilities. The
13 APM position is a uniform position, regardless of the Wal-Mart the APM works in.

14    7.    I estimate that approximately fifteen percent (15%) of my time or less is
15 spent performing "managerial" tasks, such as training subordinate employees or drafting
16 schedules. I do not have the authority to fire employees, even if they are Asset Protection
17 Associates. If I witness an associate engaging in behavior that Wal-Mart has identified as
18 behavior that warrants termination, I document this behavior and notify either a Market
19 Asset Protection Manger, or Store Manager. The Market Asset Protection Manger or
20 Store Manager then decides whether or not the associate will be terminated.

21    8.    Each week, I work approximately sixty (60) hours as an APM. When I was
22 given the position of APM, I was told that I would only have to work forty-five (45)
23 hours. However, it would not be possible for me to complete all of the job duties I am
24 given each week within a forty-five (45) hour timeframe. I am still only scheduled to
25 work forty-five (45) hours each week, but my Market Asset Protection Manger and Store
26 Manger know that I am working more than these scheduled hours. I am not allowed to
27 leave the store when my scheduled shift ends, I have to work as many hours as it takes to
28 complete the various job tasks that I am given.

DECLARATION OF KAHALA LINCOLN

PA0122

1      9.    I have been told that as an "exempt" employee, I am not able to receive

2  overtime compensation, regardless of the number of hours I work each week. Wal-Mart

3  knows that I am working in excess of my scheduled hours, but I am not required to record

4  the actual number of hours that I spend working each day, and it is not my practice to do

5  so.

6      10.    I have never once been instructed by management or anyone at Wal-Mart,

7  that I should be spending more than fifty percent (50%) of my time performing work that

8  "managerial" tasks. Even if Wal-Mart's expectation was that an APM spend more than

9  fifty percent (50%) of their time on managerial work, it would be unreasonable and

10 unrealistic expectation in light of the nature of the responsibilities of an APM.

11     11.    I am never "off duty" and allowed to take duty free rest or meal breaks.

12 Even when I try to take a rest break, I have to keep my cell phone and radio with me, and

13 answer any calls that I receive. I almost always work through my on-duty meal breaks as

14 well. In order to meet my deadlines, I have to read paperwork or review surveillance

15 video while I eat my lunch. My meal break is also regularly interrupted by calls and

16 emails. As an "exempt," salaried employee, when I work through my rest and meal

17 breaks; I am not paid one (1) hour of pay for any meal or rest break that I missed. I have

18 never been given any additional compensation for working through my rest and lunch

19 breaks.

20     I declare under penalty of perjury under the laws of the State of California that the

21 foregoing is true and correct. Executed this __11th__ day of March, 2013, at Antelope,

22 California.

23

24                          *Kahala Lincoln*

25                          KAHALA LINCOLN

26

27

28

PA0123

1 **DECLARATION OF MICHAEL LYON**

2 I, Michael Lyon, declare that:

3      1.      I am over eighteen years of age and a resident of Lincoln City, in the State

4 of Oregon.  I have personal knowledge of the facts and statements set forth in this

5 declaration, and if called upon to testify, I could and would competently testify thereto.

6      2.      I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") from 1999 to 2012.

7 I was an "Asset Protection Coordinator" ("APC") for nearly two years between

8 approximately 2009 and 2010.   Throughout my employment as an APC, I worked at the

9 Wal-Mart located in the City of Sonora, in the State of California.

10      3.      Throughout the duration of my employment as an APC I was paid a salary

11 and did not receive overtime compensation regardless of the number of overtime hours I

12 worked.  During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's

13 policies, procedures, and practices.  However, I was not trained or informed by anyone at

14 Wal-Mart regarding California overtime exemption laws.

15      4.      I spent approximately eighty percent (80%) of my time as an APC

16 performing "non-managerial" tasks.  The "non-managerial" tasks I performed typically

17 fell into seven (7) main categories: (1) attending daily meetings with Associates; (2)

18 following National Priorities procedures; (3) verifying compliance with policies and

19 safety procedures; (4) walking the store; (5) conducting investigations; (6) performing

20 customer service duties; and (7) reviewing exceptions to reports.

21 / / / /

22 / / / /

23 / / / /

24 / / / /

25 / / / /

26 / / / /

27 / / / /

28

DECLARATION OF MICHAEL LYON

PA0124

5. Every day, I was required to attend at least one meeting. Every morning, there was a general store meeting. These general store meetings were held by store management, and all available associates were required to attend. The general store meetings could last up to thirty (30) minutes. I also attended several other meetings with other Wal-Mart associates throughout the week. Following the National Priorities procedures required me to complete a checklist every week. I would print out a checklist that had been sent to me, and tour through the store to see what polices on the checklist were being followed, and which polices and procedures were not. For each question, the checklist would describe what was supposed to be done, and what to look for in determining if it was being followed. I either gave the item a "check" or a "no." After the checklist was complete, I would submit the checklist online for my Market Asset Protection Manger (MAPM) to review. My duties of verifying compliance with policies and safety procedures required me to walk through the store, looking for safety hazards. Another associate on the Safety Team or I would check all the safety stations each day and make sure they were well stocked. I also had to perform audits such as the Hazardous Materials audit every week. Every day, I would also have to conduct a walking tour of the store. During these tours, I would look for safety hazards or possible shoplifters. Although apprehending shoplifters is the sole job duty of Asset Protection Associates, I would spend several hours conducting these job duties every week. As an APC, I apprehended over 100 shoplifters in my store. My job duties of conducting investigations primarily required me to review recordings of video tape to find the source of internal theft. After an employee had been identified as someone who had possibly conducted internal theft, I would retrieve old surveillance footage to see if their actions were caught on tape. If I began an investigation folder on an employee (in which I would document what the video surveillance showed and burn a copy of the tape to include in the folder) I would notify my Market Asset Protection Manager, Aurora Skurton. After all the video footage or any other documents had been collected, I would submit the folder Aurora Skurton for her review. Performing customer service duties included, but

2

PA0125

was not limited to, speaking with customers while I am walking the store, answering questions, and reviewing video tape to help customers find lost belongings, or items that they left at the register. Wal-Mart trains all of its associates to follow the "Ten Foot Rule," which states that if you are within ten (10) feet of a customer, you should greet them and offer to help them. As an APC, I was also expected to follow the "Ten Foot Rule" and assist any customers that were in my area who needed help or assistance. My duties of reviewing exceptions to reports required me read through several reports on a daily basis and confirm that none of exceptions were a result of internal theft. For example, I would receive a report on each cash register each week. If the cashier did anything that was out of the norm, such as too many price overrides over a certain dollar amount, or rang up items at a speed that was greatly above or below Wal-Mart's average, the report would automatically underline this activity. I would go through the reports, and look for underlined activity. If a single cashier had been underlined several times, I would pull up surveillance footage of the times noted on the report, and make sure the reports accurately reflected what I could see on the surveillance footage. If the surveillance footage did not match up with the report, I would have to notify the Assistant Store Manager.

6.      Over the course of my employment with Wal-Mart, I was able to meet and work with several other APCs. All the APCs that I spoke with had the same job responsibilities and duties described above, and spent a majority of their time on these same tasks. The Hazmat audits and National Priorities checklists were exactly the same for all APCs, and were required to be completed in the same way.

7.      I estimate that approximately twenty percent (20%) of my time or less was spent performing "managerial" tasks, such as training subordinate employees or drafting schedules. I was not given the authority to fire or issue discipline on employees. If I observed an incident that warranted discipline, I would report it to either my supervisor or a store manager who used their discretion to determine what action should be taken against the employee.

3

PA0126

8.     As an APC, I worked between forty-five (45) and fifty (50) hours every week.  My Market Asset Protection Manager, as well as my store manager, knew that I was working more than forty (40) hours a week.  On more than one occasion, I spoke with my MAPM, Aurora Skurtun, about the fact that I was working more than the forty-five (45) hours that I was scheduled to work each week.  Aurora Skurtun told me that I was not limited to working forty-five (45) hours, but instead needed to work as many hours as it took me to complete any assignments she had given me as well as my regular job duties.  As a result I would regularly work up to fifty (50) hours each week.

9.     When I was given the APC job title, I was told that I was considered an "exempt" employee.  I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week.  Wal-Mart knew that I was working in excess of my scheduled hours, but I was not required to record the actual number of hours that I spent working each day, and it was not my practice to do so.

10.     No one at Wal-Mart instructed me that I should have been spending more than fifty percent (50%) of my time performing "managerial" tasks.  Even if Wal-Mart's expectation was that an APC spend more than fifty percent (50%) of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC.

11.     Only once every two weeks was I able to take one of my daily rest breaks.  The rest of the time, I had to work through my meal break and both of my rest breaks almost every day.  As a salaried employee, I was told that I was never "off the clock" and was required to answer calls, respond to emails, and deal with incidents in the store as soon as they occurred.  I was not allowed to postpone my duties until after my rest or lunch break was over.  Furthermore, the workload that I was charged with meant that I had to spend my rest breaks and meal breaks reviewing reports and watching surveillance footage.  I ate all of my meals on the go, and did not take full thirty (30) minute lunch breaks where I was relieved of all of my work duties.  As an "exempt," salaried

4

PA0127

1   employee, when I worked through my rest and meal breaks, I was not paid one (1) hour

2   of pay for any meal or rest break that I missed. I have never been given any additional

3   compensation for working through my rest and lunch breaks.

4         I declare under penalty of perjury under the laws of the State of California and the

5   State of Oregon, that the foregoing is true and correct. Executed this _____ day of

6   March, 2013, at Lincoln City, Oregon.

7

8

9                              MICHAEL LYON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MICHAEL LYON

PA0128

# DECLARATION OF RICCO MARTINEZ

I, Ricco Martinez, declare that:

1.    I am over eighteen years of age and a resident of the city of Escondido, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.    I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") from approximately 2003 to 2008. From approximately late 2006 to 2008, I worked as an "Asset Protection Coordinator" ("APC"). When I began working as an APC, I worked at a Wal-Mart located in San Diego, but was later transferred to the Wal-Mart located in Porter Ranch, Los Angeles. Throughout the duration of my employment with Wal-Mart, I worked within the State of California.

3.    During the time that I worked as an APC at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.    I spent approximately seventy percent (70%) of my time as an APC performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fell into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

5.    Every morning there was a general store meeting that I was required to attend. These meetings were run by a store manager, assistant store manager or other member of management, and all available associates were required to attend. Following the National Priorities Procedures required me to complete a checklist that Wal-Mart had developed. The checklist described several procedures that were supposed to be in place

PA0129

throughout the store, and I would tour the store with the checklist to record whether or not these procedures were in place. Most of the items on the National Priorities checklist had to do with processing procedures, such as how items were received from deliveries, if the inventory was up to date, and if all of the paperwork had been filed out. I would tour the store and mark each item on the checklist with either a "check" or a "no." My duties of verifying compliance with policies and safety procedures required me to make sure items like the safety stations were well stocked and were properly storing all cleaning chemicals. I also had a duty to tour the store at least once each day. I would walk through the store, looking for possible spill or other safety hazards, and apprehending shoplifters. Oftentimes throughout the day, I would be notified of a possible shoplifter, and I would have to walk through the store to where the suspect was located, and shadow them through the store. I was not allowed to apprehend a suspect until I saw them commit the four (4) elements (1. Taking the item 2. Concealing the item 3. Maintaining concealment and 4. Leaving the area). I would regularly spend up to five (5) hours walking the store each day. My job duties of conducting investigations primarily consisted of internal investigations. When a department or a report identified a possible case of internal theft, I would review video tape and documents to see if the employee was documented stealing. I also spend a considerable amount of time investigating time theft, which was when associates or managers made changes to the time systems to change when a person actually started or stopped working. I would compare the time recorded in the system with surveillance footage to find out if there were any instances of time theft. When I discovered instances of time theft, I would submit it to my Market Asset Protection Manager, Monica Gomez, for her review. From there, either Monica Gomez or one of her supervisors would determine whether or not to go forward with the investigation. There were several instances in which I found video surveillance footage and a time sheet document that indicated time theft, but was told not to pursue the investigation. Performing customer service duties included, but was not limited to, speaking with customers while I was walking the store, helping customers locate

2

---

PA0130

merchandise, answering questions, and reviewing video tape to help customers find lost belongings, or items that they left at the register. My duties of reviewing exceptions to reports required me read through several reports each week. These reports were generated to underline or highlight suspicious store activity. I would take these reports, check the time stamp on that activity, and review surveillance footage to find out what had occurred. If the footage showed a customer or employee engaging in theft, I would notify my Market Asset Protection Manger. If the exception was due to harmless error, or there was no occurrence at all, I would move on to the next highlighted report.

8. I estimate that approximately thirty percent (30%) of my time or less was spent performing "managerial" tasks, such as training subordinate employees or drafting schedules. As an APC, I was only a charged with drafting schedules for and training the Asset Protection Associates. There was only one (1) or two (2) of these associates working in my store. I also was not primarily charged with their training. Asset Protection Associates received their training by visiting other Wal-Mart stores to be trained by other Asset Protection Associates.

9. I worked between forty-five (45) and fifty (50) hours each week. As an APC at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart knew that I was working in excess of forty (40) hours, but I was not required to record the actual number of hours that I spent working each day, and it was not my practice to do so.

10. I was never instructed by management or anyone at Wal-Mart, that I should have been spending more than fifty percent (50%) of my time performing "managerial" tasks. Even if Wal-Mart's expectation was that an APC spend more than fifty percent (50%) of their time on managerial work, it would be unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC.

11. As an APC, I was almost never able to take any of my rest breaks. Because of the deadlines to turn in my weekly audits, it was almost impossible for me to take ten

3

PA0131

(10) minutes out of my day to take a rest break. I also always had to be available, either by phone or email, and could not delay dealing with issues until after my rest break had ended. As a result, throughout the several years that I worked as an APC, I was only able to take a rest break a few times. As an "exempt," salaried employee, when I work through my rest and meal breaks, I was not paid one (1) hour of pay for any meal or rest break that I missed. I was never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this **25th** day of March, 2013, at Escondido, California.

RICCO MARTINEZ

PA0132

# DECLARATION OF JANICE McCURDY

I, Janice McCurdy, declare that:

      1.    I am over eighteen years of age and a resident of the city of Lindsay, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

      2.    I am currently employed by Wal-Mart Stores, Inc. ("Wal-Mart"). I have worked for Wal-Mart for twenty (20) years, and have held many job titles in that time. From June 2006 to January 2011, I worked as an "Asset Protection Coordinator" ("APC") at the Wal-Mart located in Visalia. Throughout the duration of my employment with Wal-Mart, I have worked in the State of California.

      3.    As an APC at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

      4.    I spent approximately eighty-five percent (85%) of my time as an APC performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fell into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

      5.    I was required to attend at least one general store meeting each day, as well as other meetings throughout the week, such as the weekly Safety meetings. It was my responsibility to follow the National Priorities procedures at all times. This duty included following and completing the National Priorities checklist each week. This checklist contained all of the National Priorities procedures and required me to tour the store to confirm that all of the said policies were being followed. For each policy, I would either

1

PA0133

place a check, (if the policy was being followed) or have to give it a "no" (if the policy was not being followed). At the end of each week, I would submit the completed checklist online for my supervisors to review. My duties of verifying compliance with policies and safety procedures required me to conduct audits and safety walks. There were several different checklists that I was responsible to complete on a regular basis. For example, I would have to complete the Tire Lube Express checklists, which included polices on the disposal of oil and other hazardous materials, as well as safety regulations for the workers. My job duties of conducting investigations primarily required me to review surveillance video to find the source of internal theft. I could either be notified that a specific employee was suspected of internal theft, or I would be given a schedule which told me how many hours of surveillance video I was assigned to watch each week. The schedule primarily required me to watch footage from high shrink departments. I would review this video every week to help identify and stop internal theft. It was also part of my set routine to walk the store every day. While I frequently walked the store as part of my job duties to follow National Priorities procedures or verifying Compliance, I would also take regular tours of the store. These tours were to look out for possible shoplifters or safety hazards that might be in the store. As an APC, it was also a part of my job to perform customer service duties. As I walked through the store, I would be friendly to customers, answer any questions they might have, and help them locate merchandise. I also had to review surveillance video for customers to help them find missing purses, locate items they might have left at the register, or to find out how their vehicle got damaged in the parking lot. My duties of reviewing exceptions to reports required me read through the reports for several different departments, such as the claims and cash offices. Many of these reports were online on the FERRET system. I would read through reports that were generated by certain triggering incidents, such as price overrides, and have to confirm that the price override was authorized, and not a result of mistake or internal theft.

2

PA0134

6. In the many years that I worked as an APC, and the years that I have continued to work for Wal-Mart since leaving that position, I have seen and interacted with many other APCs. All APCs are given the same exact checklists to complete each week, and are responsible for completing these checklists within their assigned deadlines.

7. I estimate that approximately fifteen percent (15%) of my time or less was spent performing "managerial" tasks, such as training subordinate employees or drafting schedules. The Asset Protection Associates conduct their initial training at training stores, and were only assigned to my Wal-Mart after this training had been completed, and my Market Asset Protection Manager approved them for work. Training the Asset Protection Associates was not one of my primary tasks and was primarily done by other associates.

8. I worked at least sixty (60) hours a week as an APC. When I took the position, I was told that I would only have to work forty-five (45) hours a week. I was instructed to work as many hours as were required for me to complete my weekly checklists and assignments. It would not have been possible for me to complete these tasks in forty-five (45) hours, and there were many weeks where I would have to work up to sixty (60) in order to meet these deadlines.

9. As an APC at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart knew that I was working in excess of my scheduled hours, but I was not required to record the actual number of hours that I spent working each day, and it was not my practice to do so.

10. Throughout my employment with Wal-Mart, I have never once been instructed by management or anyone at Wal-Mart, that I should have been spending more than fifty percent (50%) of my time performing "managerial" tasks. Even if Wal-Mart's expectation was that an APC spend more than fifty percent (50%) of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC.

3

PA0135

1    11.   I regularly had to work through my rest breaks as an APC.  At least once or
2    twice a week, I would have to work through my rest break.   Due to my deadlines and the
3    fact that I had to address incidents in the store as they occurred, I would have to work
4    through these breaks.  I was not permitted to wait until after my rest break was over to
5    address incidents that occurred in the store.   As an "exempt," salaried employee, when I
6    worked through my rest and meal breaks; I was not paid one (1) hour of pay for any meal
7    or rest break that I missed.  I have never been given any additional compensation for
8    working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.  Executed this ___9th___ day of ~~March~~ May, 2013, at Lindsay,
California.

*Janice G McCurdy*
JANICE McCURDY

4

PA0136

# DECLARATION OF RHONDA MONTANO

I, Rhonda Montano, declare that:

    1.    I am over eighteen years of age and a resident of the city of Temecula, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

    2.    I am still currently employed by Wal-Mart Stores, Inc. ("Wal-Mart"). I have worked for Wal-Mart since May 1995, and have been an "Asset Protection Coordinator" for six (6) years. In Early 2012, Wal-Mart changed the titles of all "Asset Protection Coordinators," ("APC") to "Asset Protection Managers," ("APM") but there have been no changes in my job duties or responsibilities as a result of this title change. Throughout the duration of my employment as an APC and APM, I have worked for the Wal-Mart store located in Temecula.

    3.    As an APM at Wal-Mart, I am paid a salary and do not receive overtime compensation regardless of the number of overtime hours I work. During the time I have worked as a salaried APC and APM for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices. However, I have not been trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

    4.    I spend approximately ninety percent (90%) of my time as an APM performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fall into five (5) main categories: (1) touring the store; (2) investigating and documenting internal theft and apprehensions; (3) conducting audits; (4) compliance and safety assurance; and (5) customer service.

    5.    My work duties of touring the store primarily consist of walking through the store observing security and safety issues, looking for suspicious activity, theft prevention, and looking for safety hazards. Investigating and documenting internal theft and apprehensions includes conducting investigations to find the source of internal theft and documenting all incidents in which an employee or customer are apprehended. For

1

PA0137

1   each case of internal theft, I must record the employee's information and a narrative of
2   the incident into Wal-Mart's computerized "Asset Protection Information System"
3   (APIS). Conducting audits include, but are not limited to, tasks such as inventory counts,
4   shrinkage reports, and completion of weekly checklists known as "National Priorities"
5   checklists.    These checklists are assigned to me each week, and consist of several
6   questions and instructions that guide me through the audit.  My completed audits are
7   entered into the computer so that they can be reviewed by my Market Asset Protection
8   Manager Bobby Joe Lewis.  Compliance and safety standards require me to conduct
9   routine inspections of the store to make sure safety codes and procedures are being
10  carried out.  For example, every Thursday I have to do the Hazardous Materials
11  compliance walk, which requires me to open up the hazardous materials bins and make
12  sure they are stored in the way that the compliance guidelines suggest. If the bins are
13  mislabeled or incorrectly tied, I make a note of it on my form, and fix the error.  Other
14  compliance and safety related tasks include, but are not limited to, checking the battery
15  cage, checking fire extinguishers, and emergency exits.  Customer service includes, but is
16  not limited to, speaking with customers while I am out on the floor, answering questions,
17  and helping customers locate merchandise.

18       6.    I have visited several Wal-Mart stores throughout the course of my work as
19  an APC and APM and been able to speak with several other APCs and APMs.  The job
20  duties and responsibilities of the APC and APM are determined on a corporate level, so
21  all of the APCs and APMs are hired to perform the same job.    As far as I can tell, all
22  APCs and APMs have identical job duties and responsibilities.

23       7.    I estimate that approximately ten percent (10%) of my time or less is spent
24  performing "managerial" tasks, such as training subordinate employees or drafting
25  schedules.

26       8.    As an "Asset Protection Coordinator" at Wal-Mart, I am considered an
27  "exempt" employee and I am paid a salary.  I was told that as an "exempt" employee, I
28  would not receive overtime compensation, regardless of the number of hours I work each

2

PA0138

week. Wal-Mart knows that throughout my employment as an APC, I worked more than forty (40) hours a week, but I am not required to record the actual number of hours that I spend working each day, and it is not my practice to do so.

9. I am occasionally not able to take a full thirty (30) minute uninterrupted meal break or my ten (10) minute rest break. Approximately once a month, I have to work through either my lunch break or one of my rest breaks in order to deal with an incident in the store, or to catch up on work. Whenever I am in the store, I have to deal with safety and security incidents immediately, regardless of whether or not I am trying to take a break. As an "exempt," salaried employee, when I work through my rest and meal breaks, I am not paid one (1) hour of pay for any meal or rest break that I missed. I have never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _3rd_ day of February, 2013, at Temecula, California.

_Rhonda Montano_
RHONDA MONTANO

3

PA0139

# **DECLARATION OF KRISTOFER OCHOA**

I, KRISTOFER OCHOA, declare that:

1. I am over eighteen years of age and a resident of the City of Downey in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2. From approximately June of 2008 until approximately July of 2012, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." During my employment as "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Norwalk in the State of California from June of 2008 to October of 2009 and then in the Wal-Mart store located in the City of Paramount in the State of California from October of 2009 to July of 2012.

3. As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4. As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately ninety (90) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories: observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5. Most of my job duties and the amount of time I spent performing each job duty was governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist,

PA0140

the "Asset Protection Coordinator's Monthly Checklist," the "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities" checklist.

6.     The observation and reporting of safety issues included walking the floor for safety purposes and looking for accidents or spills, debris, misplaced products, carts obstructing aisle ways, pallets stacked incorrectly, and unattended ladders.  Once a safety issue was identified I would typically resolve the issue myself.  The investigation and documentation of security incidents included conducting audits of cash registers and merchandise, reviewing video surveillance, investigating possible thefts or fraud, walking the floor and looking for suspicious behavior, and apprehending and processing shoplifters.  For each incident that occurred, I entered a report into Wal-Mart's computerized "Asset Protection Information System" (APIS) and would contact local law enforcement if necessary.  I also worked on "National Priorities" checklists.  A "National Priorities" checklist is a list of questions with "Yes" or "No" answers, provided to me by Wal-Mart, that guides the person filling out the checklist through the store and asks whether Wal-Mart's policies and procedures are being followed.  The answer to each question on the checklist was either "Yes" or "No," and I played no role in the formulation of the checklists.  Customer service included the answering of customer questions as I walked through the store.

7.     Wal-Mart's shoplifter apprehension policy is "AP09."  It is a detailed policy that specifically outlines what Asset Protection Coordinators can and cannot do once they have identified a shoplifter.  I played no role in preparing the "AP09" policy, did not have any influence over what goes into the policy, and was not permitted to deviate from the policy.  The "AP09" policy plays an important role in the Asset Protection Coordinator's job and a substantial portion of my daily job duties had to be performed in accordance with that policy.

8.     I estimate that approximately ten (10) percent of my time was spent performing "managerial" tasks (i.e. tasks different than those regularly performed by the hourly paid employees), such as training or disciplining employees.  I did not have the authority to hire or fire employees, and I also did not have the authority to set or adjust

**DECLARATION OF KRISTOFER OCHOA**

PA0141

rates of pay. I did not have the authority to formulate policy for the store, but rather simply implemented Wal-Mart's policies without discretion.

9. I regularly worked over eight (8) hours per day and over forty (40) hours per week. Although my schedule varied from week to week, I typically worked ten (10) to twelve (12) hour shifts, such as from 8:00 a.m. to 8:00 p.m. During shifts when Wal-Mart received inventory, I would regularly work fourteen (14) to sixteen (16) hour days. I would generally work six (6) days a week. Additionally, a theft or accident sometimes occurred while I was at home. As a salaried employee I was always "on call," and if such issues occurred, I would have to deal with the issues over the phone or in person at the store even though I not scheduled to work. I estimate that as an "Asset Protection Coordinator" I worked, on average, approximately sixty (60) to seventy (70) hours each week. I was instructed to work as many hours as necessary to complete the tasks and responsibilities assigned to me, and the implication of being a salaried employee was that working shifts of twelve (12) hours or more was the norm.

10. As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. As I was considered an "exempt" employee, I was not told I was entitled to overtime compensation and I did not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart did not require that I record my hours, so it was not my practice to do so.

11. My immediate supervisors at Wal-Mart knew we were spending the vast majority of our time performing the same tasks as the hourly employees, and it was never conveyed to me in any way that this is not what Wal-Mart expected. I was never once instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers. Even if Wal-Mart's expectation was that "Asset Protection Coordinators" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an "Asset Protection Coordinator."

12. As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I was permitted to take a thirty (30) minute off duty meal break where I was relieved of all duties. I was able to take a thirty (30) minute uninterrupted, off duty meal period only twice a week, and frequently had to eat my lunch while completing work responsibilities. As "Asset Protection Coordinators" we were constantly "on call" and work responsibilities took precedence over our lunch and rest breaks. For example, if I saw a customer committing theft or fraud, or if an employee reported theft or fraud to me, I was obligated to deal with the issue, regardless of whether I was trying to take a lunch break. My lunch breaks were also commonly interrupted by security and safety meetings, visits from senior management, conference calls, internal investigations, and questions from associates. Also, I was only able to take a ten (10) minute rest break once a week. As an "exempt," salaried employee, when I worked through my rest and meal breaks, I was not paid one hour of pay for any meal or rest break missed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _17_ day of July, 2013, at _Downey_, California.

_[signature]_

KRISTOFER OCHOA

PA0143

# DECLARATION OF STEVE OLIVER

I, STEVE OLIVER, declare that:

1.  I am over eighteen years of age and a resident of the City of Grand Terrace in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.  From approximately June of 2006 to the present, I have been employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." Throughout the duration of my employment as "Asset Protection Coordinator," I have worked for the Wal-Mart store located in the City of Rialto in the State of California.

3.  As an "Asset Protection Coordinator" at Wal-Mart, I am paid a salary and have not received overtime compensation regardless of the number of overtime hours I have worked. During the time I have worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices. However, as an "Asset Protection Coordinator" I have not been trained or informed by anyone at Wal-Mart regarding the application of California overtime exemption laws to the position of "Asset Protection Coordinator."

4.  As an "Asset Protection Coordinator" at Wal-Mart, I have spent and continue to spend approximately eighty-five (85) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I perform typically fall into four primary categories: observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.  Most of my job duties and the amount of time I spend performing each job duty has been and continues to be governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the

PA0144

1 "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities"
2 checklist.

3      6.     The observation and reporting of safety issues primarily includes walking
4 the floor and looking for accidents or spills, debris, misplaced products. Reporting of
5 safety issues typically requires that I e-mail my "Market Asset Protection Manager"
6 (MAPM) about the issue, and contact my regional compliance manager if necessary. The
7 investigation and documentation of security incidents involves a significant amount of
8 time spent reviewing surveillance videos for incidents of theft of fraud. Security
9 incidents are also be brought to my attention through reports and audits that show cash or
10 inventory shortages, reports from associates and managers of theft or fraud, and the
11 witnessing of suspicious activity by employees. I documented each incident into a report
12 that I enter into Wal-Mart's computerized "Asset Protection Information System"
13 (APIS). I also worked on "National Priorities" checklists. A "National Priorities"
14 checklist is a list of questions with "Yes" or "No" answers, provided to me by Wal-Mart,
15 that guides me through the store and asks whether Wal-Mart's policies and procedures
16 are being followed. The answer to each question on the checklist was either "Yes" or
17 "No," and I play no role in the formulation of the checklists. Customer service primarily
18 includes the answering of customer questions as I walk through the store.

19      7.     Wal-Mart's shoplifter apprehension policy is "AP09." It is a detailed
20 policy that specifically outlines what Asset Protection Coordinators can and cannot do
21 once they have identified a shoplifter. I play no role in preparing the "AP09" policy, do
22 not have any influence over what goes into the policy, and am not permitted to deviate
23 from the policy. The "AP09" policy plays an important role in the Asset Protection
24 Coordinator's job and a substantial portion of my daily job duties must be performed in
25 accordance with that policy.

26      8.     I estimate that approximately fifteen (15) percent of my time has been spent
27 and continues to be spent performing "managerial" tasks (i.e. tasks different than those
28 regularly performed by the hourly paid employees), such as training subordinate

PA0145

1  employees, directing the work of subordinate employees, or handling employee
2  complaints. I do not have the authority to formulate policy for the store, but rather
3  simply implement Wal-Mart's policies without discretion.

4      9.    I regularly work over eight (8) hours per day and work over forty (40)
5  hours per week. I regularly work ten (10) to thirteen (13) hours a day, from either
6  approximately 7:00 a.m. to 7:00 p.m. or from 9:00 a.m. to 9:00 p.m. During shifts when
7  Wal-Mart receives inventory, I typically work sixteen (16) to seventeen (17) hours that
8  day. I also generally work five (5) to six (6) days each week. Additionally, I receive
9  phone calls while I am at home regarding safety and security issues. As a salaried
10 employee I am always "on call," and if such issues arise, I have to deal with them over
11 the phone or in person at the store. I estimate that I have worked approximately sixty
12 (60) to seventy (70) hours each week while employed by Wal-Mart as an "Asset
13 Protection Coordinator." When I voiced my concern to my supervisor that I work long
14 hours, my supervisor laughed and told me, "that is part of being a salaried employee" and
15 I have to "stay until [my] work was done."

16     10.    As an "Asset Protection Coordinator" at Wal-Mart, I am considered an
17 "exempt" employee and I am paid a salary. Because I am considered an "exempt"
18 employee, I have been under the impression that I cannot receive overtime compensation,
19 regardless of the number of hours I work each week. Wal-Mart does not require that I
20 record my hours, so it is not my practice to do so.

21     11.    I have not once been instructed by management, my immediate supervisor
22 or anyone else at Wal-Mart that I should be spending more than 50% of my time
23 performing work different than the work performed by the hourly workers. Even if Wal-
24 Mart's expectation is that an "Asset Protection Coordinator" spend more than 50% of
25 their time on managerial work, it would be an unreasonable and unrealistic expectation in
26 light of the nature of the responsibilities of an "Asset Protection Coordinator."

27     12.    As an "Asset Protection Coordinator" at Wal-Mart, I have not been told
28 that I am permitted to take a thirty (30) minute off duty meal break where I am relieved

PA0146

1  of all duties. I am able to take a thirty (30) minute uninterrupted, off duty meal period
2  only twice a week, and frequently eat my lunch while completing work responsibilities.
3  My lunch breaks are commonly interrupted by accidents, spills, shoplifters, supervisors
4  or inspectors who I must walk through the store through the store, and the investigation
5  of compliance issues. As "Asset Protection Coordinators" we are constantly under
6  pressure to complete our daily work responsibilities, and completing our assigned tasks
7  take precedence over our lunch breaks.

8      I declare under penalty of perjury under the laws of the State of California that the
9  foregoing is true and correct. Executed this _26_ day of _March_, 2013, at
10  _Rialto_ ____, California.

11
12
13
14  STEVE OLIVER
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PA0147

## DECLARATION OF EDDIE ORTIZ

I, EDDIE ORTIZ, declare that:

1. I am over eighteen years of age and a resident of the City of Riverside in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2. From approximately December of 2008 until approximately August of 2010, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." Throughout the duration of my employment as "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Chino located in the State of California.

3. As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4. As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately seventy-five (75) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories: observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5. Most of my job duties and the amount of time I spent performing each job duty was governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities" checklist.

1

DECLARATION OF EDDIE ORTIZ

PA0148

1  6. The observation and reporting of safety issues primarily included walking

2 the floor for safety purposes and looking for accidents or spills, debris, misplaced

3 products, checking that emergency doors were locked, and ensuring that safety cones

4 were in the proper location. Once a safety issue was identified, I would report the issue

5 to the store manager. The investigation and documentation of security incidents involved

6 the reviewing of video surveillance, investigating reported thefts and fraud, apprehending

7 and processing of shoplifters, and looking for possible cash or inventory shortages. Our

8 primary concern was investigating internal theft and fraud because, as an "Asset

9 Protection Manager," I was under pressure from Wal-Mart to develop as many internal

10 theft or fraud cases as possible. For each incident that occurred, I entered a report into

11 Wal-Mart's computerized "Asset Protection Information System" (APIS). Conducting

12 quality control audits primarily included ensuring that jewelry cases were locked,

13 checking the security of the cosmetic department, and checking inventory in the

14 backroom, such as cosmetics and electronics. I also worked on "National Priorities"

15 checklists. A "National Priorities" checklist is a list of questions with "Yes" or "No"

16 answers, provided to me by Wal-Mart, that guides the person filling out the checklist

17 through the store and asks whether Wal-Mart's policies and procedures are being

18 followed. The answer to each question on the checklist was either "Yes" or "No," and I

19 played no role in the formulation of the checklists. Customer service primarily included

20 the answering of customer questions as I walked through the store, handling customer

21 complaints regarding safety, security, or cash disputes.

22  7. Wal-Mart's shoplifter apprehension policy is "AP09." It is a detailed

23 policy that specifically outlines what Asset Protection Coordinators can and cannot do

24 once they have identified a shoplifter. I played no role in preparing the "AP09" policy,

25 did not have any influence over what goes into the policy, and was not permitted to

26 deviate from the policy. The "AP09" policy plays an important role in the Asset

27 Protection Coordinator's job and a substantial portion of my daily job duties had to be

28 performed in accordance with that policy.

**DECLARATION OF EDDIE ORTIZ**

PA0149

8. I estimate that approximately twenty-five (25) percent of my time or less was spent performing "managerial" tasks (i.e. tasks different than those regularly performed by the hourly paid employees), such as training or disciplining employees. I did not have the authority to hire or fire employees, and I also did not have the authority to set or adjust rates of pay.

9. I regularly worked over eight (8) hours per day and over forty (40) hours per week. Although my schedule varied from week to week, I typically worked ten (10) to twelve (12) hour shifts, such as from 8:00 a.m. to 8:00 p.m. During shifts when Wal-Mart received inventory, I would regularly work fourteen (14) to sixteen (16) hour days. Additionally, sometimes a compliance issue, theft issue, or fraud issue would arise while I was at home. As a salaried employee I was always "on call," and if such issues arose, I would have to deal with the issues over the phone or in person at the store even though I not scheduled to work at that time. I estimate that as an "Asset Protection Coordinator" I worked, on average, approximately fifty (50) to fifty-eight (58) hours each week. I was instructed to work as many hours as necessary to complete the tasks and responsibilities assigned to me. When I voiced my concern to my supervisor that I had been working long hours, I was told, "that's why you are salaried, the work needs to be done."

10. As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. As I was considered an "exempt" employee, I was told that I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart did not require that I record my hours, so it was not my practice to do so.

11. My immediate supervisors at Wal-Mart knew we were spending the vast majority of our time performing the same tasks as the hourly employees, and it was never conveyed to me in any way that this is not what Wal-Mart expected. I was never once instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers. Even if Wal-Mart's expectation was that "Asset Protection Coordinators" spend more than 50% of their time on managerial work, it

DECLARATION OF EDDIE ORTIZ

PA0150

1  would be an unreasonable and unrealistic expectation in light of the nature of the
2  responsibilities of an "Asset Protection Coordinator."

3      12.    As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I
4  was permitted to take a thirty (30) minute off duty meal break where I was relieved of all
5  duties. I was able to take a thirty (30) minute uninterrupted, off duty meal period only
6  twice a week, and frequently had to eat my lunch while completing work responsibilities.
7  As "Asset Protection Coordinators," we were constantly under pressure to complete our
8  daily work responsibilities, and completing our assigned tasks took precedence over our
9  lunch breaks. If I saw a customer committing theft or fraud, or if an employee reported
10  theft or fraud to me, I was obligated to deal with the issue at that time, regardless of
11  whether I was trying to take a lunch break. If a manager required assistance, I had to
12  interrupt my lunch break to assist the manager. When I complained to my supervisor that
13  I was unable to take an uninterrupted lunch break, I was told, "[w]ork has to get done. It
14  needs to be completed." Also, I was only able to take a ten (10) minute rest break twice a
15  week. As an "exempt," salaried employee, when I worked through my rest and meal
16  breaks, I was not paid one hour of pay for any meal or rest break missed.

17      I declare under penalty of perjury under the laws of the State of California that the
18  foregoing is true and correct. Executed this _25_ day of March, 2013, at
19  _Riverside_, California.

20
21
22
23                           EDDIE ORTIZ
24
25
26
27
28

**DECLARATION OF EDDIE ORTIZ**

PA0151

## DECLARATION OF MIKE PERKINS

I, Mike Perkins, declare that:

1.     I am over eighteen years of age and a resident of the city of San Diego, in the State of California.  I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     I am still currently employed by Wal-Mart Stores, Inc. ("Wal-Mart").  I have worked for Wal-Mart since 2001, and have been employed as an "Asset Protection Coordinator" since approximately 2006.  In Early 2012, Wal-Mart changed titles of all "Asset Protection Coordinators" ("APC") to "Asset Protection Managers," ("APM") but there have been no changes in my job duties or responsibilities as a result of this title change.  The transition from APC to APM was in title only, and coincided with a reduction of my weekly hours.  Throughout the duration of my employment as an APC and APM for Wal-Mart, I have worked at the store located in the City of Chula Vista in the State of California.

3.     As an APM at Wal-Mart, I am paid a salary and do not receive overtime compensation regardless of the number of overtime hours I work.  During the time I have worked as a salaried APC and APM for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices.  However, I have not been trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     I spend approximately sixty-five percent (65%) of my time as an APM performing "non-managerial" tasks.  The "non-managerial" tasks I performed typically fall into five (5) main categories: (1) touring the store; (2) investigating and documenting internal theft and apprehensions; (3) conducting audits; (4) compliance and safety assurance; and (5) customer service.

5.     My work duties of touring the store primarily consist of walking through the store observing security and safety issues, looking for suspicious activity, theft prevention, and looking for safety hazards.   I walk through the store several times a day,

1

PA0152

1 every day, and periodically I will walk the perimeter of the store exterior. Approximately
2 once a week, I will walk the store "undercover" in to better observe possible incidents of
3 theft. On days that I tour the store "undercover," I usually will spend the entire day
4 walking the floor. Walking the floor "undercover" is the main job duty of "Asset
5 Protection Associates," who are hourly employees. Investigating and documenting
6 internal theft and apprehensions includes conducting investigations to find the source of
7 internal theft and writing up apprehensions in Wal-Mart's computerized "Asset
8 Protection Information System" (APIS). Most investigations occur when an associate or
9 lead notices that there is a loss or shrinkage, and ask me to look at the video tape or
10 receipts to help them find the source of their loss. Common types of investigations
11 include fraudulent returns and "under-ringing" cashiers. Conducting department audits
12 includes, but is not limited to, performing inventory counts, shrinkage reports, and
13 completion of weekly checklists known as "National Priorities" checklists. I estimate
14 that I spend at least fifty percent (50%) of my time working on my weekly assigned
15 audits. "National Priorities" audits must be completed every week, but there are several
16 other audits that I will have to complete on a periodic or daily basis. For example, there
17 are several situations that trigger a "red flag" (according to the training that Wal-Mart
18 provided to me) which will require me to audit the department. These situations arise
19 most frequently when high priced items, such as Ipads, are sold. For high priced items, I
20 have to look at the receipts and the number of Ipads still in stock to see if we have had
21 any of these items stolen every day. These types of audits are constantly being done by
22 other hourly associates in the store, but I am required to perform them as well so that any
23 loss is guaranteed to be discovered on a timely basis. Compliance and safety standards
24 require me to conduct routine inspections of the store to make sure Wal-Mart's written
25 safety codes and procedures are being used throughout the store. I have to open and
26 inspect the buckets where hazardous materials are thrown out to make sure bags are not
27 leaking and that all the materials have been placed in the appropriate bucket. Other
28 compliance and safety related tasks include, but are not limited to, checking the battery

2

PA0153

cage, and checking fire extinguishers. Customer service includes, but is not limited to, speaking with customers while I am out on the floor, answering questions, and trying to calm down customers that are having altercations within the store.

6.     In my capacity as an APC and APM, I have visited all of the seventeen (17) Wal-Mart stores in my market. I am sent to other Wal-Mart stores for visits in order to assist the APM at that store with an investigation or to perform an audit. In my several years of experience traveling to multiple Wal-Marts, I have seen that the "Asset Protection Management" program is a consistent program throughout all of Wal-Mart's stores. All APMs have the same job duties and responsibilities and must follow the same policies and procedures. The position of APM is identical at all Wal-Mart stores that I have visited and worked in.

7.     I estimate that approximately thirty-five percent (35%) of my time or less is spent performing "managerial" tasks, such as training subordinate employees or drafting schedules. I do not have the authority to fire or even discipline employees. If I observe an employee stealing, or discover internal theft through an investigation, I must report these incidents to my Market Manager, Victor Benitez, or to the Store Manager. My supervisor will then read through my account of the events, and make the final decision on what action should be taken.

8.     Prior to the title transition from APC to APM, I was working between fifty (50) and sixty (60) hours each week. My Supervisor, Victor Benitez, would approve a schedule of fifty (50) hours each week, but I would often have to work in excess of these hours in order to complete all of my assigned job duties. Near the beginning of 2012 when the APCs experienced a title change, our hours were cut back to forty (40) per week, and I was told that I should not work in excess of these hours unless it was under special circumstances.

9.     As an APM at Wal-Mart, I am considered an "exempt" employee and I am paid a salary. I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I work each week. Wal-Mart knows

3

PA0154

that I have regularly worked in excess of forty (40) hours throughout my employment as an APC, but I have never been required to record the actual number of hours that I spend working each day, and it is not my practice to do so.

10. I am rarely able to take my full ten (10) minute uninterrupted rest break. In order to meet deadlines, answer questions, or deal with incidents in the store, I regularly work through my rest breaks. Occasionally, I am also not able to take a full thirty (30) minute uninterrupted meal break. A few times a month, I either have to work through my lunch break, or am interrupted during my break. As an "exempt," salaried employee, when I work through my rest and meal breaks, I am not paid one (1) hour of pay for any meal or rest break that I missed. I have never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _____ day of January, 2013, at San Diego, California.

MIKE PERKINS

Declaration of Mike Perkins

PA0155

## DECLARATION OF RICARDO RODRIGUEZ-CARRANZA

I, RICARDO RODRIGUEZ-CARRANZA, declare that:

1.    I am over eighteen years of age and a resident of the City of Anaheim in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.    From approximately July of 2010 to the present, I have been employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." Throughout the duration of my employment as "Asset Protection Coordinator," I have worked for the Wal-Mart store located in the City of Lakewood in the State of California.

3.    As an "Asset Protection Coordinator" at Wal-Mart, I am paid a salary and have not received overtime compensation regardless of the number of overtime hours I work. During the time I have worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I have learned Wal-Mart's policies, procedures, and practices. However, as an "Asset Protection Coordinator" I have not been trained or informed by anyone at Wal-Mart regarding the application of California overtime exemption laws to the position of "Asset Protection Coordinator."

4.    As an "Asset Protection Coordinator" at Wal-Mart, I have spent and continue to spend approximately eighty (80) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I perform typically fall into four primary categories: observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.    Most of my job duties and the amount of time I spend performing each job duty has been and continues to be governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the

1

PA0156

1 "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities"
2 checklist.

3      6.     The observation and reporting of safety issues primarily includes walking
4 the floor for safety purposes and looking for accidents or spills, debris, and misplaced
5 products.   The investigation and documentation of security incidents involve the
6 reviewing of video surveillance, the reviewing of external reports on potential theft or
7 fraud, and the discovery of theft through merchandise shortages. For each security
8 incident that occurs, I investigate what happened, how the security problem occurred, and
9 I prepare information for the internal investigator or local law enforcement. I document
10 the incident into a report that I enter into Wal-Mart's computerized "Asset Protection
11 Information System" (APIS). As to quality control, I worked on checklists regarding
12 inventory counts, merchandise placement and quality, and the disposal of hazardous
13 materials. I also worked on "National Priorities" checklists. A "National Priorities"
14 checklist is a list of questions with "Yes" or "No" answers, provided to me by Wal-Mart,
15 that guides the person filling out the checklist through the store and asks whether Wal-
16 Mart's policies and procedures are being followed. The answer to each question on the
17 checklist was either "Yes" or "No," and I play no role in the formulation of the
18 checklists. Customer service includes the answering of customer questions as I walk
19 through the store.

20      7.     Wal-Mart's shoplifter apprehension policy is "AP09." It is a detailed
21 policy that specifically outlines what Asset Protection Coordinators can and cannot do
22 once they have identified a shoplifter. I play no role in preparing the "AP09" policy, do
23 not have any influence over what goes into the policy, and am not permitted to deviate
24 from the policy. The "AP09" policy plays an important role in the Asset Protection
25 Coordinator's job and a substantial portion of my daily job duties must be performed in
26 accordance with that policy.

27      8.     I estimate that approximately twenty (20) percent of my time has been
28 spent and continues to be spent performing "managerial" tasks (i.e. tasks different than
those regularly performed by the hourly paid employees), such as training subordinate

2

DECLARATION OF RICARDO RODRIGUEZ-CARRANZA

PA0157

employees or directing the work of subordinate employees. I do not have the authority to hire or fire employees, set rates of pay, or handle employee complaints. I do not have the authority to formulate policy for the store, but rather simply implement Wal-Mart's policies without discretion.

9.     I occasionally work over eight (8) hours per day and typically work over forty (40) hours per week. Although I am regularly scheduled to work five days a week, from either 12:00 p.m. to 9:00 p.m., 8:00 a.m. to 5:00 p.m., or 2:00 p.m. to 11:00 p.m., I sometimes have to work ten (10) to twelve (12) hours in a single day. Additionally, a couple times a week a security issue arises while I am at home, in which case I have to deal with that security issue over the phone or in person at the store. I estimate that I work approximately fifty (50) hours each week while employed by Wal-Mart as an "Asset Protection Coordinator."

10.     As an "Asset Protection Coordinator" at Wal-Mart, I am considered an "exempt" employee and I am paid a salary. As I am considered an "exempt" employee, I have been under the impression that I cannot receive overtime compensation, regardless of the number of hours I work each week. Wal-Mart has not required that I record my hours, and it did not inform me that I am entitled to any overtime compensation.

11.     I have not once been instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers. Even if Wal-Mart's expectation is that an "Asset Protection Coordinator" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an "Asset Protection Coordinator."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _27_ day of March, 2013, at _BELLFLOWER_, California.

RICARDO RODRIGUEZ CARRANZA

3

DECLARATION OF RICARDO RODRIGUEZ-CARRANZA

## DECLARATION OF JUAN ROMERO

I, JUAN ROMERO, declare that:

1.     I am over eighteen years of age and a resident of the City of Crescent City in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     From approximately August of 2010 until approximately March of 2012, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." Throughout the duration of my employment as "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Crescent City in the State of California.

3.     As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, as an "Asset Protection Coordinator" I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately 90 percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories: observing and reporting safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.     The observation of safety issues included, but was not limited to, walking the floor for safety purposes, identifying safety issues, and resolving any safety issues. Such issues included obstructions in the parking lot, improper operation of equipment and machinery by employees, unsafe building fixtures, and accidents and spills. The reporting of safety issues included face-to-face conversations or phone calls with the "Assistant Manager" or the "Store Manager," both my superiors. The investigation and

1

DECLARATION OF JUAN ROMERO

PA0159

1 | documentation of security incidents involved the reviewing of video surveillance,
2 | conducting personal surveillance as I walked through the store, meeting with specific
3 | individuals identified as security risks, such as employees or customers who committed
4 | fraud or theft, and relaying information regarding security threats to management and
5 | local law enforcement. For each incident that occurred, I entered a report into Wal-
6 | Mart's computerized "Asset Protection Information System" (APIS). Conducting quality
7 | control audits included, but was not limited to, the completion of weekly checklists
8 | regarding the quality of the store building and the parking lot, the quality of equipment
9 | and machinery, the quality of fresh and frozen food, the quality of merchandise, and the
10 | compliance of employees with Wal-Mart policies and processes.   Customer service
11 | included, but was not limited to, the answering of customer questions as I walked through
12 | the store.

13 |       6.      I estimate that approximately 10 percent of my time or less was spent
14 | performing "managerial" tasks (i.e. tasks different than those regularly performed by the
15 | hourly paid employees), such as training subordinate employees or handling employee
16 | complaints. I did not have the authority to hire or fire employees, set rates of pay, or
17 | direct the work of subordinates. I did not have the authority to formulate policy for the
18 | store, but rather simply implemented Wal-Mart's policies without discretion.

19 |       7.      I regularly worked over eight (8) hours per day and over forty (40) hours
20 | per week. I was scheduled to work from either 8:00 a.m. to 6:00 p.m. or from 7:00 a.m.
21 | to 6:00 p.m., Monday through Friday. However, sometimes a compliance issue, theft
22 | issue, or fraud issue would arise while I was at home, and I would have to handle the
23 | issue then. Also, employees would occasionally require assistance with an aspect of the
24 | security system, such as the video surveillance system. In the event that such issues
25 | arose, I would have to deal with that issue even if I was not scheduled to work. I estimate
26 | that I worked, on average, approximately fifty (50) to fifty-five (55) hours each week
27 | while employed by Wal-Mart as an "Asset Protection Coordinator." I was instructed to
28 | work as many hours as necessary to ensure the safety and security of the store and to
protect against the shrinkage (i.e., loss of products) of the store.

2

**DECLARATION OF JUAN ROMERO**

8.    As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. As I was considered an "exempt" employee, I was told that I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart did not require that I record my hours, so it was not my practice to do so.

9.    My immediate supervisors at Wal-Mart, Kyle Cabadingan, Haley Congdon, Robert Boucher, and Nick Gonella, knew we were spending the vast majority of our time performing the same tasks as the hourly employees, and it was never conveyed to me in any way that this is not what Wal-Mart expected. I was never once instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers. Even if Wal-Mart's expectation was that "Asset Protection Coordinator" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an "Asset Protection Coordinator."

10.    Although there was an information session regarding lunch breaks for hourly employees, I was instructed that as a salaried employee "my lunch breaks were not as regulated as the lunch breaks of hourly employees." I often had to work through my lunch break, and I was only able to take a 30 minute, uninterrupted, off duty meal period twice per week. If I saw a customer committing theft or fraud, or if an employee reported theft or fraud to me, I was obligated to deal with the issue, regardless of whether I was trying to take a lunch break. Further, because of my workload I would often have to eat lunch while writing reports, completing paperwork, and receiving phone calls. Also, I was not instructed that I was permitted to take a 10 minute off duty rest break, and I never took one. As an "exempt," salaried employee, when I worked through my rest and meal breaks, I was not paid one hour of pay for any meal or rest break missed.

///

3

**DECLARATION OF JUAN ROMERO**

PA0161

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.    Executed this _3l_ day of January, 2013, at

3    CRESCENT CITY , California.

4

5

6                                        _Juan_ 1/31/13

7                                        JUAN ROMERO

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF JUAN ROMERO**

PA0162

# DECLARATION OF CEMAR RUPERT

I, CEMAR RUPERT, declare that:

1.     I am over eighteen years of age and a resident of the City of Long Beach in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     From the summer of 2006 to May of 2011, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." During my employment as an "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Torrance in the State of California.

3.     As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately eighty-five (85) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories: observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.     Most of my job duties and the amount of time I spent performing each job duty was governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities" checklist.

1

DECLARATION OF CEMAR RUPERT

PA0163

6. The observation and reporting of safety issues included walking the floor for safety purposes and looking for accidents or spills, debris, misplaced products, carts obstructing aisle ways, pallets stacked incorrectly, and unattended ladders. Once a safety issue was identified I typically resolved the issue myself. The investigation and documentation of security incidents included conducting audits of cash registers and merchandise, reviewing video surveillance, investigating possible thefts or fraud, walking the floor and looking for suspicious behavior, and apprehending and processing shoplifters. For each incident that occurred, I was required to enter a report into Wal-Mart's computerized "Asset Protection Information System" (APIS) and would contact local law enforcement if necessary. I also worked on "National Priorities" checklists. A "National Priorities" checklist was a list of questions provided by Wal-Mart with "Yes" or "No" answers. The checklist guided the person filling out the checklist through the store and asked whether certain Wal-Mart policies and procedures were being followed. The answer to each question on the checklist was either "Yes" or "No" and I played no role in the formulation of the checklists. Customer service included the answering of customer questions as I walked through the store.

7. Wal-Mart's shoplifter apprehension policy was "AP09." It was a detailed policy that specifically outlines what Asset Protection Coordinators can and cannot do once they have identified a shoplifter. I played no role in preparing the "AP09" policy, did not have any influence over what goes into the policy, and was not permitted to deviate from the policy. The "AP09" policy played an important role in the Asset Protection Coordinator's job and a substantial portion of my daily job duties had to be performed in accordance with that policy.

8. I estimate that approximately fifteen (15) percent of my time was spent performing "managerial" tasks (i.e. tasks different than those regularly performed by the hourly paid employees), such as training or disciplining employees. I did not have the authority to hire or fire employees, and I also did not have the authority to set or adjust rates of pay. I did not have the authority to formulate policy for the store, but rather simply implemented Wal-Mart's policies without discretion.

2

**DECLARATION OF CEMAR RUPERT**

PA0164

9.     I regularly worked over eight (8) hours per work day and over forty (40) hours per work week. I typically worked five (5) or six (6) days per work week, and typically worked ten (10) to twelve (12) hours per work day. During shifts when Wal-Mart received inventory, I typically worked fourteen (14) to sixteen (16) hours per day. Additionally, a theft or accident occasionally occurred while I was at home. As a salaried employee I was always "on call," and if such an issue occurred I was required to respond to the issue over the phone or in person at the store even though I was not scheduled to work. I estimate that as an "Asset Protection Coordinator" I typically worked approximately fifty (50) to sixty (60) hours per work week. I was instructed to work as many hours as necessary to complete the tasks and responsibilities assigned to me, and as a salaried "Asset Protection Coordinator" I was required to work ten (10) hours or more per work day.

10.     As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. As I was considered an "exempt" employee, I was not told I was entitled to overtime compensation and I did not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart did not require that I record my hours, so it was not my practice to do so.

11.     My immediate supervisors at Wal-Mart knew I was spending the vast majority of my work time performing the same tasks as the hourly employees, and it was never conveyed to me in any way that this was not what Wal-Mart expected. I was never once instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers. Even if Wal-Mart's expectation was that "Asset Protection Coordinators" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an "Asset Protection Coordinator."

12.     As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I was permitted to take a thirty (30) minute off duty meal break where I was relieved of all work duties. I was typically able to take an uninterrupted, off duty thirty (30) minute

3

DECLARATION OF CEMAR RUPERT

meal period approximately three (3) times per work week. "Asset Protection Coordinators" were constantly "on call," and work duties took precedence over our lunch and rest breaks. For example, on occasions when I witnessed a customer committing theft or fraud, or when an employee reported a theft or fraud to me, I was required to respond to the issue, regardless of whether I was trying to take a lunch break. This occurred regularly. My lunch breaks were also commonly interrupted by security and safety meetings, visits from senior management, conference calls, internal investigations, and questions from associates. As a result, I regularly had to work through part or all of my lunch periods. Similarly, I almost never was able to take ten (10) minute rest breaks. As an "exempt," salaried employee, when I worked through my rest and meal breaks, I was not paid one hour of pay for any meal or rest break missed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 22ND day of July, 2013, at LAKEWOOD , California.

CEMAR RUPERT

PA0166

## DECLARATION OF PENNY SAMPIER

I, Penny Sampier, declare that:

1.    I am over eighteen years of age and a resident of the city of Forrest Ranch, in the State of California.  I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.    Wal-Mart Stores, Inc. ("Wal-Mart") was my employer from 1991 to 2011.  From 2008 to 2011, I worked as an "Asset Protection Coordinator" ("APC").  Throughout the duration of my employment as an APC, I worked out the Wal-Mart located in Manteca, California.

3.    As an APC at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked.  During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices.  However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.    I spent approximately eighty-five percent (85%) of my time as an APC performing "non-managerial" tasks.  The "non-managerial" tasks I performed typically fell into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

5.    I was required to attend several meetings each day.  There were always daily meetings run by the Store Manager, as well as weekly meetings for different departments.  These other meetings would be led by other associates or myself, and provided an opportunity for people to voice concerns or suggestions for the upcoming week.  Following the National Priorities procedures required me to complete a checklist every week.  The checklist had dozens of items on it, and I would either give the item a check, or a "no" by touring the store and following the instructions on the checklist.  At

PA0167

the end of every week, I would submit my completed checklist to my Market Asset
Protection Manager, who would review the checklist to find out what items did and did
not receive a checkmark. My duties of verifying compliance with policies and safety
procedures required me to conduct audits and safety walks. Each week there would be a
different checklist, such as "floor compliance" which would require me to make sure
items on the floor were marked as the same price Wal-Mart expected them to be marked.
I also conducted safety walks outside the building to make sure the parking lot lights
were on, and that there were no obstructions on the sidewalk. My job duties of
conducting investigations primarily required me to review survlliance video to find the
source of internal theft. Each week I would be assigned a certain number of hours that I
was required to review the video tape for certain departments. I would review the
surveillance footage, and document any instances of internal theft that I witnessed. Once
an incident was documented, I would begin working through a checklist that Wal-Mart
created that would guild me through the rest of the investigation process. I was required
to keep my Market Asset Protection Manager, Craig Holder, informed of all internal
investigations. The MAPM had to approve all investigations before I was allowed to
begin the checklist. When I began an internal investigation, I would inform my Market
Asset Protection Manager (MAPM), and send him the surveillance footage and checklist
after the investigation was completed. Performing customer service duties included, but
was not limited to, helping and speaking with customers while I was out on the floor. My
duties of reviewing exceptions to reports required me read through the reports for several
different departments, such as the claims and cash offices. I would read through these
reports and document "exceptions" (such as errors or incomplete tasks) as defined by
Wal-Mart. I would then submit my findings to my MAMP for his review. All reports
had to be reviewed on a weekly basis.

      6.     Although I only worked at one Wal-Mart store as an APC, I was sent to
several other stores for daily visits. These visits were either to cover for other APCs, or
to help them with audits or inventory. Through this process, I was able to see many other

2

PA0168

APC's at work in their home store. In all the stores that I visited, the APC position was consistent, and had the same job duties and responsibilities. It seemed to me that the APC was the same job position at all Wal-Mart stores, and required identical job tasks and procedures.

7.     I estimate that approximately fifteen percent (15%) of my time or less was spent performing "managerial" tasks, such as training subordinate employees or drafting schedules. I spent very little time training because the Asset Protection Associates were trained at designated training stores. I was not given the authority to hire fire or even issue discipline on employees. My MAMP made all the hiring and firing decisions. Even though Wal-Mart told me that I was the supervisor for the Asset Protection Associates in my store, and provided guidelines of when an employee should be coached along with the level of discipline, I was still not allowed to issue any disciplinary actions or coaching myself. If I observed behavior that Wal-Mart identified as behavior that required coaching, I would have to report it to a MAMP or Store Manager. In one instance, I attempted to coach an associate who committed an action warranting discipline, but was coached by my MAMP for taking this initiative.

8.     I worked approximately fifty (50) hours every week as an APC. The average day was between eight (8) and twelve (12) hours, but I would have to work as many as sixteen (16) hours in a single day. My Market Asset Protection Manager, as well as my store manager, knew that I was working more than forty (40) hours a week. When I spoke to Craig Holder, my MAPM, about my workload, and the fact that I was charged with too many tasks to be able to complete them within forty (40) hours each week, I was told, "It's just part of the job, you signed up for this."

9.     As an APC at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart knew that I was working in excess of my scheduled hours, but I was not required to record the actual number of hours that I spent working each day, and it was not my practice to do so.

3

PA0169

10.     I have never once been instructed by management or anyone at Wal-Mart, that I should have been spending more than fifty percent (50%) of my time performing "managerial" tasks. Even if Wal-Mart's expectation was that an APC spend more than fifty percent (50%) of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC. I had weekly deadlines, such as my National Priorities Checklists, safety walks checklists, and exceptions to reports that had to be completed no matter how many hour it took, and could have easily taken me forty (40) hours to complete. However, there were several other daily tasks, such as walking the store, speaking with customers, responding to any safety incident in the store, documenting apprehensions and conducting internal investigations that I was expected to handle immediately, and delayed my ability to complete my checklists.

11.     On almost a daily basis, I had to work through my rest and meal breaks as an APC. Due to my deadlines and the fact that I had to address incidents in the store as they occurred, I was rarely able to take a thirty (30) minute uninterrupted meal break. I was only able to take a ten (10) minute rest break once or twice a week, even though I tried to take one every day. As an "exempt," salaried employee, when I work through my rest and meal breaks; I was not paid one (1) hour of pay for any meal or rest break that I missed. I have never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26th day of February, 2013, at Forrest Ranch, California.

_P. Sampier_

PENNY SAMPIER

4

PA0170

## DECLARATION OF MICHELE SCHULL

I, Michele Schull, declare that:

1.    I am over eighteen years of age and a resident of the city of Palmdale, in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.    I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") from 2003 to 2009. From 2007 to 2008, I worked as an Asset Protection Coordinator ("APC"). Throughout the duration of my employment as an APC I worked at the Wal-Mart located in the City of Lompoc, in the State of California.

3.    As an APC at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.    I spent approximately seventy percent (70%) of my time as an APC performing "non-managerial" tasks. The "non-managerial" tasks I performed typically fell into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

5.    I was required to attend several meetings each day. The general meetings were run by the Store Manager, and were held at the beginning of every standard shift. This means that in an average day, I would have to attend two (2) to three (3) of these general meetings. Following the National Priorities procedures required me to complete a checklist every week. These checklists were very time consuming and required me to read several reports and tour the store. The checklist was basically a store wide audit that I was guided through my either placing a check or a "no" next to each item. The

1

PA0171

1   National Priorities Checklists had strict deadlines that I was required to meet each week.

2   I was required by my Market Asset Protection Manager to have my National Priorities

3   Checklist completed by a certain time each week.  My duties of verifying compliance

4   with policies and safety procedures required me to walk through the store, looking for

5   safety hazards, and completing checklists such as the Hazardous Materials Audit.   I also

6   had to make sure that all of the Safety Stations were fully stocked.  I was also required to

7   tour the store at least once each day.  I spent at least one (1) hour touring the store each

8   day.  At least once a week, I would conduct a tour of the store "undercover" in order to

9   catch shoplifters.  If I witnessed a shoplifter trying to steal merchandise, I would have to

10  apprehend the shoplifter and enter their information into the APIS system.  I also would

11  have to make copies of any surveillance video that documented the crime to give to the

12  police officers.   My job duties of conducting investigations primarily consisted of

13  internal investigations.  As part of my duty to perform investigations, I was given a

14  schedule each week that listed how many hours of surveillance video I was required to

15  review for each department.  I would have to watch surveillance video from a high shrink

16  department as an extra security precaution.  I would also review surveillance footage of

17  specific employees who were suspected of engaging in internal theft.  Performing

18  customer service duties included, but was not limited to, speaking with customers while I

19  was walking the store, helping customers locate merchandise, answering questions, and

20  reviewing video tape to help customers find lost belongings, or items that they left at the

21  register.   My duties of reviewing exceptions to reports required me read through several

22  reports each week.  These reports would identify possible cases of loss or shrinkage, or

23  changes in mark-ups.  It was my job to compare the lists of the reports that each

24  department produced with the expected figures produced by Wal-Mart.

25  / / / /

26  / / / /

27  / / / /

28

2

PA0172

6.     I estimate that approximately thirty percent (30%) of my time or less was spent performing "managerial" tasks, such as training subordinate employees or drafting schedules.

7.     I worked approximately sixty (60) to seventy (70) hours per week as an APC. As an APC at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week. Wal-Mart knew that I was working in excess of forty (40) hours, but I was not required to record the actual number of hours that I spent working each day, and it was not my practice to do so. On several occasion, I spoke with my Market Asset Protection Manger, Kevin King, about the number of hours that I was working, and informed him that I was working significantly more hours than the forty (40) to forty-five (45) hours that I was originally told I would be working as an APC. Kevin King told me "this is what you signed up for," and instructed me to put in as many hours as was needed in order for me to complete my assigned job duties.

8.     I have never once been instructed by management or anyone at Wal-Mart, that I should have been spending more than fifty percent (50%) of my time performing "managerial" tasks. Even if Wal-Mart's expectation was that an APC spend more than fifty percent (50%) of their time on managerial work, it would be unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC.

9.     Almost every day, I had to work through either a meal break or a rest break in order to deal with an incident in the store or to meet deadlines. I was almost never able to take a rest break throughout the entire duration of my employment as an APC. Taking a lunch break was essentially impossible because I was not allowed to postpone dealing with incidents until after I was done with my meal break. I was constantly receiving phone calls, emails, questions, instructions, and new assignments. I could not have a full thirty (30) minutes where I did not get interrupted and asked to do something in the store. As an "exempt," salaried employee, when I work through my rest and meal

3

PA0173

breaks, I was not paid one (1) hour of pay for any meal or rest break that I missed. I was never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 19th day of March, 2013, at Palmdale, California.

*Michele Schull*
MICHELE SCHULL

4

PA0174

## DECLARATION OF PEGGY SMITH

I, Peggy Smith, declare that:

1.     I am over eighteen years of age and a resident of the city of Olivehurst, in the State of California.  I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     I am currently employed by Wal-Mart Stores, Inc. ("Wal-Mart").  I have worked for Wal-Mart since 2003 and am currently employed as an Assistant Store Manager.  From 2008 to 2012, I worked as an "Asset Protection Coordinator" ("APC") at the Wal-Mart store located in the City Oroville, in the State of California.

3.     As an APC for Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked.  During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices.  However, I have not been trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     I spent approximately eighty-five percent (85%) of my time as an APC performing "non-managerial" tasks.  The "non-managerial" tasks I performed typically fell into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

5.     As an APC, I had to attend several meetings with other associates on a daily basis.  Every morning there was the general store meeting which all available associates were required to attend.  Throughout the day, there were several other meetings that I was required to attend that took place on a weekly basis, such as safety and shrink meetings.  Following the National Priorities procedures required me to complete a checklist each week.  I was assigned a specific date on which the National Priorities checklist was due, and I would have to turn it in on that date each week.  The

1

PA0175

1  checklist given to me each week was the same checklist issued to every APC that week,
2  and contained questions that lead me through a store wide audit. The checklist required
3  me to check and gather information on compliance to all the procedures that were
4  required to be in place throughout the store. The instructions described what warranted a
5  "check" and what required that I give the question a "no." My duties of verifying
6  compliance with policies and safety procedures required me to fill out several more
7  checklists. Each checklist had a set due date or schedule. For example, I was required to
8  perform the OSHA checklists on the seventh (7th) of each month. The Hazardous
9  Materials audit had to be conducted every seven (7) days and turned in each Thursday.
10 There were also general weekly safety checklists and monthly checklists, which meant
11 that the last week in the cycle required me to conduct both the weekly and monthly
12 checklist that week. All of these checklists were done on a set schedule, and I performed
13 them in the same specified manner that was described by Wal-Mart each week. Each day
14 I was also required to do a tour of the store. These tours included both the interior and
15 exterior of the store, and required me to look for any possible safety hazards (such as
16 objects in front of the fire doors), and look for possible shoplifters in the store. Even
17 though clearing safety hazards and apprehending shoplifters were the job duties of other
18 associates, such as associates on the safety team or in Asset Protection, I was also
19 responsible for these tasks. My job duties of performing internal investigations, unlike
20 the checklists and audits, were not done on a scheduled basis, but I did not have
21 discretion on when to take on an internal investigation. Whenever certain events
22 occurred, such as a cash register coming up short $20 or more, I was required to begin an
23 internal investigation on the event. For a cash register, there could be up to fifteen (15)
24 associates who were assigned to and used a register within a single day. For my
25 investigation, I was required to review footage of each associate that used the register,
26 and document any instances of theft that were recorded on tape. The purpose of these
27 investigations was to gather information for assistant store managers, store managers, and
28 my Market Asset Protection Manager (MAPM) on the possible source of shrinkage or

2

PA0176

loss within the store. Like all Wal-Mart employees and associates, I was required to
perform customer service duties that included speaking with customers while I am
walking the store, answering questions, and helping them locate merchandise. I also
would review surveillance footage to help customers find items lost in the store or left at
the register. My duty of reviewing exceptions to reports required me to review certain
reports each week. Certain reports, such as the Purchase Recap Report and the Inventory
Recap Report would have to be completed on a set day each week. I would be given the
report on the 6th of the month, for example, and had to have it reviewed by the 8th of the
month. If I was not given the report until the 7th of the month, I was still required to
have completed the report before I left the store on the 8th.

6.    I have been employed by Wal-Mart since 2003, and throughout that time I
have been able to observe and interact with several other APCs. All of the APCs that I
have met and worked with have been responsible for the same job duties that I was
charged with, and were assigned the same checklists and due dates that I was given as an
APC. In addition to addressing internal investigations which APCs do not have
discretion on when to take, all APC's have to complete all their checklists, audits,
meetings, and report reviews on set schedules that other employees determine for them.
As far as I can tell, not only do these tasks mean that all APCs are performing identical
job duties, but these job duties are universally designed to take more than forty (40) hours
to complete each week.

7.    I estimate that approximately fifteen percent (15%) of my time or less was
spent performing "managerial" tasks, such as training subordinate employees or drafting
schedules. I only had one Asset Protection Associate at my store at a time, and all Asset
Protection Associates received their primary training from other Asset Protection
Associates at other stores.

8.    I was told that the APC position would require me to work forty (40) to
forty-five (45) hours each week. In fact, I had to work sixty (60) hours each week, and
worked as many as eighty (80) hours in a single week. My Market Asset Protection

3

PA0177

1  Manager, Haley Congdon, and the members of store management knew that I was

2  working beyond my scheduled hours.  When I brought it to my Market Asset Protection

3  Manager's attention that I was working so many hours, Haley Congdon told me that it

4  was "part of the job; read your job description."  Haley Congdon had previously worked

5  as an APC before being promoted to Market Asset Protection Manager, and knew exactly

6  the types of tasks I had to complete each week, and that they were impossible to complete

7  within forty (40) hours.  However, she told me this was the nature of the position, and

8  that if I could not put in the hours that it required that I should look for another position

9  in the company.

10       9.     While working as an APC, I was told that as an "exempt" employee, I was

11  not able to receive overtime compensation, regardless of the number of hours I worked

12  each week.  Even though I was given a schedule to work each week, this schedule was

13  my "minimum" number of hours to work, and signified which hours I was required to be

14  in the store.  However, I was not allowed to leave just because my scheduled shift had

15  ended, I could not leave the store until my work was completed.  Wal-Mart never

16  formally recorded the hours that I actually spent working in the store, and never required

17  me to document when I arrived or left the store each day.

18       10.    I have never once been instructed by management or anyone at Wal-Mart,

19  that as an APC, I should have been spending more than fifty percent (50%) of my time

20  performing work that "managerial" tasks.  Even if Wal-Mart's expectation was that an

21  APC spend more than fifty percent (50%) of their time on managerial work, it would be

22  unreasonable and unrealistic expectation in light the daily and weekly deadlines that

23  APCs were required to meet by completing various checklists.

24       11.    Even though Wal-Mart provided a schedule of what days I was required to

25  work, I was never scheduled to take rest or lunch breaks.  Due to the nature of my work

26  and the responsibilities of an APC, I was never able to take a rest or meal break where I

27  was relieved of all my job duties.  The only way that I could eat lunch was by eating at

28  my desk while I reviewed surveillance footage.  I was almost never able to take a rest

4

PA0178

break throughout the entire time that I worked as an APC. As an "exempt," salaried employee, when I worked through my rest and meal breaks, I was not paid one (1) hour of pay for any meal or rest break that I missed. I was never given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _20th_ day of March, 2013, at Olivehurst, California.

_Peggy M. Smith_

PEGYY SMITH

5

PA0179

# DECLARATION OF ANTHONY VENEGAS

I, ANTHONY VENEGAS, declare that:

1.    I am over eighteen years of age and a resident of the City of Lodi in the State of California. I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.    From approximately January of 2005 until Approximately May 2008, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." Throughout the duration of my employment as an "Asset Protection Coordinator," I worked for the Wal-Mart store located on Florin Road in the City of Sacramento located in the State of California.

3.    As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices. However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.    As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately 90 percent of my time performing "non-managerial" tasks (i.e. tasks also regularly performed by the hourly paid employees). The "non-managerial" tasks I performed typically fell into four primary categories: observing and reporting security and safety issues, investigating and documenting incidents, conducting quality control audits, and customer service.

5.    My work duties of observing security and safety issues included, but was not limited to, walking the floor for security and safety purposes, looking for suspicious activity, preventing shoplifting, reviewing security videos, and ensuring there were not accidents or spills. The reporting of security and safety issues included the entering of a report into Wal-Mart's computerized Asset Protection Information System (APIS) for

1

DECLARATION OF ANTHONY VENEGAS

each security or safety issue that occurred. The investigation and documentation of incidents occurred when I was notified of an ongoing incident or personally witnessed an incident, such as a theft or fraud. I would watch the shoplifter or perpetrator of the fraud, and then confront him or her if necessary. Investigation and documentation also included watching security videos and documenting the security violations I witnessed. For each incident that occurred, I would enter a report into APIS, a computer system. The computer system required that I select options from different drop down boxes describing the type of incident. It also required that I occasionally add comments into a comment dialog box. Conducting quality control audits included, but was not limited to, tasks such as inventory counts, checks on perishable food items, and the completion of weekly checklists known as "National Priorities" checklists. Customer service included, but was not limited to, the answering of customer questions as I walked through the store and the retrieving of empty shopping carts from the parking lot.

6.      I estimate that approximately 10 percent of my time or less was spent performing "managerial" tasks (i.e. tasks different than those regularly performed by the hourly paid employees), such as training subordinate employees. I did not have the authority to hire, fire, or discipline employees. I also did not have the authority to set rates of pay or direct the work of subordinates.

7.      I regularly worked over eight (8) hours per day and over forty (40) hours per week. I was scheduled to work from either 9:00 a.m. to 7:00 p.m. or from 7:00 a.m. to 5:00 p.m., Monday through Friday. However, sometimes a compliance issue, theft issue, or fraud issue would arise after my shift had ended, while I was at home. In the event that such an issue arose, I would have to deal with that issue even if the issue arose outside my in-store scheduled work hours. I estimate that I worked, on average, approximately fifty (50) to sixty (60) hours each week while employed by Wal-Mart as an "Asset Protection Coordinator." I was instructed to work as many hours as necessary to get my job done.

8.      As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary. As I was considered an "exempt" employee,

PA0181

1  I was told that I would not receive overtime compensation, regardless of the number of
2  hours I worked each week. Wal-Mart did not require or even suggest that I record my
3  hours, so it was not my practice to do so.

4      9.  My immediate supervisor at Wal-Mart, George Hardy, knew we were
5  spending the vast majority of our time performing the same tasks as the hourly
6  employees, and it was never conveyed to me in any way that this is not what Wal-Mart
7  expected. I was never once instructed by management, my immediate supervisor or
8  anyone else at Wal-Mart that I should be spending more than 50% of my time performing
9  work different than the work performed by the hourly workers. Even if Wal-Mart's
10  expectation was that "Asset Protection Coordinators" spend more than 50% of their time
11  on managerial work, it would be an unreasonable and unrealistic expectation in light of
12  the nature of the responsibilities of an "Asset Protection Coordinator."

13      10.  As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I
14  was permitted to take a 30 minute off duty meal break where I was relieved of all duties.
15  Meal breaks were for hourly employees only per company policy. I was able to take a 30
16  minute, uninterrupted, off duty meal period once a week, if I was lucky. On the contrary,
17  if I saw a customer committing theft or fraud, or if an employee reported theft or fraud to
18  me, I was obligated to deal with the issue, regardless of whether I was trying to take a
19  lunch break. Further, because of my workload I would often have to work through my
20  lunch breaks and eat my sandwich or hamburger while writing reports and receiving
21  phone calls. When I complained to my supervisor that I was unable to take an
22  uninterrupted lunch break, I was told, "You're salaried. You'll get your lunch break when
23  you get it." Also, I was never told that I was permitted to take a 10 minute off duty rest
24  break, and I never took one. As an "exempt," salaried employee, when I worked through
25  my rest and meal breaks, I was not paid one hour of pay for any meal or rest break
26  missed.
27  ///
28  ///

DECLARATION OF ANTHONY VENEGAS

PA0182

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct.   Executed this _17_ day of January, 2013, at
3  _LODI_____, California.

4
5
6                                    _____
7                                    ANTHONY VENEGAS
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4

**DECLARATION OF ANTHONY VENEGAS**

# DECLARATION OF JIM VRETZOS

I, JIM VRETZOS, declare that:

1.     I am over eighteen years of age and a resident of the City of Folsom in the State of California.  I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     From approximately April 2007 to approximately June 2008, I was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as an "Asset Protection Coordinator." During my employment as an "Asset Protection Coordinator," I worked for the Wal-Mart store located in the City of Oakland in the State of California.

3.     As an "Asset Protection Coordinator" at Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked.  During the time I worked as a salaried "Asset Protection Coordinator" for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices.  However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.     As an "Asset Protection Coordinator" at Wal-Mart, I spent approximately seventy (70) percent of my time performing "non-managerial" tasks (i.e. tasks regularly performed by the hourly paid employees).  The "non-managerial" tasks I performed typically fell into four primary categories:  observing and reporting miscellaneous safety issues, investigating and documenting security incidents, conducting quality control audits, and customer service.

5.     Most of my job duties and the amount of time I spent performing each job duty was governed by routines and checklists like the "Asset Protection Coordinator Routine," the "Asset Protection Coordinator Daily, Weekly, Monthly Tasks" checklist, the "Asset Protection Coordinator's Monthly Checklist," the "Asset Protection Coordinator Safety & Security Tour," and the "National Priorities" checklist.

6. The observation and reporting of safety issues included walking the floor for safety purposes and looking for accidents or spills, debris, misplaced products, carts obstructing aisle ways, pallets stacked incorrectly, and unattended ladders. Once a safety issue was identified I would typically resolve the issue myself. The investigation and documentation of security incidents included conducting audits of cash registers and merchandise, reviewing video surveillance, investigating possible thefts or fraud, walking the floor and looking for suspicious behavior, and apprehending and processing shoplifters. For each incident that occurred, I was required to enter a report into Wal-Mart's computerized "Asset Protection Information System" (APIS) and was required to contact local law enforcement if necessary. I also worked on "National Priorities" checklists. A "National Priorities" checklist was a list of questions provided by Wal-Mart with "Yes" or "No" answers. The checklist guided the person filling out the checklist through the store and asked whether certain Wal-Mart policies and procedures were being followed. The answer to each question on the checklist was either "Yes" or "No" and I played no role in the formulation of the checklists. Customer service included the answering of customer questions as I walked through the store.

7. Wal-Mart's shoplifter apprehension policy is "AP09." It was a detailed policy that specifically outlines what Asset Protection Coordinators can and cannot do once they have identified a shoplifter. I played no role in preparing the "AP09" policy, did not have any influence over what goes into the policy, and was not permitted to deviate from the policy. The "AP09" policy plays an important role in the Asset Protection Coordinator's job and a substantial portion of my daily job duties had to be performed in accordance with that policy.

8. I estimate that approximately thirty (30) percent of my time was spent performing "managerial" tasks (i.e. tasks different than those regularly performed by the hourly paid employees), such as training or disciplining employees. I did not have the authority to hire or fire employees, and I also did not have the authority to set or adjust rates of pay. I did not have the authority to formulate policy for the store, but rather simply implemented Wal-Mart's policies without discretion.

**DECLARATION OF JIM VRETZOS**

PA0185

9.     I regularly worked over eight (8) hours per work day and over forty (40) hours per work week.  I typically worked six (6) days per work week, Monday through Friday.  I also worked Saturday or Sunday each work week.  I typically worked from approximately 7:00 a.m. to 6:00 p.m. each work day.  Additionally, during shifts when Wal-Mart received inventory, I was required to work fourteen (14) to sixteen (16) hours per work day.  Thefts or accidents occasionally occurred while I was at home.  As a salaried employee I was always "on call," and if such an issue occurred I was required to respond to the issue over the phone or in person at the store even though I was not scheduled to work.  I estimate that as an "Asset Protection Coordinator" I typically worked approximately sixty (60) hours per work week.   I was instructed to work as many hours as necessary to complete the tasks and job duties assigned to me, and as a salaried "Asset Protection Coordinator" I was required to work shifts of ten (10) hours or more per work day.

10.     As an "Asset Protection Coordinator" at Wal-Mart, I was considered an "exempt" employee and I was paid a salary.  As I was considered an "exempt" employee, I was not told I was entitled to overtime compensation and I did not receive overtime compensation, regardless of the number of hours I worked each week.  Wal-Mart did not require that I record my hours, so it was not my practice to do so.

11.     My immediate supervisors at Wal-Mart knew we were spending the vast majority of our time performing the same tasks as the hourly employees, and it was never conveyed to me in any way that this is not what Wal-Mart expected.  I was never once instructed by management, my immediate supervisor or anyone else at Wal-Mart that I should be spending more than 50% of my time performing work different than the work performed by the hourly workers.  Even if Wal-Mart's expectation was that "Asset Protection Coordinators" spend more than 50% of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the job duties of an "Asset Protection Coordinator."

12.     As an "Asset Protection Coordinator" at Wal-Mart, I was never told that I was permitted to take ten (10) minute, uninterrupted rest breaks. As a result, I was almost

**DECLARATION OF JIM VRETZOS**

PA0186

never able to take a ten (10) minute rest break. As an "exempt," salaried employee, when I worked through my rest breaks, I was not paid for any rest break missed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 18th day of July, 2013, at Folsom _____, California.


_____
JIM VRETZOS

PA0187

## DECLARATION OF BRANDY WALKENHAUER

I, Brandy Walkenhauer, declare that:

1.      I am over eighteen years of age and a resident of the City of Citrus Heights, California.  I have personal knowledge of the facts and statements set forth in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.      I am currently employed by Wal-Mart.  I worked for Wal-Mart Stores, Inc. ("Wal-Mart") since 2004.   I originally worked in Washington, but moved to California in January 2011. From January 2011 to December 2011, I worked as an "Asset Protection Coordinator" ("APC') in the Wal-Mart located in Folsom, California.  Since December 2011, I have been working as an "Asset Protection Manager" at the Sam's Club located in Roseville.

3.      As an APC working in the Folsom Wal-Mart, I was paid a salary and did not receive overtime compensation regardless of the number of overtime hours I worked. During the time I worked as a salaried APC for Wal-Mart, I learned Wal-Mart's policies, procedures, and practices.  However, I was not trained or informed by anyone at Wal-Mart regarding California overtime exemption laws.

4.      I spent approximately seventy-five percent (75%) of my time as an APC performing "non-managerial" tasks.  The "non-managerial" tasks I performed typically fell into seven (7) main categories: (1) attending daily meetings with Associates; (2) following National Priorities procedures; (3) verifying compliance with policies and safety procedures; (4) walking the store; (5) conducting investigations; (6) performing customer service duties; and (7) reviewing exceptions to reports.

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

PA0188

5.      Throughout each day, I was required to attend several meetings with other Associates. These meetings included the general store meeting, (which were every day) as well as any other weekly meetings that might have been held that day. Each meeting could last anywhere between ten (10) minutes and an hour, and I could attend as many as four (4) in a single day. Following the National Priorities procedures required me to complete a checklist every week. I would print the checklist each week and give either a check or a "no" for each item on the list. The checklist covered the National Priorities procedures that Wal-Mart wanted in place in every store. I completed one of these checklists every week, and would submit it online. Once it was online, it could be reviewed by my Market Asset Protection Manager, Chad Nevarez. My duties of verifying compliance with policies and safety procedures required me to make sure safety stations were well stocked, and conduct safety inspections such as the Hazmat or OSHA inspections. Like the National Priorities checklists, the safety audits contained questions and descriptions of what to look for that guided me through the audit. I was told how often to do each audit, and some, such as the Hazmat Audit, had to be completed once a week. Checking the safety stations required me to tour the store and make sure that all of the safety stations were well stocked, and to bring more supplies to them when they were running low. There were approximately fifteen (15) safety stations in the Wal-Mart located in Folsom that I would regularly check. Every day, I would also have to conduct a walking tour of the store. I would walk throughout the entire store, looking for possible shoplifters or spills in the aisle. I would occasionally conduct these tours "undercover" so that I would be able to catch shoplifters. My job duties of conducting investigations meant that I had to conduct internal investigations of Wal-Mart employees. These investigations primarily required me to review surveillance footage of Associates. I would most commonly review footage of specific employees who were suspected of engaging in internal theft, but I would also periodically review old footage from high shrink departments as well. Performing customer service duties was an important aspect of my job because all Wal-Mart employees are expected to be friendly and helpful to

2

PA0189

customers.  While I was walking the floor, I would answer any questions that a customer might have, and help them find merchandise when I could.  I would also review surveillance footage to help customers find items they believe they might have left at the register, or lost in the store.  My duties of reviewing exceptions to reports required me read through several reports on a daily basis and confirm that the exceptions that were marked in the report were accurate.  In order to do this, I would have to physically go down the store aisles and to the back inventory to make sure that the exception which reported shrinkage had accurately reported a loss in inventory.

6.    Through my job duties as an APC for Wal-Mart, I was sent to several other stores to either help with internal investigations or to assist in store inventory.  During these visits, I was able to see how several other Wal-Mart stores operated, and the type of work the APC's in that store were required to perform.  All of the APCs that I observed would perform all of the same types of job duties and tasks as described above in their home store.  The APC job position is an identical position at all Wal-Mart stores.

7.    I estimate that approximately twenty-five percent (25%) of my time or less was spent performing "managerial" tasks, such as training subordinate employees or drafting schedules.  I was not given the authority to hire or fire employees.

8.    As an APC, I would regularly work from forty-five (45) to fifty (50) hours each week.  My Market Asset Protection Manager, Chad Nevarez, as well as my store manager, knew that I was working more than forty (40) hours a week.  I was required to work as many hours as were necessary to complete my weekly assignments.

9.    When I was given the APC job title, I was told that I was considered an "exempt" employee.  I was told that as an "exempt" employee, I would not receive overtime compensation, regardless of the number of hours I worked each week.  I was not required to record the actual number of hours that I spent working each day, and it was not my practice to do so.

/ / / /

3

PA0190

10.    No one at Wal-Mart instructed me that I should have been spending more than fifty percent (50%) of my time performing "managerial" tasks.  Even if Wal-Mart's expectation was that an APC spend more than fifty percent (50%) of their time on managerial work, it would be an unreasonable and unrealistic expectation in light of the nature of the responsibilities of an APC.

11.    Because of the pressure to meet my weekly deadlines, and my obligation to always be accessible to associates and other members of management, I was almost never able to take a full ten (10) minute rest break, or a thirty (30) minute uninterrupted lunch break.   Throughout my day, I had to keep my phone and radio with me, and take any calls that I received.  It was nearly impossible for me to take a full thirty (30) minute lunch break where I would not be interrupted.  As an "exempt," salaried employee, when I worked through my rest and meal breaks; I was not paid one (1) hour of pay for any meal or rest break that I missed.  I have never been given any additional compensation for working through my rest and lunch breaks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 24 day of March, 2013, at Citrus Heights, California.

_____
BRANDY WALKENHAUER

4

PA0191

EXHIBIT "7"

PA0192

R. Rex Parris, Esq. (SBN 96567)
rrparris@rrexparris.com
Alexander R. Wheeler, Esq. (SBN 239541)
awheeler@rrexparris.com
Kitty Szeto, Esq. (SBN 258136)
kszeto@rrexparris.com
Jacob L. Karczewski, Esq. (SBN 268295)
jkarczewski@rrexparris.com
John M. Bickford, Esq. (SBN 280929)
jbickford@rrexparris.com
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:   (661) 949-2595
Facsimile:    (661) 949-7524

Edwin Aiwazian, Esq. (SBN 232943)
edwin@lfjpc.com
**LAWYERS for JUSTICE, PC**
410 West Arden Avenue, Suite 203
Glendale, California 91203
Telephone: (818) 265-1020
Facsimile:  (818) 265-1021

Attorneys for Plaintiff and the Putative Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALADDIN ZACKARIA; individually, and on behalf of other members of the general public similarly situated, and on behalf of aggrieved employees pursuant to the Private Attorneys General Act ("PAGA"); <br><br> Plaintiff, <br><br> v. <br><br> WAL-MART STORES, INC., a Delaware corporation and Does 1 through 100, inclusive, <br><br> Defendants. | Case No. 5:12-cv-01520-FMO-SP <br><br> **CLASS ACTION** <br><br> **DECLARATION OF ALEXANDER R. WHEELER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION (DEPOSITIONS)** <br><br> [Assigned for All Purposes to the Honorable Fernando M. Olguin, Courtroom 22] |

I, Alexander R. Wheeler, declare as follows:

I am an attorney duly licensed to practice before all courts of the State of California and I am a partner at the R. Rex Parris Law Firm, attorneys of record for Aladdin Zackaria ("Plaintiff") in this case. The facts set forth in this declaration are within my personal knowledge and, if called as a witness, I could and would competently testify as follows.

1.     I have practiced law in Southern California since December of 2005, with the vast majority of my time focused solely on the prosecution of class action litigation. Our law firm and I have been court-appointed class counsel on multiple cases and have obtained the recovery of hundreds of millions of dollars for California employees. Additionally, I was litigation and trial counsel in *Marciano v. Fahs*, Los Angeles Case No. BC 375824, which resulted in the highest jury verdict of 2009. I received a "trial lawyer of year" award in 2009 for obtaining this verdict.

2.     I, along with R. Rex Parris, am primarily responsible for handling this litigation on behalf of the R. Rex Parris Law Firm. Myself, along with R. Rex Parris, Kitty Szeto, Jacob L. Karczewski, and John M. Bickford, interact on a regular basis in regards to this litigation.

3.     On January 22, 2013, Plaintiff took the deposition of Kristel Ariana Alamares, an Asset Protection Coordinator. Attached hereto as **Exhibit "A"** are true and correct copies of various excerpts from the deposition transcript of Ms. Alamares.

4.     On July 24, 2013, Wal-Mart took the deposition of Mike Alvarez, an Asset Protection Coordinator. Attached hereto as **Exhibit "B"** are true and correct copies of various excerpts from the deposition transcript of Mr. Alvarez.

5.     On July 19, 2013, Wal-Mart took the deposition of Roberto Alvarez, an Asset Protection Coordinator. Attached hereto as **Exhibit "C"** are true and correct copies of various excerpts from the deposition transcript of Mr. Alvarez.

1

6.     On September 6, 2013, Wal-Mart took the deposition of April Banks, an Asset Protection Coordinator.  Attached hereto as **Exhibit "D"** are true and correct copies of various excerpts from the deposition transcript of Ms. Banks.

7.     On July 17, 2012, Plaintiffs took the deposition of Jeffrey Coburn, a Rule 30(b)(6) deponent and a Regional Asset Protection Manager.  Attached hereto as **Exhibit "E"** are true and correct copies of various excerpts from the deposition transcript of Mr. Coburn.

8.     On August 15, 2012 and March 14, 2013, Plaintiff took the deposition of Maryann Dabney, a Rule 30(b)(6) deponent a Regional Asset Protection Manager.  Attached hereto as **Exhibit "F"** are true and correct copies of various excerpts from the deposition transcript of Ms. Dabney.

9.     On September 5, 2013, Wal-Mart took the deposition of Randy Devine, an Asset Protection Coordinator.  Attached hereto as **Exhibit "G"** are true and correct copies of various excerpts from the deposition transcript of Mr. Devine.

10.     On July 18, 2013, Wal-Mart took the deposition of Jim Galbreath, an Asset Protection Coordinator.  Attached hereto as **Exhibit "H"** are true and correct copies of various excerpts from the deposition transcript of Mr. Galbreath.

11.     On September 3, 2013, Wal-Mart took the deposition of Henry Garcia, an Asset Protection Coordinator.  Attached hereto as **Exhibit "I"** are true and correct copies of various excerpts from the deposition transcript of Mr. Garcia.

12.     On August 29, 2013, Wal-Mart took the deposition of David Gomez, an Asset Protection Coordinator.  Attached hereto as **Exhibit "J"** are true and correct copies of various excerpts from the deposition transcript of Mr. Gomez.

13.     On January 8, 2013, Plaintiff took the deposition of Estela Gonzalez, an Asset Protection Coordinator.  Attached hereto as **Exhibit "K"** are true and correct copies of various excerpts from the deposition transcript of Ms. Gonzales.

DECLARATION OF ALEXANDER R. WHEELER

PA0195

14.     On September 4, 2013, Wal-Mart took the deposition of Randall Howdeshell, an Asset Protection Coordinator.  Attached hereto as **Exhibit "L"** are true and correct copies of various excerpts from the deposition transcript of Mr. Howdeshell.

15.     On October 1, 2013, Plaintiff took the deposition of Patricia Kaiser, an Asset Protection Coordinator.  Attached hereto as **Exhibit "M"** are true and correct copies of various excerpts from the deposition transcript of Ms. Kaiser.

16.     On June 5 and June 6, 2012, Plaintiff took the deposition of Ron Lance, a Rule 30(b)(6) deponent and the Senior Director, Operations Support, Asset Protection.  Attached hereto as **Exhibits "N"** and **"O"** are true and correct copies of various excerpts from the deposition transcript of Mr. Lance.

17.     On November 7, 2012, Plaintiff took deposition of Bobbie Jo Lewis, a Market Asset Protection Manager.  Attached hereto as **Exhibit "P"** are true and correct copies of  various excerpts from the deposition transcript of Ms. Lewis.

18.     On July 23, 2013, Wal-Mart took deposition of Kahala Lincoln, an Asset Protection Coordinator.  Attached hereto as **Exhibit "Q"** are true and correct copies of various excerpts from the deposition transcript of Ms. Lincoln.

19.     On September 10, 2013, Wal-Mart took deposition of Michael Perkins, an Asset Protection Coordinator.  Attached hereto as **Exhibit "R"** are true and correct copies of various excerpts from the deposition transcript of Mr. Perkins.

20.     On January 29, 2013, Plaintiff took deposition of S. Earl Watson, a Rule 30(b)(6) deponent and a Business Unit Leader.  Attached hereto as **Exhibit "S"** are true and correct copies of various excerpts from the deposition transcript of Mr. Watson..

14.     On February 7, 2013, Plaintiff took deposition of Eric York, a Regional Asset Protection Manager.  Attached hereto as **Exhibit "T"** are true and correct copies of various excerpts from the deposition transcript of Ms. York.

3

PA0196

15.     On August 16 and August 17, 2012, Wal-Mart took deposition of Plaintiff Aladdin Zackaria.  Attached hereto as **Exhibits "U"** and **"V"** are true and correct copies of various excerpts from the deposition transcript of Mr. Zackaria.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of March 2014 at Lancaster, California.


/s/ Alexander R. Wheeler
Alexander R. Wheeler