**EXHIBIT "A"**

PA0198

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4  ALADDIN ZACKARIA, individually,
   and on behalf of other members
5  of the general public similarly
   situated, and on behalf of        CASE NO. 5:12-cv-01520-
6  aggrieved employees pursuant to   VAP-SP
   the Private Attorney's General
7  Act ("PAGA");

8          Plaintiff,

9      vs.

10 WAL-MART STORES, INC., a
   Delaware corporation and DOES 1
11 through 100, inclusive,

12         Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
13

14              NONCONFIDENTIAL PORTION

15

              VIDEOTAPED DEPOSITION OF
16
              KRISTEL ARIANA ALAMARES
17

18              January 22, 2013

19                10:04 a.m.

20

              402 West Broadway
21
                Suite 1600
22
              San Diego, California
23

24

       Barbara A. Baker, RPR, CSR No. 13033
25



1      Q.  How long have you been at Encinitas store as an

2  APM?

3      A.  A little over six months.

4      Q.  Is this a superstore or a regular Wal-Mart?

5      A.  Supercenter.

6      Q.  Vista; is that a supercenter or a regular?

7      A.  It now is a supercenter.

8      Q.  It went through some changes back in 2010;

9  right?

10     A.  I don't recall the year.  But it was -- it went

11  through an expansion.

12     Q.  Now, Kearny Mesa; was that a superstore or a

13  regular Wal-Mart?

14     A.  It was a regular.

15     Q.  How long did you work out of the Vista store as

16  an APC or APM?

17     A.  About three, four years.

18     Q.  Now, whether you were job titled APC or APM,

19  you were always paid a salary; correct?

20     A.  Yes.

21     Q.  And they never paid you overtime if you worked

22  more than 40 hours a week; is that correct?

23     A.  No.  Yes, that is correct.  I'm sorry.

24     Q.  When you worked out of the Vista store,

25  approximately how many hours a day do you work or did

1   So you're not necessarily distributing information.

2       Q.  I see.  So they're directives from corporate on

3   what to look in to for a particular time period?

4           MS. MÜNCK:  Object to the form of the question.

5   BY MR. HAN:

6       Q.  Yes?

7       A.  Yes.

8       Q.  And this is -- and the national priorities are

9   job duties which you perform as well as you delegate to

10  other members of your staff; right?

11      A.  No.  Well, yes.

12      Q.  Okay.  So you do perform some, and you delegate

13  some; right?

14      A.  Yes.

15      Q.  Do you ever have the discretion to deviate from

16  the national priorities?  For example, if the national

17  priority says you have to do the audit on the electronic

18  sales for that particular store, can you say "No, I

19  don't want to do it.  I don't think it's necessary"?

20      A.  No.

21      Q.  If it's on the national priority, it's a

22  checklist you have to follow; right?

23          MS. MÜNCK:  Object to the form of the question.

24          THE WITNESS:  I wouldn't say it's a checklist.

25  ///



1          Now, in the eight job categories that's listed,

2     which you confirmed are performed by APMs, which of the

3     eight job categories would that -- this particular task

4     fall under?

5          And you can refer to Exhibit 1 where it has the

6     eight.

7        A.  It could be controls unexplained loss.  It

8     could be coordinates -- coordinating assignments.  It

9     could be detecting the problem and fixing it and

10    investigating it.  It could be compliance.

11       Q.  Safety?

12       A.  Safety.  It could be training.

13       Q.  I see.  So when you're performing these

14    functions that are outlined here on this job

15    description, which you confirmed are performed by APMs,

16    you're following this routine; correct?

17       A.  I don't follow the routine to the T, no.

18       Q.  Well, are you supposed to verify hazardous

19    waste, food, and leaking item handling?  Do you do that?

20       A.  I do that, yes.

21       Q.  And that's an APM function; right?

22       A.  Yes.  But it says "due by 10:30 a.m."  And I

23    don't always do it by 10:30 a.m.

24       Q.  Okay.  But you do it; right?

25       A.  Yes.

1        REPORTER'S CERTIFICATION

2

3        I, Barbara A. Baker, a Certified Shorthand

4   Reporter in and for the State of California, do hereby

5   certify:

6

7        That the foregoing witness was by me duly

8   sworn; that the videotaped deposition was then taken

9   before me at the time and place herein set forth; that

10  the testimony and proceedings were reported

11  stenographically by me and later transcribed into

12  typewriting under my direction;

13

14       That the foregoing is a true record of the

15  testimony and proceedings taken at that time.

16

17       IN WITNESS WHEREOF, I have subscribed my name

18  this 27th day of January, 2013.

19

20       /S/ Barbara A. Baker

21       Barbara A. Baker, RPR, CSR No. 13033

22

23

24

25



EXHIBIT "B"

PA0204

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4

5    ALADDIN ZACKARIA; individually,
     and on behalf of other members
6    of the general public similarly
     situated, and on behalf of
7    aggrieved employees pursuant to
     the Private Attorneys General
8    Act ("PAGA");

9            Plaintiff,

10       vs.                            CASE NO. EDCV12-01520
                                        VAP (SPx)
11
     WAL-MART STORES, INC., a
12   Delaware corporation; and DOES
     1 through 100, inclusive,
13
             Defendant.
14
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
15

16                    DEPOSITION OF

17                    MIKE ALVAREZ

18

19                    July 24, 2013

20                      9:51 a.m.

21

22          1325 Spruce Street; Suite 310

23                 Riverside, California

24

25      Margaret M. Bourgeois, CSR No. 11569



1      A.    45.

2      Q.    And 45, you said?

3      A.    Yes.

4      Q.    And you became an asset protection

5   coordinator in 2006.  Right?

6      A.    Yes.  Yes.

7      Q.    Has your -- the -- have the hours for which

8   you've been scheduled in a work week, have they

9   fluctuated over the last seven years?

10          MS. SZETO:  Objection.  Vague and ambiguous.

11          THE WITNESS:  Yes.

12   BY MS. MUNCK:

13     Q.    So today your schedules typically have you

14   scheduled to work 45 hours.  Right?

15     A.    Yes.

16     Q.    In the past, give me the range of hours, if

17   you can recall, that you were scheduled to work.

18     A.    I believe it was 40, and it might have even

19   been less than that.

20     Q.    Okay.  Do you know if your 45-hour work week

21   schedule today includes meal breaks?

22          MS. SZETO:  Objection.  Vague and ambiguous.

23          THE WITNESS:  Yes, it does.

24   BY MS. MUNCK:

25     Q.    Do you know whether that 45-hour work week



1   customer, ringing them out, then they cancel it, cancel

2   it.  So what happened to that product?  Did it go back

3   to the store or did the customer walk out with it?

4   BY MS. MUNCK:

5       Q.   And in this instance your AP team was able to

6   identify additional cases?

7       A.   Correct.  It started showing it was another

8   associate involved that was getting the free

9   merchandise.  Then we start watching that person and

10  there was another associate involved.

11      Q.   How many associates ultimately were involved,

12  if you recall, with this particular pattern?

13           MS. SZETO:  Objection.  Incomplete

14  hypothetical.

15           THE WITNESS:  Four or five.

16  BY MS. MUNCK:

17      Q.   Under "Strength and Opportunities, Associate

18  Comments," this is the next section of this Performance

19  Evaluation.  The third item down you identified

20  "Execution of national priorities."  Do you see that?

21      A.   Yes.

22      Q.   What are national priorities?

23      A.   They were weekly tasks that were assigned to

24  us and they broke them down in different categories

25  such as -- jeez, I forgot.  They switched it now.



1    They're called -- it's "AP assessment" is what they

2    call it now.  But they fell in buckets such as external

3    theft, safety -- I forgot the other one.

4        Q.   That's okay.  This isn't a memory test.

5        A.   Okay.

6        Q.   I'm just looking for your best recollection

7    sitting in a chair in a strange environment.  What's

8    the purpose of having you complete particular tasks for

9    national priorities or AP assessment?

10            MS. SZETO:  Objection.  Calls for

11   speculation.  Lacks foundation.

12            THE WITNESS:  To impact any potential losses,

13   shrink or safety or compliance violations.

14   BY MS. MUNCK:

15       Q.   Flipping to the back side of this page.  And

16   before I do that I want to make sure that we're on

17   the -- in kind of the same -- we have looked at

18   "Strengths and Opportunities," "Associate Comments."

19   The next box is "Strength and Opportunities," "Manager

20   Comments."  Right?

21       A.   Yes.

22       Q.   And flipping, then, to the back side is one

23   of the strengths -- one of your strengths identified by

24   your MAPM, the utilizing a hands-on approach for

25   teaching and training both within the AP and management



1  with the market manager and I want to say quarterly,

2  like, market meetings where they're elaborating and

3  they're going over the new procedures or the same ones.

4  BY MS. SZETO:

5      Q.   Let me clarify my question.  We talked about

6  the PIR checklist, and that's one example of the

7  checklist that tells you, an APC, what to look for in

8  doing your job.  Right?

9      A.   Correct.

10     Q.   Are there other checklists that tell APCs

11 what to do with respect to each of their tasks?

12         MS. MUNCK:  Objection.  Vague and ambiguous.

13         THE WITNESS:  Yeah, it's that guide that I

14 was talking about; it gives you like a daily breakdown

15 of your daily requirements.  And then inside that guide

16 they also give you the SOP, which is that standard

17 operating procedures, which kind of breaks down and

18 elaborates more on what those assigned tasks are.

19 BY MS. SZETO:

20     Q.   This guide, what are examples of the daily

21 requirements of APC?

22     A.   Verifying the PLE.  I don't know, I can't

23 think right now.  I have it in my -- it's in my wall.

24 I walk with it.

25     Q.   You have a copy of the daily guide on your



1    find as an APC?

2              MS. MUNCK:  Vague and ambiguous.

3              THE WITNESS:  I don't recall.

4    BY MS. SZETO:

5        Q.   Are any of the specific routines that we have

6    talked about today in your deposition reflected on the

7    job description that you reviewed that's Exhibit 2?

8              MS. MUNCK:  Objection.  Vague and ambiguous.

9    Overbroad.

10             THE WITNESS:  On the job descriptions here?

11   BY MS. SZETO:

12       Q.   Yes.

13       A.   In detail or do they pertain to it?

14       Q.   Are the routines that we identified today

15   specifically reflected on the job description that's on

16   Exhibit 2?

17             MS. MUNCK:  Objection.  Vague and ambiguous

18   with respect to "specifically."

19             THE WITNESS:  It doesn't say the name of that

20   report on the job description.

21   BY MS. SZETO:

22       Q.   Does the job description that's marked as

23   Exhibit 2 that you've looked at contain the names of

24   each of the routines that we have just identified?

25             MS. MUNCK:  Objection.  Vague and ambiguous.



1  Mischaracterizes his testimony.

2          THE WITNESS:  No, they don't.

3  BY MS. SZETO:

4      Q.   Does the job description that you looked at

5  marked as Exhibit 2 talk about APCs watching CCTV

6  tapes?

7          MS. MUNCK:  Objection.  Vague and ambiguous.

8          THE WITNESS:  Do you mind if I look at it?

9  BY MS. SZETO:

10     Q.   Sure.

11     A.   No, it does not.

12     Q.   Does the job description talk about checking

13  E-mails as a daily routine of the APCs?

14     A.   No, it does not.

15     Q.   Does the job description talk about the APC

16  routine of verifying hazardous waste handled?

17          MS. MUNCK:  Assumes facts not in evidence.

18  Vague and ambiguous.

19          THE WITNESS:  No, it does not.

20  BY MS. SZETO:

21     Q.   Does the job description state that the APC

22  job -- one of the APC's job duties is to enter APIS

23  cases?

24          MS. MUNCK:  Assumes facts not in evidence.

25          THE WITNESS:  No, it does not.



1    BY MS. SZETO:

2        Q.   Does the job description talk about the APCs

3    using the guidelines that you've testified to earlier

4    to do their job?

5               MS. MUNCK:  Vague and ambiguous.  Assumes

6    facts not in evidence.

7               THE WITNESS:  No, it does not.

8    BY MS. SZETO:

9        Q.   Does the job description talk about the APC

10   doing national priorities?

11       A.   No, it does not.

12       Q.   Does the job transcription talk about APCs

13   doing AP assessments?

14       A.   No, it does not.

15       Q.   Does the job description identify the use of

16   any checklist by the APC?

17       A.   No, it does not.

18       Q.   Does the job description talk about walking

19   the store?

20       A.   No, it does not.

21       Q.   As an APC do you provide customer service at

22   the stores?

23       A.   Occasionally.

24       Q.   What do you do when you provide customer

25   service?



1    Q.   Is your lunch break also scheduled in there?

2    A.   No.

3    Q.   Is there anywhere that you can see what

4  time -- strike that.

5         Does Wal-Mart schedule a lunch break for you?

6         MS. MUNCK:  Objection.  Asked and answered.

7         THE WITNESS:  No.

8  BY MS. SZETO:

9    Q.   Does Wal-Mart schedule any rest breaks for

10  you as an APM?

11   A.   On the calendar?

12   Q.   At all.

13   A.   No.

14   Q.   What time do you normally take lunch break?

15   A.   There is that daily -- that daily checklist

16  that does tell us a lunch break, and it's three hours

17  after in the shift, but it doesn't give no meal breaks.

18   Q.   Okay.  Lunch break -- I think you're -- let

19  me clarify your testimony.  Does -- you're talking

20  about this daily routine checklist?

21   A.   Yes.

22   Q.   The new one?

23   A.   Right.

24   Q.   Does it have a lunch break?

25   A.   Yes.



1          MS. SZETO:  Objection.  Leading.  Compound.

2     Document speaks for itself.

3          THE WITNESS:  Yes.

4          MS. MUNCK:  That's all I have.  Thank you.

5          MS. SZETO:  Just a few more.

6

7                    FURTHER EXAMINATION

8     BY MS. SZETO:

9          Q.    It took you approximately a minute or so to

10    figure out which essential function, following up with

11    the key log, falls into.  Right?

12         A.    Yes.

13         Q.    Can the judge or the jury read Exhibit 2 by

14    itself and get a complete picture of what your

15    day-to-day job duties and tasks are as an APM?

16         A.    Repeat the question.

17         Q.    Can the judge or jury pick up the job

18    description that's been marked as Exhibit 2, read this

19    by itself and have a clear picture of what you do on a

20    day-to-day basis as an APM?

21         A.    Probably not.

22         MS. SZETO:  No more questions.

23         MS. MUNCK:  We are done.

24         (The deposition concluded at 6:36 p.m.)

25                         ***



```
 1              REPORTER'S CERTIFICATION

 2

 3        I, Margaret M. Bourgeois, Certified Shorthand

 4   Reporter, in and for the State of California, do hereby

 5   certify:

 6

 7        That the foregoing witness was by me duly sworn;

 8   that the deposition was then taken before me at the

 9   time and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony

13   and proceedings taken at that time.

14

15        IN WITNESS WHEREOF, I have subscribed my name this

16   29th day of July, 2013.

17

18

19

20
```



```
21   _____

22        Margaret M. Bourgeois, CSR No. 11569

23

24

25
```

ESQUIRE
SOLUTIONS

EXHIBIT "C"

PA0216

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4

5  ALLADIN ZACKARIA;            )
   individually, and on behalf )
6  of other members of the      )
   general public similarly     )
7  situated, and on behalf of   )
   aggrieved employees          )
8  pursuant to the Private      )
   Attorneys General Act        )
9  ("PAGA");                    )
                                )
10                 Plaintiffs,  )
                                )
11    VS.                       ) CASE NO:
                                ) EEDCV12-01520 VAP (SPx)
12                              )
   Wal-Mart STORES, INC., a     )
13 Delaware corporation; and    )
   DOES 1 through 100,          )
14 inclusive,                   )
                                )
15                 Defendant.   )
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

16

17                   DEPOSITION OF

18                  ROBERTO ALVAREZ

19

20                  JULY 19, 2013

21                    9:31 A.M.

22

23                   Suite 1900
                1840 Century Park East
                Los Angeles, California

24

25          Aurora Bowser, CSR No. 12801



1  store, what were your responsibilities?

2      MS. SZETO:  Objection, lacks foundation,

3  vague and ambiguous.

4      THE WITNESS:  To ensure merchandise

5  protection is in place, that the associates in the

6  store are providing an environment where customer

7  service is number one, you know, priority to deter

8  theft.

9  BY MR. GOLDICH:

10     Q    And in doing your role of managing shrink

11 in the store, did you conduct various audit or

12 reviews of store procedures on a regular basis?

13     A    Yes.

14     Q    Are you familiar with the term "national

15 priorities"?

16     A    Yes.

17     Q    What are the national priorities, or what

18 have they been over the years at Wal-Mart?

19     A    To summarize -- they've been specific

20 tasks that we do to monitor specific process, to

21 audit a specific process.

22     Q    And what is your understanding what the

23 purpose is in doing the monitoring functions as

24 you've described them?

25     A    To ensure they are in place to reduce



1      Q    Do you know what SSOP is?

2      A    Yeah.

3      Q    What is that?

4      A    It's safety and security -- I can't

5  recall the exact term, but --

6      Q    Operating procedure probably?

7      A    Something like that.

8      Q    Go ahead.  I interrupted you.

9      A    It's a -- it was the revision to national

10  priorities.

11      Q    So would you agree that national

12  priorities and SSOPs are the same thing?

13      A    Yes.

14      Q    Do you complete review of the SSOP or

15  national priorities?

16      A    Yes.

17      Q    As an APC?

18      A    Yeah.  The thing is that, these things

19  like update every year, so we're no longer doing

20  it.

21      Q    You're no longer doing what?

22      A    SSOP.

23      Q    Are you doing national priorities still?

24      A    No.  It's AP Assessment.

25      Q    Okay.  Another name change, right?



1      A    Yes.

2      Q    But the same thing?

3      A    Different procedures.

4      Q    There are different questions that are

5   asked of you, right?

6      A    Correct.

7      Q    National priorities or SSOPs or

8   assessments are questions that Wal-Mart poses to

9   each of the APCs to be answered either on a weekly

10  or daily basis, right?

11     A    Weekly.

12     Q    They are all done on a weekly basis?

13     A    The SSOPs are done weekly.  The AP

14  assessments are done biweekly now.

15     Q    And there's documents that you are

16  provided to conduct the SSOPs, national

17  priorities, and assessments, correct?

18     A    Correct.

19     Q    So it would have a question for you to

20  answer, right?

21     A    Correct.

22     Q    And in order to answer that question,

23  there are different steps for to you follow in

24  order to figure out the answer to that question,

25  right?



1        A    Correct.

2        Q    Do all APCs at all stores in California

3    do the same SSOPs, national priorities, or

4    assessments at the same time?

5        MR. GOLDICH:  Objection to the form, vague.

6        THE WITNESS:  Not at the same time.

7    BY MS. SZETO:

8        Q    Let me rephrase the question.

9        A    Okay.

10       Q    You said national priorities are weekly,

11   right?

12       A    Yeah.

13       Q    So any given week, are you performing the

14   same National Priority as an APC at a store in

15   Sacramento?

16       A    It all depends on where they fit it on

17   there on their week.

18       Q    You don't finish it all on July 18th,

19   right?

20       A    We submit our results on Fridays.

21       Q    Okay.  There's a deadline by when APCs

22   must complete the national priorities, right?

23       A    Correct.

24       Q    But whenever -- you know, whether you do

25   it Monday, Tuesday, Wednesday or Thursday or even



1    Friday, that may be different among APCs, right?

2        A    Correct.

3        Q    But all APCs are required to complete the

4    same national priorities in a given week, correct?

5        A    Correct.

6        Q    How long would you say it took or it

7    takes -- let's say, took.

8            How long did it took for you to perform or

9    to conduct the national priorities on average on a

10   weekly basis?

11       MR. GOLDICH:  I'm just going to object to

12   vagueness in terms of the absence of any time

13   frame, because he already said the procedure

14   changed a lot over the years, so I object to the

15   lack of a time frame.

16       THE WITNESS:  It depends on what program we

17   were on.

18   BY MS. SZETO:

19       Q    When you say "what program," meaning

20   SSOPs or national priorities or assessments?

21       A    Correct.

22       Q    Okay.  Let's talk about SSOPs.

23           On average, how long did it take for you to

24   complete your SSOPs -- let me strike that.

25           Were they done on a weekly basis, SSOPs?



1    that correct?

2         A    It's given to us on a weekly basis.  We

3    complete it on a week and anything that we came

4    across to where it -- we didn't do or we found an

5    opportunity, the second week is mainly used for

6    corrective action or action planning.

7         Q    They are called exceptions, right?

8         A    Yes.

9         Q    And with the exceptions -- so your -- you

10   have these -- you have a question/answer, right,

11   on a weekly basis?

12        A    Correct.

13        Q    And there are all of these steps for you

14   to answer that question, right?

15        A    Correct.

16        Q    And then you may have exceptions, right,

17   as the result of your conducting the National

18   Priority, right?

19        A    Correct.

20        Q    And then are there red flags that come

21   up?

22        A    What do you mean by "red flags"?

23        Q    Here's where I'm going to struggle a

24   little bit with your Wal-Mart technology.

25             When used national priorities, when you have



1    an exception, you go on to Feret and retrieve.

2         Do you do anything with Feret?

3         A    That is a -- a program that we use during

4    case development time, you could say.  So -- and

5    what it is, is just it generates transactions that

6    may lead to potential internal cases.  So when you

7    say a "red flag," yeah, if I -- if I click on

8    exception and it appears that a cashier passed

9    merchandise, yeah, I would research it.

10        Q    What are "red flags"?

11        A    So if there's a transaction where the

12   cashier voided out 10 items out of the 15, I would

13   definitely look to see what happened to those

14   items.  Did they get scanned, voided and bagged?

15        Q    Okay.  So there are certain red flags

16   that Wal-Mart has created and what you just told

17   me is an example.  So you're looking for these red

18   flags, right?

19        A    Correct.

20        Q    Now, is that -- am I mixing the two?  Is

21   that just Feret or is that national priorities?

22        A    That's just Feret.

23        Q    Okay.  Let's go back to national

24   priorities then.

25        When you find an exception, what happens?



1  live recording that's going on in the back office?

2      A     In our office?

3      Q     Yes.

4      A     Yes.

5      Q     So when you're watching CCTV video, are

6  you watching a live feed or the tapes or

7  selections that you're reviewing?

8      A     It's video that's already been recorded.

9      Q     Do you ever watch the live recording?

10     A     Rarely.

11     Q     Does anybody do that?

12     A     My APAs.

13     Q     When you're on the sales floor, are you

14 ever watching to see if customers are stealing?

15     A     Yeah.  I have an eye for it just because

16 I've done it before, so you can say that I know

17 what to look for in behaviors and behaviors, so it

18 will stand out to me.

19     Q     It's something that you're consciously

20 doing all the time when you're on the sales floor,

21 right?

22     A     Yeah.

23     Q     As an APC, do you apprehend perpetrators

24 of theft?

25     A     Very rare.



1      MR. GOLDICH:  Objection to the form of the
2  question, vague and ambiguous.
3  BY MS. SZETO:
4      Q    As a salaried employee, do you expect to
5  work more than eight hours a day without overtime
6  pay?
7      A    Yeah.  As needed.
8      Q    And even with that expectation, you still
9  cut short your next day when you did these
10  interviews of associates for integrity purposes,
11  right?
12      A    Right.
13      Q    And you said Joe told you to do that?
14      A    Throneberry.
15      Q    That's your MAPM, right?
16      A    Right.  I guess, you could say, it's like
17  a practice, because my current supervisor tells me
18  the same thing.
19      Q    So it's a practice by MAPM to tell APC
20  and APM to go home early if you worked overtime
21  the night before or the day before?
22      A    Yeah.
23      Q    Do MAPM know if you're working overtime?
24      A    Not if they are there or we tell them,
25  like, I'm going to be at, you know, interviewing



```
 1              REPORTER'S CERTIFICATION

 2

 3      I, Aurora Bowser, a Certified Shorthand Reporter

 4  in and for the State of California, do hereby

 5  certify:

 6          That the foregoing witness was by me duly sworn;

 7  that the deposition was then taken before me at the

 8  time and place herein set forth; that the testimony

 9  and proceedings were reported stenographically by me

10  and later transcribed into typewriting under my

11  direction; that the foregoing is a true record of the

12  testimony and proceedings taken at that time.

13

14          IN WITNESS WHEREOF, I have subscribed my name

15  this 24th day of July, 2013.

16

17

18  _____

19              Aurora Bowser, CSR No. 12801

20

21

22

23

24

25
```



Exhibit "D"

PA0228

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DISTRICT

4    ALADDIN ZACKARIA, individually, and)
     on behalf of other members of the  )
5    general public similarly situated, )
     and on behalf of aggrieved         )
6    employees pursuant to the Private  )
     Attorneys General Act ("PAGA"),    )
7                                        )
                 Plaintiffs,             )
8                                        )
             vs.                         ) EEDCV12-01520
9                                        )  VAP (SPx)
     WAL-MART STORES, INC., a Delaware   )
10   corporation; and DOES 1 through     )
     100, inclusive,                     )
11                                       )
                 Defendant.              )
12   _____)

13

14

15              DEPOSITION OF

16               APRIL BANKS

17

18        Friday, September 6, 2013

19        8:57 a.m. - 12:18 p.m.

20

21      3161 Michelson Drive, Suite 1000

22           Irvine, California

23

24

25     Reported by Ruben Garcia, CSR 11305



1    deposition of April Banks.  We are now going off the

2    record.

3              (Recess.)

4         THE VIDEOGRAPHER:  We are now going back on the

5    record.  The time on the video monitor is 10:50.

6    This is the beginning of DVD number 2 in the

7    continuing deposition of April Banks.

8    BY MS. STONE:

9         Q    Ms. Banks, you understand you're still

10   under oath, correct?

11        A    Yes.

12        Q    Are you familiar with something called the

13   National Priorities at Wal-Mart?

14        A    Yes.

15        Q    What do the National Priorities require?

16        MR. KARCZEWSKI:  Vague.  Calls for a narrative.

17        THE WITNESS:  I believe it was a list of --

18   checklist of items that need to be done every week

19   for the APM.

20   BY MS. STONE:

21        Q    This checklist of items, does that include

22   audits?

23        A    Yes.

24        Q    What type of audits?

25        A    If I recall correctly, we had to audit



1  boxes in claims. We had to audit boxes of

2  merchandise at the -- in the receiving area with the

3  DSD associates.

4      Q   Anything else?

5      A   I believe there were audits of the

6  electronics department with DVDs as well.

7      Q   What would the audits in these -- strike

8  that.

9          What would these audits in these various

10  departments entail?

11     MR. KARCZEWSKI: Same objections.

12     THE WITNESS: Basically scanning the

13  merchandise on hand or in the box that were going to

14  be shipped out to the claims facility or that were

15  coming into the store from warehouses and making

16  sure that the DSD associates had counted correctly;

17  they should be scanning each item, not scanning one

18  and then multiplying the number.

19  BY MS. STONE:

20     Q   As part of this audit process, did you

21  have to review any reports?

22     MR. KARCZEWSKI: Vague.

23     THE WITNESS: I don't recall.

24  BY MS. STONE:

25     Q   If the -- strike that.



1        A     No.

2        MR. KARCZEWSKI:   Object.

3   BY MS. STONE:

4        Q     Why not?

5        MR. KARCZEWSKI:   Object to the form.   Vague.

6   Calls for speculation.

7              If you know, go ahead.

8        THE WITNESS:   Some boxes were bigger than

9   others.

10  BY MS. STONE:

11       Q     In other words, may contain more goods

12  than a smaller box, for example?

13       A     Yes.

14       Q     Did the National Priorities have certain

15  questions that you had to complete?

16       MR. KARCZEWSKI:   Calls for speculation.

17       THE WITNESS:   Yes.

18  BY MS. STONE:

19       Q     And did you answer all those questions

20  yourselves -- yourself?

21       MR. KARCZEWSKI:   Object to the form of the

22  question.   Vague.   Assumes facts.

23              Go ahead.

24       THE WITNESS:   Yes.

25



1    BY MS. STONE:

2        Q    Did you ever delegate out any of those

3    questions to other member of your APA team?

4        MR. KARCZEWSKI:    Asked and answered.    Assumes

5    facts.    Object to the form of the question.

6        THE WITNESS:    No.

7    BY MS. STONE:

8        Q    Are you familiar with anything that

9    Wal-Mart designates as "routines"?

10       MR. KARCZEWSKI:  Vague.  Object to the form.

11       THE WITNESS:  And I'm sorry.  I have to go back

12   and say, yes, I did actually delegate some of the

13   questions on the National Priorities.  There were

14   times that I wasn't there and my APAs would do it.

15   BY MS. STONE:

16       Q    So in other words, they would fill that

17   role in your absence?

18       A    Yes.

19       Q    Okay.  And going back to the next

20   question, are you familiar with something Wal-Mart

21   calls "routines"?

22       A    Yes.

23       MR. KARCZEWSKI:  Same objections.  Sorry.

24   BY MS. STONE:

25       Q    And what do you understand "routines" to



1       THE WITNESS:  Not the training plan, no.

2    BY MS. STONE:

3       Q    Is there any other type of documentation

4    that tells you how to perform your job daily, weekly

5    or monthly?

6       MR. KARCZEWSKI:  Same objections, and

7    compound -- or I'm sorry, assumes facts.

8       THE WITNESS:  There is a routine that's in

9    place now, yes.

10   BY MS. STONE:

11      Q    And what do these routines instruct you to

12   do, if anything?

13      MR. KARCZEWSKI:  Calls for speculation.  Vague.

14           Go ahead.

15      THE WITNESS:  There is a chart that's set up

16   on -- that sets up your whole day that instructs you

17   to check everything from your e-mail to different

18   reports and different departments throughout the

19   day.  And even where your lunch should be.

20   BY MS. STONE:

21      Q    Does this routine plot out a 40-hour per

22   week work schedule?

23      MR. KARCZEWSKI:  Vague.  Assumes facts.  Object

24   to the form.

25      THE WITNESS:  I have not calculated the hours



1    THE WITNESS:  Yes.

2  BY MS. STONE:

3    Q    Do you regularly take rest breaks?

4    MR. KARCZEWSKI:  Vague.  Calls for speculation.

5  Calls for a legal conclusion.

6         Go ahead if you know what she's talking

7  about.

8    THE WITNESS:  No.

9  BY MS. STONE:

10    Q    Do you have any responsibility in

11  scheduling APAs at your store?

12    MR. KARCZEWSKI:  Vague.

13    THE WITNESS:  Yes.

14  BY MS. STONE:

15    Q    And what is your role in assigning

16  schedules?

17    MR. KARCZEWSKI:  Misstates witness' testimony.

18  Vague.

19    THE WITNESS:  I do the assigning of the

20  scheduling.

21  BY MS. STONE:

22    Q    Do you handle requests for time off?

23    A    Yes.

24    Q    Have you ever denied a request for time

25  off?



```
1              Do you recall that?
2         MS. STONE:  I'm sorry, about what?
3         MR. KARCZEWSKI:  I'll say that again.  Maybe it
4    didn't come out clear.
5    BY MR. KARCZEWSKI:
6         Q    You had a chance to talk with Ms. Stone
7    about the routine that applies for the APM position.
8              Do you recall that?
9         A    Yes.
10        Q    I think you mentioned it was a chart that
11   sets up the whole day -- and I'm paraphrasing -- and
12   what you do as an APM and when.
13             Do you recall that?
14        A    Yes.
15        Q    So the routine would be a tool that you
16   use to know what job duties you're supposed to
17   perform on a day-to-day basis; is that correct?
18        MS. STONE:  Object to form.  Vague.  Ambiguous.
19   Speculation.  Mischaracterizes witness' testimony.
20        THE WITNESS:  Yes.
21   BY MR. KARCZEWSKI:
22        Q    Do you -- strike that.
23             In your position as an APM, you still do
24   audits, right?
25        A    Yes.
```



1        Q    Okay.   Do you -- on a weekly basis, do you

2   still submit a summary to Wal-Mart at the end of the

3   week, letting them know that you completed certain

4   job duties?

5        MS. STONE:   Object to form.   Vague and

6   ambiguous.

7        THE WITNESS:   Yes.

8   BY MR. KARCZEWSKI:

9        Q    When you were an asset protection

10  coordinator -- we're going to operate under that

11  timeframe for the next series of questions.   Okay?

12       A    Okay.

13       Q    I believe you had a chance to talk with

14  Ms. Stone about the fact there were National

15  Priorities in place.

16            Do you recall that?

17       A    Yes.

18       Q    National Priorities is a check -- I think

19  you mentioned is a checklist of items for APCs to do

20  every week.

21            Do you recall that?

22       MS. STONE:   Object to form.   Vague.   Ambiguous.

23  Mischaracterizes testimony.

24       THE WITNESS:   Yes.

25



 1          MS. STONE:  Object to form.  Vague and

 2    ambiguous.  Foundation.  Assumes facts.

 3    Mischaracterizes witness' testimony.

 4    BY MR. KARCZEWSKI:

 5          Q    Go ahead.

 6          A    Yes.

 7          Q    Are these competencies really just skills

 8    that you use in the performance of your job duties

 9    as an APC?

10          MS. STONE:  Object to form.  Vague and

11    ambiguous.

12          THE WITNESS:  Yes.

13    BY MR. KARCZEWSKI:

14          Q    If I wanted to know -- strike that.

15               If the Court, in looking at your dec --

16    strike that.

17               If the Court looking at the APC job

18    position wanted to know what an APC did on a

19    day-to-day basis, should the Court rely on

20    Exhibit 3, the job description, or your description

21    of your job duties in paragraph 4 and paragraph 6 of

22    your declaration?

23          MS. STONE:  Object to form.  Vague and

24    ambiguous.  Compound.  Leading.  Speculation.

25    Mischaracterizes witness' testimony.



1       THE WITNESS:   The declaration.

2   BY MR. KARCZEWSKI:

3       Q    Okay.  You mentioned that -- you're

4   currently an APM; is that correct?

5       A    Yes.

6       Q    You mentioned that when you first came on

7   as an APM, you were classified as what's called an

8   APM in training.

9            Do you recall that?

10      A    Yes.

11      Q    Are there any different job duties you

12  performed as an APM in training than the job duties

13  you perform now as just a regular APM, that you can

14  recall?

15      MS. STONE:  Object to form.  Vague and

16  ambiguous.

17      THE WITNESS:  Just areas I may not be able to

18  go into; like the cash office, I wouldn't be able to

19  go in there without a salaried member of management.

20  I wouldn't be able to do a pharmacy audit by myself.

21  BY MR. KARCZEWSKI:

22      Q    Okay.  But you could do -- you could be --

23  you could go along with another APM and do a

24  pharmacy audit; is that correct?

25      A    Yes.  I'm sorry.

1  fire marshal logs?

2       A    Yes.

3       Q    Okay.  So you're still walking the store;

4  is that correct?

5       A    Yes.

6       Q    And you walked the store when you were an

7  APC; is that correct?

8       A    Yes.

9       Q    Okay.  You had a chance to talk with

10 Ms. Stone about instances where you've interacted

11 with different APCs during your tenure at Wal-Mart.

12           Do you recall that?

13      A    Yes.

14      Q    Have you had conversations with different

15 APCs during your tenure at Wal-Mart?

16      MS. STONE:  Object to form.

17      THE WITNESS:  Yes.

18 BY MR. KARCZEWSKI:

19      Q    Have you discussed the APC job with these

20 APCs that you've had these discussions with?

21      A    Yes.

22      MS. STONE:  Object to form.

23 BY MR. KARCZEWSKI:

24      Q    Remember, just a little bit of a pause.

25           Did you have a chance to talk about the



1    types of job duties that those APCs were doing at

2    their stores?

3         MS. STONE:   Object to form.   Vague and

4    ambiguous.

5         THE WITNESS:   Yes.

6    BY MR. KARCZEWSKI:

7         Q    From your experience based on those

8    conversations, is it your understanding that they

9    were performing substantially the same job duties as

10   an APC that you were performing as an APC?

11        MS. STONE:   Object to form.   Vague and

12   ambiguous.

13        THE WITNESS:   Yes.

14   BY MR. KARCZEWSKI:

15        Q    Do you know whether Wal-Mart has a

16   definition for the term "high-risk store"?

17        MS. STONE:   Object to form.   Vague and

18   ambiguous.

19   BY MR. KARCZEWSKI:

20        Q    If you know.

21        A    I don't know what the definition is.

22        Q    For hiring APAs, you mentioned you were

23   involved in that to some extent.

24             Do you recall that?

25        A    Yes.



```
 1   STATE OF CALIFORNIA        )
                                ) ss:
 2   COUNTY OF LOS ANGELES      )

 3

 4        I, RUBEN GARCIA, CSR, do hereby certify that I

 5   am a duly qualified Certified Shorthand Reporter, in and

 6   for the State of California, holder of Certificate

 7   Number 11305, which is in full force and effect and that

 8   I am authorized to administer oaths and affirmations;

 9        That the foregoing deposition testimony of the

10   herein named witness was taken before me at the time and

11   place herein set forth; that prior to being examined,

12   the witness named in the foregoing deposition, was duly

13   sworn or affirmed by me, to testify the truth, the whole

14   truth, and nothing but the truth;

15        That the testimony of the witness and all

16   objections made at the time of the examination were

17   recorded stenographically by me, and were thereafter

18   transcribed under my direction and supervision;

19        That I am not a relative or employee or attorney

20   or counsel of any of the parties nor am I financially

21   interested in the outcome of this action.

22        IN WITNESS WHEREOF, I have subscribed my name

23   this  10th    day of  September , 2013.

24

25        _____
          RUBEN GARCIA, CSR NO. 11305
```


ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
PA0242

EXHIBIT "E"

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2               FOR THE COUNTY OF SAN BERNARDINO

 3


 4    ALADDIN ZACKARIA;              )
      individually, and on behalf   )
 5    of other members of the       )
      general public similarly      )
 6    situated, and on behalf of    )
      aggrieved employees pursuant  )
 7    to the Private Attorneys      )
      General Act ("PAGA"),         )
 8                                   )
                      Plaintiff,    )
 9                                   )
                      VS.           ) CASE NO.  CIVRS1107132
10                                   ) CLASS ACTION
                                     )
11    WAL-MART STORES, INC., a       )
      Delaware corporation; and     )
12    DOES 1 through 100,            )
      inclusive,                    )
13                                   )
                      Defendants.   )
14                                   )

15

16            DEPOSITION OF JEFFREY LYLE COBURN

17                 LOS ANGELES, CALIFORNIA

18                 TUESDAY, JULY 17, 2012

19

20

21

22

23

24    REPORTED BY:
      HEATHERLYNN GONZALEZ
25    CSR #13646
```

2

PA0244

1     Q   So you mean a higher-level manager; right?

2     A   I mean another member of management.  So it

3  could be another assistant manager, shift manager, or

4  store manager.

5     Q   <u>But it wouldn't be another APC?</u>

6     <u>A</u>   <u>Usually, correct.  There's only one APC in</u>

7  <u>each store.</u>

8     Q   Did the APCs have the authority to terminate

9  any Wal-Mart Stores, Inc., employee without first

10  consulting a higher manager or the personnel

11  department?

12     A   They could consult an assistant manager,

13  which, in my opinion, is an equal level of

14  management.

15     Q   Okay.  Okay.  Did -- did the APCs have the

16  authority to terminate any Wal-Mart Stores, Inc.,

17  employee without first consulting a higher manager, a

18  personnel manager, or an assistant store manager?

19     A   I think that anyone that is going to

20  terminate an associate at Wal-Mart needs to consult

21  someone else, one of those that you just stated.

22  Another is assistant manager, a store manager, maybe

23  somebody in personnel -- HR or personnel.  I don't

24  think anybody at Wal-Mart is going to go off on their

25  own without at least consulting with someone else.

17

PA0245

1    in charge of the tire, lube express on the inside and

2    outside.  So because the tire lube express stores had

3    the shop outside, you were responsible for just that

4    one department.

5        Q    What are your primary responsibilities right

6    now?

7        A    As a regional AP manager?

8        Q    Correct.

9        A    As a regional AP manager, I -- I oversee the

10   asset protection programs in central California,

11   Alaska, and Hawaii.  I manage five direct reports,

12   five Market Asset Protection Managers.

13       Q    And what is your region called?

14       A    We -- the actual title of it is central

15   California, Alaska, and Hawaii.  We have a region

16   number which is region 54.

17       Q    How many regions cover California?

18       A    There's three regions in California.  One in

19   Northern California.  One in Southern California.

20   Then Central California is mine, but it also includes

21   Alaska and Hawaii.

22       Q    And what are your primary job duties?

23       A    It's managing the asset protection program.

24   I mean, it could include communicating with my MAPMs,

25   could be dealing with any customer complaints that

1    might come up.  You know, basically -- I mean,

2    there's a lot.  But managing the asset protection

3    program is the best way I can broadly state it.

4         Q    And as a Market Asset Protection Manager,

5    what were your primary job responsibilities?

6         A    I over -- oversaw the asset protection; so

7    the safety, security, and asset protection in nine

8    Wal-Mart Stores in Metro L.A.

9         Q    And what were your job -- primary job

10   duties?

11        A    I was managing the APMs at the nine stores.

12   Primary job duties is reviewing the safety, security

13   in stores, as well as the loss prevention or asset

14   protection programs in the stores.

15        Q    Currently what percentage of your time is

16   spent on managing?

17        A    In my current position?

18        Q    Yeah.

19        A    Almost 100 percent.  I'd -- I'd say it's

20   pretty -- pretty -- above 90, easy.

21        Q    So 90 to 100 percent?

22        A    Yes.

23        Q    And the other 10 percent, what is it spent

24   on, approximately?

25        A    Like I said, it's probably the vast majority

PA0247

1    A    Asset Protection Coordinator.

2    Q    Was it an APC or APM at that time?  Do you

3    know?

4    A    You know, I don't.  I don't know when that

5    name change happened.

6    Q    Okay.  Do you know what happened sometime

7    when Mr. -- do you know if it happened when

8    Mr. Zackaria was employed?

9    A    I'm not sure.  I'm not sure when the name --

10   the title change happened.

11   Q    Do you know whether it happened in the last

12   two years?

13   A    Yes.  It happened within the last two years,

14   yes.

15   Q    Okay.  Can you be any more specific than

16   that?

17   A    As to when the title change happened?

18   Q    Yeah.

19   A    My estimate would be it was about a year and

20   a half ago.

21   Q    Okay.  That's your best estimate?

22   A    Yeah.

23   Q    Yes?

24   A    Yes.

25   Q    Do you have a better estimate?

PA0248

1    Q    And when he was an APA, were you his direct

2    supervisor?

3    A    No, I was not.

4    Q    Were you his supervisor?

5    A    As an APA?

6    Q    Yeah.

7    A    No.

8    Q    Did you supervise him?

9    A    No.

10   Q    Did you manage him?

11   A    No.

12   Q    When you were a Market Asset Protection

13   Manager, how many direct reports did you have?

14   A    Nine.

15   Q    When Zackaria was a APC, how many direct

16   reports did he have?

17   A    It depends on which store you're referring

18   to, because he was an APC in two different stores.

19   Q    Tell me both stores.

20   A    At 2948, I think that's Santa Fe Spring's

21   store number -- but Santa Fe Springs was his first

22   store that he was an APC at.  He had anywhere

23   between, I'd say, one and three APAs there.  At

24   Rosemead, which was the second store that he was an

25   APC at, I'd say he had any where between two and four

1    <u>APAs at that store.</u>

2        Q    And Rosemead, what is the store number?

3        A    51 -- 5154, I believe.

4        Q    So at Santa Fe Springs, do you know if it

5    was one, two, or three APAs?  Or you don't know?

6        A    I don't know that it can fluctuate so big --

7        q    I don't want to talk about hypotheticals.

8    Do you know if he -- as direct reports, he had one,

9    two, or three?

10       A    I'm not talking about hypotheticals.

11   There's times in which he may have two.  And then

12   there was turnover, which means he may have had one.

13   He may have rehired.  And then there's times when he

14   might have more than one.

15       Q    So was there a time he had only one?

16       A    I'm not sure.  I'm not sure.

17       Q    Okay.  Was there a time when he only had

18   two?

19       A    I'm not sure.

20       Q    Was there a time he only had three?

21       A    I'm not sure.

22       Q    Was there a time he had more than three

23   APAs?

24       A    Not that I remember.

25            MR. GOLDICH:  We're talking about the first

85

PA0250

1      A    I'm sorry.  Can you repeat the question?

2           MR. AIWAZIAN:  Madam Court Reporter, if you

3      can read back the question.

4                (The record was read as follows:

5                "Q  Well, most likely or less than 50

6                percent?")

7           THE WITNESS:  Sorry.  I'm trying to think of

8      all the APAs at that store.

9      BY MR. AIWAZIAN:

10     Q    Please, take your time.

11     A    I'm only coming up with probably three.  So

12     there could have been four.  I'm not sure though.  I

13     just honestly don't know.

14     Q    Were all of these APAs that you speak of at

15     Santa Fe and Rosemead, were they all full-time?

16     A    Yes.

17     Q    And what is full-time?

18     A    Full-time with Wal-Mart is, I believe,

19     anything more than 34 hours a week.

20     Q    Was Aladdin Zackaria authorized to work

21     overtime?

22     A    As a salaried member of management, he'd

23     work a schedule which would include however many

24     hours they were scheduled at that time.

25     Q    Was he authorized to work over eight hours

87

1   in a given day?

2       A    Yes.   Our -- our APM schedule does have

3   shifts that are over eight hours.

4       Q    Was he authorized to work over 40 hours in a

5   workweek?

6       A    When I first became a MAPM, before they'd

7   come out with the new APC schedule, their schedule

8   was 45 hours -- 45 work hours in a week.   So yes.

9       Q    Was Aladdin Zackaria authorized to work over

10  12 hours in a given day?

11      A    I -- I wouldn't say that that would be on

12  their schedule.   But if there was a circumstance that

13  required it, then yes.   I mean if there was, like,

14  inventory day, a lot of times the APMs will work more

15  hours than 12.

16      Q    Was Aladdin Zackaria authorized to work over

17  16 hours in a day?

18      A    No.   I've never seen an APM work more than

19  16 hours in a day.

20           MR. AIWAZIAN:   Nonresponsive.   Move to

21  strike.

22      Q    I'm asking you if he was authorized to work.

23           MR. GOLDICH:   Objection to the form.

24           MR. HAN:   Overruled.

25           MR. AIWAZIAN:   Stop that.

88

PA0252

1    your basis for your testimony that Zackaria Aladdin

2    took a lunch break is based on his scheduled shift

3    and only his scheduled shift; right?

4        A    I would say there's -- there's been times

5    when he would call me on the phone and tell me that

6    he was on lunch, or me asking and he'd say, "Yeah,

7    I'm at lunch."

8            So, I mean, there -- there are different

9    circumstances where maybe a phone call informed me

10   that he went to lunch.

11       Q    Okay.  Did you ever talk to him when he was

12   at lunch?

13       A    Yeah, I -- he called me on -- on his lunch

14   break, yes.

15       Q    And you called him when he was on his lunch

16   break?

17       A    Possibly, yeah.

18       Q    Okay.  And you folks, when you guys went to

19   lunch, what did you guys talk about?

20       A    I don't recall.

21       Q    Did you talk about work?

22       A    Yes.  Yeah.

23       Q    Okay.  Was he ever instructed to -- how long

24   of a lunch was he instructed to take?  One hour?

25       A    Yes, one hour.

95

PA0253

1          A    I don't know if it would be every morning,

2     but there's several occasions throughout the week

3     that they would need to do case development and case

4     review within APIS.

5          Q    Was he ever instructed in writing that he

6     needed to do that every morning?

7          A    Not -- not that I'm aware of.  It is the

8     responsibility of the APM to approve and close the

9     APAs' cases.  So if an APA were to submit a case in

10    APIS, which is our system, the APM would be

11    responsible for approving and closing that.

12         Q    Was -- was Aladdin Zackaria ever responsible

13    for completing review of the SSOP and complete tasks

14    required by APC every morning?

15         A    No.  SSOP is --

16         Q    Don't explain what it is, sir.  Just answer

17    the question, please.  I don't have all day.  I've

18    got so much to ask.  I mean, we're going to be here

19    for days.

20         A    Yeah.  I couldn't answer it without

21    explaining it.  The SSOP is -- is a checklist that's

22    a weekly checklist; so they would have to, throughout

23    that week, complete that checklist.  I don't know if

24    they would put it all in one day, or put it all

25    throughout every day.  I mean, it just depends on

117

PA0254

1    month?

2        A    Yes.

3        Q    Was Mr. Zackaria expected to insure store

4    management and department managers are reviewing

5    purchase recap -- per cap on a monthly basis?

6        A    Yes.

7        Q    Was Zackaria expected to audit two entire

8    returns recalls twice a month?

9        A    I believe that was an SSOP question, yes.

10       Q    Was Zackaria expected to discuss strategic

11   business plans once a month?

12       A    I would say at least -- yes, at least once

13   per month.  They would be part of the management

14   meetings where they would talk about their strategic

15   business plans.

16       Q    At least twice a month was he required to

17   inspect portable fire extinguishers?

18       A    I believe the expectation was at least once

19   per month.  So I don't think the expectation was ever

20   that you had to check it twice.

21       Q    Was Zackaria expected to verify fire alarm

22   panel inspection was complete twice a month?

23       A    I'm not aware of that one, no.

24       Q    Was Zackaria expected to verify fire door

25   alarm inspections are complete every month?

PA0255

1    A   Yes.

2    Q   Was he expected to inspect emergency lights

3  and exit signs every month?

4    A   Yes.

5    Q   Do you know what a "routine" is?

6    A   Yes.

7    Q   In the context of Wal-Mart, in the context

8  of APM?

9    A   A Wal-Mart routine?  Yes.

10    Q   What is it?

11    A   It's a document that the company puts out

12  for a position that talks about what -- what a daily,

13  weekly, or monthly task would be for that position.

14    Q   Was Zackaria expected to make sure that all

15  the department doors were operating properly on the

16  sales floor every day?

17    A   I'm not sure what you mean by "department

18  doors."

19    Q   Okay.  Was Zackaria expected to complete a

20  tour every day?

21        MR. GOLDICH:  Objection.  Asked and

22  answered.

23        You can answer again.

24        THE WITNESS:  Yeah, any day that he worked,

25  he was expected to tour with the management team.

134

1      Q   Did Aladdin Zackaria have any discretion to

2  deviate from AP09 and deterrence training

3  participation guide?

4      A   So AP09 is our shoplifter policy.  That --

5  the manual you're referring to there is a participant

6  guide from a training about AP09.  I'm sure a lot of

7  the things in there are similar.  But to answer the

8  question, no, an APM or APA could not deviate from

9  AP09.

10     Q   Okay.  And what is the business reason for

11  that?

12     A   AP09 is our policy that -- that outlines

13  what we can or can't do in catching a shoplifter.  Of

14  course, a lot of those keep us out of trouble, if you

15  will.  I'm sure there's -- there's legal requirements

16  on apprehending shoplifters.

17     Q   Okay.  I haven't asked about the legal ones

18  yet, sir.  You're not a lawyer, and I don't want to

19  get objections.  But I might do that just for the

20  record to be clear.  Okay?

21         Right now, sir, you work for Wal-Mart;

22  right?

23     A   Yes.

24     Q   And you're biased in favor of Wal-Mart;

25  right?

PA0257

1         MR. GOLDICH:  I'm just going to object based

2    on lack of foundation.  He's not the PMK witness on

3    the promulgation of the policy.  And you're asking

4    him for the corporate purpose.

5         MR. AIWAZIAN:  Because he helped implement

6    this.  And, you know, if he's the immediate

7    supervisor of Zackaria, and Zackaria's expected to

8    follow this, then if he tells me there's good

9    business reasons, then there's more likely that he

10   enforced it.

11       Q   So you can say it works or whatever you want

12   to say, but what are the business reasons why you

13   don't want to deviate from AP09, other than legal

14   reasons?

15       A   As an employee of Wal-Mart, we don't want to

16   deviate from any policy.  So -- I mean, if it's a

17   policy put out by our company, we're going to follow

18   it.

19       Q   And if Aladdin Zackaria deviated from any

20   portion of AP09, and you became aware of that, he

21   would be reprimanded; true?

22       A   He could be reprimanded.  We -- we would

23   review what exactly happened and the severity of it

24   and what part of AP09 was broken before determining

25   whether if there was any reprimand or not.

155

PA0258

1      A    No.

2      Q    So his essential -- the duty -- his primary

3    job duties and tasks that he performed on a daily

4    basis, they were typical of the primary job duties

5    and tasks that your other APMs performed on a daily

6    basis; true?

7      A    Yes.

8      Q    The primary job duties and tasks that --

9    okay, strike that.

10          Are the --

11          (Telephonic interruption.)

12     A    No.  I'm sorry.  I forgot to turn off my

13   phone.  I apologize.

14     Q    No.  No.  Please.  Same thing would have

15   happened to me.  I just didn't have my phone with me.

16     A    Yeah.  I turned it on during break.

17     Q    Unfortunately, folks have Doug's cell phone,

18   and they're texting him to get to me and distract me.

19          But that's -- you are not the PMK on this,

20   sir.  I'll stipulate to that.

21          Are you aware of any differences in the

22   essential duties of APMs in the various markets in

23   California?  Regions.  Sorry.

24     A    No.  They're -- there would be no variance

25   between regions.

PA0259

```
 1              C E R T I F I C A T E

 2

 3         I, HEATHERLYNN GONZALEZ, CSR #13646, a

 4   Certified shorthand Reporter within and for the State

 5   of California, do hereby declare:

 6         That pursuant to 2093(b) CCP, I administered

 7   the oath to the deponent;

 8         That the foregoing deposition was taken

 9   Before me at the time and place set forth and was

10   taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction and

12   supervision;

13         That the foregoing deposition is a full,

14   true and correct transcript of my shorthand notes so

15   taken.

16         I further declare that I am neither counsel

17   for nor related to any of the parties to said action

18   nor in any way interested in the outcome thereof.

19         I declare under penalty of perjury this

20   28th day of July , 2012, that the foregoing is

21   true and correct.

22

23

24         CERTIFIED SHORTHAND REPORTER

25             FOR THE STATE OF CALIFORNIA
```

EXHIBIT "F"

PA0261

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  ALADDIN ZACKARIA; individually,    Case No. 5:12-cv-01520-
    and on behalf of other members of            VAP-SP
 5  the general public similarly
    situated, and on behalf of
 6  aggrieved employees pursuant to
    the Private Attorneys General Act
 7  ("PAGA"),

 8              Plaintiff,

 9       vs.

10  WAL-MART STORES, INC., a Delaware
    corporation and Does 1 through
11  100, inclusive,

12              Defendants.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
13

14           VIDEOTAPED DEPOSITION OF

15         PERSON MOST KNOWLEDGEABLE OF

16             WAL-MART STORES, INC.

17               MARYANN DABNEY

18          NON-CONFIDENTIAL PORTIONS

19

20               March 14, 2013

21                10:07 a.m.

22         535 Anton Boulevard, Suite 400

23            Costa Mesa, California

24

25       Reported by Arleen Jimenez, CSR No. 4240
```



1    BY MR. KARCZEWSKI:

2        Q    And, again, I think my question was, do you know

3    whether Wal-Mart has conducted time studies on how long it

4    takes to complete the national priorities?

5        A    Yes, I am aware that there have been time studies

6    regarding national priorities.

7        Q    Okay.  And in preparing for your deposition

8    today, did you refresh your recollection by looking at any

9    documents that pertain to those time studies?

10       A    I did not.

11       Q    Okay.  Do you recall a number associated with how

12   long it takes to perform national priorities on a weekly

13   basis?

14       A    I'm sorry, I don't.  I know that -- I believe, on

15   an annual basis, and I'm not even sure of that, that the

16   company annually reviews the national priorities, reviews

17   the questions and refines to continually improve the

18   questions, but I don't know any of the specifics, therein.

19       Q    Would you be surprised to learn that,

20   approximately, 20 hours per week APCs -- strike that.

21            Would you be surprised to learn that APCs spend,

22   approximately, 20 hours per week performing job duties

23   associated with the national priorities?

24            MR. GOLDICH:  Objection to the form.

25            THE WITNESS:  I would not be surprised.  I'm not



1      A    Correct.

2      Q    Would the set being conducted next week differ as

3  to the subject matter?

4      A    I'm not sure.  I don't believe -- I don't believe

5  so.  I believe that the monthly questions had different

6  questions that you would do on a weekly basis and then you

7  would submit those once a month, but I'm not sure.  It's

8  been a long time since I've looked at that.

9      Q    Do you know if there is a requirement that once a

10  week the results of the national priorities are submitted

11  on the wire?

12      A    Yes, there is.

13      Q    And do you know, I guess, from week to week, are

14  the results pertaining to different areas of an APC's job

15  duty?

16      A    I'm sorry, I don't understand that.

17          MR. GOLDICH:  Objection to the form.

18          MR. KARCZEWSKI:  That was a little vague.

19  BY MR. KARCZEWSKI:

20      Q    I guess, from week to week, when APCs are

21  submitting the results of the national priorities, okay?

22      A    Okay.

23      Q    Do those results pertain to different areas of an

24  APC's job?

25          MR. GOLDICH:  Objection, vague.



1     Q     Sure.  Definitely.

2     A     Okay.

3     Q     Have you seen this document before?

4     A     I don't know if I have seen this exact document,

5  but I have seen a copy of the SSOPs.  I'm not sure if

6  there was more than one version or not, but I've seen a

7  copy of the shrink safety operations playbook.

8     Q     And what do you understand this document to be

9  here?

10     A     So, what the SSOPs are is -- so, the company

11  started out with national priorities and then, after an

12  amount of time, I don't know how many years, they switched

13  the title to SSOP.  Then, after an amount of time, they

14  switched it back to national priorities because they found

15  that SSOP was confusing to the field because we also have

16  SOPs, so then they switched it back to national

17  priorities.

18          So, for all intents and purposes, it's national

19  priorities that ran for an unspecified amount of time that

20  I don't know.

21     Q     Fine.  So, here, for reviewing this document on

22  the first page has a big chunk that, on the right-hand

23  side, says how often and then it lists "weekly."  In the

24  lower part it says the same thing, but on the right hand

25  it says "monthly"?

1  a statement like that.

2      A     Then I can't answer your question.  I don't

3  understand it.

4      Q     Ma'am, you're here to answer my questions.

5  You're under oath.  You're required to do so, okay, to the

6  best of your ability to give me a yes or a no when you

7  can, to ask for clarification if there is something vague

8  about my questions you don't understand.  So you said you

9  were having trouble with --

10     A     Question --

11     Q     Hold on.  You said you were having trouble with

12  "intends" and "following," right?

13     A     No, that's not what I said.

14         MR. GOLDICH:  Let me just object to the form of

15  the question.  Argumentative, plus the witness said she

16  didn't understand the question.  If she doesn't understand

17  your question, she can't answer.

18         MR. KARCZEWSKI:  Okay.  And I'm trying to explore

19  what about my question she doesn't understand so we can

20  come to a common ground.

21  BY MR. KARCZEWSKI:

22     Q     What about my question do you not understand?

23     A     You're asking me to answer a question with an

24  untruth in it.

25     Q     Okay.  That's not what I was asking you.  My



1  question is, do you know whether Wal-Mart has a habit of

2  creating ten pages of procedures with the intent that

3  those procedures are not followed?

4       A    Wal-Mart has no intent of creating however many

5  pages they deem necessary with the intent that they not be

6  followed.

7       Q    Great.  So they intend these procedures to be

8  followed then; is that correct?

9       A    Wal-Mart intends for every SOP to be followed.

10      Q    Thank you.  There are other, sort of, sub

11 questions that go toward answering 14 enumerated questions

12 on the weekly hazardous inspection form.  Do you see

13 those?

14      A    What page are you on?

15      Q    148404.

16      A    You're on 148 --

17      Q    148404.  It's the weekly hazardous inspection

18 form.  You have it there.

19      A    Oh, here.  Okay.  I'm sorry.  What was the

20 question?

21      Q    That's fine.  You see there's 14 enumerated

22 questions; do you see that?

23      A    Yes, I do.

24      Q    Okay.  You've already had a chance to read this

25 and read through the contents of it.  Is it your



1     A     Yes, there's many sets of teams.

2     Q     I'm sorry?

3     A     There's many sets and levels of teams.

4     Q     Okay.  And so, you would consider yourself

5     regional management then?

6     A     Yes.

7     Q     Okay.  Do you know whether there is -- outside

8     of, I guess, the CEO and the CFO, do you know whether

9     there is national management -- a national management

10    team?

11    A     I'm not sure what you mean by a "national."

12    Q     Individuals that are responsible for more than

13    just a region, I guess.

14    A     Yes.

15    Q     Okay.  And what's -- I guess, who is responsible

16    for more than just a region?

17    A     The divisional team.

18    Q     Divisional teams, okay.  And there's multiple

19    divisional teams?

20    A     Yes.

21    Q     And is there a level above divisional teams?

22    A     Yes.

23    Q     What's that?

24    A     Business unit, BU.

25    Q     Is there anything above business unit or BU?



1      A     Yes.  Vice-presidents.

2      Q     So, we've got four different levels; regional,

3   divisional, BUs --

4      A     Uh-huh.

5      Q     -- and then VPs.

6      A     And then SVP and etcetera.

7      Q     Okay.  Out of those groups we just talked about,

8   do you know whether any of them are involved in making

9   policies for Wal-Mart?

10     A     I believe so.

11     Q     Do you know which level?

12     A     I couldn't speak to that.

13     Q     Okay.  Is it above your level?

14     A     Yes.

15     Q     Okay.  Do you know if it's above the divisional

16  level?

17     A     I don't know if divisionals contribute to policy

18  formation.

19     Q     Okay.  Do you ever advise the board or investors

20  on the direction that Wal-Mart should take as a company?

21     A     I don't.

22     Q     Do you know what level, of the management levels

23  we just spoke of, are involved in that function?

24     A     I do not.

25     Q     Okay.  Do you know if any of them are?



1     A     I would assume so, but I don't know which.

2     Q     That's fine.  I don't want you to guess.  APCs

3  don't write policies for Wal-Mart, right?

4     A     No, they do not.

5     Q     Or procedures?

6     A     No, they do not.

7     Q     Or guidelines or routines?

8     A     No, they do not.

9     Q     Do they advise Wal-Mart, as a company, on any

10  courses of action the company should take?

11     A     I don't know that.

12     Q     Do you know if they negotiate on Wal-Mart's

13  behalf?

14     A     I don't believe so.  I can't think of a time that

15  would happen.

16     Q     Do you know if Wal-Mart has ever instructed APCs

17  to spend more than 50 percent of their time performing

18  exempt or managerial-type duties?

19          MR. GOLDICH:  Object to the form insofar as it

20  uses a legal term.

21          THE WITNESS:  Can you ask the question again?

22  BY MR. KARCZEWSKI:

23     Q     Sure.  Do you know whether Wal-Mart has ever

24  instructed its APCs to spend more than half of their time

25  performing a certain type of duties?

1    A    I don't believe that Wal-Mart has instructed the

2  APCs as to how to spend any specific percentages of their

3  time.

4    Q    Okay.  In your opinion, could APCs in Wal-Mart

5  stores in California move to a different store without

6  substantial new training?

7    A    Can you define by "move" to a new store?

8    Q    Sure.  If I'm an APC at a store in Irvine and my

9  family moves to Los Angeles and I want to move up to a

10  store up there, what level of training -- additional

11  training would I need to make that move, consider -- yeah.

12    A    You would need significant additional training to

13  go from Irvine to Metro LA.

14    Q    Okay.  Why is that?

15    A    Because the challenges that the team faces at

16  those stores vary.  Really, from store to store within the

17  company, the challenges vary.

18    Q    What do you mean by "challenges"?

19    A    Whatever situations that an APM would encounter

20  and would have to deal with on a daily basis vary from

21  store to store.

22    Q    So, do the standard operating procedures, for

23  instance, differ as they apply to Irvine stores versus Los

24  Angeles stores?

25    A    I couldn't speak to those specific stores, but



1 there are variations on SOPs based on geographic areas,

2 yes.

3     Q   And how -- do you know -- have you seen those

4 specific variations, themselves?

5     A   I'm sure they've passed my desk at one time or

6 another, if I had reason to look at it.

7     Q   Can you give me a specific example of an SOP that

8 differs for Irvine versus Los Angeles?

9     A   I can't.

10     Q   Can you give me any examples of variations in

11 SOPs as they apply in Los Angeles and Irvine?

12     A   Not off the top of my head, no.

13     MR. KARCZEWSKI:  Okay.  I'm done with the

14 witness.

15     MR. GOLDICH:  I have no questions.

16     MR. KARCZEWSKI:  Okay.

17     MR. GOLDICH:  We're adjourned.  Thank you.

18     MR. KARCZEWSKI:  Thank you.

19     MR. GOLDICH:  Did we stay confidential the whole

20 time?

21     MR. KARCZEWSKI:  I think we did.  Yeah, we were

22 working off documents.

23     MR. GOLDICH:  If you feel, at some point, that we

24 shouldn't have gone off confidential, you can let me know

25 that.



1                    REPORTER'S CERTIFICATION

2

3        I, Arleen Jimenez, a Certified Shorthand

4   Reporter, in and for the State of California, do hereby

5   certify:

6

7        That the foregoing witness was by me duly sworn;

8   that the deposition was then taken before me at the time

9   and place herein set forth; that the testimony and

10  proceedings were reported stenographically by me and later

11  transcribed into typewriting under my direction; that the

12  foregoing is a true record of the testimony and

13  proceedings taken at that time.

14

15       In witness whereof, I have subscribed my name

16  this 27th day of March, 2013.

17

18

19

20

21       

22            Arleen Jimenez, CSR No. 4240

23

24

25

EXHIBIT "G"

PA0274

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5   ALADDIN ZACKARIA, individually, and)
    on behalf of other members of the )
6   general public similarly situated, )
    and on behalf of aggrieved          )
7   employees pursuant to the Private   )
    Attorneys General Act ("PAGA"),     )
8                                       )
                 Plaintiffs,            )
9                                       )
                 vs.                    )  EEDCV12-01520
10                                      )   VAP (SPx)
    WAL-MART STORES, INC., a Delaware   )
11  corporation; and DOES 1 through     )
    100, inclusive,                     )
12                                      )
                 Defendant.             )
13  _____)

14

15

16                   DEPOSITION OF

17                 RANDY ERIC DEVINE

18

19          Thursday, September 5, 2013

20           9:04 a.m. - 12:45 p.m.

21

22      1840 Century Park East, Suite 1900

23            Los Angeles, California

24

25      Reported by Ruben Garcia, CSR 11305



1  BY MS. STONE:

2      Q    Do you understand what I mean by "root

3  cause analysis"?

4      A    Yes.

5      Q    What is your understanding of that?

6      A    The root cause of a problem.  If there's

7  an issue, try and find exactly where the issue

8  derives from.

9      Q    Did you do root cause analysis in your job

10  as an APC?

11      MR. KARCZEWSKI:  Vague.  Object to the form of

12  the question.

13          Go ahead.

14      THE WITNESS:  Yes.

15  BY MS. STONE:

16      Q    Has the National Priorities program

17  changed over time, if you know?

18      MR. KARCZEWSKI:  Vague.

19      THE WITNESS:  I believe it changed one time

20  while I was there.

21  BY MS. STONE:

22      Q    In what way?

23      A    I don't remember.  Different stuff we had

24  to look at or how often we had to look at things.

25      Q    Did the name of the National Priorities



1      MR. KARCZEWSKI:  Calls for speculation.  Object

2   to the form of the question.  Vague.

3      THE WITNESS:  I don't know.

4   BY MS. STONE:

5      Q    Did these National Priorities contain a

6   lot of different tasks that you were instructed to

7   complete as an APC?

8      MR. KARCZEWSKI:  Vague.

9      THE WITNESS:  Yes.

10  BY MS. STONE:

11     Q    Were you able to deviate from the

12  checklist?

13     A    No.  The checklist had to be done.

14     Q    Could you take the responsibilities out of

15  order?

16     MR. KARCZEWSKI:  Vague.  Assumes facts not in

17  evidence.  I'm sorry.

18         Go ahead.

19     THE WITNESS:  There was no specific order,

20  like -- yeah, there was no specific order.

21  BY MS. STONE:

22     Q    So you had the discretion to perform those

23  checklists as long as they got done?

24     MR. KARCZEWSKI:  Misstates witness' testimony.

25  Assumes facts not in evidence.  Vague.  Object to



```
 1        THE WITNESS:  On a weekly, no.
 2   BY MS. STONE:
 3        Q    Any other basis, monthly or annually?
 4        A    Well, annually, of course, the
 5   evaluations.
 6        Q    Okay.
 7        A    And the hiring.
 8        Q    What accounts for the other 75 percent of
 9   your time while you were an APC?
10        MR. KARCZEWSKI:  Object to the form of the
11   question.  Vague.  Calls for a narrative.
12             Go ahead.
13        THE WITNESS:  Approximately 45 percent of my
14   time was spent with National Priorities, dealing
15   with that; and that includes safety and everything
16   else.
17             And then the rest of my time was spent
18   with investigations and shoplift apprehension.
19   BY MS. STONE:
20        Q    Stepping back just to the National
21   Priorities, you said that included safety.
22             What else would that include?
23        A    All the audits and report reviews.
24        Q    And then the remaining 30 percent would be
25   investigations and shoplifting?
```



1   store manager.

2       Q    If an APA had a complaint about store

3   conditions, for example, you're in the asset

4   protection field, if they felt there was not enough

5   video surveillance, is that something that would

6   come under your responsibility?

7       MR. KARCZEWSKI:   Incomplete hypothetical.

8   Vague.

9       THE WITNESS:   I can request it, but I wouldn't

10  be the one to decide whether we get it or not.

11  BY MS. STONE:

12      Q    Who would decide it?

13      MR. KARCZEWSKI:   Calls for speculation.

14      THE WITNESS:   That's more of a corporate

15  decision.

16  BY MS. STONE:

17      Q    I believe you testified that your normal

18  working schedule as an APC was 45 hours per week,

19  correct?

20      A    Correct.

21      Q    Did that schedule of work hours ever

22  change over time?  That was poorly phrased.

23           Were you ever scheduled to work more or

24  less than 45 hours per week?

25      A    No.



1          Q    Did you have occasion to regularly take

2    meal breaks?

3          MR. KARCZEWSKI:  Calls for a legal conclusion.

4    Vague.  Object to the form of the question.

5               Go ahead if you know.

6          THE WITNESS:  It wasn't regularly, but I did

7    take them.

8    BY MS. STONE:

9          Q    And how long were the meal breaks?

10         A    It varied.

11         Q    30 minutes?

12         MR. KARCZEWSKI:  Object to the form of the

13   question.

14         THE WITNESS:  It could be anywhere from 15

15   minutes to 45 minutes.

16   BY MS. STONE:

17         Q    Did you take rest periods?

18         MR. KARCZEWSKI:  Same objections.  Calls for --

19   I'll just state them again.  Hold on.

20              Calls for legal -- calls for legal

21   conclusion.  Vague.  Object to the form of the

22   question.

23              Go ahead.

24         THE WITNESS:  Regular rest periods, like 15

25   minute breaks?



1        MS. STONE:  Correct.

2        THE WITNESS:  No.

3   BY MS. STONE:

4        Q    Did you take any breaks shorter than 15

5   minutes?

6        MR. KARCZEWSKI:  Same objections.

7        THE WITNESS:  Nothing regular.

8   BY MS. STONE:

9        Q    What would decide whether or not you were

10  able to take meal or rest breaks?

11       MR. KARCZEWSKI:  Same objections.

12       THE WITNESS:  If I had the time to; if I was

13  tired.

14  BY MS. STONE:

15       Q    What would prevent you from taking a meal

16  or rest break?

17       MR. KARCZEWSKI:  Same objections.

18       THE WITNESS:  Having to finish up my work or an

19  investigation or shoplift apprehension.

20  BY MS. STONE:

21       Q    So it could be according to what was

22  happening in the store that day, correct?

23       MR. KARCZEWSKI:  Same objections.

24       THE WITNESS:  Yes.

25



1           You were asked at the end of the questions

2    by Ms. Stone about your experience in communicating

3    with other APCs about their jobs.

4           Do you recall that?

5    A     Yes.

6    Q     And I think that you stated something to

7    the effect -- and I'm going to paraphrase -- after

8    the National Priorities came out, the APCs' job

9    duties were the same from store to store; is that

10   correct?

11   MS. STONE:  Objection.  Mischaracterizes

12   testimony.

13   BY MR. KARCZEWSKI:

14   Q     Go ahead.

15   A     Yes.

16   Q     Does that correctly paraphrase what you

17   had told Ms. Stone?

18   MS. STONE:  Same objection.

19   THE WITNESS:  Yes.

20   BY MR. KARCZEWSKI:

21   Q     So based on your experience and knowledge

22   as an APC employed by Wal -- at Wal-Mart, and your

23   interactions with other APCs, is it your testimony

24   that your job duties were the same as other -- as

25   other APCs during that same timeframe?



1          MS. STONE:  Object to form.

2          THE WITNESS:  Yes.

3          MS. STONE:  Object to foundation.

4          MR. KARCZEWSKI:  Okay.

5     BY MR. KARCZEWSKI:

6          Q    If you go back to Exhibit 4 -- and this is

7     your Fiscal Year 2009 Performance Evaluation, if you

8     would.

9               And you can turn to page 2 for me, please.

10    And then also if you could pick up your declaration

11    as well.  I'm just going to ask you a question that

12    incorporates both of these, all right?

13         A    Okay.

14         Q    And we're on page 2 of the Performance

15    Evaluation exhibit, which is Exhibit 4.  There's a

16    heading here that says, "Competency Section."

17              Do you see that?

18         A    Yes.

19         Q    Do you understand what that means?

20         A    Yes.

21         Q    Is it your understanding that competencies

22    are skills that you all have as an APC?

23         MS. STONE:  Objection.  Leading.

24         THE WITNESS:  Yes.

25

ESQUIRE
SOLUTIONS

1          MS. STONE:  Object to form.

2    BY MR. KARCZEWSKI:

3          Q     So you did actually go through the hiring

4    process with Ricardo and --

5          A     Rinisha.

6          Q     -- Rinisha?

7          A     Yes, I did.

8          Q     Okay.  You remember talking a bit about

9    National Priorities with Ms. Stone, don't you?

10         A     Yes.

11         Q     And I think that you mentioned that

12   National Priorities has a series of checklists that

13   tells you how to go about performing certain job

14   duties throughout the week.

15               Is that accurate?

16         MS. STONE:  Object to form.  Mischaracterizes

17   testimony.

18         THE WITNESS:  Say that again.

19   BY MR. KARCZEWSKI:

20         Q     That's fine.  It was a bad question.

21               I think that you mentioned that National

22   Priorities is a series of checklists that tell you

23   various job duties that you have to complete and

24   submit at the end of the week; is that correct?

25         MS. STONE:  Same objections.



1         THE WITNESS:  Yes.

2    BY MR. KARCZEWSKI:

3         Q    Okay.  You had a chance to discuss root

4    cause analysis with Ms. Stone.

5              Do you recall that?

6         A    Yes.

7         Q    Does the National Priorities checklist

8    walk you through the steps in completing a root

9    cause analysis in your opinion?

10             MS. STONE:  Objection.  Form.  Vague.

11             THE WITNESS:  I don't remember.  It was

12   something involved, like, if you found something, an

13   exception, it would tell you how to go about

14   investigating it on the, I guess, resolution page.

15   BY MR. KARCZEWSKI:

16        Q    Got it.

17        A    If I remember correctly.

18        Q    Okay.  Do you remember SOPs related to the

19   National Priorities?

20        A    SLP?

21        Q    SOPs.

22        A    I don't remember.

23        Q    It's okay if you don't.

24             As an APC at Wal-Mart, did you also

25   conduct tours of the store?



RANDY ERIC DEVINE
ZACKARIA vs. WAL-MART STORES

September 05, 2013
198

1  STATE OF CALIFORNIA        )
                             ) ss:
2  COUNTY OF LOS ANGELES      )

3

4      I, RUBEN GARCIA, CSR, do hereby certify that I

5  am a duly qualified Certified Shorthand Reporter, in and

6  for the State of California, holder of Certificate

7  Number 11305, which is in full force and effect and that

8  I am authorized to administer oaths and affirmations;

9      That the foregoing deposition testimony of the

10  herein named witness was taken before me at the time and

11  place herein set forth; that prior to being examined,

12  the witness named in the foregoing deposition, was duly

13  sworn or affirmed by me, to testify the truth, the whole

14  truth, and nothing but the truth;

15      That the testimony of the witness and all

16  objections made at the time of the examination were

17  recorded stenographically by me, and were thereafter

18  transcribed under my direction and supervision;

19      That I am not a relative or employee or attorney

20  or counsel of any of the parties nor am I financially

21  interested in the outcome of this action.

22      IN WITNESS WHEREOF, I have subscribed my name

23  this ____11____ day of _September_, 2013.

24

25  _____
    RUBEN GARCIA, CSR NO. 11305

