EXHIBIT "H"

PA0287

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5   ALLADIN ZACKARIA;            )
    individually, and on behalf )
6   of other members of the      )
    general public similarly     )
7   situated, and on behalf of   )
    aggrieved employees          )
8   pursuant to the Private      )
    Attorneys General Act        )
9   ("PAGA");                    )
                                 )
10                  Plaintiffs,  )
                                 )
11     VS.                       ) CASE NO:
                                 ) EEDCV12-01520 VAP (SPx)
12                               )
    WAL-MART STORES, INC., a     )
13  Delaware corporation; and    )
    DOES 1 through 100,          )
14  inclusive,                   )
                                 )
15                  Defendant.   )
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~

16

17                  DEPOSITION OF

18                  JIM GALBREATH

19

20                  JULY 18, 2013

21                    9:05 A.M.

22

23                    Suite 1900
                 1840 Century Park East
                 Los Angeles, California

24

25            Aurora Bowser, CSR No. 12801



1      A     No.

2      Q     Have you ever spoken to him?

3      A     No.

4      Q     Have you had discussions with other

5   Wal-mart employees about this lawsuit?

6      A     No, I have not.

7      Q     What is your understanding of what this

8   lawsuit brought by Mr. Zackaria involves?

9      A     I believe my understanding of what the

10   lawsuit brought by Mr. Zackaria involves, Asset

11   Protection Managers conducting hourly work, as

12   we're exempt managers, which is being classified

13   as exempt managers.

14      That would mean that we are performing 50

15   percent or more of our job duties in a managerial

16   function, and which we're not.

17      Q     Have you asked other Wal-mart employees

18   to provide information concerning this lawsuit?

19      A     Not that I'm aware of.

20      Q     Have you asked other Wal-mart employees

21   to speak to your attorneys about the case?

22      A     I don't personally recall asking any

23   employees to speak to anyone about the case.  I do

24   know that it has been discussed amongst other

25   employees, that they have spoken to counsel, they



1   into detail than I think they should have.

2        Q    Regardless of that, what did they tell

3   you?

4        A    They said that the previous APC that I

5   was replacing there was concerns about his work

6   ethic, and, you know, him being at work when he

7   should have been at work, and that he didn't see

8   eye to eye with them on where the store needed to

9   go.  So they made the decision that it was best

10  for him to step down and that they would fill the

11  spot with someone else.

12       Q    Other than what you've already testified

13  to, do you remember anything else that was said

14  during the second interview process?

15       A    No.  Just basically they were giving me

16  the reason why the store required two APCs at the

17  time, and that it wasn't just a job that you come

18  in there 9:00 to 5:00, it's not going to be your

19  typical job, you're going to have to put in lot of

20  hours.  That was based on that location and what

21  they were up against.

22       Q    Were there Asset Protection Associates

23  working at that store at that time?

24       A    When I first got there, I believe there

25  was approximately four -- four to six Asset



1     Q     As far as the duties of Asset Protection

2   Coordinator and Asset Protection Manager, what is

3   the significance of being in an Urban/Metro

4   location?

5     A     That's just the way that Wal-mart

6   classified them.  It's just that they are of a

7   higher risk factor when it comes to theft and

8   safety, and all the stores that I'm aware of and

9   the market that I was in at that time and the one

10  I'm currently in are all Urban/Metro stores.

11     And the responsibilities in terms of the APC

12  Coordinator are the same in all those locations.

13     Q     Do you know whether the responsibilities

14  carried out by APCs in locations other than

15  Urban/Metro locations are different?

16     MS. SZETO:  Objection, vague and ambiguous.

17     THE WITNESS:  The Asset Protection

18  Coordinator, are you talking about in the past or

19  currently?

20  BY MR. GOLDICH:

21     Q     Let's say currently.

22     A     Okay.  In terms of answering currently,

23  and I would say in connection with the past, the

24  APC routine has always been the same for every

25  Asset Protection Coordinator or Manager regardless



1   of their location.  It's been one routine that's

2   been defined.

3        Q    So you don't know if the -- do you know

4   if the APCs in Urban/Metro locations spend more

5   time doing certain parts of their job?

6        A    We are all assigned with the same

7   routine, so we are all assigned with the

8   responsibility to be carrying out the same tasks.

9   So I guess to clarify, there is no defined routine

10  for APMs or APCs in Urban/Metro locations, there's

11  only one defined routine for all APMs or APCs.

12                (Exhibit 3 marked.)

13  BY MR. GOLDICH:

14       Q    Okay.  Mr. Galbreath, we've marked as

15  Galbreath 3, a copy of some documents from your

16  Wal-mart personnel file consisting of your job

17  offer and the attached job description.  Have you

18  seen these before?

19       A    Yes, I have.

20       Q    Okay.  Is this a copy of the job offer

21  you've received from Wal-mart?

22       A    Yes, it is.

23       Q    And over on Page 4 of the document, is

24  that a copy of your signature?

25       A    Yes, it is.



1   but only normally when we've identified something,

2   "Hey, we need this program.  That's not being

3   effective, that we keep identifying in these

4   audits when you have us walk the sales floor.  We

5   need this addressed.  We need to compromise and be

6   a better business partner."  So yeah, that's when

7   I've heard that term used.

8        Q    That wasn't my question.

9        A    That was the question.  You asked if I

10  ever used the term myself.

11       Q    Correct.

12       A    So I said I've heard the term, but I've

13  not used the term myself.

14       Q    Thank you.  That was my answer.

15       What processes in the store do you look at?

16       A    I follow my routine as every APM does

17  within the store.

18       Q    In doing that routine, what processes do

19  you look at?

20       A    Do you have a copy of the routine?

21       Q    Answer to the best of your ability.

22       A    To the best of my ability I follow my

23  routine.  So I can't remember every single step

24  that's on there.  Just the routine that we've had

25  in the past, which was the same across the board



 1 | for everybody.

 2 |     We have a new routine as well, which covers

 3 | different processes that's been implemented.  And

 4 | those are the routines I do my best to follow just

 5 | like every other APM that's in the company.

 6 |     Q    Are you able, sir, to identify any

 7 | processes you look at?

 8 |     A    I look at all the processes.  But in

 9 | order to go through and breakdown, and if you had

10 | seen a copy of our routine, it's not a short

11 | amount of information to read.

12 |     So my answer -- so I don't say something and

13 | mistakenly add something or take away from the

14 | routine, my answer is I follow the routine that's

15 | been assigned to me by Wal-mart, both when I was

16 | hired and the ones that they currently have now.

17 |     Q    Are you able to identify any processes

18 | that you look at in using those routines?

19 |     A    So I'm answering that question with the

20 | same answer, yes.  I identify those routines

21 | because we have a checklist that we put on a

22 | clipboard that we walk out and we follow step by

23 | step what that routine is almost minute-by-minute

24 | on what they want us to follow currently.

25 |     The other ones, they would have what time in



1    BY MR. GOLDICH:

2        Q     Let's talk about National Priorities.

3    Are you familiar with that term as it relates to

4    the Asset Protection function at Wal-mart?

5        A     Yes, I am.

6        Q     So what is National Priorities?

7        A     National Priorities are questions that

8    the company has identified nationally or as a

9    company that needs to be checked, so it's like a

10   checklist.

11       Q     Do the National Priorities change from

12   year to year?

13       A     They have changed.  When I first joined

14   they were called SSOPs, then they changed to

15   National Priorities.  Every year we have a

16   meeting, and they either change the questions, or

17   they change the titles.  So do they change from

18   year to year, yes.

19       Q     And in doing the National Priorities, are

20   you looking at different processes within the

21   store?

22       A     Yes.

23       Q     And are you going through that checklist

24   in order to determine whether the processes are

25   being carried out correctly within the store?



1       MS. SZETO:  Objection, vague and ambiguous.

2       THE WITNESS:  We are walking those checklists

3   or items and ensuring or attempting to identify

4   why the process is or isn't working, and then we

5   input that through Archer.

6   BY MR. GOLDICH:

7       Q    And in terms of the time involved in the

8   Asset Protection Manager job, has the amount of

9   time you spend doing National Priorities changed

10  during the time you have worked at Wal-mart?

11      A    Has the time that it takes to do them

12  changed or has the expectation for the time that

13  it takes to do them changed?

14      Q    I asked you whether the time changed, the

15  expectation was not my question.

16      A    I think it's consistent across the board

17  to say that they have reduced the amount of

18  questions; however, I don't believe the time that

19  has changed to do those functions has been

20  impacted.

21      Q    Okay.  Why don't we just break it down

22  time-wise so the record is clear.

23      When you first became an Asset Protection

24  Coordinator beginning of 2011, how many hours a

25  week did it take you to complete the National



1 | Priorities or SSOP part of your job?

2 |     A    Being new to the company, it took

3 | anywhere from 28 to about 35 hours.

4 |     Q    And at some point after you gained more

5 | experience, did that change?

6 |     A    Yes, but not significantly.  Probably 24

7 | -- about 24 hours to complete accurately.

8 |     Q    And as of today, are you still doing

9 | National Priorities as part of your job as an

10 | Asset Protection Manager?

11 |     A    As of today we're doing a version of

12 | National Priorities.  They just keep changing the

13 | title.

14 |     Q    I understand.  As of today, regardless of

15 | title associated with it, is it still taking 24

16 | hours per week?

17 |     A    So the processes changed all together.

18 |     Q    If I could, why don't you put your

19 | statement aside, because you statement was given

20 | in 2013.  Thank you.

21 |     A    Okay.  I'll set it over here.

22 |     Q    I promise you I'll ask you questions

23 | about it later.  I haven't had a chance to read it

24 | yet.

25 |     A    I'm not reading anything off there, if



1  last year you've spent 21 to 24 hours per week

2  working on the National Priorities?

3      A    I would say that's an average, because

4  depending on what exceptions you find it could

5  fluctuate.

6      Q    What happens if you find an exception?

7      A    If you find an exception, you don't want

8  it to be another exception.  So you would attempt

9  to try to figure out why that exception occurred.

10     Q    What did you have to do to do that?

11     A    Depends on what the exception is.

12 There's a breakdown of SOPs if there's an

13 exception on what it is exactly what steps to

14 take, and each one has it's own SOP.

15     Q    And ultimately do those SOPs guide you to

16 some solution that you have to implement to

17 correct the exemption?

18     A    They guide you to a solution you should

19 be implementing, and once again that requires the

20 approval of the MAPM or the store manager.

21     Q    Now, as an Asset Protection Manager, do

22 you answer all of the questions in the National

23 Priorities, or are other employees responsible for

24 answering some of the questions?

25     A    We're the ones actually gathering the



1     That's a communication.  The ideas weren't

2   our ideas.  I put on there share ideas, we're

3   talking ideas from the company.  And I was getting

4   ideas from APCs that knew more about this than I

5   did, and all we're doing is effectively

6   communicating those down.

7       There's Safety Action Plan, but if you look,

8    they are all pretty much the same throughout every

9   single store, which just goes to show that the

10  APMs are following already a set of standards that

11  the company is taking to us, "Hey, this is what

12  you guys need to do.  And this is a problem, this

13  is how you fix it."

14     And every quarter they want it changed up a

15  little bit, so we look at what are the current

16  things based off the Accident Trend Analysis,

17  which is a database that's done for us.  You

18  change one or two items that you think may have an

19  impact, which once again, has to be approved by

20  the store manager.  And I've had times where

21  that's not happened, or we've had these reports

22  forwarded up to the MAPMs.

23     So I see and understand what you're asking

24  here, I really do.  But that's why if you look at

25  what I'm putting, I'm putting the credit where



1      A     No.   There's no difference.

2      Q     Did you have the support of the store

3   manager to make the changes that were necessary to

4   turn the situation around?

5      MS. SZETO:   Objection, vague and ambiguous.

6      THE WITNESS:   In what specific area are you

7   asking for?

8   BY MR. GOLDICH:

9      Q     Well, again I'm comparing it to Baldwin

10   Hills.   In Baldwin Hill in your job evaluation you

11   talked about being able to team with the store

12   manager to achieve the results that you achieved?

13      A     Right.

14      Q     Was the situation the same or different

15   in Long Beach in terms of your relationship with

16   the store manager?

17      A     Yeah.   The situation the same.   We're

18   always attempting to create that relationship,

19   because that's the only way that we would be able

20   to have an impact.

21      Q     Were there any differences in what you

22   did at the two stores?

23      A     It was pretty much basically the same,

24   trying to look at the company programs and what

25   the expectation was for us to impact the shrink



1   and profitability.  So the expectation didn't

2   change, just different locations.

3        Q    Were there any changes in your daily

4   routines between the two stores?

5        A    As defined by Wal-mart?

6        Q    What you did every day.

7        A    Our daily routines is what we followed

8   every day.

9        Q    Were there any changes in those routines

10  from one year to the next, from 2011 into 2012?

11       A    That's a very broad question.  Are you

12  asking did the company change routines?

13       Q    Yes.

14       A    From 2011 to 2012?

15       Q    Yes.

16       A    I'm unaware there may have been.  I'm

17  unaware at this time if there were any changes in

18  their routines.

19       Q    Going from 2012 into 2013, were there any

20  changes in your job at Long Beach?

21       A    Like I said, once again that's a very

22  broad question.

23       Q    It is a broad question.  If you can

24  identify specific changes, I'll ask you to do so.

25       A    Including now, 2013?



1      Q     We're still in 2013?

2      A     Any changes in 2013?

3      Q     I'm not trying to limit you in time.  I'm

4   not trying to trick you either.  I'm looking for

5   from the time you arrived in the Long Beach store

6   until today whether you would say there have been

7   any significant changes in the job duties that you

8   perform as an Asset Protection Manager from when

9   you first arrived in Long Beach?

10     A     Yes.  I would say the routine for the APC

11  position APM position has changed.

12     Q     Okay.  What changes can you identify that

13  have occurred?

14     A     The initial APM routine that the company

15  had set was our daily task what we should be doing

16   in the morning, and afternoon, weekly, and

17  monthly, now it's more detailed.  It tells you

18  exactly almost within the hour of what you should

19  be doing, and exactly which reports you should be

20  working on which days.

21     Q     Any other changes?

22     A     Not that I can think of right off the

23  bat.  There may have been some, but not that I can

24   recall off the bat.

25     Q     Do the routines tell us how much time you



1   should be spending doing each task?

2       A    The current routines, or the previous

3   routines?

4       Q    Start with the current.

5       A    The current routines are very detailed

6   how much time you should be spending doing each

7   task.

8       Q    Can you give me any time frame on when

9   the current routines were introduced?

10      A    They were introduced -- I want to -- they

11  had a year beginning meeting in March.  And then

12  we had a training session immediately after that,

13  I want to believe that was either early March or

14  early April, and then they introduced them I

15  believe the month of April.

16      Q    That would be April of 2013?

17      A    That is correct.

18      Q    Okay.

19           (Exhibit 6 marked.)

20  BY MR. GOLDICH:

21      Q    What we've marked as an exhibit,

22  Galbreath 6, a Mid-Year Performance Evaluation for

23  FY 13.  And it's labeled in the lower right-hand

24  corner, Galbreath 17 through Galbreath 23.  Have

25  you seen this before?



1        A    I have not been invited to participate in

2   High Shrink Review Teams this year, to my

3   knowledge.

4        Q    Now, if we go to the next page, Page 105,

5   there's an opportunity for you to provide your

6   assessment of your strengths and opportunities,

7   correct?

8        A    That's correct.

9        Q    And you said, "I believe being my

10  strengths are thought leadership, results

11  leadership, personal leadership, and delivering

12  Asset Protection training."  Correct?

13       A    That is correct.

14       Q    And why did you identify those four

15  specific things as your strengths?

16       A    I'm trying to remember back to when I

17  completed this document.  It wasn't as detailed as

18  the one before, so I do not recall exactly why I

19  chose those four as my strengths.

20       Q    This was obviously a few months ago,

21  correct?

22       A    That's correct.  I'm rereading below it,

23  because I believe that explains right there why I

24  thought those were my strengths.

25       Q    Sure.



1      A    It says, "Thoroughly analyzing concerns

2  I'm able to better" --

3      Q    Can you louder and slower for the

4  reporter?

5      A    "Through thoroughly analyzing the root

6  causes of shrink and safety concerns, I am able to

7  deliver training based on factual data.  I build

8  personal relationships with all associates and

9  have a full engaging impact on the shrink and

10 safety throughout the store.  By leading by

11 example, I feel I create a model that all

12 associates can relate to and utilize to build

13 confidence through self-motivation and

14 self-improvement."

15     Q    So is that what you were referring to in

16 the first sentence?

17     A    Yes.

18     Q    When you said, "Thoroughly analyzing root

19 causes of shrink and safety concerns," what were

20 you referring to?

21     A    Just following the routines, collecting

22 information, and then following the procedures

23 that were sought out for us to once we identified

24 those red flags to move on to the next step.

25     So pretty much by following the routines,



1   per week that you were officially scheduled to

2   work on that rotating schedule?

3       A    I'm trying count to make sure I have all

4   the hours.  I believe the hours reflected that we

5   should have been working 40 hours.

6       Q    And during that period of time, how many

7   -- how much were you actually working?

8       A    In the last year?

9       Q    Yeah.  That year.  We're looking at

10  fiscal year ending beginning of 2013.

11      A    I want to say I was working between 60 to

12  70 hours.

13      Q    And if you needed to work hours beyond

14  your scheduled hours, did you have to go to anyone

15  to seek permission?

16      A    No, because we were salary members of

17  management, so it was never explained to us that

18  if we needed to work past those hours, that we

19  would need to seek authorization.

20      Q    So you would not go to your MAPM to

21  report that you were working more than your

22  scheduled hours?

23      MS. SZETO:  Objection, misstates testimony,

24  vague and ambiguous.

25  BY MR. GOLDICH:



1      Q     I'll rephrase.  Did you go to your MAPM

2    to tell your MAPM that you were putting in the

3    extra hours?

4      A     Did I inform my MAPM if I was going extra

5    hours, yes.  Yes.

6      Q     So that would have been Tara Pitterson

7    for the year we're talking about?

8      A     That is correct, except for the months

9    she was out on a leave of absence from March or

10   April up until October of that year.

11     Q     When she was out, did you go to anyone to

12   report that you were working extra hours?

13     A     The temporary MAPMs, yes.

14     Q     And who gave you your schedule?

15     A     Our schedule wasn't given to us, it was

16   rotation that was online that they told us, "You

17   follow Schedule A, B, or C."

18     Q     So you get your schedule online?

19     A     Yes.  Follow that rotation.

20     Q     That would tell you what days you were

21   supposed to be in the store, and how many hours

22   you were supposed to be in the store each day you

23   were scheduled?

24     MS. SZETO:  Objection, vague and ambiguous.

25     THE WITNESS:  Yes.



1    BY MR. GOLDICH:

2        Q    And the extras hours beyond the scheduled

3    hours, did they include working longer hours on

4    scheduled days?

5        A    Can you repeat the question?

6        Q    Yes.  Did some of your hours above 40

7    include days that you were scheduled to work where

8    you would work longer than eight hours per day?

9        A    Within following the normal routine of

10   the schedule, we would be contacted sometimes by

11   the MAPM and say, "Hey, I have a something that's

12   happening at your store.  I need you to stay

13   longer.  We would have to do some type of

14   followup."

15       So we had that schedule, but there were times

16   we would be informed either through e-mail, and

17   other times, "Hey, we need to get this taken care

18   of or this audit done."  So while we had scheduled

19   hours, we did receive communications that kept us

20   past our hours than what we were normally

21   scheduled.

22       Q    You made reference through your testimony

23   to the routines that you were given by the

24   company.  Did the routines provide for you to

25   complete all of your required duties within normal



1   every APM.

2       Q    Do you know if they spend the same number

3   of hours associated with investigation that is you

4   spend?

5       A    All investigations are independently

6   different, so I don't think it would be accurate

7   to be able comment whether they do spend the same

8   amount of time on investigations that I do.

9       Q    You say you spend a lot of time on

10  internal and external investigations, correct?

11      A    Correct.

12      Q    If there are no internal or external

13  investigations to be done in certain stores, do

14  you know how those Asset Protection Managers spend

15  their time?

16      MS. SZETO:  Objection, vague and ambiguous.

17      THE WITNESS:  So if we look at the routines,

18  as part of the routines, APMs to take time to

19  review investigations.  So they are spending time

20  reviewing investigations because it's part of

21  their routine.

22  BY MR. GOLDICH:

23      Q    Okay.  Now, if we look at Paragraph 7 you

24  stated, "I estimate that approximately 30 percent

25  of my time or less is spent performing managerial



1    tasks; is that correct?

2        A    That is correct.

3        Q    What's that 30 percent figure based upon?

4        A    That 30 percent figure based upon is the

5    hours that I've worked in the last two and a half

6    years in the time that I spent performing

7    managerial tasks, such as being able to train

8    subordinate employees or create schedules.

9        Q    Okay.  That does not include any of your

10   time on the National Priorities, you included that

11   on the non-managerial tasks, correct?

12       A    That one is sort of in the middle, and I

13   feel like it's that way for every APM in every in

14   store.  Because I feel that the National

15   Priorities, the way that it's written -- how do I

16   explain this?

17       I don't know if when I made my additional

18   declaration if I did include that in my time on

19   either way, because those questions and being able

20   to execute them and trying get them resolved,

21   sometimes you're out there gathering information

22   initially when they are not being resolved and

23   you're being told that they need to get resolved,

24   you actually go out there and complete the tasks.

25       If you're completing the tasks, it's not



1   managerial aspect at that point.  So you're doing

2   it as hourly associates if you look at some of the

3   tasks that need to be completed.

4        So actually 30 percent of my time doing

5   managerial tasks, doing schedules, training

6   subordinates, hiring associates, firing

7   associates.

8        Q   Okay.  And but you can't really tell me

9   whether you included time doing National

10  Priorities in the 30 percent or not?

11       A   National Priorities and routines vary on

12  your time frame that you put inside them based off

13  of what the section is.  And if you're able to

14  just be able to evaluate it and gather

15  information, or if you actually need to go out

16  there and complete the tasks which is an hourly

17  task, so you don't get that exception again so

18  your boss is not asking why that's a repeated

19  exception.

20       So based on exceptions, based on what's

21  happening, they could fall in either section.  I

22  do 30 minutes or less performing managerial

23  duties.

24       Q   Okay.  Is there a job at Wal-mart called

25  the APEA job?



1       A      There is.

2       Q      Asset Protection Egress Attendant?

3       A      That is correct.

4       Q      Are there any employees in that

5   classification in the Long Beach store?

6       A      There is.

7       Q      Who's their supervisor?

8       A      They fall underneath Asset Protection, so

9   I'm their supervisor.

10      Q      Do you play any role in hiring them?

11      MS. SZETO:  Objection, calls for legal

12   conclusion.

13      THE WITNESS:  Like I said, their name is

14   selected, and it has to be approved by the store

15   manager first before I can hire them.  So do I

16   play a role in that process, yes.

17   BY MR. GOLDICH:

18      Q      Do you supervise them in the same way you

19   supervise APAs?

20      A      No.

21      Q      What is the difference?

22      A      An APA is an undercover agent, and an

23   APEA is a uniformed attendant that checks receipts

24   that ensures merchandise is paid for when you walk

25   outside the door.



1      Q    What role do you play in supervising the

2  daily activities of the APEA?

3      MS. SZETO:  Objection, vague and ambiguous,

4  calls for a legal conclusion.

5      THE WITNESS:  Doing their scheduling, if

6  there's any -- because their training is done by

7  APAs, which is part of their routine, they train

8  all new APA associates.  It's in the routine that

9  way.

10     So I mean to ask what supervisors are there,

11  it's a new position, so at some point there will

12  be an evaluation which still has to be submitted

13  to the MAPM and the store manager for review.

14     If there's any type of disciplinary actions,

15  that would have to be submitted upwards as well.

16             (Exhibit 8 marked.)

17  BY MR. GOLDICH:

18     Q    Mr. Galbreath, we marked as Galbreath 8 a

19  JOB DESCRIPTION for the Asset Protection Manager

20  position published in December of 2011.  Have you

21  ever seen this job description before?

22     A    Is it the same one that was included with

23  my job offer that you showed me?

24     Q    No.  That was an Asset Protection

25  Coordinator job description.



1   section.

2       Q    Earlier I believe you testified that

3   Wal-mart thinks you can complete all of these

4   routines within a 40 hour work week, correct?

5       A    Yes.

6       Q    But you complete this every single day;

7   is that correct?

8       A    The routines?

9       Q    Yes.

10      A    They are attempted to be completed every

11  single day within this time frame.

12      Q    And do you see where it says 10:30 in the

13  morning at the very top of the page, and then the

14  next thing it says -- does it say 11:00 a.m. or

15  p.m.?

16      A    I believe it says -- I can't answer that

17  one, because on my copy I can't tell if it says

18  a.m.

19      MR. GOLDICH:  I can't tell either, and some

20  of them may be a.m. or p.m..

21      THE WITNESS:  But it's underneath the morning

22  section.  So looking at it, I would believe that

23  it's a.m.

24  BY MS. SZETO:

25      Q    And the ones that you you've used look



1    don't know exactly which questions may have been

2    added or taken away from each form.  But they were

3    a series of questions that each time that was --

4    pretty much said that this is the company

5    priorities, things we need to be doing for this

6    specific position.

7    BY MS. SZETO:

8        Q    So National Priorities are the same

9    thing, right, it's just a different set of

10   questions?

11       MR. GOLDICH:  Objection, mischaracterizes his

12   testimony.

13       THE WITNESS:  Correct.  That's why they were

14   called National Priorities, they are priorities of

15   the company.

16       MS. SZETO:  I'm going to mark this next

17   exhibit as Exhibit 13.

18            (Exhibit 13 marked.)

19   BY MS. SZETO:

20       Q    Could you just sort of flip through it

21   and familiarize yourself with it, and I'll ask you

22   a few questions?

23       A    Okay.

24       Q    What is Exhibit 13?

25       A    Exhibit 13 is the Standard Operating



1    Procedures for the SSOP questions.  And SSOP

2    stands for Shrink Safety Operations Procedures.

3        Q    This is the SSOP you were talking about

4    earlier, right?

5        A    That is correct.

6        Q    You've seen this document before?

7        A    Yes, when I was first hired by the

8    company.

9        Q    So these are the series of questions that

10   you have to answer, right, as an APC?

11       A    That is correct.

12       Q    And National Priorities would have --

13   it's similar to this, but different types of

14   questions; is that correct?

15       A    That is correct.  National Priorities,

16   they changed the format of it, but similar

17   questions with details of how they wanted.

18       Q    When you're talking about questions, at

19   the top it says "SSOP question."  Is that one of

20   the questions that you were referring to?

21       A    That is one of the questions that is

22   being referred to.

23       Q    So how did you go about completing this

24   SSOP or completing the SSOP questions?

25       A    I would follow the step-by-step guides,



1                    REPORTER'S CERTIFICATION

2

3          I, Aurora Bowser, a Certified Shorthand Reporter

4    in and for the State of California, do hereby

5    certify:

6          That the foregoing witness was by me duly sworn;

7    that the deposition was then taken before me at the

8    time and place herein set forth; that the testimony

9    and proceedings were reported stenographically by me

10   and later transcribed into typewriting under my

11   direction; that the foregoing is a true record of the

12   testimony and proceedings taken at that time.

13

14         IN WITNESS WHEREOF, I have subscribed my name

15   this 24th day of July, 2013.

16

17                   _Aurora D. Bowser_

18   _____

19                   Aurora Bowser, CSR No. 12801

20

21

22

23

24

25



EXHIBIT "I"

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5    ALADDIN ZACKARIA;                )
     individually, and on behalf )
6    of other members of the         )
     general public similarly        )
7    situated, and on behalf of      )
     aggrieved employees             )
8    pursuant to the Private         )
     Attorneys General Act           )
9    ("PAGA");                       )
                                     )
10                  Plaintiffs, )
                                     )
11      VS.                          ) CASE NO:
                                     ) EEDCV12-01520 VAP (SPx)
12                                   )
     WAL-MART STORES, INC., a        )
13   Delaware corporation; and       )
     DOES 1 through 100,             )
14   inclusive,                      )
                                     )
15                  Defendant.  )
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

16

17           VIDEOTAPED DEPOSITION OF

18                  HENRY GARCIA

19

20             SEPTEMBER 3, 2013

21                   9:10 A.M.

22

23                  Suite 1900
                1840 Century Park East
                Los Angeles, California

24

25        Aurora Bowser, CSR No. 12801



1       MR. KARCZEWSKI:  Same objections.

2       THE WITNESS:  I work very closely with every

3  manager -- with the store manager and every

4  assistant manager that he had.  And I just made

5  sure that the shrink plans that I had in place for

6  every department that it was followed.

7       And it was.  Then my Asset Protection

8  Associates were the ones that were looking for

9  external theft shoplifting.  I always made sure

10  they were always on the job doing the right thing

11  and not loafing around.

12  BY MR. GROTZINGER:

13       Q    How did you do that?

14       A    By walking the floor too.

15       Q    How else?

16       A    Well, I would also look at their

17  apprehensions, how many they would have in a

18  month.  If I felt that was too low, I would take

19  them aside, "What seems to be the problem?  Can I

20  help you?"

21       Q    We're talking about Asset Protection

22  Associates?

23       A    Yes.

24       Q    Okay.  And did you have a team of Asset

25  Protection Associates under you during your two-



1   year period at Duarte?

2        THE WITNESS:   Object.

3   BY MR. GROTZINGER:

4        Q    Do you understand my question?

5        A    Yes.

6        Q    And you did?

7        A    Yes.

8        MR. KARCZEWSKI:   Vague.

9   BY MR. GROTZINGER:

10       Q    How large was that team?

11       A    In Duarte, I had three associates.

12  That's what I had.

13       Q    Okay.  And how did you supervise them

14  besides walking the floor and making sure they

15  were doing what they needed to be doing?

16       MR. KARCZEWSKI:   Objection, misstates

17  witness' testimony, calls for a narrative, vague,

18  overbroad.

19       THE WITNESS:   I would just, like I said,

20  would see how their other numbers were every

21  month.  If I saw they were not productive, then I

22  would take that person aside and walk the floor

23  with him to see if I could give him some knowledge

24  what to look for when it comes to external theft.

25       That's basically what I would do is review



1    depend in part on the size of the store?

2        MR. KARCZEWSKI:  Same objections.

3        THE WITNESS:  I don't understand your

4    question.

5    BY MR. GROTZINGER:

6        Q    In other words, the bigger the store the

7    more security is needed, correct?

8        MR. KARCZEWSKI:  Same objections, and object

9    to the form of the question.

10       THE WITNESS:  It would be needed, but there

11   was times where that didn't happen.

12   BY MR. GROTZINGER:

13       Q    Okay.  Did the kinds of products in

14   particular stores dictate the security measures

15   that would need to be implemented for those

16   stores?

17       MR. KARCZEWSKI:  Same objections.

18       THE WITNESS:  I believe in most of your

19   Wal-Marts, the shrink department's are basically

20   the same every high shrink electronics would be in

21   any of Wal-Mart would be the highest shrink

22   Cosmetics, Health and Beauty.

23       So basically those are the three shrink

24   departments that would be true with all Wal-Marts.

25   BY MR. GROTZINGER:



1

2

3

4

5

6                    (Afternoon session)

7

8

9        THE WITNESS:  We're back on the record.  It

10   is approximately 12:36.

11   BY MR. GROTZINGER:

12        Q    Do you understand you're still under

13   oath, Mr. Garcia?

14        A    Yes.

15        Q    Okay.  You mentioned this morning

16   National Priorities.  What is that?

17        A    It's basically a checklist that goes from

18   corporate, what areas to audit, each department.

19   That was basically like a checklist plan what

20   areas to audit throughout the store.

21        Q    Okay.  And what was your role, if any, in

22   the National Priorities program?

23        MR. KARCZEWSKI:  Vague, overbroad.

24   BY MR. GROTZINGER:

25        Q    As an APC?



1      A      I don't know.

2      Q      When you were doing these audits for the

3   National Priorities, did you have to complete a

4   questionnaire?

5      A      I believe we did.  Yes.

6      Q      How frequently did you have to do that?

7      A      That was weekly basis.

8      Q      Did that ever change to bi-weekly when

9   you were there.

10     A      No.

11     Q      How much time per week -- strike that.

12  You might have told me this already, I just

13  forgot.  How frequently did you participate in

14  audits?

15     A      I would say probably an average of 25

16  hours a week on the National Priorities.

17     Q      And that was throughout the time that you

18  were an APC?

19     A      Yes.

20     Q      25 hours per week?

21     A      To complete it, it would take 25 hours if

22  I wasn't interrupted and doing other things.  If I

23  was interrupted, it would take me 70 hours to

24  complete it all.

25     Q      I'm not following.  It would take you 25



 1      A    No.

 2      Q    You never said anything?

 3      A    No.

 4      Q    Did anybody -- did the supervisor tell

 5 you why she wanted to you take notes?

 6      A    She really didn't tell me why, but

 7 normally that's basically what I did was take

 8 notes.

 9      Q    How frequently in a given week, if you

10 can answer this, did you take meal breaks as an

11 APC?

12      MR. KARCZEWSKI:  Vague, calls for

13 speculation.

14      THE WITNESS:  What was your question?

15 BY MR. GROTZINGER:

16      Q    How many times in a given week, or if the

17 weeks varied too much, tell me that.  I just want

18 to see if you can answer that.

19      MR. KARCZEWSKI:  Same objection, calls for a

20 legal conclusion.

21      THE WITNESS:  How many lunch breaks I would

22 take?

23 BY MR. GROTZINGER:

24      Q    How frequently would you take meal breaks

25 while you were an APC?



1      A      Try to take one every day.

2      Q      Once per day?

3      A      Yes.   Yes.   Yes.   Yes.

4      Q      Did you take separate rest breaks as an

5   APC?

6      A      No.

7      Q      Never?

8      A      Not that I can recall.

9      Q      You didn't keep track of when you took

10   meal breaks, did you?

11     A      No.

12     Q      Let's go off the record.

13      THE VIDEOGRAPHER:   Okay.   Going off the

14   record.   The time is approximately 1:03 p.m.

15            (Pause in the proceedings.)

16      THE VIDEOGRAPHER:   Back on the record.   It is

17   approximately 1:05 p.m.

18      MR. GROTZINGER:   I have no further questions

19   at this time.

20

21                      EXAMINATION

22   BY MR. KARCZEWSKI:

23     Q      Okay.   Hank, I'm going to ask you some

24   questions now if it's okay.

25     A      Okay.



1       Q      You finished up talking with Jordan about

2   meal breaks and rest breaks.  Do you recall that?

3       A      Yes.

4       Q      Okay.  I think you mentioned that you had

5   a meal break every day; is that right?

6       A      I believe so.

7       Q      Okay.  Do you recall whether you were

8   ever interrupted during one of your meal breaks?

9       A      Yes.

10      Q      Did it happen quite frequently?

11      A      Twice a week.

12      Q      Twice a week?

13      A      Yeah.

14      Q      Would that be an interruption like an

15  associate coming to you to ask you a question?

16      A      Most of the time it was during an

17  apprehension, one of my associates would need some

18  help, or when we had no associate -- Asset

19  Protection Associate on duty, store management

20  would call for me to go out there and see what's

21  going on.  That happened a couple of times.

22      Q      Okay.  Do you remember about how long --

23  strike that.  Did you regularly take about the

24  same length of a meal break every day?

25      A      It was different.



1      Q    Okay.  What's the average -- if you could

2   give me an average length of a meal break that you

3   would typically take, what would that be?

4      A    Half an hour.

5      Q    Half an hour.  Would frequently be less

6   than half an hour?

7      A    Sometimes.

8      Q    Why sometimes would it be less than half

9   an hour?

10     MR. GROTZINGER:  Calls for speculation.

11     THE WITNESS:  A lot of times, like I said, it

12  would be a potential shoplifting incidents where I

13  would help out.  A lot of times the police were

14  called, so I never went back to my lunch break.

15  BY MR. KARCZEWSKI:

16     Q    I understand.  Okay.  Did you have an

17  email account at an APC at Wal-Mart?

18     A    An email account?

19     Q    Like a Wal-Mart email account?

20     A    Yes.

21     Q    Did you check it every day?

22     A    Yes.

23     Q    Every day did you verify the hazardous

24  waste at your store was being properly stored and

25  maintained?



1          MR. GROTZINGER: Assumes facts.

2          THE WITNESS: Yes.

3     BY MR. KARCZEWSKI:

4          Q     Did you say yes?

5          A     Yes.

6          Q     You didn't- strike that.  You did a some

7     sort of security or safety tour every day; is that

8     correct?

9          A     Yes.

10         Q     You mentioned the APIS system.  Do you

11    remember that?

12         A     Yes.  APIS.

13         Q     Did you use APIS every day?  Of course,

14    I'm not going to -- every single day during your

15    employment, but was it typical that you would use

16    APIS system every day?

17         A     No.

18         Q     About how often do you recall using the

19    APIS system?

20         A     I would say average of three times a

21    week.

22         Q     Okay.  Did you ever look into closed

23    circuit television as an APC at Wal-Mart?

24         A     Yes, many times.

25         Q     That was a daily occurrence for you?



1    speculation, calls for a legal conclusion.

2         THE WITNESS:  No.

3    BY MR. KARCZEWSKI:

4         Q    Okay.  Was it your understanding that as

5    an APC at Wal-Mart you were expected to follow the

6    National Priorities checklist in conducting an

7    audit of the Duarte store?

8         MR. GROTZINGER:  Vague.

9         THE WITNESS:  Yes.

10   BY MR. KARCZEWSKI:

11        Q    Is that, in fact, what you did on a

12   weekly basis?

13        A    Yes.

14        Q    Is it true you didn't deviate from those

15   checklists, those policies and procedures we just

16   talked about?

17        MR. GROTZINGER:  Vague, calls for a legal

18   conclusion.

19        THE WITNESS:  That's correct.

20   BY MR. KARCZEWSKI:

21        Q    Is it your understanding if you had

22   deviated from policies and procedures, Wal-Mart

23   checklists, you would have been disciplined by

24   your MAPM?

25        MR. GROTZINGER:  Same objections, calls for



```
 1        A     Yes.

 2        Q     What's a work plan, do you know?

 3        A     I don't know.

 4        Q     Have you ever seen these --  do you know

 5   what a work plan to any extent as far as your

 6   experience as an APC at Wal-Mart?

 7        A     No.

 8        Q     What does this sentence mean to you, if

 9   anything?

10        A     Doesn't mean anything to me.  I don't

11   understand it.

12        Q     Okay.  If you go to the top paragraph it

13   says, "Gathers appropriate data and perform

14   necessary analysis to" -- something.  I can't read

15   that word, "The need for AP training."  Those

16   first three words, "Gathers appropriate data," do

17   you know what appropriate data inside referring

18   to?

19        A     No, I don't.

20        Q     If you go down to under "Judgement,"

21   skipping a little bit it says, "Focus on the

22   customer.  Reviews customer focused data."  Do you

23   know what customer focus data is?

24        A     No, I don't.

25        Q     We've talked about the job duties that
```



1   you performed as sort of your routine on

2   day-to-day basis.  Do you recall that?

3        A    Yes.

4        Q    Are those duties a more accurate

5   representation of what you actually did than this

6   description did?

7        MR. GROTZINGER:  Assumes facts.

8        THE WITNESS:  Yes.

9   BY MR. KARCZEWSKI:

10       Q    Okay.  Isn't it true to say these

11  competencies as you've gone over them today in

12  detail don't accurately reflect your job duties

13  that you perform as an APC on a day-to-day basis?

14       MR. GROTZINGER:  Calls for a legal

15  conclusion, vague.

16       THE WITNESS:  That's correct.

17  BY MR. KARCZEWSKI:

18       Q    You talked a little bit about assessing

19  -- strike that.

20       You talked a little bit about Safety Team

21  meetings earlier today.  Do you recall that?

22       A    Yes.

23       Q    I think you said that during those

24  meetings safety issues are discussed about once a

25  week; is that correct?



1          MR. GROTZINGER:  Misstates testimony.

2          THE WITNESS:  Yes.

3     BY MR. KARCZEWSKI:

4          Q    You know David Gomez, right?

5          A    Yes.

6          Q    And you had spoken with David Gomez about

7     his job duties as an APC, correct?

8          A    Yes.

9          Q    Is it your understanding his job duties

10    as an APC were very similar to yours?

11         MR. GROTZINGER:  Assumes facts, calls for

12    speculation.

13         THE WITNESS:  Yes.

14    BY MR. KARCZEWSKI:

15         Q    You consider David Gomez a pretty good

16    friend, right?

17         A    Yes.

18         Q    You had a lot of time to talk with him

19    about the APC job in general; is that correct?

20         MR. GROTZINGER:  Assumes facts, vague.

21         THE WITNESS:  Yes.

22    BY MR. KARCZEWSKI:

23         Q    Did you also speak with any other APCs

24    about their job duties at their Wal-Mart stores?

25         A    Yes.



1      Q     And is it your experience from talking

2   with other APCS that they had very similar job

3   duties to you when you were an APC at Wal-Mart?

4      MR. GROTZINGER:  Assumes facts, calls for

5   speculation, and vague.

6   BY MR. KARCZEWSKI:

7      Q     Can you think of any job duties, any

8   specific job duties that any other APCs that you

9   spoke with, that they had that you didn't also

10  have as an APC?

11     A     No.

12     Q     So is it fair to say that from your

13  experience speaking with other APCs at Wal-Mart

14  stores that your job duty was nearly identical to

15  the other APCs at other Wal-Mart stores in

16  California?

17     MR. GROTZINGER:  Assumes facts, calling for

18  speculation.

19     THE WITNESS:  Yes.

20  BY MR. KARCZEWSKI:

21     Q     You mentioned going to other Wal-Mart

22  stores helping APCs out with inventory.  Do you

23  recall that?

24     A     Yes.

25     Q     Okay.  When you were doing that, I think



1          REPORTER'S CERTIFICATION

2

3      I, Aurora Bowser, a Certified Shorthand Reporter

4   in and for the State of California, do hereby

5   certify:

6      That the foregoing witness was by me duly sworn;

7   that the deposition was then taken before me at the

8   time and place herein set forth; that the testimony

9   and proceedings were reported stenographically by me

10  and later transcribed into typewriting under my

11  direction; that the foregoing is a true record of the

12  testimony and proceedings taken at that time.

13

       IN WITNESS WHEREOF, I have subscribed my name

15  this 5th day of September, 2013.

16

17

18  
    _____

19          Aurora Bowser, CSR No. 12801

20

21

22

23

24

25

EXHIBIT "J"

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4

5   ALADDIN ZACKARIA; individually,
    and on behalf of other members
6   of the general public similarly
    situated, and on behalf of aggrieved
7   employees pursuant to the Private
    Attorneys General Act ("PAGA");

8
                    Plaintiff,
9
         vs.              CASE NO. EDCV12-01520 VAP(SPx)
10
    WAL-MART STORES, INC., a Delaware
11  corporation; and DOES 1 through 100,
    inclusive,
12
                    Defendant.
13
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14

15

16            VIDEOTAPED DEPOSITION OF

17                   DAVID GOMEZ

18

19                 August 29, 2013

20             9:49 a.m. - 1:46 p.m.

21             1840 Century Park East
                    Suite 1900
22             Los Angeles, California

23
         Marceline F. Noble, CSR No. 3024
24

25



 1   six years?

 2        A.  Five to six years.

 3        Q.  Uh-huh.

 4            How often would you see him generally speaking

 5   over those five to six years?

 6            MR. KARCZEWSKI:  Objection.  Vague.

 7            THE WITNESS:  Could be anywhere from two -- one

 8   to two times a month depending on if we had meetings or

 9   not.

10   BY MR. GROTZINGER:

11        Q.  Did you work together over that time?

12        A.  Yes.

13        Q.  How?

14        A.  When we visit each other's stores, we would

15   basically go to each other's stores and help each other

16   out.  I actually trained him a bit --

17        Q.  Okay.

18        A.  -- when he first got the position.

19        Q.  Got what position?

20        A.  The asset protection coordinator position.

21        Q.  All right.  Was that always his position as far

22   as you knew?

23        A.  As far as I know, yes.

24        Q.  Okay.  Are you -- are you close with him?

25   Would you say that's fair?



1      A.   Yes.

2      Q.   What other stores?

3      A.   Pico Rivera.

4      Q.   Any others?

5      A.   I covered stores here and there.  Covina.

6      Q.   What do you mean by "covered"?

7      A.   Whenever they needed assistance in those stores

8   and light on coverage or they didn't have an agent to

9   cover the store, I would go to those stores to help out.

10     Q.   Was that as an APC?

11     A.   No.

12     Q.   As a sales -- not a sales associate -- a loss

13  prevention associate?

14     A.   Yes.

15     Q.   When you were an APC -- how long were you an

16  APC?  From when to when?

17     A.   From the year -- from about March 2007 to

18  February 2009.

19     Q.   And after that you stopped working at Wal-Mart?

20     A.   Yes.

21     Q.   So from March 2007 through February 2009, did

22  you work at any other stores besides Baldwin Park?

23     A.   Yes.

24     Q.   What stores?

25     A.   Duarte.



1      Q.  Any others?

2      A.  No.

3      Q.  Okay.

4      A.  Can I clarify something?

5      Q.  Sure.

6      A.  Even if it was coverage you want to know?

7          So if I went to cover, let's say, an inventory,

8   is that something you want to know?

9      Q.  Yes.

10     A.  Okay.  So then that would be yes.

11     Q.  What other stores?

12     A.  Foothill Ranch.

13     Q.  Folio Ranch?

14     A.  Foothill Ranch.

15     Q.  Foothill Ranch.

16         Okay.  Any others?

17     A.  The Orange store.

18     Q.  And again these are just coverage?

19     A.  Yes.

20     Q.  As an APC?

21     A.  Yes.

22         MR. KARCZEWSKI:  And this is just for

23   inventory, correct?

24         THE WITNESS:  Correct.

25   ///



1      A.  I don't recall.

2      Q.  So you were an APC from March 2007 through

3   February 2009; correct?

4      A.  Yes.

5          MR. KARCZEWSKI:  Asked and answered.

6   BY MR. GROTZINGER:

7      Q.  And did you have a day-to-day routine as an

8   APC?

9          MR. KARCZEWSKI:  Vague.

10         THE WITNESS:  Yes.

11  BY MR. GROTZINGER:

12     Q.  Can you describe it for me.

13         MR. KARCZEWSKI:  Calls for a narrative.  Vague.

14         THE WITNESS:  It -- it was basically a

15  checklist.

16  BY MR. GROTZINGER:

17     Q.  Can you describe that with some more detail?

18         MR. KARCZEWSKI:  Same objections.

19         THE WITNESS:  Checklist just stated what we had

20  to do on a daily, weekly, monthly basis.

21  BY MR. GROTZINGER:

22     Q.  And when did you first receive this checklist?

23         MR. KARCZEWSKI:  Calls for speculation.

24         THE WITNESS:  That I do not recall.

25  ///

1  during my training.

2      Q.  During your training to be an APC?

3      A.  Yes.

4      Q.  So during your training to be an APC, were you

5  given a document that is similar to this?

6          MR. KARCZEWSKI:  Calls for speculation.

7          THE WITNESS:  Yes.

8  BY MR. GROTZINGER:

9      Q.  And -- and it summarized essential functions

10 and competencies of an APC?

11     A.  Yes.

12         MR. KARCZEWSKI:  Document speaks for itself.

13 BY MR. GROTZINGER:

14     Q.  And have -- yes?

15     A.  Yes.

16     Q.  Okay.  And did you read through each of the

17 Essential Functions and Competencies in this document?

18     A.  Yes.

19     Q.  And does -- did all of those Essential

20 Functions and Competencies look familiar in terms of the

21 document you received when you were in training for an

22 APC?

23         MR. KARCZEWSKI:  Calls for speculation.  Lack

24 of foundation.  This document was published after the

25 deponent was terminated from Wal-Mart.



1          THE WITNESS:  I don't recall.

2     BY MR. GROTZINGER:

3          Q.  You don't recall?

4          A.  I don't recall.

5          Q.  Do these Essential Functions and Competencies

6     look familiar to you?

7               MR. KARCZEWSKI:  Same objection.

8               THE WITNESS:  Somewhat.

9     BY MR. GROTZINGER:

10         Q.  Would you say that these -- this job

11    description accurately described your job when you were

12    hired as an APC?

13              MR. KARCZEWSKI:  Vague.  Calls for speculation.

14    Assumes facts not in evidence.

15              THE WITNESS:  Can you clarify that a little

16    more?

17    BY MR. GROTZINGER:

18         Q.  Sure.  You've read the Essential Functions and

19    Competencies on this document.

20              Would you say they are a fair summary of what

21    your job was as an APC?

22              MR. KARCZEWSKI:  Same objections.

23              THE WITNESS:  What it was or what I did?

24    BY MR. GROTZINGER:

25         Q.  Well, I'm not sure the distinction you're



1  making.  I'm talking about the job you actually did.

2      A.  The job I actually did?

3      Q.  Yeah.

4      A.  I would say no.

5      Q.  Why?

6      A.  Because a lot of what's on here is managing

7  certain things, managing aspects of the business and we

8  didn't really manage.  We -- our time was spent doing a

9  lot of audits and -- and stuff like that.

10     Q.  So which functions or competencies do you think

11 were not part of the job that you did as an APC?

12         MR. KARCZEWSKI:  Object to the form of the

13 question.

14         Are you asking him to point out each and every

15 function and competency on this document that he thinks

16 he was not involved in --

17         MR. GROTZINGER:  Well, let --

18         MR. KARCZEWSKI:  Hold on.

19         -- on a daily basis, on a weekly basis, at any

20 time during his career as an APC?

21         MR. GROTZINGER:  I'll rephrase the question.

22     Q.  You made a distinction between what your job

23 was versus what you did.  Can you explain that

24 distinction to me?

25         MR. KARCZEWSKI:  Asked and answered.  He just



1  explained it.

2  BY MR. GROTZINGER:

3      Q.  You can answer.

4      A.  Yes.  What the description states on here is

5  they were managing a lot of functions within the store.

6  And not to say we didn't manage those functions, but the

7  majority of our time was spent auditing so we didn't

8  really have a lot of time where we were out, for

9  instance, managing our APAs.

10         Our APAs knew what they had to do and that was

11  it.

12     Q.  Okay.  Generally speaking, do you think you did

13  a good job as an APC during the time you were in that

14  position?

15         MR. KARCZEWSKI:  Vague.

16         THE WITNESS:  Yes.

17  BY MR. GROTZINGER:

18     Q.  I'm going to go through some of the Essential

19  Functions and Competencies in this document starting

20  with the first one.  And I'm not going to completely

21  quote every single thing, but let me start here.

22         So the first Essential Function says, quote,

23  "Controls the unexplained loss of merchandise and

24  improves profitability by identifying and communicating

25  performance goals and objectives."



1  some other way?

2          MR. KARCZEWSKI:  Objection.  Compound.  Object

3  to the form of the question.  Vague.

4          Go ahead.

5          THE WITNESS:  It was a one-on-one conversation

6  with whoever I hired.

7  BY MR. GROTZINGER:

8     Q.  Okay.  And how many such conversations do you

9  think you might have had over the course of, let's say,

10  a year?

11          MR. KARCZEWSKI:  Calls for speculation.

12          THE WITNESS:  It's kind of hard to say because

13  we had a staff and unless I fired somebody which didn't

14  happen often --

15  BY MR. GROTZINGER:

16     Q.  Would it be fair to say that you were

17  frequently involved in training asset protection

18  associates?

19          MR. KARCZEWSKI:  Misstates the witness'

20  testimony.  Argumentative.  Vague.

21  BY MR. GROTZINGER:

22     Q.  I haven't asked you that yet so you haven't

23  testified on it.  I'm just -- I just want know if you

24  think that would be a fair way to describe the amount of

25  time you spent training asset protection associates.



1      A.   Definitely when -- when we go out on -- to make

2   an apprehension.

3      Q.   So give me an example, if you can.

4      A.   We had to make a judgment call whether or not

5   we're going to make -- make the apprehension.  I mean I

6   don't know -- I don't know how you want --

7      Q.   Okay.  Just whether or not you were going to --

8      A.   Yes.

9      Q.   -- apprehend somebody?

10         Okay.  Can you give me any other examples of

11  when you exercised your judgment as an APC other than

12  when deciding whether to apprehend somebody?

13         MR. KARCZEWSKI:  Same objection.

14         THE WITNESS:  I don't recall.

15  BY MR. GROTZINGER:

16     Q.  This paragraph also says, "Identifies and uses

17  data and evidence to determine the cause of problems and

18  develop solutions to address them."

19         Is that something you did as an APC?

20         MR. KARCZEWSKI:  Vague.

21         THE WITNESS:  The data we used would be our

22  inventory numbers.  We can also go on the -- the -- in

23  the system and identify how often we're having

24  accidents.

25         As far as developing a plan, the plan was



1   developed for us, we just had to execute.

2   BY MR. GROTZINGER:

3       Q.  Okay.  So can you give me an example of when

4   data showed a particular problem and you had to address

5   it and there was some plan in place?

6       A.  For instance, our shortage in -- bring up

7   electronics again.

8           The data we had from the inventory numbers

9   shows that we were high shortage there, so they

10  implemented in our checklist conducting audits of new

11  received merchandise, merchandise that's being sent back

12  out as damaged or returned to the warehouse, and that's

13  one example.

14      Q.  Going to the next page at the top, it says,

15  "Manage, Execution and Results - Holds associates

16  accountable for completing work within expectations and

17  time requirements."

18          Was that part of your job as an APC?

19      A.  Holding associates accountable, no.

20      Q.  It was not?

21      A.  No.

22          For completing tasks?  No.

23      Q.  So APAs were not -- it's your testimony that

24  APAs were not accountable to you for completing tasks?

25          MR. KARCZEWSKI:  Argumentative.  Asked and



1   while.

2       Q.   Anybody else?

3       A.   No.

4       Q.   You said you worked in a few different Wal-Mart

5   Stores?

6       A.   Yes.

7       Q.   Are there differences between the stores, in

8   other words, in terms of size?

9           MR. KARCZEWSKI:  Object to the form of the

10  question.  Compound.  Vague.

11          THE WITNESS:  Yes.

12  BY MR. GROTZINGER:

13      Q.   Can you tell me what you mean.  In other words,

14  you know, are there -- I've heard terms like super

15  center, that kind of thing.

16          Can you tell me the different kinds of Wal-Mart

17  Stores as far as you know?

18      A.   As far as I know, there's a neighborhood

19  market, which I believe is a grocery store only.

20      Q.   Uh-huh.

21      A.   There's a super center and then there is -- I

22  don't know what you would call -- a regular Wal-Mart, I

23  guess.

24      Q.   The -- what was it four or so Wal-Marts that

25  you worked at?  Does that -- actually it looks like



1  the mail, you had an interview with someone on the

2  telephone; is that correct?

3       A.  Yes.  That's correct.

4       Q.  Did that interview -- during that interview,

5  did you speak about your experiences as an -- as an APC?

6  And I'm going to use that term APC to mean the same

7  thing you've been using it to mean for the duration of

8  the day today.

9            During the interview, did you explain your

10 experiences working as -- as an APC at Wal-Mart?

11      A.  Yes, I did.

12      Q.  Okay.  Does your declaration, to the best of

13 your personal knowledge of those experiences, reflect a

14 true and accurate, I guess, portrayal of what you went

15 through at Wal-Mart?

16      A.  Yes.

17           MR. GROTZINGER:  Vague.

18           THE WITNESS:  Yes.

19 BY MR. KARCZEWSKI:

20      Q.  Is there anything you want to change in your --

21 in your declaration now?

22      A.  No.

23      Q.  Okay.  You had a chance for talk about

24 different Wal-Mart Stores, do you recall that, super

25 centers?



1      A.  Yes.

2      Q.  Okay.  And I think you said that there was --

3  you were asked whether there was more to do as an asset

4  protection coordinator at a super center.

5           Do you recall that?

6      A.  Yes.

7      Q.  You were doing the same job duties at a super

8  center that you were at -- at a regular Wal-Mart; is

9  that correct?

10          MR. GROTZINGER:  Assumes facts.

11          THE WITNESS:  That is correct.

12  BY MR. KARCZEWSKI:

13     Q.  Okay.  You mentioned that you -- that you

14  answered, I guess it would be, to the district manager.

15  The district manager was your superior; is that correct?

16     A.  Correct.

17     Q.  Okay.  At -- at the store level, was there

18  another employee that -- strike that.

19          You had a -- a -- a -- a store manager when you

20  were employed as an asset protection coordinator;

21  correct?

22     A.  That is correct.

23     Q.  Okay.  Did the store manager have ultimate

24  authority over the entirety of the Wal-Mart store that

25  you worked at?



1         MR. GROTZINGER:  Vague.

2         THE WITNESS:  As far as?

3   BY MR. KARCZEWSKI:

4     Q.  Who had the final say at the store level I

5   guess is what I'm trying to -- is what I'm trying to get

6   at here?

7         MR. GROTZINGER:  Vague.

8         THE WITNESS:  It would be the store manager.

9   BY MR. KARCZEWSKI:

10    Q.  Okay.  So if you had a -- a planned course of

11  action with respect to an issue at the store level and

12  the store manager had a different plan of action with

13  respect to that same issue, who's plan of action would

14  trump at that point?

15        MR. GROTZINGER:  Vague.  Incomplete

16  hypothetical.

17        THE WITNESS:  More than likely the store

18  manager's.

19  BY MR. KARCZEWSKI:

20    Q.  Okay.  And why do you say more likely -- more

21  than likely?

22    A.  Because it is -- it is the store manager's

23  store and pretty much the store manager runs it however

24  they want to run it.

25    Q.  So the store manager is ultimately in charge;



1   is that correct?

2     A.  That is correct.

3     Q.  Okay.  The buck stops at the store manager, is

4   that right?

5         MR. GROTZINGER:  Vague.

6   BY MR. KARCZEWSKI:

7     Q.  Okay.  Do you understand that term "the buck

8   stops here"?

9     A.  Final say, yes.

10     Q.  Okay.  You mentioned that before -- strike

11   that.

12        You mentioned that you currently work as a loss

13   prevention manager at Macy's; is that right?

14     A.  That is correct.

15     Q.  Okay.  Are you paid hourly or salary in that

16   position?

17     A.  Hourly.

18     Q.  Hourly you said?

19     A.  Yes.

20     Q.  Okay.  And you've had that position for about

21   how long?

22     A.  A little over two years.

23     Q.  Okay.  And you're familiar with the job duties

24   that you currently perform as a loss prevention manager

25   at Macy's; is that right?



1          Do you recall that?

2     A.  Yes.

3     Q.  Okay.  And I think that you said you spent a

4 decent amount of time on auditing.

5          Do you recall that?

6     A.  Yes.

7     Q.  When you were auditing, were you always

8 following Wal-Mart's policies and procedures with what

9 you were auditing?

10    A.  Yes.

11    Q.  Okay.  You never created a -- a procedure, for

12 instance, for auditing the -- the cash box at the end of

13 the night, right?

14    A.  No.

15         MR. GROTZINGER:  Vague.

16 BY MR. KARCZEWSKI:

17    Q.  Okay.  You mentioned an instance where you

18 terminated -- where you -- strike that.

19         You mentioned an instance when you were

20 involved in the termination of an employee.

21         Do you recall that?

22    A.  Yes.

23    Q.  Okay.  I think you said that he had violated

24 Wal-Mart's apprehension policy; is that correct?

25    A.  That is correct.



1      Q.  And that's a -- is that AP 09?

2      A.  Yes.

3      Q.  Okay.  And asset protection employees at

4  Wal-Mart are required to follow AP 09; is that correct?

5      A.  Correct.

6      Q.  There's no discretion to just simply not follow

7  AP 09, correct?

8      A.  Correct.

9      Q.  Okay.  Do you know whether AP 09 requires

10  termination of an employee -- of employees that violate

11  its policy?

12      A.  No.

13      Q.  Okay.  Do you -- you -- you -- I guess -- I

14  want to clarify that.

15          You don't know whether it requires termination

16  or it doesn't require termination?

17      A.  From experience, it doesn't.

18      Q.  Okay.  And you said that you had spoken to the

19  district manager related to this incident with the

20  terminating of the employee and you were told to

21  terminate him; is that correct?

22      A.  That is correct.

23      Q.  Okay.  You didn't feel like it was appropriate

24  to terminate that employee based on what happened; is

25  that correct?



1    A.  Yes.

2    Q.  Okay.  In apprehending -- in apprehending --

3  excuse me -- shoplifters and suspected shoplifters,

4  correct?

5    A.  Correct.

6    Q.  And you recall going over Exhibit 2, which is

7  the job description document in some detail, right?

8    A.  Yes.

9    Q.  Is this -- is this how you would choose to

10  describe your job?

11    A.  Not really.

12    Q.  Okay.  As far as what you did on a day -- on a

13  day -- actually did on a day-to-day basis, this isn't

14  very representative of what you did, correct?

15    A.  Correct.

16        MR. GROTZINGER:  Vague.  Argumentative.

17  Misstates testimony.  Assumes facts.

18  BY MR. KARCZEWSKI:

19    Q.  In your declaration, you described duties --

20  job duties that you did on a day-to-day basis.  Is that

21  a better representation of the duties you actually

22  performed on a day-to-day basis than this job

23  description?

24        MR. GROTZINGER:  Assumes facts.

25        THE WITNESS:  Yes.



1          REPORTER'S CERTIFICATION

2

3      I, MARCELINE F. NOBLE, a Certified Shorthand

4  Reporter in and for the State of California, do hereby

5  certify:

6

7      That the foregoing witness was by me duly sworn;

8  that the deposition was then taken before me at the time

9  and place herein set forth; that the testimony and

10  proceedings were reported stenographically by me and

11  later transcribed into typewriting under my direction;

12  that the foregoing is a true record of the testimony and

13  proceedings taken at that time.

14

15      IN WITNESS WHEREOF, I have subscribed my name this

16  1st day of September, 2013.

17

18

19  

20  _____

21          MARCELINE F. NOBLE, CSR No. 3024

22

23

24

25



**EXHIBIT "K"**

PA0358

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

| | |
|---|---|
| ALADDIN ZACKARIA; individually, and on behalf of other members of the general public similarly situated, and on behalf of aggrieved employees pursuant to the Private Attorneys General Act ("PAGA"), | ) Case No. 5:12-CV-01520-<br>)         VAP-SP<br>)<br>) Volume I<br>)<br>)<br>) |
| Plaintiff, | ) |
| | ) |
| Vs. | ) |
| | ) |
| WAL-MART STORES, INC., a Delaware corporation and DOES 1 through 100, inclusive, | ) |
| | ) |
| Defendants. | ) |

DEPOSITION OF ESTELA GONZALEZ

TAKEN ON

TUESDAY, JANUARY 8, 2013

9:55 A.M. - 3:23 P.M.

Reported by:   LISA RAE SOMMERHAUSER

CSR NO. 10985

1

PA0359

1          Have you been asked to provide a declaration

2    related to this case?

3          A    No.

4          Q    And I'll just represent to you that the name

5    of this case is Zackaria v. Walmart.  And when I say

6    "this case," that's what I'm referring to.

7          A    Okay.

8          Q    So you haven't been asked to submit any kind

9    of information, other than your deposition today,

10   related to this case?

11         A    No.

12         Q    Okay.  Do you know whether you're owed any

13   unpaid overtime for being employed by Walmart since

14   2006?

15         A    Well, no.  I wouldn't have overtime.  I'm a

16   salary manager.

17         Q    Okay.  So let's start with that.  What do you

18   consider to be a salary manager?

19         A    I don't get paid per hour.  I have a monthly

20   salary that I receive for my job.

21         Q    Do you have an understanding as to why you're

22   paid a salary versus paid by the hour?

23         A    I don't understand your question.

24         Q    It's okay.  Let me try to rephrase it.  Do you

25   have an understanding that there are certain

                                                        17

PA0360

1      Q      So for you personally, you have nine

2   associates that you perform reviews on -- or I'm

3   sorry -- evaluations on once a year; is that correct?

4      A      Yes.

5      Q      And those evaluations take approximately one

6   to two hours each; is that correct?

7      A      Yes.

8      Q      And this is the one difference between APCs

9   and APMs; is that correct?

10      A      Yes.

11      Q      Okay.  Going back to -- so now we're in 2013.

12   When is the last time you didn't have nine associates?

13      A      When I was in the Pico Rivera store.  I had

14   six.

15      Q      You had six there.  Okay.  And when did you

16   leave the Pico Rivera store?

17      A      It's been about, about a year and a half.

18      Q      Do you understand that you can -- so we're

19   going to talk about this case again.  Okay?

20      A      Yes.

21      Q      Do you understand that this case is a class

22   action case?

23      A      Yes.

24      Q      Do you understand what that means?

25      A      No.

27

PA0361

1    Q    Paramount.

2         And are there any stores -- any other stores,

3    other than those three that you've worked at, since

4    you've been with Walmart?

5    A    Yes.  One more.  Oceanside.

6    Q    When was that?

7    A    In 1996 when I first got hired.

8    Q    Do you know the difference between an exempt

9    employee and a nonexempt employee?

10        MS. MUNCK:  I'm going to object to the form of

11   the question.  Calls for a legal conclusion.

12        MR. KARCZEWSKI:  I asked her if she knows the

13   difference, Counsel.

14        You can answer.

15        MS. MUNCK:  In any event, it's asking for a

16   legal conclusion.

17        If you know the answer, you certainly can

18   answer, Ms. Gonzalez.

19        THE WITNESS:  No.

20   BY MR. KARCZEWSKI:

21   Q    Okay.  Do you know the different job duties

22   that are involved in being a manager?

23        MS. MUNCK:  Object to the form of the

24   question.

25        THE WITNESS:  No.

                                                    51

1    But usually the -- if I miss something, it's not

2    anything I can't do, you know, before the end of the

3    week.

4         Q    How do you know to follow the routine from the

5    Wire?

6         A    I don't understand.

7         Q    Did you just stumble upon it one day and say:

8    This is a good way to figure out what I have to do

9    during the day?  Or did someone tell you that you should

10   look at this routine?

11        A    It's company -- it's a company program.

12        Q    So --

13        A    So everybody has routines.

14        Q    I see.  Okay.  And did someone at Walmart at

15   some point tell you, "Estela, you should follow this

16   routine"?

17        A    It's a program.  So yes.

18        Q    What do you mean by "program"?

19        A    It's something that everybody's on,

20   management, associates, cashiers, CSMs.  Everybody has a

21   routine.

22        Q    Okay.  So these routines are something that

23   Walmart gives its employees and says:  "Follow these

24   routines"; is that correct?

25             MS. MUNCK:  Object to the form of the

                                                           67

1    question.

2    BY MR. KARCZEWSKI:

3        Q    You can answer.

4        A    Yes.

5        Q    Okay.  And what happens if you just say, "I'm

6    not going to follow the routine"?

7        A    A lot of times things fall behind.  So it's

8    more -- like I said, it's more of a guide, a time

9    management guide, especially, like, for assistant

10   managers as well.  Because they are running around so

11   much.  It reminds them of what needs to be done at what

12   times.

13           For management, sometimes they have some

14   things that have to be done by a certain time; just like

15   the APM position.  There's certain things that we have

16   to have done at a certain time.  So those routines, like

17   I said, are time management to help us get everything

18   completed that needs to be done within that week.

19       Q    So if you just -- if you decided when you go

20   in this next month for all of February, "I'm not going

21   to follow the routines.  I'm just going to do what I

22   think is best in the store," would there be any

23   consequences from Walmart if you did that?

24       A    From Walmart?  Well, no, not that I've ever

25   seen, no.  If you're not doing your job, of course

                                                        68

1    throw it away?

2        A    Yes.  If there's spills, I pick them up.  If

3    there's something that needs to be moved, I'll move it.

4        Q    If a customer -- I'm sorry.  Go ahead.  I

5    didn't mean to cut you off.

6        A    There's nothing that I wouldn't do that I

7    wouldn't ask an associate to do.

8        Q    If a customer came up and asked you a

9    question, would you answer it?

10       A    Yes.

11       Q    If they said, "Where is the bleach?"

12       A    I would take them to the bleach.

13       Q    You would physically take them to the bleach?

14       A    Yes.

15       Q    What if somebody needed -- what if they

16   were -- strike that.

17            What if Walmart was -- your store was

18   extremely busy, would you help check out?

19       A    I'm not allowed to.

20       Q    Okay.  Why aren't you allowed to?

21       A    Conflict of interest.

22       Q    Because -- okay.  Anything else that's

23   involved, that's involved when you're walking the store

24   that we've missed so far?

25       A    Not that I can think of, no.  Because most of

95

1    it includes safety, security, shrink.  And that's what I

2    walk, is, you know, safety concerns, shrink concerns.

3         Q    Okay.  And is there a document or anything

4    that tells you how to walk the floor?

5         A    No.

6         Q    Okay.  Is the -- strike that.

7              Is walking the floor part of the routine that

8    you pull up on the Wire?

9         A    I believe it's not.  I think it just says,

10   like, "tour shrink departments."

11        Q    Oh, okay.

12        A    If it even says that.

13        Q    So it's not -- it doesn't tell you "walk the

14   floor," the actual words, does it?

15        A    No.

16        Q    Okay.  Do you know -- would you look at -- is

17   there other language on the routine that would tell you

18   to perform the same kinds of duties you perform when you

19   walk the floor?

20        A    What do you mean by "other language"?

21        Q    Is there anything on the routines that say,

22   "Walk around and look at the different apartments --

23   departments"?  Excuse me.

24        A    No, not that I can recall, no.

25        Q    Okay.  How do you know to go out and walk the

                                                          96

1    went back and looked at e-mails and reports and things,

2    you would have a better idea at how long you spent on

3    different tasks; is that accurate?

4        A    Yes.

5        Q    If this -- if we needed an accurate estimate

6    of exactly how much time you spent on each one of these

7    specific duties that we've just talked about, cleaning

8    and all those things, over the course of a week, would

9    you be able to get that information from looking at

10   these reports and e-mails and things?

11       A    Well, if there's a spill, there's not a report

12   for that.  It's obvious that we'd clean it up.  It's

13   not, like, okay.  This took me 30 minutes, so now, you

14   know, I'm owed this, or anything like that.  It's just,

15   if it's there, clean it.  And then, you just go about

16   your day.  You don't really think twice about it.

17            I've never really had to put much thought into

18   how much time I spend on every little thing that I'm

19   doing.  So if I would have to estimate, that would be

20   really hard.

21       Q    Do you know if you could ever estimate that

22   accurately?

23       A    No.

24       Q    Has Walmart ever told you that you need to

25   spend a certain amount of time doing any type of duty?

                                                        101

1     A    Um, I know that my pay is to reflect 45 hours.

2     Q    So that's 45 total hours during a week; is

3  that right?

4     A    Yes.

5     Q    And of those 45 hours, has Walmart ever told

6  you how you should spend your time on certain duties

7  versus other duties?

8     A    Well, they just came up with that routine,

9  like, this is kind of a glimpse of the things you need

10  to get done.  But there's always other things that are

11  added.

12        Like I said, sometimes detectives will contact

13  me.  Sometimes home office investigators will contact

14  us.  And that will take away time from the other duties

15  that we have to conduct.

16        So there might be a time where I'm a week

17  behind, and I have to play catch up, you know, for

18  spending so much time pulling video for an investigation

19  that might go to trial, you know.  So it is hard for me

20  to be able to estimate.

21     Q    Okay.  And I think we got a little bit off

22  track on that answer.  My question was:  Has anyone at

23  Walmart told you specifically how you're supposed to

24  allocate your time to different job duties, other than

25  the routine that we've spoke of?

102

PA0368

1    A    No, not that I can recall.

2    Q    No one -- has anyone ever -- strike that.

3    Has anyone at Walmart ever said, "Estela, you

4 need to spend more than 50 percent of your time doing

5 anything"?

6    A    No.

7    Q    Do you know that there's an expectation from

8 Walmart that you spend the majority of your time doing

9 anything?

10    A    Well, I know --

11    MS. MUNCK:  Object to the form of the

12 question.

13    But you can answer.

14    THE WITNESS:  I know that the national

15 priorities, they based it off of -- I think it's

16 approximately -- I think they said it will take, like,

17 17 hours, if they were to put, you know, actually how

18 much time everybody put.  They estimated maybe an

19 average of 17 hours, I believe.

20    For it to be accurate, I'm not positive.  I

21 would be making a guess.  But I believe it's 17 hours.

22 They consider that's how much it would take.  But it

23 doesn't take that long.

24 BY MR. KARCZEWSKI:

25    Q    Okay.  So this is what Walmart, Walmart has

1  said about these national priorities, which is a list of

2  duties that you're supposed to complete within a week?

3      A    Follow-up.

4      Q    That those -- that, that conducting those

5  duties would take -- should take 17 hours; is that

6  correct?

7      A    I believe it's 17 hours.  I might be wrong on

8  the hours.  But I believe it's 17 hours.

9      Q    Okay.  But other than that, no one has ever

10  come to you and said, "Estela, I need you to spend

11  50 percent of your time walking the floor"?

12     A    No.

13     Q    Or any other specific expectation?  Has anyone

14  ever --

15     A    As far as that, no.

16     Q    Okay.  Are you aware of any document,

17  either on the Wire or that you've seen while working at

18  Walmart, that tells you how you should spend your time

19  on various job duties throughout the day, other than the

20  routines?

21     A    No.

22     Q    Okay.  Does the routine -- strike that.

23        The routines we've talked about a little bit

24  is a form that's on the Wire?

25     A    Yes.

1   would there be any consequence from Walmart for doing

2   that?

3       A    If I didn't follow --

4            MS. MUNCK:  Object to the form of the

5   question.

6            You may answer.

7            THE WITNESS:  If I don't -- if I don't use a

8   checklist?  Is that your question?

9   BY MR. KARCZEWSKI:

10      Q    I'll restate it.  It was a little bit, again,

11  a little bit of a weird question.

12           You said that there's a checklist for going

13  about checking the compliance for hazardous waste;

14  correct?

15      A    Yes.

16      Q    If you, Estela, decided that you were going to

17  check compliance with the hazardous waste policy

18  completely differently, would there be a response from

19  your management?

20           MS. MUNCK:  Object to the form of the

21  question.

22           THE WITNESS:  Management doesn't have any say

23  in the checklist.  It's something that's sent from home

24  office and from our compliance managers.

25           I have to use that checklist in order to

                                                      116

1  <u>ensure that I'm checking exactly what it is that's on</u>

2  there.  If I was to falsify that document, it could lead

3  to, I guess, getting written up or even termination

4  because it's compliance.  So I definitely use that

5  checklist also to cover myself and ensure that I'm

6  checking everything that's on that.

7  BY MR. KARCZEWSKI:

8      Q    How many times in your career, if you can

9  estimate, have you looked at compliance for the

10  hazardous waste policy?

11     A    Once a week for the six years that I've been

12  an APM.  So times that.

13     Q    We won't make you do the math.

14          And each time, you're taking the checklist

15  with you and looking through the hazardous waste policy;

16  correct?

17     A    If I'm not in the building, it would be the

18  assistant manager that conducts it.

19     Q    Let's go to the next one, money orders.  We're

20  looking at money order compliance?  Or can you explain

21  that?

22     A    Well, it's not -- it's not really compliance.

23  Sometimes there is compliance, making sure, like, say,

24  for instance, they change the fee, then there's a

25  compliance where we have to make sure that that signing

117

PA0372

1    better accurate -- I try to meet with him at least once

2    a week to sit down for any issues that, you know, that I

3    have throughout the week.  So he usually tries to sit

4    down with me for about an hour.  If something comes up

5    with me during the day, maybe five, ten minutes real

6    quick, but at least one hour to discuss any exceptions,

7    anything that I need his support on, as far as from his

8    management team.

9        Q    Do you consider that time to be management

10   time?

11       A    Well, we're discussing things as far as

12   managers.  So yes, I would.

13       Q    Are you -- do you consider that to be managing

14   your employees at that point?

15       A    If I'm talking to the store manager?  No.

16       Q    Do you consider time when you're cleaning up a

17   spill to be managing employees?

18       A    Sometimes, yes.

19       Q    In what regard?

20       A    Well, I'm leading by example.  So if the

21   associates see me picking up a spill, that's also going

22   to let them know, that, "Hey, if this member in

23   management is able to pick up a spill, so am I."

24       Q    Does that same leading-by-example idea apply

25   to customer service, helping people out when they are

                                                        147

1    lost in the store?

2         A    Yes.  Well, not lost.  Sometimes they just

3    need to know where something is at.  Because they don't

4    want to go looking for it.  It's right there in front of

5    them.  But as a manager, and you want to lead by example

6    to your associates, to show them that, if they are

7    asking for that bleach, you're not just saying "It's

8    down over there."  You are taking them to the bleach.

9    And if they need anything else, then they'll ask you at

10   the same time.

11        Q    Sure.  When you're out performing these

12   leading-by-example duties, do you tell your APAs, "Hey,

13   watch how I handle this situation"?

14        A    Sometimes when they are with me, like, they

15   won't butt in, you know; if they have questions, then

16   yes, you know.  Or I'll be, like, hey -- if I see that

17   maybe they helped the customer, and there was something

18   that the customer asked, and they didn't answer it, then

19   I'll show them, like, "Hey, you know what, this is

20   probably the approach you could have took."

21             A lot of times that happens, especially when

22   they make stops on a juvenile and -- like, like a mother

23   and father will come.  And they want to, all of a

24   sudden, you know, "My kid doesn't do no wrong."

25             I want to make sure that my associates handle

                                                      148

1    that situation correctly.  So, you know, I would say,

2    "Hey, next time this is how you should handle it," or

3    give them a better way of going about it.  So yes, I

4    would say yes.

5        Q    Okay.  How much time in a typical day do you

6    spend looking for people that might be stealing from

7    Walmart?

8        A    It depends on what I'm looking at.  Because

9    some of the reports are like the red flags.  So if I'm

10   looking at the weekly refund review, that takes -- I do

11   that in separate parts.  So I do that throughout the

12   week.  Maybe an hour, maybe four hours.  I mean, it's

13   really hard to say.

14       Q    So going back to the example, again -- I don't

15   think this is a duty that we've separately covered.  But

16   how much time in that June 2012 example, if you can give

17   me an estimate of how much time during a week back in

18   June 2012 that you spent looking for shoplifters?

19       A    I don't look for shoplifters.

20       Q    Okay.  Ever?

21       A    That's my associates that cake care of the

22   shoplifters.

23       Q    Okay.  So performing the functions that you

24   just spoke about, looking at reports, looking at the

25   refund reports, things like that, how much time would

149

1     A   Yes.

2     Q   What kind of complaints would APAs typically

3 get at the Pico store?

4     A   Normally, they would get the kind of

5 complaints, as far as, like, how they were handled in

6 the office.  Or parents really didn't want to believe

7 that their kids stole something.  So those were the kind

8 of complaints that they would complain about, you know

9 "Oh, my daughter didn't steal anything."

10    Q   Okay.  You're part of the management team at

11 Pico; is that correct?

12    A   At the time when I was there, yes.

13    Q   I'm sorry.  At the time that you were there.

14 We're going to be talking about at the time you were

15 there as an APM; is that correct?

16    A   Okay.  Yes.

17    Q   So at the time you were a manager at the Pico

18 Rivera store; is that correct?

19    A   Yes.

20    Q   You were part of the management team during

21 that time?

22    A   Yes.

23    Q   Did you ever receive complaints about the

24 management team when you were there?

25    A   Yes.

171

PA0376

REPORTER'S CERTIFICATE

I, LISA RAE SOMMERHAUSER, CSR No. 10985,
Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken
before me at the time and place therein set forth, at
which time the witness was put under oath by me;

That the testimony of the witness, the
questions propounded, and all objections and statements
made at the time of the examination were recorded
stenographically by me and were thereafter transcribed;

I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

I declare under penalty of perjury under the
laws of California that the foregoing is true and
correct.

Dated this 11th day of January, 2013.


LISA RAE SOMMERHAUSER,
C.S.R. No. 10985

EXHIBIT "L"

PA0378

1          UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3             EASTERN DIVISION

4

5

6    ALADDIN ZACKARIA; individually,)
     and on behalf of other members )
7    of the general public          )
     similarly situated, and on     )
8    behalf of aggrieved employees  )
     pursuant to the Private        )
9    Attorneys General Act ("PAGA"),)
                                    )
10             Plaintiff,           )
                                    )
11             vs.                  )    Case No.
                                    )    EDCV12-01520
12   WAL-MART STORES, INC., a       )    VAP(SPx)
     Delaware Corporation; and      )
13   DOES 1 through 100, inclusive, )
                                    )
14             Defendants.          )
     _____)

15

16

17         VIDEOTAPED DEPOSITION OF

18           RANDALL HOWDESHELL

19      WEDNESDAY, SEPTEMBER 4, 2013

20              9:11 A.M.

21

22          3161 Michelson Drive
                Suite 1000
23        Irvine, California 92612

24   REPORTED BY:  SANDRA K. MARTINOVICH, CSR NO. 11537

25


ESQUIRE
SOLUTIONS

1    A.   No.

2    Q.   When did you leave Wal-Mart?

3    A.   April 24th.

4    Q.   Did that have something to do with this lawsuit?

5    A.   No.

6    MR. KARCZEWSKI:  Vague.

7    BY MR. GROTZINGER:

8    Q.   Why did you leave Wal-Mart?

9    A.   I was terminated.

10   Q.   Do you know why?

11   A.   The reason --

12   Q.   Right.

13   A.   -- was performance.

14   Q.   Can you be more specific?

15   A.   During my exit interview basically I was told that I

16   wasn't keeping certain reports and paperwork up to date and

17   that was basically it.

18   Q.   Did you agree with that assessment?

19   A.   I did.

20   Q.   You did.  Why weren't you keeping reports up to date?

21   A.   I was on medical leave intermittent throughout that

22   whole year, so I had maybe half the time that everybody else

23   would have had to keep up with the same paperwork and I wasn't

24   receiving any help at my store, so I was falling behind.

25   Q.   Were you upset at Wal-Mart for terminating you?



1   streamline the data selection to make it easier and faster and

2   stuff like that.

3       Q.   Okay.  Was it your idea to do that?

4       A.   Yes.

5       Q.   Can you give me any other specific examples of how

6   you improved work processes or practices to increase results?

7       MR. KARCZEWSKI:  Asked and answered; vague.

8       THE WITNESS:  No.

9   BY MR. GROTZINGER:

10      Q.   Okay.  Under D in the next paragraph first sentence

11  is, "Promotes ideas and links them to business needs and

12  benefits."  Would you say that was a competency of your job as

13  an APC?

14      MR. KARCZEWSKI:  Hold on.  Okay.  Vague.  Go ahead.

15      THE WITNESS:  Yeah, I don't even really understand that

16  competency, it's too vague for me to understand it.

17  BY MR. GROTZINGER:

18      Q.   Okay.  Under E it says, "Demonstrates creativity and

19  strength in the face of change, obstacles, and adversity."  Do

20  you think that was a competency of the APC job?

21      MR. KARCZEWSKI:  Again, vague.

22      THE WITNESS:  Yes.

23  BY MR. GROTZINGER:

24      Q.   Why do you say that?

25      A.   Because Wal-Mart was an ever changing environment, so



1   sentence is, "I am a source for my fellow APM's and APA's to

2   come to when they have questions or concerns when dealing with

3   unusual circumstances."  Do you see that?

4       A.   Yes.

5       Q.   What do you mean by my fellow APM's?

6       A.   Other APM's in the market, our market or surrounding

7   markets.

8       Q.   What's an APM?

9       A.   APC, they changed our title shortly before this to

10  asset protection manager instead of asset protection

11  coordinator.

12      Q.   Did your job responsibilities change at all when your

13  title changed?

14      A.   No.

15      Q.   Okay.  You referred to unusual circumstances, can

16  you -- or dealing with unusual circumstances, can you give me

17  an example?

18      A.   I mean, I don't know of a specific example.  I

19  wouldn't want to misinterpret some -- something that happened

20  before.

21      Q.   The next sentence is, "I have become a better leader

22  since I have been put in my current position."  Why did you

23  say that?

24      A.   I don't know what my mind set was at the time, but I

25  would assume that I felt -- because this was towards the end



1       MR. GROTZINGER:  Did we go over that already?

2       MR. KARCZEWSKI:  Yeah.

3   BY MR. GROTZINGER:

4       Q.   Did you take a meal break every day during your job

5   as an APC?

6       MR. KARCZEWSKI:  Vague; calls for expert -- not -- sorry,

7   calls for a legal conclusion.

8       THE WITNESS:  No.

9   BY MR. GROTZINGER:

10      Q.   Did you usually take a meal break --

11      MR. KARCZEWSKI:  Vague.

12  BY MR. GROTZINGER:

13      Q.   -- when you worked as an APC?

14      MR. KARCZEWSKI:  Sorry again, vague.

15      THE WITNESS:  No.

16  BY MR. GROTZINGER:

17      Q.   During a given week, can you say approximately how

18  many days you would take a meal break versus not taking a meal

19  break?

20      MR. KARCZEWSKI:  Vague; calls for legal -- excuse me,

21  calls for a legal conclusion.

22      THE WITNESS:  Once -- once maybe twice a week I would

23  actually leave the store to take a meal break.

24  BY MR. GROTZINGER:

25      Q.   What about taking a break for a meal within the



1    store, did you ever do that?

2        MR. KARCZEWSKI:  Same objections.

3        THE WITNESS:  Most of the time it would just be grab a

4    snack or something and eat it while I was checking my e-mail

5    or something, but I was still doing kind of work-related tasks

6    to make sure I could get everything done that day.

7    BY MR. GROTZINGER:

8        Q.   Okay.  Did you take other breaks when you worked as

9    an APC during the day?

10       MR. KARCZEWSKI:  Vague; calls for a legal conclusion.

11       THE WITNESS:  No, not -- not usually at all.

12   BY MR. GROTZINGER:

13       Q.   Did you ever keep track of how many meal or rest

14   breaks you took as an APC?

15       MR. KARCZEWSKI:  Same objections.

16       THE WITNESS:  No.

17       MR. GROTZINGER:  I have no further questions at this time.

18

19                          EXAMINATION

20

21   BY MR. KARCZEWSKI:

22       Q.   I'm going to ask you a series of follow-up questions

23   at this point.  Okay?

24       A.   Yes.

25       Q.   Are you okay with your throat and everything to go



1   the exact same thing as the National Priority; is that

2   correct?

3       A.   Correct.

4       Q.   Okay.  National Priority have audits that go along

5   with them; is that correct?

6       A.   Yes.

7       Q.   National Priority are broader than just performing

8   audits; is that correct?

9       A.   Yes.

10      Q.   Okay.  I think that you mentioned that you made --

11  Mr. Grotzinger asked you about an estimation of time that you

12  spend on audits per week.  Do you recall that?

13      A.   Yes.

14      Q.   If you're -- now, if you're thinking of just your

15  duties related to National Priority generally, okay, do you

16  understand where I'm going?

17      A.   Yes.

18      Q.   Okay.  So do you have an idea of how much -- what

19  percentage of time or what number of hours per week you

20  averaged performing job duties related to the National

21  Priority, are you able to give me an estimate on that?

22      MR. GROTZINGER:  Speculation.

23      THE WITNESS:  I can say that the company -- it's expected

24  it to take around 20 to 22 hours per week performing National

25  Priority tasks.  Sometimes that would be accurate, sometimes

1  it would be more, sometimes it would be less.

2  BY MR. KARCZEWSKI:

3      Q.   Okay.  And when you say sometimes more, sometimes

4  less, is -- is the variation pretty minimal as far as the

5  number of hours it varies?

6      A.   Yes.

7      MR. GROTZINGER:  Vague.

8      THE WITNESS:  Yes.

9  BY MR. KARCZEWSKI:

10     Q.   So it would never take you, for instance, just five

11 hours in a week to perform the National Priority; correct?

12     A.   Correct.

13     Q.   Okay.  When you're performing audits -- strike that.

14          When you were performing the National Priority, which

15 as we talked about encompasses auditing as a job duty; is that

16 correct?

17     A.   Yes.

18     Q.   When you were performing the National Priority,

19 Wal-Mart's policies and procedures told you exactly how to

20 perform those job duties; is that correct?

21     MR. GROTZINGER:  Assumes facts; vague.

22     THE WITNESS:  Each question had a standard operating

23 procedure along with it, you could pull that up and read that,

24 yes.

25 BY MR. KARCZEWSKI:



1    Q.   So it told you how to conduct the audit; is that

2    right?

3    A.   Yes.

4    Q.   It told you how to conduct whatever steps you needed

5    to take to complete -- to answer that question, I guess; is

6    that correct?

7    MR. GROTZINGER:  Vague; document speaks for itself.

8    THE WITNESS:  Yes.

9    BY MR. KARCZEWSKI:

10   Q.   And then if there was a discrepancy, did that SOP

11   tell you also how to follow up after you had -- after you had

12   answered the question?

13   MR. GROTZINGER:  Same objections plus incomplete

14   hypothetical.

15   THE WITNESS:  I believe certain SOP's did have follow-up

16   questions if there was a no or -- involved in that question,

17   if there was a -- yeah.

18   BY MR. KARCZEWSKI:

19   Q.   Okay.  Did the National Priority also tell you how

20   and when to report the results of the National Priority which

21   included the audits?

22   MR. GROTZINGER:  Objection; vague; document speaks for

23   itself.

24   THE WITNESS:  Yes.

25   BY MR. KARCZEWSKI:



1    Q.   And you were discussing other APC's jobs and what

2    they were doing as an APC in a different store; correct?

3    A.   Yes.

4    Q.   And was it your understanding based on these

5    conversations that the APC job that they were performing,

6    these other APC's, was very similar to the job that you were

7    performing at your store?

8    MR. GROTZINGER:  Assumes facts.

9    THE WITNESS:  Yes.

10   BY MR. KARCZEWSKI:

11   Q.   Would you say it was identical to what you were

12   doing?

13   MR. GROTZINGER:  Same.

14   THE WITNESS:  No.

15   BY MR. KARCZEWSKI:

16   Q.   Okay.  Would you say that the job duties that they

17   were responsible for performing were -- were very similar to

18   the job duties that you were responsible for performing --

19   MR. GROTZINGER:  Vague.

20   BY MR. KARCZEWSKI:

21   Q.   -- excuse me, on a day-to-day basis?

22   MR. GROTZINGER:  Vague; speculation.

23   THE WITNESS:  Yes.

24   BY MR. KARCZEWSKI:

25   Q.   And that was based on, excuse me, conversations that



1  | you had with these other APC's; is that correct?

2  |    A.   Yes.

3  |    Q.   And if you go to -- that's fine.

4  |        You had some time to talk about shoplifter blitzes;

5  | is that right?

6  |    A.   Yes.

7  |    Q.   Earlier today?

8  |    A.   Yes.

9  |    Q.   Do you know whether Wal-Mart instructs its asset

10 | protection employees when to perform shoplifter blitzes?

11 |    A.   I don't think there's a policy written down anywhere

12 | about that, no.

13 |    Q.   Do you know whether the MAPM decides whether and when

14 | to do a shoplifter blitz?

15 |    MR. GROTZINGER: Vague; speculation.

16 |    THE WITNESS: The MAPM can give input and most of the time

17 | I would decide when to do it.

18 | BY MR. KARCZEWSKI:

19 |    Q.   Okay. Going on -- which one do you have there?

20 |    A.   13 mid year.

21 |    Q.   If you could go to the competencies portion of this,

22 | if you would, and I think it's on -- the second page it

23 | starts. There you are. Just give me one second. And I'll

24 | read it -- I'll read the sentence for you, "Competencies are

25 | the knowledge, skills, abilities, and other behaviors needed



1    to successfully perform the job."  Do you see that?

2        A.   Yes.

3        Q.   So competencies aren't job duties you're actually

4    performing as an APC on a day-to-day basis; is that correct?

5        MR. GROTZINGER:   Objection; vague; assumes facts.

6        THE WITNESS:   Correct.

7    BY MR. KARCZEWSKI:

8        Q.   Wal-Mart has sort of explained what these

9    competencies are; correct?

10       MR. GROTZINGER:   Vague.

11       THE WITNESS:   Yes.

12   BY MR. KARCZEWSKI:

13       Q.   It's knowledge; right?

14       A.   Yes.

15       Q.   And does any of this portion say that competencies

16   are job duties you perform on a day-to-day basis that you can

17   see here?

18       MR. GROTZINGER:   Document speaks for itself.

19       THE WITNESS:   No.

20   BY MR. KARCZEWSKI:

21       Q.   Okay.  If you can pick up your declaration, if you

22   would, please.  And this is Exhibit 2.  And paragraphs 4, 5,

23   and 6 you talk about, quote unquote, non-managerial tasks.  Do

24   you see that?

25       A.   Yes.



1                      REPORTER'S CERTIFICATION

2

3           I, Sandra K. Martinovich, a Certified Shorthand

4    Reporter in and for the State of California, do hereby

5    certify:

6

7           That the foregoing witness was by me duly sworn; that

8    the deposition was then taken before me at the time and place

9    herein set forth; that the testimony and proceedings were

10   reported stenographically by me and later transcribed into

11   typewriting under my direction; that the foregoing is a true

12   record of the testimony and proceedings taken at that time.

13

14          IN WITNESS WHEREOF, I subscribe my name this 4th Day

15   of September, 2013.

16

17

18

19          _____

20          SANDRA K. MARTINOVICH

21          CSR. NO. 11537

22

23

24

25



EXHIBIT "M"

PA0392

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4   ALADDIN ZACKARIA;
    individually, and on
5   behalf of other members
    of the general public
6   similarly situated, and
    on behalf of aggrieved
7   employees pursuant to the
    Private Attorneys General
8   Act ("PAGA");

9              Plaintiff,

10          vs.              Case No. 5:12-cv-01520-FMO-SP

11  WAL-MART STORES, INC., a
    Delaware corporation and
12  Does 1 through 100,
    inclusive,

13             Defendants.
14  ~~~~~~~~~~~~~~~~~~~~~~~~~

15

16              VIDEOTAPED DEPOSITION OF

17           PATRICIA KLINGENBECK KAISER

18                 October 1, 2013

19                   10:00 a.m.

20

21        2151 River Plaza Drive, Suite 300
                Sacramento, California
22

23

24

25     Reported by Sharon C. Holloway, RPR, CSR 12227



1   employment there or closer to the two thousand and --

2   well, closer to the 2008 side of the --

3        A.    Closer to the 2011.

4        Q.    Okay.  And do you recall about how long you

5   covered as an APM at the Fremont -- or at the second

6   Fremont location?

7        A.    It was different times.  Can I elaborate on

8   that a little bit?

9        Q.    Sure.

10       A.    There was a time where the current APM was on

11  leave of absence for a few months, so I covered that.

12  And I always covered any vacations that that -- so

13  another two to three weeks a year I would always cover.

14       Q.    Okay.  So it was a semiregular occurrence that

15  you would go and cover at the other Fremont location; is

16  that accurate?

17            MS. MUNCK:  Objection.  Vague.

18            THE WITNESS:  During the times that I stated,

19  yes.

20  BY MR. KARCZEWSKI:

21       Q.    Okay.  Were the job duties the same at both

22  stores?

23       A.    Yes.

24       Q.    Were Wal-Mart's policies and procedures as

25  they applied to APMs or APCs the same?



1    A.   Yes.

2    Q.   Did your job change as an APM or an APC if you

3    went and covered at the other Fremont location?

4         MS. MUNCK:  Objection.  Vague.

5         THE WITNESS:  No.

6    BY MR. KARCZEWSKI:

7    Q.   I'm trying to get -- you mentioned there was

8    differences between the San Leandro stores and the

9    other -- the other two stores that you covered at as an

10   APM when you were working at the Livermore store.  I'm

11   trying to see if there was any similar differences

12   between these two stores.

13   A.   Which stores?

14   Q.   The two Fremont locations.

15   A.   No.

16   Q.   Okay.  Do you know Zackaria -- or Aladdin

17   Zackaria?

18   A.   No.

19   Q.   Okay.  You said you're currently employed as a

20   market assistant.

21   A.   Yes.

22   Q.   Can you explain that job to me, what you do, I

23   guess.

24   A.   I'm the assistant to two market managers, two

25   markets.



1   BY MR. KARCZEWSKI:

2       Q.   What -- assuming that you work a five-day

3   workweek, there's five lunch breaks in there, right?

4       A.   Yes.

5       Q.   Okay.  Out of those five, how many were --

6   how -- on how many occasions were you on average able to

7   take a 30-minute uninterrupted meal break for yourself?

8       A.   Approximately three of those days.

9       Q.   Okay.  And I want to elaborate a little bit on

10  the -- on the interrupted portion of that.

11           Now, we know that three of the five days

12  you -- you said that you were able to take an

13  uninterrupted lunch break.

14           Does that number change at all if I ask you

15  how many days during those lunch breaks were you not

16  answering e-mails or phone calls or a customer's or an

17  associate's questions?  Does that -- does that change

18  your answer at all?

19           MS. MUNCK:  Objection.  Vague.

20           THE WITNESS:  Can you be more specific?

21  BY MR. KARCZEWSKI:

22      Q.   Sure.  So you said about three out of five

23  lunch breaks per week on average you would have a

24  30-minute uninterrupted period for yourself, correct?

25      A.   Yes.



1      A.    Yes.

2      Q.    And is it your experience as an APM or an APC

3  that that actually happened?

4      A.    Yes.

5      Q.    Okay.  Can you recall ever deviating

6  specifically from a Wal-Mart policy or procedure in

7  performing your job as an APM?

8      A.    Not that I can recall.

9      Q.    Okay.  How about as an APC?

10      A.    Not that I can remember.

11      Q.    Do you recall why you never deviated from a

12  policy or procedure?

13      A.    Because it's --

14          MS. MUNCK:  Objection.  Incomplete

15  hypothetical, calls for speculation.

16          THE WITNESS:  It's my job to follow policies

17  and procedures and I'd like things black and white.

18  BY MR. KARCZEWSKI:

19      Q.    Is it your understanding that if you had

20  deviated from a Wal-Mart policy and procedure you could

21  have been disciplined?

22      A.    Yes.

23      Q.    And you could have been possibly terminated,

24  depending on what the deviation was?

25          MS. MUNCK:  Incomplete hypothetical.



1   well?

2          MS. MUNCK:  Same objection.

3          THE WITNESS:  From what I can recall, yeah.

4   BY MR. KARCZEWSKI:

5      Q.   Okay.  About how long did it take you to go

6   through this list?

7      A.   On a weekly basis, I'd say up to 20 hours, up

8   to half of my week.

9      Q.   Okay.  You can set this one aside.

10         MR. KARCZEWSKI:  This is 6, I think.  Yeah.

11                         [Plaintiff's Exhibit 6 was

12                          marked for identification.]

13         THE WITNESS:  Okay.

14   BY MR. KARCZEWSKI:

15     Q.   You've had a chance to familiarize yourself

16   with this document?

17     A.   Yes.

18     Q.   Have you seen it before?

19     A.   Yes.

20     Q.   What is it?

21     A.   The monthly national priorities that we used

22   to do.

23     Q.   Okay.  And I understand that now they're

24   called AP assessments.  Correct?

25     A.   Yes.



1                    REPORTER'S CERTIFICATE

2                         --oOo--

3          I, the undersigned, a Certified Shorthand

4    Reporter in the State of California, do hereby certify:

5          That the foregoing proceedings were taken by me

6    at the time and place herein set forth; that any

7    witnesses in the foregoing proceedings, prior to

8    testifying, were placed under oath; that a verbatim

9    record of the proceedings was made by me using machine

10   shorthand, which was thereafter transcribed under my

11   direction; further, that the foregoing is an accurate

12   transcription thereof.

13         I further certify that I am neither financially

14   interested in the action nor a relative or employee of

15   any attorney of any of the parties.

16         IN WITNESS THEREOF, I have this date subscribed

17   my name.

18

19   Dated:   October 3, 2013

20

21

22   _____
     Sharon C. Holloway, RPR
23   Certified Shorthand Reporter
     State of California
24   Certificate No. 12227

25



**EXHIBIT "N"**

PA0400

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA,

 2                   COUNTY OF SAN BERNARDINO

 3

 4

 5   ALADDIN ZACKARIA; INDIVIDUALLY,) CASE NO.
     AND ON BEHALF OF OTHER MEMBERS ) CIVRS1107132
 6   OF THE GENERAL PUBLIC SIMILARLY)
     SITUATED, AND ON BEHALF OF     ) VOLUME I
 7   AGGRIEVED EMPLOYEES PURSUANT TO) (PAGES 1-150)
     THE PRIVATE ATTORNEYS GENERAL  )
 8   ACT ("PAGA");                  )
                                    )
 9                PLAINTIFF,        )
                                    )
10        VS.                       )
                                    )
11   WAL-MART STORES, INC., A       )
     DELAWARE CORPORATION; AND      )
12   DOES 1 THROUGH 100, INCLUSIVE, )
                                    )
13                DEFENDANTS.       )
                                    )
14   _____)

15

16

17        VIDEOTAPED DEPOSITION OF RON LANCE,

18        A WITNESS, TAKEN AT 1840 CENTURY PARK EAST,

19        SUITE 1900, LOS ANGELES, CALIFORNIA,

20        COMMENCING AT 10:04 A.M. ON TUESDAY,

21        JUNE 5, 2012, BEFORE CLAUDIA P. MARSH,

22        CSR NO. 6353.

23

24

25
```

2

PA0401

1       Q       THE ASSET PROTECTION MANAGERS ARE NOT

2    INVOLVED IN THAT, CORRECT?

3       A       YES, THEY ARE.

4       Q       IN WHAT SENSE?

5       A       THEY ARE NOT INVOLVED IN THE CRIME, OF

6    COURSE.  BUT FROM THE INVESTIGATIVE WORK, WHICH I

7    THINK YOU REFERENCED, YES, THEY ARE INVOLVED IN THE

8    INVESTIGATIVE PART OF THAT.

9       Q       DESCRIBE FOR ME BRIEFLY THE SENIOR DIRECTOR

10   OF BUSINESS UNIT OF ASSET PROTECTION.

11          YOU HAVE DESCRIBED FOR ME THERE ARE THREE

12   INDIVIDUALS.  WHAT ARE THEIR ROLES?  LET'S START

13   WITH MISS KELLY YOUNG.

14      A       MR. KELLY YOUNG.

15      Q       I'M SORRY.  MR. KELLY YOUNG.

16      A       THERE'S THREE BUSINESS UNITS.  ONE THAT'S

17   EAST, THEN YOU HAVE CENTRAL, THEN YOU HAVE WEST.

18   KELLY YOUNG IS OUR SENIOR DIRECTOR OVER THE CENTRAL.

19          SO THE WALMART STORES OPERATION, CHAINWIDE,

20   IS DEVELOPED -- IS DIVIDED INTO THREE DIFFERENT

21   BUSINESS UNITS ACROSS THE COUNTRY.

22      Q       HOW IS THIS BUSINESS UNIT DIFFERENT IN THE

23   ASSET PROTECTION DIVISION FROM ANY BUSINESS UNIT

24   PART OF WALMART?

25      A       THERE'S -- THE PRIMARY DIFFERENCE, OF

60

PA0402

1    COURSE, IS OVERALL OBJECTIVE RESPONSIBILITIES

2    FOCUSED WHERE, FOR OUR PART OF THAT BUSINESS UNIT,

3    WE HAVE ASSET PROTECTION, SAFETY, SECURITY IS OUR

4    PRIMARY FOCUS OF OUR BUSINESS, OUR RESPONSIBILITIES.

5         THERE'S SOME DIFFERENCE -- SOME DIFFERENCES

6    IN STRUCTURE AS RELATED TO OTHER AREAS THAT ARE

7    SERVICING THE SAME BUSINESS UNIT, BUT THE LARGE,

8    LARGE DIFFERENCE IS IN TERMS OF EVERYDAY FOCUS

9    RESPONSIBILITY.

10    Q    ALTHOUGH THERE ARE THREE SEPARATE BUSINESS

11    UNITS IN THE ASSET PROTECTION DEPARTMENT OR

12    DIVISION, WITHIN THE EAST, CENTRAL AND WEST, ARE

13    THEY STRUCTURED PRETTY MUCH THE SAME?

14    A    IN TERMS OF ORGANIZATION, YES.

15    Q    AND WHAT DOES THAT STRUCTURE LOOK LIKE?

16    A    YOU HAVE THE BUSINESS UNIT.  YOU HAVE

17    THREE, AS I MENTIONED, ACROSS THE COUNTRY, THREE.

18    YOU HAVE DIVISION, ACROSS THE COUNTRY, YOU HAVE 12.

19    AND THEN YOU HAVE REGION.  I BELIEVE, CURRENTLY,

20    ACROSS THE COUNTRY FOR ASSET PROTECTION, WE HAVE

21    ABOUT 45 REGIONS.  THEN BELOW REGION, YOU HAVE

22    MARKET AND WE HAVE ABOUT 30 -- 325 OR SO MARKETS.

23    AND THEN BELOW MARKET AT THE FACILITY STORE LEVEL,

24    YOU HAVE THE ASSET PROTECTION MANAGERS, WHO IS

25    MANAGEMENT.  UNDER THE ASSET PROTECTION MANAGERS,

61

PA0403

1    YOU HAVE ASSET PROTECTION ASSOCIATES, WHO ARE HOURLY

2    ASSOCIATES AT THE STORES.

3        Q    DO YOU KNOW WHICH DIVISION CALIFORNIA FALLS

4    UNDER?

5        A    IT FALLS UNDER THE WEST B.U. PACIFIC

6    DIVISION.

7        Q    AND HOW MANY REGIONS FALL WITHIN THE

8    PACIFIC DIVISION OF WEST B.U.?

9        A    I BELIEVE THERE'S FOUR.

10       Q    HOW MANY REGIONS ARE COVERED IN CALIFORNIA?

11       A    THREE.

12       Q    AND WITHIN THOSE THREE REGIONS IN

13   CALIFORNIA, HOW MANY MARKETS ARE THERE?

14       A    I WOULD ESTIMATE -- I DON'T KNOW THE EXACT

15   NUMBER.  I WOULD ESTIMATE 19 TO 20, SOMETHING OF

16   THAT NATURE.

17       Q    CAN YOU GIVE ME A RANGE, YOUR BEST ESTIMATE

18   ABOUT THE NUMBER OF STORES THAT ARE WITHIN EACH

19   MARKET?

20       A    IT WOULD BE JUST AN ESTIMATE, BECAUSE IT

21   DOES VARY SIGNIFICANTLY FROM MARKET TO MARKET.  AND

22   I WOULD SAY AN AVERAGE WOULD BE AROUND 15 OR SO, AS

23   AN AVERAGE, 12 TO 15, SOMETHING OF THAT NATURE.

24       Q    SO WOULD THERE BE ABOUT 300 STORES WITHIN

25   CALIFORNIA?

62

PA0404

1    A   YES.

2    Q   IS THERE A REGIONAL A.P. DIRECTOR?

3    A   THERE'S A REGIONAL A.P. MANAGER.

4    Q   THERE IS ONE IN EACH REGION?

5    A   YES.

6    Q   MAY I HAVE THE THREE -- NAMES OF THE THREE

7 REGIONAL A.P. MANAGERS THAT ARE IN CALIFORNIA.

8    A   JEFF COBURN, C-O-B-U-R-N.  MARYANN, MARYANN

9 SPELLS HER NAME AS ONE WORD, M-A-R-Y-A-N-N, DABNEY,

10 D-A-B-N-E-Y, AND THEN ERIC, E-R-I-C, YORK, Y-O-R-K.

11    Q   AND DO YOU KNOW THE NAMES OF THE REGIONAL

12 A.P. MANAGER FOR THE FOURTH REGION THAT IS NOT IN

13 CALIFORNIA?

14    A   YES.  JOY, J-O-Y, BAUCOM.  I BELIEVE JOY'S

15 LAST NAME IS B-A-U-C-O-M.

16    Q   WHAT REGION DOES JOY BAUCOM COVER, WHAT

17 STATES?

18    A   SHE HAS OREGON AND WASHINGTON.

19    Q   NOW, WITHIN EACH MARKET, IS THERE ONE

20 MARKET A.P. MANAGER?

21    A   YES.

22    Q   DO ANY MARKETS HAVE MORE THAN ONE A.P.

23 MANAGER?

24    A   NO.

25    Q   IS THERE A MARKET WITHOUT A MARKET A.P.

66

PA0405

1    MORE THAN ONE OPERATIONS MARKET.  THAT'S WHY IT

2    CONFUSED ME IN TERMS OF NUMBER OF STORES.

3          SO THAT'S -- BUT THEY HAVE THE MARKET

4    STRUCTURE AND THEN THEY HAVE THE STORE STRUCTURE.

5    GENERALLY THAT'S HOW THEIR -- MONICA MULLINS REPORTS

6    TO GISELLE REESE, WHO IS THE CHIEF OPERATING OFFICER

7    FOR WALMART STORES.  GISELLE HAS THE OPERATIONS AREA

8    UNDER HER, BUT SHE ALSO HAS A.P. ORGANIZATION UNDER

9    HER, BUT THEY REPORT SEPARATELY TO HER.

10      Q    AT THE STORE LEVEL, THE STORE MANAGER

11   INDIRECTLY SUPERVISES THE ASSET PROTECTION MANAGER,

12   CORRECT?

13      A    YES.

14      Q    HOWEVER, THE PRIMARY RESPONSIBILITY OF

15   SUPERVISION OF THE ASSET PROTECTION MANAGER BELONGS

16   TO THE MARKET ASSET PROTECTION MANAGER IN EACH OF

17   THE MARKETS, CORRECT?

18      A    YES.

19      MR. HAN:  BEFORE WE TAKE LUNCH CAN WE FINISH OFF

20   THE INDIVIDUAL STORE ORGANIZATION?  I THINK WE

21   TALKED ABOUT IT BEFORE.

22          THE TYPICAL ORGANIZATION, YOU HAVE A STORE

23   MANAGER, IS THAT CORRECT?

24      A    YES.

25      Q    DO YOU ONLY HAVE ONE?

1    THEIR MARKETS AND THEY ALSO -- AND THERE WERE MORE

2    OF THEM.

3        Q    THERE WAS MORE OVERSIGHT BY THE MARKET A.P.

4    MANAGERS?

5        A    UH-HUH.  AND THERE WAS ALSO AN ADDITIONAL

6    CHANGE THAT CAME WITH THAT RESTRUCTURING OUTSIDE OF

7    A.P. WHERE THERE WAS SOME OTHER MARKET LEVEL

8    POSITIONS THAT HAD BEEN IN PLACE THAT WENT AWAY.

9            SO, AGAIN, THE AMOUNT OF THE ATTENTION FROM

10   MARKET-LEVEL MANAGERS AND SUPERVISION TO THE STORE

11   FROM OTHER ROLES WAS WHAT IT HAD BEEN BEFORE.

12       Q    HOW ABOUT IN TERMS OF THE ORGANIZATIONAL

13   STRUCTURE AT THE STORE LEVEL.  DID THAT -- WAS THAT

14   IMPACTED BY THE 2010 RESTRUCTURING?

15       A    THERE WAS ALREADY, PRIOR TO 2010 -- AND

16   THIS RELATES TO THE EARLIER DISCUSSION ABOUT THE

17   STRUCTURE AT STORE LEVEL, THE SCHEDULES AND SO

18   FORTH.

19           OPERATIONS HAD ALREADY STARTED CHANGING

20   SOME OF THE STRUCTURE WITHIN THE STORE.  AND SO THAT

21   HAD ALREADY STARTED HAPPENING.  SOME OF THAT HAD

22   ALREADY BEEN IMPLEMENTED PRIOR TO THE CHANGE OF

23   2010.

24       Q    SO WHEN WE DISCUSSED THE MANAGEMENT-LEVEL

25   INVOLVING STORE MANAGERS, SHIFT MANAGERS, ASSISTANT

                                                      104

PA0407

1    MANAGERS AND ASSET PROTECTION COORDINATORS, HOW FAR

2    BACK IN TERMS OF YEARS DID THAT STRUCTURE REMAIN OR

3    WAS IN PLACE?

4        A    I WOULD SAY THAT THE CURRENT APPROACH THAT

5    WE HAVE TALKED ABOUT PROBABLY GOES BACK NOW PROBABLY

6    ABOUT FOUR YEARS WHEN THEY REALLY STARTED WORKING

7    DIFFERENTLY WITH THAT STRUCTURE.  IT WASN'T THE

8    WAY -- THE WAY I RECALL, IT WASN'T ALL AT ONCE.

9            AS A COMPANY, WE TESTED, WE PILOTED SOME

10   CHANGES AND WE IMPLEMENTED THOSE CHANGES OVER A

11   PERIOD OF TIME AT STORE LEVEL.

12       Q    SO YOU WOULD SAY THE EARLIEST WE SEE THE

13   STRUCTURE AS IT PRESENTLY CONSISTS AT THE

14   FIELD-LEVEL LOCATION STARTED BACK IN 2008?

15       A    THAT WOULD BE MY ESTIMATE, YES.

16       Q    PRIOR TO 2008, WHAT DID THE STORE STRUCTURE

17   LOOK LIKE AT THE STORE LEVEL?

18       A    YOU HAD COMANAGERS INSTEAD OF SHIFT

19   MANAGERS.  THE SCHEDULES WERE QUITE A BIT DIFFERENT.

20   THE MANAGERS' SCHEDULE WALL NOW, THE MANAGEMENT

21   SCHEDULE IS THE SHIFT MANAGERS TYPICALLY WILL WORK

22   FOUR DAYS ON, FOUR DAYS OFF.  THE ASSISTANT MANAGERS

23   WORK THREE DAYS ON, THREE DAYS OFF.  THE STORE

24   MANAGERS STILL TYPICALLY, THEY WORK SOME WEEKENDS,

25   BUT THEY ARE MORE ON A -- THEY ALSO WORK SOME

105

PA0408

1      A    YES.

2      Q    ARE YOU ABLE TO ANSWER THE SECOND QUESTION

3   I HAVE: IS IT PART OF THE SAME MEMO THAT'S IN

4   EXHIBIT 4?

5      A    YES.  ON THE FIRST PAGE, PAGE 1 OF 2, I

6   BELIEVE WHAT'S MISSING HERE, IT SAYS, "THE ATTACHED

7   SPREADSHEET OUTLINES THE SCHEDULE ROTATION."

8           WHAT I REMEMBER FROM THIS INITIAL

9   COMMUNICATION WAS THAT WE DID HAVE AN ATTACHMENT

10  THAT WENT WITH IT TO GIVE THE EXAMPLE OF WHAT THE

11  SCHEDULES WOULD BE.

12     Q    IS EXHIBIT 5 THAT ATTACHMENT?

13     A    YES.  I BELIEVE SCHEDULE 5 AND THE -- YES,

14  SCHEDULE 5.  THEY ARE BOTH NUMBERED SCHEDULE 5, I

15  GUESS.

16     MR. GOLDRICH:  EXHIBIT 5, YOU MEAN?

17     THE WITNESS:  EXHIBIT 5, YES.

18     MR. GOLDRICH:  YOU MARKED BOTH PAGES AS

19  EXHIBIT 5, RIGHT?

20     MR. HAN:  YES.

21     Q    AND YOU EARLIER REFERENCED PAGE 3599 AND

22  3600?

23     A    YES.

24     Q    SINCE THE ROLLOUT OF THIS NEW SCHEDULE, THE

25  ASSET PROTECTION COORDINATORS ARE ONLY SCHEDULED TO

109

PA0409

1    WORK 42 HOURS, CORRECT, PER WEEK?

2         A    YES, THAT'S WHAT THE SCHEDULE IS.  THEN IN

3    ADDITION TO THAT, THERE IS A NOTE THAT THERE CAN BE

4    EXCEPTIONS TO THAT AND ALSO THERE CAN BE BUSINESS

5    NEEDS THAT AFFECT THAT SCHEDULE.

6         Q    IF THEY WORK OVER 42 HOURS, DO THEY GET

7    PAID FOR OVERTIME?

8         A    NO.

9         Q    DO ASSET PROTECTION COORDINATORS, ARE THEY

10   REQUIRED TO CLOCK IN AND OUT OF A TIMEKEEPING

11   SYSTEM?

12        A    NO.

13        Q    WHAT IS THE PURPOSE OF LIMITING A SALARIED

14   EMPLOYEE'S HOURS TO ONLY 42 HOURS PER WEEK?

15        A    IT'S THE SCHEDULE THAT'S DESIGNATED FOR

16   THEM.

17        Q    IS THIS A RECOMMENDED SCHEDULE THAT THE

18   STORES FOLLOW BUT THEY CAN DEVIATE FROM THIS?

19        A    THEY CAN DEVIATE, BASED UPON THE NEEDS OF

20   THE BUSINESS.

21        Q    SO AN ASSET PROTECTION COORDINATOR COULD BE

22   REQUIRED TO WORK 60 HOURS A WEEK?

23        A    YES, THEY COULD.  THE SAME AS AN ASSISTANT

24   MANAGER OR OTHER MEMBER OF MANAGEMENT IN THE STORE.

25        Q    SIR, DO YOU UNDERSTAND WHAT IT MEANS TO BE

110

PA0410

1    IT IS NOT TAKING ENOUGH, THEN WE COULD THINK, WELL,

2    IS THERE ONE OR TWO ADDITIONAL REVIEW PROCESSES THAT

3    WE COULD ADD TO IT BECAUSE IT WOULD BE IMPORTANT IN

4    TERMS OF HOW WE OPERATE AND IMPACT OUR BUSINESS.

5         Q    SO THERE ARE SOMETIMES RANDOM SURVEYS IN

6    THE BEGINNING OF THE YEAR THAT DETERMINE THE AMOUNT

7    OF TIME THAT IT SHOULD TAKE FOR AN A.P.C. TO FOLLOW

8    CERTAIN PROCESS, PROCEDURE OR CONTROL, IS THAT

9    RIGHT?

10        A    YEAH.  WHAT THE SURVEY, THE TIME STUDY

11   DOES, IT REALLY -- IT DOESN'T NECESSARILY SAY THIS

12   IS HOW MUCH TIME IT SHOULD TAKE.  BUT IT GIVES US A

13   SENSE OF AN AVERAGE BASED UPON THOSE PEOPLE WHO

14   ACTUALLY CONDUCTED IT THROUGH THE SURVEY.  AND WITH

15   DIFFERENT LEVELS OF EXPERIENCE, DIFFERENT KINDS OF

16   OPERATIONS, DIFFERENT ISSUES THAT THEY MAY COME

17   ACROSS.  IT GIVES US A GOOD SENSE OF AVERAGE OF HOW

18   MUCH TIME IT'S GOING TO TAKE.

19        THAT'S A VERY SHORT WINDOW OF EITHER A

20   WEEK, TWO WEEKS, SAMPLING, SURVEY, WHICH IS JUST

21   KIND OF AS WE DEVELOP THE PROGRAM TO IMPLEMENT IT

22   OUT INTO THE FIELD, IT GIVES US A SENSE OF WHAT DOES

23   THIS MEAN IN TERMS OF A WORK EFFORT FOR THE PEOPLE

24   THAT WILL BE INVOLVED IN THE PROCESS.

25        Q    SO THERE IS NO ABILITY FOR WALMART TO

1    MONICA MULLINS OF OUR VICE PRESIDENT OVER A.P.  IT

2    WAS INITIATED OVER THE A.P. ORGANIZATION.

3       Q    WHAT IS YOUR ROLE WITH RESPECT TO NATIONAL

4    PRIORITY?

5       A    I WORK WITH THE -- TYPICALLY TO DEVELOP THE

6    NATIONAL PRIORITIES.

7            EACH YEAR WE HAVE A GROUP OF PEOPLE THAT

8    COME IN AND ACTUALLY WORK ON DEVELOPING THIS, WHAT

9    THE QUESTIONS WILL BE, WHAT PROCESSES WILL BE

10   REVIEWED.  I WORK WITH THAT GROUP.  I OVERSEE THAT

11   GROUP.

12           WE USUALLY HAVE ONE OF OUR DIVISIONALS OR

13   ONE OR TWO OF OUR DIVISIONALS ASSIGNED TO BE

14   DIRECTLY RESPONSIBLE FOR THE GROUP AND THE

15   DEVELOPMENT OF THE REVISION.

16      Q    AND YOU ARE ADVISING THE PROCESS,

17   PROCEDURES AND CONTROLS?

18      A    YES.  THE QUESTIONS, WHAT QUESTIONS DO WE

19   WANT THE A.P.C.S, A.P.M.S TO LOOK AT WITHIN THE

20   STORE, WHAT PROCESSES DO WE WANT THEM TO LOOK AT.

21           WE ARE NOT CHANGING THE PROCESS ITSELF, BUT

22   AS FAR AS WHAT PROCESS, WE WANT THEM TO REVIEW IN

23   THE STORE AT A CLOSER LEVEL.

24           LIKE AN AREA OF OPPORTUNITY FOR LOSS FOR

25   US, AN IMPORTANT AREA FOR US IS HOW WE RECEIVE

PA0412

REPORTER'S CERTIFICATE

1
2
3
4          I, JENNIFER J. ANGELOV, CSR No. 12287, a
5   Certified Shorthand Reporter in and for the State of
6   California, do hereby certify:
7          That prior to being examined, the witness
8   named in the foregoing proceedings declared under
9   penalty of perjury to testify to the truth, the whole
10  truth, and nothing but the truth;
11         That said proceedings were taken by me in
12  shorthand at the time and place herein named and was
13  thereafter transcribed into typewriting under my
14  direction, said transcript being a true and correct
15  transcription of my shorthand notes.
16         I further certify that I have no interest in
17  the outcome of this action.
18
19
20
21
22
23  _____
    JENNIFER J. ANGELOV
24  CSR No. 12287
25

EXHIBIT "O"

PA0414

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         FOR THE COUNTY OF SAN BERNARDINO

3

4  ALADDIN ZACKARIA; individually,)
    and on behalf of other members )
5  of the general public similarly)
    situated, and on behalf of    )
6  aggrieved employees pursuant   )
    to the Private Attorneys     )
7  General Act ("PAGA"),       )
                           )
8             Plaintiff,  )
                           )
9      vs.           )  NO. CIVRS1107132
                           )
10  WAL-MART STORES, INC., a    )
    Delaware corporation; and DOES )
11  1 through 100, inclusive,   )
                           )
12           Defendants.  )
    _____)

13

14        Deposition of RON LANCE, VOLUME I, taken on

15         behalf of Plaintiff at 1840 Century Park East,

16         19th Floor, in the City of Los Angeles,

17         California, commencing at 9:09 a.m. on

18         Wednesday, June 6, 2012, before Jennifer J.

19         Angelov, CSR No. 12287, a Certified Shorthand

20         Reporter for the State of California.

21

22

23

24

25

                                      1

PA0415

1          He's answered the question as to

2    non-managerial, and you changed it to non-exempt, which

3    is a legal term; so --

4          THE WITNESS:  Not that I'm aware of.

5    BY MR. AIWAZIAN:

6      Q.   Can you think of a single task or duty that

7    the APMs perform typically or regularly that you would

8    consider to be non-administrative?

9      A.   I'm not clear on the definition of

10   "administrative."  So under my understanding, I can't

11   think of any responsibility or function that they

12   perform that I would say would not somehow fall within

13   a realm of administrative.

14     Q.   Are the APMs informed in any way to spend more

15   time on any particular activity versus less time?

16     A.   Again, I can't think of any.

17     Q.   Okay.

18     A.   I think they're allowed that latitude based

19   upon their situation within their store to make those

20   decisions.

21     Q.   Are the APMs informed at any time to spend

22   more than 50 percent of their time on administrative or

23   managerial or exempt tasks?

24     A.   No.

25     Q.   Who's responsible at Walmart to make sure that

                                                            81

PA0416

1    Q.   And do you know why the title change happened?

2    A.   Yes.

3    Q.   Why?

4    A.   We had -- we had intended to do that some time

5    ago.  You know, better timing would have been when we

6    actually increased the pay back in 2010, but -- because

7    that would have been in lines with another change, just

8    the fact that one change was occurring, make it with

9    another change.

10         But it was really just reflecting back that,

11    when we initially created the position, that, you know,

12    the -- for the whole restructuring process the company

13    was undergoing at that time -- and I'm talking about

14    developing, restructuring during 2005, to be

15    implemented in 2006, just creating a new position, what

16    kind of -- the title that came across was asset

17    protection coordinator.

18         And as it evolved, it just didn't seem to be

19    the right title.  So we decided at some point in time

20    we really needed to change that to asset protection

21    manager, and that's what we did.

22    Q.   Are the asset protection managers ever

23    informed by the company as to what it means to be

24    classified as exempt?

25    A.   Not to my knowledge.

98

1     Q.   Are they ever informed as to what tasks are

2  administrative in nature and which ones are not?

3     A.   Not to my knowledge.  Other than just their

4  job responsibility as an APM.

5     Q.   Are they ever instructed not to perform duties

6  that are not administrative in nature?

7     A.   No.

8     Q.   Is it your opinion that all of the duties that

9  are performed by the APAs are not administrative in

10  nature?

11     A.   Are not administrative?  To my best

12  understanding of what non-administrative, I would say

13  yes.

14     Q.   And what is the basis for your testimony on

15  that?

16     A.   The basis of -- thinking of the APA position

17  in terms of their typical, normal work is really

18  designed around external, internal theft, but primarily

19  external theft.

20       They also help with the managing of the camera

21  systems within our stores, our CCTV.  They make

22  observations related to safety procedures, policies,

23  but overall it's a very narrow, more defined

24  expectation on day-to-day basis around specific job

25  responsibilities that relate to more repetitive-type

99

1    conduct a midyear evaluation?

2    A.   Yes.

3    Q.   Now, are there any other types of formal

4    evaluations of the APMs, for example, mystery law --

5    mystery folks coming -- or secret folks coming and

6    interacting with them or other reports or other

7    documents that would discuss their performance other

8    than the midyear and annual evaluation?

9    A.   Not outside the range of the normal

10   supervision-type activities.

11   Q.   And what are the -- what are the APMs

12   evaluated based upon?

13   A.   Their evaluation has objectives as well as

14   competencies.

15   Q.   So there's core competencies, right?

16   A.   Yes.

17   Q.   And what are those, the APM position in

18   California?

19   A.   I couldn't recite those off the top of my head

20   for certain.  Again, we have the evaluation form that

21   has those outlined.

22   Q.   Do any of those core competencies involve

23   spending more time -- more than half of their time

24   engaged in managerial exempt work versus

25   non-managerial, non-exempt?

1     A.   No.

2     Q.   Any of the objectives you spoke of, do any of

3   those have anything to do -- do any of the objectives

4   involve spending more than half their time engaged in

5   managerial exempt work versus non-managerial,

6   non-exempt work?

7     A.   No.

8     Q.   So they are eval -- the bonuses that the APMs

9   receive, they're merit bonuses?

10    A.   They're incentive bonuses based upon how well

11  their overall store has performed.

12    Q.   And are they discretionary or

13  non-discretionary?

14    A.   Non-discretionary.  It's based upon the

15  metrics and applied the same for the APM as it is for

16  other positions as far as what the incentive is in

17  terms of over -- what the overall outcome is.

18    Q.   And does the shrink -- this is -- I'm going to

19  show my ignorance, but does the shrink percentage

20  factor into the profitability of the store?

21    A.   It does.

22    Q.   Less shrink, you would be more profitable?

23    A.   Yes.  It's one of the expenses within a store.

24         MR. AIWAZIAN:  Sorry about that.

25         MR. GOLDICH:  No.  I knew you could figure it

```
1   STATE OF CALIFORNIA   )
                          ) SS.
2   COUNTY OF LOS ANGELES)

3

4       I,  CLAUDIA P. MARSH, CSR NO. 6353, CERTIFY:

5       THAT THE FOREGOING DEPOSITION OF RON LANCE WAS

6   TAKEN BEFORE ME AT TIME AND PLACE SET FORTH, AT

7   WHICH TIME THE WITNESS WAS PUT ON OATH BY ME;

8       THAT THE TESTIMONY OF THE WITNESS AND ALL

9   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

10  RECORDED STENOGRAPHICALLY BY ME, AND WERE THEREAFTER

11  TRANSCRIBED;

12      THAT THE FOREGOING DEPOSITION IS A TRUE RECORD

13  OF THE TESTIMONY OF THE WITNESS AND OF ALL

14  OBJECTIONS MADE AT THE TIME OF THE EXAMINATION;

15      THAT THE DISMANTLING OF THE ORIGINAL TRANSCRIPT

16  WILL VOID THE REPORTER'S CERTIFICATE.

17      I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR

18  NOR RELATED TO ANY PARTY TO SAID ACTION, NOR ANYWISE

19  INTERESTED IN THE OUTCOME THEREOF.

20      IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME

21  AND AFFIXED MY SEAL THIS 13 DAY OF JUNE, 2012.

22

23

24      _____
        CLAUDIA P. MARSH, CSR NO. 6353
25
```

Exhibit "P"

PA0422

```
 1                 UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4
                                    )
 5   ALADDIN ZACKARIA; INDIVIDUALLY, )
     AND ON BEHALF OF OTHER MEMBERS OF )
 6   THE GENERAL PUBLIC SIMILARLY     )
     SITUATED, AND ON BEHALF OF       )
 7   AGGRIEVED EMPLOYEES PURSUANT TO  )
     THE PRIVATE ATTORNEYS GENERAL ACT )
 8   ("PAGA");                        )
                                      )
 9                    PLAINTIFF,      )
                                      )
10             VS.                    ) CASE NO.
                                      ) 5:12CV-01520-VAP-SP
11   WAL-MART STORES, INC., A DELAWARE )
     CORPORATION AND DOES 1 THROUGH   )
12   100, INCLUSIVE,                  )
                                      )
13                    DEFENDANTS.     )
                                      )
14

15

16

17          DEPOSITION OF BOBBIE JO LEWIS, TAKEN ON

18          BEHALF OF PLAINTIFF, AT 12100 WILSHIRE

19          BOULEVARD, 8TH FLOOR, LOS ANGELES,

20          CALIFORNIA, COMMENCING AT 10:05 A.M.,

21          WEDNESDAY, NOVEMBER 7, 2012, BEFORE

22          CANDI DONNELS, CSR NO. 10436.

23

24

25
```

2

PA0423

1      A     NO, I DO NOT KNOW IF THAT'S THE SAME ACROSS

2  THE BOARD.

3      Q     DO YOU KNOW IF THAT'S BEEN THE SAME FOR YOU

4  SINCE YOU'VE BEEN A MAPM?  I'LL STRIKE THAT.

5            SINCE YOU'VE BEEN A MAPM, HAVE YOU HAD

6  ONE APM AT EACH OF YOUR STORES THAT YOU SUPERVISE?

7      MR. GOLDICH:  OBJECTION TO THE FORM.

8  BY MR. KARCZEWSKI:

9      Q     YOU CAN ANSWER.

10     A     I HAVE STAFFED EACH OF MY STORES WITH AN

11  APM WHEN THERE WAS A -- IF THERE WAS A POSITION

12  AVAILABLE.  YOU KNOW, IF SOMEBODY QUIT, I HAD TO

13  HIRE.

14     Q     OKAY.

15     A     SO THERE WERE TIMES WHEN THERE WOULD BE A

16  VACANCY.

17     Q     OKAY.  AND DO YOU KNOW ABOUT -- WHEN IS THE

18  LAST TIME THERE WAS A VACANCY?

19     A     I DON'T REMEMBER.

20     Q     CAN YOU GIVE ME AN ESTIMATE?

21     A     MAYBE SIX MONTHS AGO.

22     Q     SIX MONTHS AGO WAS THE LAST TIME YOU HAD A

23  VACANCY AT THE APM POSITION IN ONE OF YOUR STORES?

24     A     ESTIMATING, YEAH.

25     Q     OKAY.  DO YOU KNOW ABOUT HOW LONG THAT

PA0424

1      Q     THAT'S FINE.

2      A     OKAY.

3      Q     DO YOU RECALL MR. ZACKARIA HAVING THE BEST

4   NUMBERS IN YOUR TWO MARKETS?

5      A     HIS STORE DID HAVE SOME HIGH PERFORMING

6   NUMBERS.

7      Q     DO YOU RECALL WHAT THEY WERE IN SEPTEMBER

8   OF 2011?

9      A     NO, I DO NOT.

10      Q     DO YOU RECALL WHETHER THEY WERE HIGH?

11      A     I -- I DO NOT REMEMBER.

12      Q     DO YOU RECALL WHETHER THEY WERE THE WORST

13   OF YOUR, AT LEAST, NINE STORES AT THAT TIME?

14      MR. GOLDICH:  OBJECTION TO THE FORM.

15   BY MR. KARCZEWSKI:

16      Q     YOU CAN ANSWER.

17      A     WELL, IT'S GONNA DEPEND BECAUSE IF -- IT

18   DEPENDS.  IF HE HAS FIVE PEOPLE WALKING HIS SALES

19   FLOOR DOING APPREHENSIONS AND ANOTHER STORE ONLY HAS

20   ONE PERSON, HIS NUMBERS OBVIOUSLY WOULD BE -- HE

21   WOULD HAVE MORE IN EXTERNAL APPREHENSIONS HAVING

22   FIVE PEOPLE APPREHENDING CUSTOMERS -- SUSPECTS

23   VERSUS SOMEBODY AT A STORE THAT ONLY HAS ONE PERSON.

24      Q     THAT WASN'T THE QUESTION.  THE QUESTION'S

25   WHETHER HE HAD THE HIGHEST NUMBERS.

130

PA0425

1    STATE OF CALIFORNIA      )
                              )  SS.
2    COUNTY OF LOS ANGELES    )

3

4           I, CANDI S. DONNELS, CERTIFIED SHORTHAND

5    REPORTER, CERTIFICATE NO. 10436, FOR THE STATE OF

6    CALIFORNIA, HEREBY CERTIFY:

7           I AM THE DEPOSITION OFFICER THAT

8    STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

9    FOREGOING DEPOSITION;

10          PRIOR TO BEING EXAMINED, THE DEPONENT WAS

11   BY ME FIRST DULY SWORN;

12          THE FOREGOING TRANSCRIPT IS A TRUE RECORD

13   OF THE TESTIMONY GIVEN.

14          BEFORE COMPLETION OF THE DEPOSITION, REVIEW

15   OF THE TRANSCRIPT [ XX ] WAS    [   ] WAS NOT

16   REQUESTED.  IF REQUESTED, ANY CHANGES MADE BY THE

17   DEPONENT (AND PROVIDED TO THE REPORTER) DURING THE

18   PERIOD ALLOWED ARE APPENDED HERETO.

19

20   DATED:_____, 2012

21

22

23   _____
                       CANDI DONNELS
24                     CSR NO. 10436

25

                                                   231

PA0426

Eᴀʜɪʙɪᴛ "Q"

PA0427

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4                        --oOo--

5    ALADDIN ZACKARIA;
     individually, and on
6    behalf of other members
     of the general public
7    similarly situated, and
     on behalf of aggrieved
8    employees pursuant to
     the Private Attorneys
9    General Act ("PAGA");

10               Plaintiff,

11          vs.              Case No. EDCV12-01520 VAP(SPx)

12   WAL-MART STORES, INC.,
     a Delaware corporation;
13   and DOES 1 through 100,
     inclusive,

14               Defendant.
15   ~~~~~~~~~~~~~~~~~~~~~~~

16

17                    DEPOSITION OF

18                    KAHALA LINCOLN

19                    July 23, 2013

20                     8:59 a.m.

21

22              1201 K Street, Suite 1100
                  Sacramento, California
23

24

25      Reported by Sharon C. Holloway, RPR, CSR 12227



1   tied down.  But if they choose not to do that, we get

2   the credit for the failure.

3   BY MS. MUNCK:

4       Q.   Springboarding off of what you've said are

5   some of the characteristics of a competent APC, would

6   you agree with me that you are, in fact, a competent

7   APC?

8            MS. SZETO:  Objection.  Vague and ambiguous.

9            THE WITNESS:  I am excellent at what I do.

10  Call me whatever you want.

11  BY MS. MUNCK:

12      Q.   Let's take a look at your declaration.  It's

13  been previously marked as Lincoln 3.

14           Looking at paragraph 2, you note in your

15  declaration that the title has changed from APC to APM

16  but there have been no changes in your job duties or

17  responsibilities as a result of this title change,

18  right?

19           And my question is, I understood your

20  testimony this morning to be that while there may not be

21  a change in your duties and responsibility, there's sort

22  of an increased focus on financials recently.  Is that

23  right?

24      A.   At the -- at the time that this declaration

25  was done, there was not any changes to the job duties.



 1   Since this declaration, there have been new routines

 2   that have been installed that are very, very, very

 3   specific to the hour; actually, to the 15-minute.

 4        Q.   And am I correct in understanding your

 5   testimony this morning that in addition to the routines,

 6   there's an increased focus on financials?

 7        A.   Yes.

 8        Q.   Looking at paragraph 4, at least beginning

 9   with paragraph 4, you state that you spend approximately

10   85 percent of your time performing nonmanagerial tasks.

11   Tell me in your words what you understand a managerial

12   task to be.

13        MS. SZETO:  Objection.  Document speaks for

14   itself.

15        THE WITNESS:  I think a managerial position is

16   one that I had as an assistant manager, where you hire

17   and you fire.  I know that "manager" is a part of the

18   title I hold today, but it is a tremendous amount of

19   attending meetings, walking the store for safety

20   procedures and to make sure that certain things are in

21   play, doing -- monitoring different investigations or

22   receivings, which would be watching CCTV.

23   BY MS. MUNCK:

24        Q.   And I don't want to cut you off.  Are you

25   finished?



1        A.    Yes.

2        Q.    Or SOPs.

3        A.    Yes.

4        Q.    What are those?

5        A.    They -- the words replaced "policies."

6        Q.    Do you know what national priorities are?

7        A.    Yes.

8        Q.    What are national priorities?

9        A.    National priorities are reports that were

10   filed on a weekly basis on different things that were

11   happening within the facility, feeding it into the home

12   office.

13        Q.    As an APC, did you have to do national

14   priorities?

15        A.    Yes.

16        Q.    Were they specific questions that you had to

17   answer as an APC on a weekly basis?

18        A.    Yes.

19        Q.    This national priorities, did it have a set of

20   guidelines or instructions on how to answer the specific

21   question of the week?

22        A.    Not specifically on how to answer it, because,

23   again, it was going to be a "yes," "no," or "not

24   applicable."  But the guidelines to follow, yes.

25        Q.    You followed those guidelines in order to do



1    the national priorities for each week?

2        A.   Yes.

3        Q.   How long would it take for you to do the

4    national priorities on a weekly basis?

5        A.   It was a process that would take all week to

6    do a little bit each day, depending on the needs of the

7    facility.

8        Q.   Would you spend at least an hour each day

9    dedicated to doing national priorities?

10               MS. MUNCK:  Objection.  Leading.

11               THE WITNESS:  I would say so.

12   BY MS. SZETO:

13       Q.   Would you spend more than an hour each day on

14   national priorities?

15       A.   I'm trying to think back to what some of the

16   questions on national priorities were.  I would say it

17   would be very possible to spend more than that.

18       Q.   Are you able to give me any estimate as to how

19   long it took for you to do national priorities?

20               MS. MUNCK:  Objection.  What's the time

21   period?

22               THE WITNESS:  For the week?

23   BY MS. SZETO:

24       Q.   Yes.

25               MS. MUNCK:  Same objection.



1        THE WITNESS:  I hate to guess.  It's going to

2   come back to bite me.

3   BY MS. SZETO:

4        Q.   Okay.  We don't want you to guess.  Are you

5   able to give us a range?

6        A.   No.

7        Q.   What about on a daily basis?  You told me it

8   could take more than an hour, correct?

9        A.   Correct.

10       Q.   Could it take more than five hours a day to do

11  national priorities?

12       A.   My brain is a little tired, and I cannot

13  remember the questions on national priorities at the

14  moment.

15       Q.   You don't do national priorities right now,

16  right?

17       A.   I do not.

18       Q.   Okay.  Now you do what's called "assessments";

19  is that correct?

20       A.   AP assessments.

21       Q.   When did AP assessments come into play?

22       A.   About eight weeks ago.

23       Q.   Have you always done national priorities as an

24  APC prior to the AP assessments being implemented?

25       A.   I don't believe that we had that in the very



1   see if all of the data has been inputted?

2       A.   Correct.

3       Q.   Do the APIS cases get sent to anyone else

4   after you look at them?

5       A.   No.  They're held in storage.  I believe our

6   retention on them is five years for apprehensions.  For

7   internals, generally those are going to be held in the

8   market office.

9       Q.   As an APC, do you review CCTV tapes?

10       A.   Yes.

11       Q.   Do you do that on a daily basis?

12       A.   Yes.

13       Q.   How much -- and reviewing CCTV tapes, you're

14   sitting in front of the monitor and watching the tape,

15   right?

16       A.   Correct.

17       Q.   How much time on a daily basis do you spend

18   reviewing CCTV tapes?

19       A.   That's going to vary on a day-to-day basis.  I

20   like to have a day that -- that maybe it's full of

21   meetings.  It's kind of the way that things go.  If

22   there's been any accidents, I'm going to be looking at

23   video an hour before and an hour after the particular

24   incident.

25            There are some days that I can walk in that



 1   the Wire that are limited to the Roseville Wal-Mart

 2   Supercenter?

 3          MS. MUNCK:  Calls for speculation, foundation.

 4          THE WITNESS:  No.

 5   BY MS. SZETO:

 6      Q.   The national priorities, we discussed briefly

 7   about doing the national priorities.  Is it your

 8   understanding that the question is the same question

 9   that all APMs are answering throughout the nation?

10          MS. MUNCK:  Calls for speculation, foundation.

11          THE WITNESS:  That was my understanding.

12   BY MS. SZETO:

13      Q.   Do you know why it's called "national

14   priorities"?

15      A.   Because it was a national report.

16      Q.   Did anyone explain that to you?

17      A.   I don't recall.

18      Q.   Do you remember your testimony about the DOT

19   report?

20      A.   Yes.

21      Q.   And you talked about putting dots on certain

22   things?  And I don't mean to --

23      A.   Yes.

24      Q.   If you can just summarize again what you did

25   with the DOT report.



1                    REPORTER'S CERTIFICATE

2                          --oOo--

3          I, the undersigned, a Certified Shorthand

4   Reporter in the State of California, do hereby certify:

5          That the foregoing proceedings were taken by me

6   at the time and place herein set forth; that any

7   witnesses in the foregoing proceedings, prior to

8   testifying, were placed under oath; that a verbatim

9   record of the proceedings was made by me using machine

10  shorthand, which was thereafter transcribed under my

11  direction; further, that the foregoing is an accurate

12  transcription thereof.

13         I further certify that I am neither financially

14  interested in the action nor a relative or employee of

15  any attorney of any of the parties.

16         IN WITNESS THEREOF, I have this date subscribed

17  my name.

18

19  Dated:   July 25, 2013

20

21

22  _____
    Sharon C. Holloway, RPR
23  Certified Shorthand Reporter
    State of California
24  Certificate No. 12227

25



EXHIBIT "R"

PA0437

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DISTRICT

4   ALADDIN ZACKARIA, individually, and)
    on behalf of other members of the  )
5   general public similarly situated, )
    and on behalf of aggrieved         )
6   employees pursuant to the Private  )
    Attorneys General Act ("PAGA"),    )
7                                      )
                Plaintiffs,            )
8                                      )
            vs.                        )  EEDCV12-01520
9                                      )   VAP (SPx)
    WAL-MART STORES, INC., a Delaware  )
10  corporation; and DOES 1 through    )
    100, inclusive,                    )
11                                     )
                Defendant.             )
12  _____)

13

14

15                  DEPOSITION OF

16                  MICHAEL PERKINS

17

18          Tuesday, September 10, 2013

19            9:03 a.m. - 12:06 p.m.

20

21          402 West Broadway, 16th Floor

22             San Diego, California

23

24

25     Reported by Ruben Garcia, CSR 11305



1      Q    What does SSOP stand for?

2      A    I don't recall the acronym.

3      Q    But they're referring to the same concept?

4      A    The concept, yes.

5      Q    And do the National Priorities require you

6  to complete a given number of audits within a day?

7      A    I don't recall.

8      Q    Does part of the National Priorities

9  require you to complete any type of questionnaire?

10      A    Yes.

11      Q    How often do you have to complete that?

12      MR. KARCZEWSKI:  Vague.  Calls for speculation.

13  Overbroad.

14           Go ahead.

15      THE WITNESS:  Those were daily, weekly and

16  monthly.

17  BY MS. STONE:

18      Q    And they still are?

19      MR. KARCZEWSKI:  Object to the form of the

20  question.  Vague.

21      THE WITNESS:  In some cases.

22  BY MS. STONE:

23      Q    How much time on a weekly basis do you

24  estimate per week you spend performing audits?

25      MR. KARCZEWSKI:  Calls for speculation.  Vague.



1          A     Yes.

2          Q     And asset protection manager routine was

3    one of the ones you had a chance to talk about.

4                Do you recall that?

5          A     Yes.

6          Q     I think that you said that routines give a

7    general view of what your day would look like.  And

8    I may be paraphrasing.  Is that accurate?

9          A     Yes.

10         Q     Is that the same for the APC or APM job?

11         MS. STONE:  Object to form.

12         THE WITNESS:  Can you be more specific?

13   BY MR. KARCZEWSKI:

14         Q     That's fine.  Is it true that APMs have a

15   very specific routine that they're required to

16   follow currently?

17         MS. STONE:  Object to form.

18         THE WITNESS:  Yes.

19   BY MR. KARCZEWSKI:

20         Q     And does that APM routine allocate that

21   certain tasks must be completed within certain

22   timeframes?

23         MS. STONE:  Object to form.  Vague.  Ambiguous.

24         THE WITNESS:  Yes.

25



 1   BY MR. KARCZEWSKI:
 2        Q    And does that routine also require that
 3   you sign off whether a task was, in fact, completed
 4   during the specified time period?
 5        MS. STONE:  Same objections.
 6        THE WITNESS:  Yes.
 7   BY MR. KARCZEWSKI:
 8        Q    And if it wasn't completed and you mark a
 9   "no" on the APM routine, do you have to explain why
10   the task was not completed within the allocated
11   timeframe?
12        A    Yeah.
13        MS. STONE:  Same objections.  Mischaracterizes
14   witness testimony.
15   BY MR. KARCZEWSKI:
16        Q    Is that accurate?
17        A    Yes.
18        Q    And does your MAPM -- strike that.
19             Your MAPM is Bobbie Jo Lewis currently,
20   correct?
21        A    Correct.
22        Q    Does Bobbie Jo Lewis review your APM job
23   routine on a daily basis?
24        MS. STONE:  Object to form.
25        THE WITNESS:  I don't know which way I word



1   that.

2   BY MR. KARCZEWSKI:

3       Q    That's fine.  Let me ask it, I guess, a

4   little bit more generally.

5           Has Bobbie Jo Lewis ever reviewed one of

6   your APM job -- APM routines?

7       A    Yes.

8       Q    And is this -- is it typical for Bobbie Jo

9   Lewis to review your APM job -- strike that.

10          Is it typical for Bobbie Jo Lewis to look

11  at whether you have completed the APM routine as

12  it's set forth currently in your position within

13  Wal-Mart?

14      MS. STONE:  Object to form.  Vague and

15  ambiguous.  Compound.

16      THE WITNESS:  Yes.

17  BY MR. KARCZEWSKI:

18      Q    When Bobbie Jo Lewis reviews your

19  completed routines, do you know whether she's

20  looking at whether you've completed the tasks within

21  the identified time periods as they're set forth in

22  your routine?

23      MS. STONE:  Calls for speculation.  Object to

24  form.  Vague and ambiguous.

25      THE WITNESS:  Yes.



 1   BY MR. KARCZEWSKI:

 2        Q    Do you know if -- strike that.

 3             So currently the APM job routine reflects

 4   accurately the job duties that you're performing on

 5   a day-to-day basis; is that correct?

 6        MS. STONE:  Object to form.  Vague and

 7   ambiguous.

 8        THE WITNESS:  Correct.

 9   BY MR. KARCZEWSKI:

10        Q    You had a chance to talk with Ms. Stone

11   about safety meetings.

12             Do you recall that?

13        A    Yes.

14        Q    About how many times a week are you

15   involved in a safety meeting?

16        MS. STONE:  Object to form.  Vague and

17   ambiguous.

18        THE WITNESS:  Specific meeting?

19   BY MR. KARCZEWSKI:

20        Q    Correct.

21        A    Is once a week.

22        Q    And is there an average length of time

23   that a meeting lasts?  For instance, is it typically

24   a half hour or less?

25        MS. STONE:  Object to form.  Vague.  Ambiguous.



1  performance of your jobs?

2      MS. STONE:  Object to form.  Vague and

3  ambiguous.  Mischaracterizes witness' testimony.

4      MR. KARCZEWSKI:  I'll strike that.  That was a

5  bad question.

6  BY MR. KARCZEWSKI:

7      Q    Is it your understanding that competencies

8  are skills and not actual job duties?

9      MS. STONE:  Object to form.  Vague and

10  ambiguous.

11      THE WITNESS:  Yes.

12  BY MR. KARCZEWSKI:

13      Q    If I didn't know anything about this case

14  and I was to -- and I wanted to understand what you

15  actually did on a day-to-day basis, would you point

16  me in the direction of your declaration or would you

17  point me in the direction of this job description

18  document?

19      MS. STONE:  Object to form.  Vague and

20  ambiguous.  Compound.  Calls for speculation.

21      THE WITNESS:  My deculation -- declaration.

22  BY MR. KARCZEWSKI:

23      Q    Thank you.  In talking about your

24  declaration now, you and Naomi from my office -- I

25  think you said you had a chance to speak with her

```
1   STATE OF CALIFORNIA        )
                               ) ss:
2   COUNTY OF LOS ANGELES      )

3

4         I, RUBEN GARCIA, CSR, do hereby certify that I

5   am a duly qualified Certified Shorthand Reporter, in and

6   for the State of California, holder of Certificate

7   Number 11305, which is in full force and effect and that

8   I am authorized to administer oaths and affirmations;

9         That the foregoing deposition testimony of the

10  herein named witness was taken before me at the time and

11  place herein set forth; that prior to being examined,

12  the witness named in the foregoing deposition, was duly

13  sworn or affirmed by me, to testify the truth, the whole

14  truth, and nothing but the truth;

15        That the testimony of the witness and all

16  objections made at the time of the examination were

17  recorded stenographically by me, and were thereafter

18  transcribed under my direction and supervision;

19        That I am not a relative or employee or attorney

20  or counsel of any of the parties nor am I financially

21  interested in the outcome of this action.

22        IN WITNESS WHEREOF, I have subscribed my name

23  this ___11___ day of September, 2013.

24

25  _____
    RUBEN GARCIA, CSR NO. 11305
```



EXHIBIT "S"

PA0446

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


ALADDIN ZACKARIA; individually        No. 5:12-cv-01520-VAP-SP
and on behalf of other members
of the general public similarly
situated, and on behalf of
aggrieved employees pursuant
to the Private Attorneys
General Act ("PAGA"),

          Plaintiff,

vs.

WAL-MART STORES, INC., a
Delaware corporation and Does
1 through 100, inclusive,

          Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



VIDEOTAPED DEPOSITION OF

S. EARL WATSON


January 29, 2013

10:03 a.m.


3800 North Central Avenue, Suite 1700

Phoenix, Arizona


MaryJo Schumacher, RPR, CR No. 50134

Page 16

1     thinking in your head as far as what "management-level

2     employee" means?

3                MR. GROTZINGER:  Same objections.

4                THE WITNESS:  I would be thinking about my direct

5     reports, who are directors within the organization.

6          Q.   BY MR. WHEELER:  That would be your definition?

7          A.   That's what I would be thinking about if you asked

8     me under the circumstances you described.

9          Q.   Understood.

10               So would you be including the asset protection

11    managers that work at Walmart under that interpretation of

12    what we just talked about?

13               MR. GROTZINGER:  Same objections.

14               THE WITNESS:  I -- based on the question you asked

15    me, I would be thinking about my direct reports, who are

16    director-level asset protection managers for the company.

17         Q.   BY MR. WHEELER:  Got it.

18               So who are your direct reports?  And I don't mean

19    individuals' names.  I mean, let's go with just job titles

20    instead of a John Smith and things like that?

21         A.   Okay.  Gotcha.  Director of asset protection;

22    divisional director of asset protection.

23         Q.   Divisional director of asset protection?

24         A.   Yes.

25         Q.   Okay.  How many of those are under you today?

Page 17

1        A.   Four.

2        Q.   And what are those folks' names?

3        A.   John Mulder, Shelly --

4        Q.   And I was just going to stop you just because she's

5   taking everything down, and it's easy if we get in the habit

6   of spelling names after you say them.

7        A.   Okay.

8        Q.   So she doesn't have to go back and do it later.

9        A.   Okay.  All right.

10       Q.   So Mr. Muller?

11       A.   Mulder.

12       Q.   Mulder.

13       A.   M-u-l-d-e-r.  Shelly Gallardo, G-a-l-l-a-r-d-o.

14   Leeann Murphy, M-u-r-p-h-y.

15       Q.   And that's all four of them?

16       A.   Yes.  I have an open position.

17       Q.   Looking to hire one now?

18       A.   Yes.

19       Q.   Are those four divisional directors -- I think I

20   know the answer, but I've got to ask it -- are they assigned

21   to a particular region?

22       A.   Division.

23       Q.   Okay.  The word is "division," not "region"?

24       A.   Yes.

25       Q.   What divisions do the four of them make up?

1          A.   Yes.

2          Q.   All right.   What's her formal title?

3          A.   Vice president of asset protection and safety for

4     Walmart U.S.

5          Q.   And then the term "vice president" makes it sound

6     like there might be somebody above her that's a president.   Do

7     you know if that's the case?

8          A.   She does report in to the company's COO, but she is

9     the lead asset protection leader for the organization.

10         Q.   Got it.

11              So if asset protection -- the asset protection

12    department or division within the company was a pyramid, would

13    Ms. Hostetler be at the very top?

14         A.   Yes.

15         Q.   And she reports to the COO of the entire

16    organization?

17         A.   Walmart U.S. organization, yes.

18         Q.   Do you know that person's name?

19         A.   Gisel Rau-ooz.   Roo-ez.   I'm sorry.

20         Q.   R-u-i-z?

21         A.   Yes.

22         Q.   So Mr. Watson, you had about an hour-and-a-half

23    meeting with counsel yesterday.   Any other meetings with him

24    or any other lawyers?   Not talking about what you discussed,

25    obviously, but just the fact that you had a meeting.

Page 44

1    can count those as part of the loss piece.

2         Q.   Okay.  Now, we talked about earlier the management

3    team at the store level.

4         A.   Yes.

5         Q.   In your understanding, what store-level employees

6    are included within the management team?

7         A.   You know, we define that as a company.  We have

8    store managers and their management team.  The asset

9    protection is part of the management team, and the manage --

10   the management of the store.  I don't know how else to answer

11   that.

12        Q.   Store managers, the APMs or APCs, before the title

13   change --

14        A.   -- and the store management management team -- the

15   store manager's management team.

16        Q.   Do you know the formal job titles that fall within

17   the folks that you've identified, store managers within the

18   management team?  Or I should say, I think I mischaracterized

19   it, the management team that falls under the store manager.

20   Is that what you said?

21        A.   Yes.

22        Q.   Okay.  Who falls within that?

23        A.   Now, since I've been at Walmart, I know the stores

24   have made several changes in their management team, so I'm not

25   an expert in their structure.

Page 49

1          A.    A big chunk.  The other piece of that would be

2     dealing with any safety risks that the company may be

3     experiencing as a result of workplace violence issues, any

4     type of threats or any of those type of things.  So primarily

5     for me, it's strategic development to mitigate shrink issues,

6     to maximize profits and to ensure that we're proactive in

7     creating a safe environment for our customers and our

8     associates.

9          Q.    So it sounds like to me there are two sides to your

10    job:  one of them is loss prevention and shrink and the other

11    is safety, store safety.

12         A.    Yes.

13         Q.    All right.  Do you have an understanding of who at

14    the Walmart store level in the state of California is

15    responsible for safety?  Which job title, not which person.

16         A.    From our perspective, the store manager is

17    responsible for everything in that box.  They're supported

18    with the APM on those two things, the safety and the shrink

19    reduction pieces, as well, for that box.

20         Q.    Got it.

21               Is it fair to say, then, that the ultimate

22    individual responsible at the store level for loss prevention

23    and shrink is the store manager, who is then supported by the

24    APM?

25         A.    From my perspective, the store manager is

Page 50

1        responsible for everything operationally involved.

2            Q.   So the buck stops on every item at the store level

3        with the store manager?

4            A.   That's our expectation.

5            Q.   Understood.

6                 Does each Walmart store in California have just one

7        store manager?  Maybe it's not a fair question to you.  If you

8        don't know, just tell me.

9            A.   I don't know.

10           Q.   All right.  That's fair.

11               And I understand your level of -- your understanding

12       of how the stores in California work is somewhat limited.

13       Throughout the day, I'll probably go at you with that.

14           A.   Okay.

15           Q.   Remind me that you don't know --

16           A.   Okay.

17           Q.   -- if we get there.  "I don't know" is perfectly

18       acceptable to say.

19           A.   Okay.

20           Q.   So as far as your component -- the component of your

21       job that relates to forecasting and looking in the future as

22       to what challenges you're going to face, does that include

23       reviewing reports?  Actually, strike that.  Let me ask a

24       different question.

25           A.   Okay.

Page 65

1       A.   The store manager owns the productivity of the box.

2    The expectation is the APM is the AP management representative

3    of the two things that we're responsible for, for shrink and

4    for safety.  So we expect them to execute their job

5    description and to deliver to those results in those areas.

6    And they do that within the framework of their job

7    description, so -- but if you're asking me if I know what they

8    do per hour, per time, no.

9       Q.   And I understand you're pretty high up in the

10   company.

11      A.   Yeah.

12      Q.   So you shouldn't necessarily have the knowledge.

13   But I am entitled to sort of pick your brain and figure out

14   what you do and don't know.

15      A.   I understand.  Yeah, I'm fine.

16      Q.   So, let me summarize.  If anything about it is

17   inaccurate, let me know.

18      A.   Okay.

19      Q.   What I understand from your testimony, Mr. Watson,

20   sir, is that your expectation is that at the store level, the

21   APMs, or formerly the APCs, will be responsible, along with

22   the store manager, of maintaining the shrink and loss

23   prevention and safety aspects of the job.

24      A.   Yes.

25      Q.   All right.  You don't know specifically the details

Page 78

1    the APMs weren't there when you were at the store.  Have you

2    noticed any differences in how the APMs execute their core job

3    duties?

4           MR. GROTZINGER:  Vague, speculation, legal

5    conclusion, incomplete hypothetical.

6           THE WITNESS:  We have some of our leaders execute

7    better than others, and some of our stores, as a result,

8    perform better than others.  So I have seen some differences

9    in level of execution.

10       Q.   BY MR. WHEELER:  Other than level of execution, have

11   you noticed any differences -- and I understand you haven't

12   seen a whole lot of how they interact in the stores.

13       A.   I haven't.

14       Q.   Let's go based upon the knowledge that you do have

15   --

16       A.   Okay.

17       Q.   -- and exhaust that.

18           Other than difference in how good somebody is at

19   their job and level of execution, have you noticed any

20   differences in how the APMs you've personally seen with your

21   own eyes do their job?

22           MR. GROTZINGER:  Same objections.

23           THE WITNESS:  You know, if you strip away the

24   personality-of-the-individual difference and the level of

25   execution, fundamentally the job, I haven't noticed any major

Page 79

1        variations or differences.

2            Q.   BY MR. WHEELER:  Okay.  Thank you.

3            As far as your expectations of what the APMs do at

4        the store level, you personally, and then, you know, in your

5        capacity as a Walmart high-level executive, do you have the

6        expectation that the APM job is performed uniformly at all of

7        the stores in California?

8            MR. GROTZINGER:  Vague, speculation, legal

9        conclusion, incomplete hypothetical.

10           THE WITNESS:  You know, I have the expectation that

11       they achieve their results.  That's my expectation.  Every

12       store's assigned goals and objectives, and I expect from my

13       team, from the APM on up, to meet those objectives.

14           Q.   BY MR. WHEELER:  And those objectives and

15       expectations, they're the same in every California store.  Is

16       that fair to say?

17           MR. GROTZINGER:  Legal conclusion, vague,

18       speculation, incomplete hypothetical.

19           THE WITNESS:  Every store has shortage goal and a

20       safety goal.  The goal itself, what they're tasked to do, may

21       vary based on the store's demand and history.

22           Q.   BY MR. WHEELER:  In the answer in the previous --

23       and I'll move to strike as nonresponsive.  That was just for

24       the record.

25           The previous answer, we talked about what it sounded

1        A.    We have a home office team, and I think Ron Lance

2   had a member of his team, but I'm not sure who, but that was

3   something that fell under his area of responsibility.

4        Q.    Got it.

5              Now I want to talk to you about computer programs,

6   software programs that are used within your division, and I

7   don't think "division" is the right word.

8              What do you call the loss prevention department

9   overall?

10       A.    The assets protection department.

11       Q.    Okay.

12       A.    My area, I have a business unit, the west business

13  unit.  The California area is in the Pacific division.

14       Q.    The name of the very top of it is loss prevention.

15       A.    Asset protection.

16       Q.    Pardon me.  Asset protection.  And safety too?

17       A.    Yes.

18       Q.    Asset protection and safety, right?

19       A.    Yes.

20       Q.    So within the asset prevention [sic] and safety

21  aspect of Walmart, what computer programs do you typically use

22  to help get your job done?  We talked about the wire.  Is that

23  one of them?

24       A.    Okay.  Yeah.  But we typically use PowerPoint,

25  Excel.  Is that what you're referring to?  I mean, those --

Page 83

1          A.   I don't know.  It'd be speculation, but my guess

2     would be the market manager.

3          Q.   But you don't know?

4          A.   I don't know.

5          Q.   Fair enough.

6               Are policies and procedures and strict adherence to

7     them, are they important within the asset prevention [sic] and

8     safety aspect of Walmart?

9               MR. GROTZINGER:  Vague.

10              THE WITNESS:  Policies and procedures?

11              MR. WHEELER:  Yes.

12              MR. GROTZINGER:  Vague.

13              You can answer.

14              THE WITNESS:  Yes.

15         Q.   BY MR. WHEELER:  Is it important in your part of

16    Walmart asset prevention [sic] and safety that those policies

17    and procedures within the department are adhered to closely

18    and in the same way at every California store?

19              MR. GROTZINGER:  Vague, compound, incomplete

20    hypothetical.

21              THE WITNESS:  Yes.

22         Q.   BY MR. WHEELER:  Okay.  Can you think of, as we sit

23    here today, any differences in how asset prevention [sic] and

24    safety policies and procedures are carried out at the store

25    level in the state of California?

Page 84

1             MR. GROTZINGER:   Speculation.

2             THE WITNESS:   No.

3        Q.   BY MR. WHEELER:   How about APIS, Asset Protection

4    Information System?

5        A.   Uh-huh.

6        Q.   Is that a system that you use, sir, in doing your

7    job?

8        A.   No.

9        Q.   Didn't think so, but I had to ask.

10            Do you know how it is used by people that may work

11   within the asset prevention [sic] and safety department?

12       A.   It's data collection, but no, not really.  I don't

13   use the system at all.

14       Q.   Do you know who does?

15       A.   I know the market manager uses the system.  I know

16   that definitively, but I couldn't tell you beyond that.

17   Typically because that's the system we capture a shoplift

18   arrest in, so we input data from store level in that system.

19       Q.   Was that a "shoplift arrest"?

20       A.   Yes, it would go in that system.

21       Q.   An arrest is something that's done by the law

22   enforcement agency, right?  Or is that a term for detaining

23   someone?

24       A.   It's a term for detaining someone.

25       Q.   When someone is detained at the store level, do you

1          What is your understanding of the different types of

2     California stores, the different types of Walmart stores there

3     are within California?

4          A.   I know we have supercenters; we have Division 1,

5     which is a Walmart without grocery; and then we have what's

6     called Neighborhood Markets now.

7          Q.   So there's the supercenter.  Did you say "Division

8     1"?

9          A.   Yeah, we refer to them as "Division 1."  So it's a

10    Walmart that doesn't have a grocery component.  It's just kind

11    of a general goods component.

12         Q.   Okay.

13         A.   And Neighborhood Market is primary grocery component

14    stand-alone.

15         Q.   Do you know how many Neighborhood Markets there are

16    in California?

17         A.   I do not.  I know over the last two years we've

18    grown significantly, but I do not.

19         Q.   Now, when you say "we've grown significantly,"

20    you're talking about Neighborhood Markets?

21         A.   Yes.

22         Q.   And are you also talking specifically within

23    California?

24         A.   Within the Pacific, so to include Oregon and

25    Washington, Pacific division.

Page 91

1      Q.   Could you estimate for me, or you just don't have

2   any idea?

3      A.   I just don't have any idea.

4      Q.   Does your expectation of what an APM -- what an

5   APM's job duties and responsibilities are, are there anything

6   unique if the store they work at is a supercenter?

7      A.   No.

8           MR. GROTZINGER:  Speculation.

9           You can answer.

10          THE WITNESS:  No.

11     Q.   BY MR. WHEELER:  Okay.  And all these questions are

12  just based upon what you know about the asset prevention [sic]

13  and safety department that you work in?

14     A.   Yes.

15     Q.   Does an APM's job duties or responsibilities, as far

16  as you're concerned, admittedly, given your high-level job

17  title in the department, but does it differ at all if a store

18  is a Division 1 store?

19     A.   No.

20     Q.   Same question for the Neighborhood Market.

21     A.   No.

22     Q.   All right.  In your opinion, would an experienced

23  APM be able to shift over to a store they've never worked at

24  and get that APM job done with little new training required?

25          MR. GROTZINGER:  Speculation, incomplete

Page 92

1      hypothetical.

2                  THE WITNESS:  Yes.

3          Q.   BY MR. WHEELER:  Okay.  Are you aware of any effort

4      on Walmart's part to determine how much time the APCs or now

5      the APMs spend doing what they do at the store level?

6                  MR. GROTZINGER:  Vague.

7                  THE WITNESS:  No.

8          Q.   BY MR. WHEELER:  That was a little bit vague.  Let

9      me tighten it up a little bit, okay?

10             Sometimes companies will go in and do what they call

11     time studies --

12         A.   Uh-huh.

13         Q.   -- or some kind of tracking of how much time, for

14     example, a bank teller will spend counting cash or helping

15     customers --

16         A.   Uh-huh.

17         Q.   -- certain buckets that they put on job duties --

18         A.   Right.

19         Q.   -- to find out, you know, what percentage of the

20     time people have spent doing things.

21         A.   Yeah.

22         Q.   Have you ever heard of that?  I should say, have you

23     ever heard of an effort similar to that?

24         A.   Historically, in the business, I know when I worked

25     for other companies, I've seen companies look at productivity

1              THE WITNESS:  Okay.

2              THE VIDEOGRAPHER:  We're off the record at 12:02.

3              (Recess.)

4              THE VIDEOGRAPHER:  We're back on the record at

5      12:16.

6          Q.   BY MR. WHEELER:  Mr. Watson, sir, are you ready to

7      get going and finish out your our deposition?

8          A.   Yes.

9          Q.   Similar to the things I asked you before the last

10     time we started up again, is there anything that you'd like to

11     change or clarify about the testimony that you've given so far

12     today?

13         A.   No.

14         Q.   Thank you.

15             Do you know whether or not APMs at the store level

16     are given any time to take a meal break at any point during

17     the day?

18             MR. GROTZINGER:  Speculation.

19             MR. WHEELER:  Just if you know.  If you don't, tell

20     me.

21             THE WITNESS:  No.

22         Q.   BY MR. WHEELER:  Didn't think so.

23             Do you know whether or not there's any policy at all

24     carried out in the state of California to provide APMs a

25     period of time during the day when they can take an

Page 99

1       uninterrupted meal or lunch break?

2                   MR. GROTZINGER:  Speculation.

3                   THE WITNESS:  No.

4           Q.   BY MR. WHEELER:  You don't know one way or the

5       other, right?

6           A.   (No audible response.)

7           Q.   And the answer was no?

8           A.   No.

9           Q.   Okay.  All right.  I'm going to go through some

10      documents with you, sir, and find out what you know about

11      them, so when you get them, I'm going to give them to your

12      lawyers as well, take a close look, as much time as you need

13      to read through them, and let me know by looking up when

14      you're ready to discuss them.

15          A.   Okay.

16          Q.   All right.  And the first document I'm going to be

17      handing to the witness is Bates control INGELS00174, and I'll

18      hand it first to court reporter to have it marked as exhibit

19      -- hang on one second.

20                   This is my first depo in the case.  Have we been

21      sequentially --

22                   MS. MUNCK:  Each new witness they've been starting

23      at number one.

24                   MR. WHEELER:  Plaintiff 1?

25                   MS. MUNCK:  Yes.

Page 110

REPORTER'S CERTIFICATION

I, MaryJo Schumacher, a Certified Reporter in and for the State of Arizona, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 8th day of February, 2013.



MaryJo Schumacher, RPR
Certified Reporter No. 50134

EXHIBIT "T"

PA0466

1                    UNITED STATE DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4    ALADDIN ZACKARIA; individually,     Case No. 5:12-cv-01520-
     and on behalf of other members of              VAP-SP
5    the general public similarly
     situated, and on behalf of
6    aggrieved employees pursuant to
     the Private Attorneys General Act
7    ("PAGA"),

8                    Plaintiff,

9         vs.

10   WAL-MART STORES, INC., a Delaware
     corporation and Does 1 through
11   100, inclusive,

12                   Defendants.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
13

14

15                      DEPOSITION OF

16                        ERIC YORK

17

18                    February 7, 2013

19                      10:08 a.m.

20

21            535 Anton Boulevard, Suite 400

22                 Costa Mesa, California

23

24

25        Reported by Arleen Jimenez, CSR No. 4240



1     Q    We've established that there's levels below

2   regional, correct?

3     A    Yes.  Markets.

4     Q    Markets, okay.  Do you typically have meetings in

5   your Pleasanton office that involved market level

6   employees?

7     A    Yes.

8     Q    Okay.  Do you recall the last time that happened?

9     A    No.

10     Q    Do you have meetings in your Pleasanton office

11   with store-level employees ever?

12     A    Yes.

13     Q    Okay.  About how frequently does that happen; how

14   many times a month?

15     A    Oh, I couldn't estimate.

16     Q    Okay.  So, you have about two of these

17   meetings -- two days a week where you have meetings all

18   day, right?

19     A    Varying, yes.

20     Q    Okay.  So it's about eight days a month of all

21   meetings, correct?

22     A    It varies.

23     Q    Okay.  Tell me how it varies.

24     A    I could spend a Wednesday in the office; I could

25   spend a Tuesday or Thursday in the office, as well --



1    Q    Yes.

2    A    No.

3    Q    Do you know whether -- strike that.

4         What are the national priorities?

5    A    National priorities are the priority audits that

6    are conducted at store level in relation to store

7    processes and procedures.

8    Q    Did you say store processing procedures?

9    A    Store processes and procedures.

10   Q    Okay.  And what do you mean by processes and

11   procedures?

12   A    The process of -- the process that associates use

13   to go about work.

14   Q    Okay.  So, there are --

15   A    The procedures.

16   Q    Okay.  I'm sorry.  I didn't mean to cut you off.

17   Continue.

18   A    I just -- the processes they use to go about

19   work, the procedures they use to go about work.

20   Q    So there's a set process -- there's a set of

21   processes and procedures that APMs use to go about their

22   work; is that correct?

23        MR. GOLDICH:  Objection, mischaracterizes your

24   testimony.

25        THE WITNESS:  I didn't say that.



1                    REPORTER'S CERTIFICATION

2

3          I, Arleen Jimenez, a Certified Shorthand

4    Reporter, in and for the State of California, do hereby

5    certify:

6

7          That the foregoing witness was by me duly sworn;

8    that the deposition was then taken before me at the time

9    and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and later

11   transcribed into typewriting under my direction; that the

12   foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15         In witness whereof, I have subscribed my name

16   this 14th day of February, 2013.

17

18

19

20

21   /s/ _Arleen Jimenez_ _____

22         Arleen Jimenez, CSR No. 4240

23

24

25



EXHIBIT "U"

PA0471

ORIGINAL

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             COUNTY OF SAN BERNARDINO

3

4  ALADDIN ZACKARIA; individually,

    and on behalf of other members

5  of the general public similarly

6  situated, and on behalf of

7  aggrieved employees pursuant

8  to the Private Attorneys

9  General Act ("PAGA");

10       Plaintiff,

      vs.              No. CIV-RS-1107132

11  WAL-MART STORES, INC., a

12  Delaware corporation; and DOES

13  1 through 100, inclusive,

14       Defendants.

15  _____

16    VIDEOTAPED DEPOSITION of ALADDIN ZACKARIA

17         LOS ANGELES, CALIFORNIA

18       THURSDAY, AUGUST 16, 2012

19            VOLUME 1

20

21  Reported by

22  Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

23  Job No. 849000

    PAGES 1 - 231

24  PAGES 103-229 ARE CONFIDENTIAL AND

25  BOUND UNDER SEPARATE COVER

                              Page 1

PA0472

```
 1    compensation because you were in a metro location?      11:43:40
 2            MR. AIWAZIAN:  Objection; calls for a legal
 3    conclusion.
 4            THE WITNESS:  Yes.
 5    BY MR. GOLDICH:                                          11:43:52
 6        Q.  Do you know how much that was?
 7        A.  I don't recall.
 8        Q.  As a member of management, were you also
 9    eligible for a bonus?
10            MR. AIWAZIAN:  Wait one second.                 11:44:07
11            Lacks foundation that he was a member of
12    management.
13            Go ahead.
14            THE WITNESS:  Yes, I remember they told me
15    there is a bonus that if the store did good, then I     11:44:25
16    will get a bonus.  If not, then.
17    BY MR. GOLDICH:
18        Q.  Did you ever get a bonus?
19        A.  Oh, yes.
20        Q.  Do you remember how much your annual bonus      11:44:39
21    was?
22        A.  I can tell you what I got last one about
23    two years ago.
24        Q.  What was that?
25        A.  It was about $2000 and some change a year.      11:44:53
                                                              Page 92
```

```
 1                REPORTER'S CERTIFICATE

 2

 3         I, DARYL BAUCUM, CSR No. 10356, do hereby

 4    certify;

 5         That the foregoing proceedings were taken

 6    before me at the time and place therein set forth, at

 7    which time the witness named in the foregoing proceeding

 8    was placed under oath and was sworn by me to tell the

 9    truth, the whole truth, and nothing but the truth;

10         That said testimony of the witness and all

11    objections by counsel at the time of the examination

12    were recorded stenographically by me, and were

13    thereafter transcribed under my direction and

14    supervision, and that the foregoing pages contain a

15    full, true and accurate record of all proceedings

16    and testimony to the best of my skill and ability.

17         I further certify that I am neither counsel

18    for any party to said action, nor am I related to

19    any party in said action, nor am I in any way

20    interested in outcome thereof.

21         IN WITNESS WHEREOF, I have subscribed my

22    name this 29th day of August, 2012.

23

24                 _____

25                 DARYL BAUCUM, CSR No. 10356
```

PA0474

EXHIBIT "V"

PA0475

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF SAN BERNARDINO

3

4    ALADDIN ZACKARIA; individually,
     and on behalf of other members

5    of the general public similarly
     situated, and on behalf of

6    aggrieved employees pursuant
     to the Private Attorneys

7    General Act ("PAGA");

8            Plaintiff,

9        vs.                      No. CIV-RS-1107132

10   WAL-MART STORES, INC., a
     Delaware corporation; and DOES

11   1 through 100, inclusive,

12
             Defendants.

13

14   _____

15

16                      CONFIDENTIAL

17

18        VIDEOTAPED DEPOSITION of ALADDIN ZACKARIA

19                 LOS ANGELES, CALIFORNIA

20                 FRIDAY, AUGUST 17, 2012

21                      VOLUME 2

22

23   Reported by
     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

24   Job No. CA849001

25   PAGES 232 - 302

                                        Page 232

1      A.   Yes.                                              09:56:48

2      Q.   How many did that happen?

3      A.   Once or twice a year.

4      Q.   Now, again, my questions here are limited to

5   the time when Bobbie Jo Lewis was your MAPM and you were    09:57:07

6   working at the Chino store.

7          During that period of time, on how many days a

8   week were you able to take a meal break where you were

9   totally relieved of your duties and had the opportunity

10  to have a meal?                                             09:57:31

11         MR. AIWAZIAN:  Object to "meal break" as

12  defined as vague and ambiguous.

13         THE WITNESS:  Can you say the question again,

14  please.

15  BY MR. GOLDICH:                                             09:57:43

16     Q.   Sure.

17         How many days a week were you able to take time

18  off to eat a meal -- time off of at least half an hour

19  without interruption?

20         MR. AIWAZIAN:  One second.                           09:57:55

21         Vague and ambiguous.

22         Go ahead.

23         THE WITNESS:  Once or twice, maybe more.

24  BY MR. GOLDICH:

25     Q.   So on the rest of the days, you didn't have        09:58:13

                                                       Page 247

PA0477

1    time to take an uninterrupted meal break?                09:58:17

2            MR. AIWAZIAN:  Vague and ambiguous.

3            Go ahead.

4            THE WITNESS:  Yes.

5    BY MR. GOLDICH:                                           09:58:24

6        Q.   How many days a week did you have the

7    opportunity to take rest breaks where, again, you would

8    be totally relieved of duties and not need to perform

9    any work?

10           MR. AIWAZIAN:  Hold on.                           09:58:46

11           Vague and ambiguous as to "rest breaks" as

12   defined.

13           THE WITNESS:  It's once, twice, three, maybe

14   three times.

15   BY MR. GOLDICH:                                           09:58:56

16       Q.   Per week?

17       A.   Yeah.

18       Q.   Yes?

19           MR. AIWAZIAN:  Before I forget, is there any

20   possibility we can address what happened before the      09:59:29

21   commencement of the depo.

22           MR. GOLDICH:  Mr. Aiwazian handed me a folder

23   of some documents just before we started today.  And so

24   at the first break, I will get them copied and we will

25   deal with them at that time.                             09:59:50

Page 248

PA0478

| | |
|---|---|
| 1 | have. This list, we print. We take that list and we go |
| | 11:06:26 |
| 2 | to TLE and go over the missing items, look for it in the |
| 3 | back room, try to locate the items. Most of the time, |
| 4 | those items are misplaced somewhere else. So we look |
| 5 | for it, find it, and then have the department manager |
| | 11:06:54 |
| 6 | correct it. |
| 7 | Q. Let me direct your attention to page 112. Page |
| 8 | 112 and 113 is something called Wal-Mart week two audit. |
| 9 | Do you see that? |
| 10 | A. Yes. |
| | 11:07:34 |
| 11 | Q. It has your name Aladdin Zackaria on it; is |
| 12 | that correct? |
| 13 | A. Yes. |
| 14 | Q. What is this document? |
| 15 | A. This is part of the checklist which is the |
| | 11:07:46 |
| 16 | national priorities. And they have another name for it, |
| 17 | SSOP. It's all the same. And it's part of that |
| 18 | checklist. We follow Wal-Mart guidelines to complete |
| 19 | that list and it's the same all over for all APC's that |
| 20 | work for Wal-Mart. So this is part of the daily, weekly |
| | 11:08:19 |
| 21 | audits, which is the national priorities that when we |
| 22 | gather all the information from our checklist and from |
| 23 | our daily routine, then we enter it into the system and |
| 24 | that's what you get. |
| 25 | Q. Now, this document has questions and then |
| | 11:08:48 |

Page 279

PA0479

```
 1              REPORTER'S CERTIFICATE

 2

 3        I, DARYL BAUCUM, CSR No. 10356, do hereby

 4    certify;

 5        That the foregoing proceedings were taken

 6    before me at the time and place therein set forth, at

 7    which time the witness named in the foregoing proceeding

 8    was placed under oath and was sworn by me to tell the

 9    truth, the whole truth, and nothing but the truth;

10        That said testimony of the witness and all

11    objections by counsel at the time of the examination

12    were recorded stenographically by me, and were

13    thereafter transcribed under my direction and

14    supervision, and that the foregoing pages contain a

15    full, true and accurate record of all proceedings

16    and testimony to the best of my skill and ability.

17        I further certify that I am neither counsel

18    for any party to said action, nor am I related to

19    any party in said action, nor am I in any way

20    interested in outcome thereof.

21        IN WITNESS WHEREOF, I have subscribed my

22    name this 29th day of August, 2012.

23

24              _____

25              DARYL BAUCUM, CSR No. 10356
```

PA0480